# EXHIBIT 1

"a"

LCIA Arbitration № 163503

**Mazlin Trading Corp**

- and -

**(1) WJ Holding Limited**
**(2) Stubrick Limited**

Claimant

Respondents

---

**Final Award**
**Dated 23 January 2018**

---

The Arbitral Tribunal:

**Jonathan Crow QC**
**Kate Davies**
**Guy Pendell**

CONTENTS

A.   Introduction                                                                    p. 1
        A.1   The parties & their representatives                     p. 1
        A.2   The arbitration agreements                                p. 2
        A.3   The Awards                                                     p. 2
        A.4   The procedural history of the conjoined claim       p. 2
        A.5   The procedural history of the separate arbitration claims  p. 10
        A.6   The oral jurisdiction and merits hearings             p. 28
        A.7   After the hearings                                           p. 29

B.   The Facts                                                                       p. 30
        B.1   The background                                              p. 30
        B.2   The valuations                                              p. 31
        B.3   The Agreement of Sale                                      p. 32
        B.4   The 2012 Privatisation Agreement & related agreements  p. 34
        B.5   The email of 11 July 2012                                  p. 35
        B.6   The Loan Agreements                                        p. 36
        B.7   The Letter of Agreement                                   p. 39
        B.8   The Personal Guarantees                                    p. 41
        B.9   Mr Spiegel's visits to the plant                          p. 43
        B.10  Payments made by the Claimants to the Respondents        p. 45
        B.11  The December 2012 draft Agreement of Sale               p. 47
        B.12  Correspondence in early 2013                             p. 49
        B.13  Power of Attorney                                          p. 51
        B.14  Health insurance                                          p. 53
        B.15  The failure of the Bender Oil project                    p. 54
        B.16  The draft Operating Agreement & MIPA                     p. 54
        B.17  Termination of the negotiations                          p. 56
        B.18  Proceedings in Cyprus                                     p. 57
        B.19  Proceedings in New York                                   p. 58
        B.20  Conclusions on the facts                                  p. 61

C.   The Juridictional Challenge                                            p. 65

D.   Remedies                                                                        p. 67
        D.1   The capital sums                                            p. 67
        D.2   Interest                                                       p. 67
        D.3   The appropriate creditor                                   p. 70
        D.4   Joint, or joint & several liability                       p. 70

E.   Costs                                                                           p. 70
        E.1   Introduction                                               p. 70
        E.2   The costs of the conjoinder issue                         p. 71
        E.3   The parties' conduct generally                            p. 72
        E.4   The Claimants' Scehdule of Costs                          p. 74
        E.5   The Arbitration Costs                                     p. 77

F.   The Award                                                                       p. 78

A. INTRODUCTION

A.1  The parties & their representatives

1.  Mazlin Trading Corp ("**Mazlin**") is a British Virgin Islands company, Company Number
    1644425, with its registered office at Trident Chambers, P.O. Box 146, Road Town, Tortola,
    British Virgin Islands.  Mazlin is the Claimant in LCIA Arbitration № 163503 ("**the Mazlin
    claim**").

2.  Shireen Maritime Ltd ("**Shireen**") is a Liberian non-resident corporation, registration number
    C-112456, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia.  Shireen
    is the Claimant in LCIA Arbitration № 173638 ("**the Shireen claim**").

3.  The Claimants' representatives in these arbitrations are:
    - Mr Stevie Loughrey, Onside Law, 23 Elysium Gate, 126-128 New Kings Road, London,
      SW6 4LZ.  Mr. Loughrey's email address is: stevie.loughrey@onsidelaw.co.uk.  His
      telephone number is +44 20 7384 6920 and his fax number is + 44 20 7384 1575.
    - Ms Anna Lintner, Enterprise Chambers, 9 Old Square, Lincoln's Inn, London WC2A
      3SR.

4.  The Respondents are:
    - WJ Holding Ltd ("**WJ Holding**") of Pamboridis Building, 45–47 Digenii Akrita Avenue,
      1070 Nicosia, Cyprus, with registration number HE104090.
    - Stubrick Limited ("**Stubrick**"), also of Pamboridis Building, 45–47 Digenii Akrita
      Avenue, 1070 Nicosia, Cyprus, with registration number HE268820.

5.  The Respondents are jointly represented by:
    - Ms Delphine Nougayrède, Solicitor of the Senior Courts of England & Wales, c/o
      Schneider Law Group, 150 Broadway, Suite 900, New York NY 10038, USA. Her
      telephone number is +1 212 804 8400 and her email address is dn@lawoffice-
      avocats.com.
    - Norair Babadjanian, Advocate (Russia) and Solicitor (England & Wales), Redstone
      Chambers, Smolenskaya Embankment 2-33, Moscow 121099, Russian Federation. His
      telephone number is +7 499 248 7278. His email address is nb@redstonechambers.com.

### A.2  The arbitration agreements

6.  The Mazlin claim was commenced by a Request for Arbitration dated 21 November 2016[1] made jointly by Mazlin and Shireen in relation to (i) a written 'Revolving Loan Agreement (Secured)' between Mazlin and the Respondents dated as of 10 August 2012[2] ("the **Mazlin Loan Agreement**") and (ii) a written 'Revolving Loan Agreement (Secured)' between Shireen and the Respondents also dated as of 10 August 2012[3] ("the **Shireen Loan Agreement**" and, together with the Mazlin Loan Agreement, "**the Loan Agreements**").  The relevant part of clause 9 of each Loan Agreement provides as follows:

> "*Any dispute arising out of or in connection with the definitive agreements shall be referred to and finally resolved by arbitration under the LCIA Rules.  The number of arbitrators shall be three.  The seat, or legal place, of arbitration shall be London, the United Kingdom.  The language to be used in the arbitral proceedings shall be English.*"

### A.3  The Awards

7.  Identical Awards are being made in each of the Mazlin claim and the Shireen claim, save for the relief.  References in this Award in square brackets are to the documents contained in the bundles used at the concurrent oral jurisdiction and merits hearings on 28 and 29 November 2017.  Bundle 1 references are to the [bundle number / tab number / page number].  Bundle 2 references are to the [bundle number / page number].

### A.4  The procedural history of the conjoined claim

8.  A Response to Request for Arbitration dated 13 January 2017[4] was submitted on behalf of WJ Holding and Stubrick in which, without prejudice to their challenge to the validity of the arbitration agreements and the jurisdiction of the Tribunal (§17), they (*inter alia*) –

    (1)  took issue with the ability of Mazlin and Shireen under the Rules of the London Court of International Arbitration 2014 as amended ("**the LCIA Rules**") to bring a single claim for arbitration in relation to the two separate Loan Agreements (§8 & §11);

    (2)  asserted that "*the Loan Agreements are not genuine commercial transactions but constitute sham agreements that were part of an elaborate scheme to document an equity investment that was made by … Mr Alexander Spiegel*" (§9);

---

[1] [1/1].

[2] [2/371].

[3] [2/366].

[4] [1/2].

(3)     alleged that the "*original agreement*" that governs "*the real subject matter of this dispute*" was an Agreement of Sale dated 15 March 2012[5] ("**the Agreement of Sale**") made between WJ Holding and AMM Consulting and Management Group LLC ("**AMM Consulting**") "*together with other ancillary agreements*" which are subject to New York law (§10);

(4)     contended that the dispute that has arisen between WJ Holding and Stubrick (of the one part) and Mr Spiegel and his *alter ego* companies (of the other) is accordingly subject to the exclusive jurisdiction of the courts of New York (§10);

(5)     stated that proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§10);  and

(6)     proposed that since the beneficial owner of the Claimants, Alexander Spiegel ("**Mr Spiegel**") and the beneficial owner of the Respondents, Yuri Drukker ("**Mr Drukker**") are both based in New York "*the proper venue for any arbitral hearings should be New York*" (§14).

9.     By email to the parties dated 23 January 2017, the LCIA required the Claimants and Respondents respectively to make a payment on account of costs in the sum of £10,000 each (*i.e.* a total of £20,000).

10.    By email dated 30 January 2017, the Respondents' legal representatives informed the LCIA that the Respondents declined to participate in funding the arbitration.

11.    By letter from the LCIA dated 23 February 2017,[6] the parties were notified of the identity of the Tribunal members who had been appointed.

12.    The Claimants replied to the Response to Request for Arbitration by letter dated 24 February 2017.[7]  In that letter, they asserted that they were entitled to commence a single arbitration with both Mazlin and Shireen as Claimants.  This question came to be known as 'the conjoinder issue'.

---

[5] [2/376].

[6] [1/23/221].

[7] [1/23/225].

13. In light of the parties' respective positions in correspondence on the conjoinder issue, the Tribunal sent them an email on 1 March 2017[8] informing them that it was *"provisionally minded to give directions for the determination of the conjoinder issue as a preliminary issue"* and against that background invited the parties to discuss and if possible agree (i) whether it was expedient to determine the conjoinder issue first; (ii) if so, what timetable should be laid down for the parties to present their full argument in that regard; and (iii) whether the parties would wish the Tribunal to hold an oral hearing, or would be content for the matter to be determined on paper.

14. The Claimants' legal representatives sent an email to the Respondents' legal representatives on 7 March 2017[9] inviting them agree to the arbitration proceeding with both Claimants, on the basis either that the Claimants were entitled (under the LCIA Rules) to proceed in that manner or, if not, the only result would be the continuation of the original claim with only one Claimant and commencement of a parallel arbitration by the other Claimant.

15. The Respondents' legal representatives answered by email the same day,[10] saying that the Respondents' position remained as set forth in the Response, *i.e.* one of general jurisdictional challenge, and asserting that the two Loan Agreements formed part of a wider commercial dispute regarding an equity investment made by Mr Spiegel in a company called OJSC Bendersky Oil Extraction Plant ("Bender Oil"), a dispute in respect of which (the Respondents contended) the New York courts were the proper venue. They also submitted that the Claimants themselves acknowledged that the commercial reality was that the dispute was actually one between Mr. Spiegel and Mr. Drukker, who are both resident in the USA. They did not answer the Tribunal's question whether they were content for the conjoinder issue to be determined as a preliminary issue, either at an oral hearing or on paper.

16. The Claimants' legal representatives sent an email on 9 March 2017[11] reiterating that their clients were entitled to bring a single arbitration under both Loan Agreements simultaneously, and agreeing that the conjoinder issue should be determined on paper as a preliminary issue.

17. In light of the continuing disagreement between the parties on the conjoinder issue, and the Respondents' failure to explain whether they were content for the matter to be resolved as a

---

[8] [1/23/228].

[9] [1/23/230].

[10] [1/23/236].

[11] [1/23/235].

preliminary issue, the Tribunal sent the parties an email on 14 March 2017,[12] directing an oral hearing to be convened in London for the purpose of determining the following questions:

(1)   *Is the Tribunal precluded, by the LCIA Rules, from proceeding with this arbitration by reason of the fact that the claim seeks a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties do not consent to a consolidation?*

(2)   *If the answer to Question 1 is "yes", can the current claim be amended pursuant to Article 22.1(i) of the LCIA Rules by the deletion of one Claimant (and its claim), such that the amended claim would then proceed only in the name of the other Claimant and only in respect of that Claimant's claim?*

(3)   *If the answer to Question 2 is "yes", and if a separate arbitration claim were then also to be commenced by whichever Claimant had been amended out of the existing claim, would it be appropriate for the Tribunal to give matching procedural directions in both arbitrations, so that the common issues in each could be determined simultaneously?*

(4)   *In any event,*

    (i)   *should the Tribunal give directions for the determination, as a preliminary issue, of the question whether the arbitration should be stayed pending the final determination of any legal proceedings in New York and*

    (ii)   *if so, what directions should be given?*

(5)   *What, if any, further directions should be given for the efficient and final disposal of the issues between the parties?*

18.   By email dated 23 March 2017[13] the Tribunal was informed that the Respondents' legal representatives "*have requested and received [their] clients' instructions to present [their] case to the Tribunal, which of course does not imply that [they] consent to its jurisdiction*". In a separate email the same day,[14] the Respondents' legal representatives repeated their assertion that legal proceedings "*have already been initiated against Mr Spiegel*" in New York.

19.   The parties' respective legal representatives each provided written submissions, as directed, on 11 April 2017.[15] In summary:

(1)   Mazlin and Shireen –

---

[12] [1/23/234].

[13] [1/23/239].

[14] [1/23/240].

[15] [1/3] and [1/4].

    (i)    conceded that a joint claim by both companies could not proceed under the LCIA Rules without the Respondents' consent (§3–8),

    (ii)   submitted that the Tribunal had jurisdiction to allow one Claimant to amend the Request for Arbitration by removing the other Claimant and proceeding with the amended claim alone (§9–10),

    (iii)  confirmed that whichever Claimant was amended out of the joint claim would issue a separate Request for Arbitration, and invited the Tribunal to make matching procedural directions in each arbitration (§11–13), and

    (iv)  submitted that the Tribunal should proceed to determine the arbitration claims, and not to stay them pending any determination of the proceedings apparently issued in New York (§14–19).

(2)    The Respondents not only served written submissions on the conjoinder issue[16] but also provided to the Tribunal an exhibit comprising a copy of certain legal proceedings between WJ Holding and Stubrick (plaintiffs) and Mazlin, Shireen, AMM Consulting and Mr Spiegel (defendants) apparently filed in the New York court, County of Kings, Index № 506949/2017 ("the New York proceedings"). The New York proceedings did not appear to have been issued on 8 December 2016 in New York County (as stated in §10 of the Response to Request for Arbitration[17]) but on 7 April 2017 in Kings County. The Respondents' written submissions –

    (i)    offered a 'Summary Presentation of the Facts' (§1–15) in which they alleged that: (a) Mr Spiegel and Mr Drukker "*agreed that Mr Spiegel would take an equity stake of 30%*" in Bender Oil "*and that the value of this stake would be US$7 million, corresponding to an enterprise valuation for [Bender Oil] of approximately US$20 million*" (§3); (b) "*the equity investment would be documented in a manner that would achieve certain specific structuring objectives for Mr Spiegel*" which Mr Drukker believed "*reflected certain tax and family estate planning considerations*" (§4); (c) the agreed structure implemented by Mr Spiegel for the purpose of his equity investment in Bender Oil consisted of (1) the March 2012 Agreement of Sale,[18] which would be the "*core agreement*" under which AMM Consulting "*would obtain 30% of the shares of [Bender Oil], in return for payment of a nominal price of US$210,000*" (§5(a)), (2) the transfer of the remaining equity investment

---

[16] [1/4].

[17] [1/2/7].

[18] [2/376].

by Mazlin and Shireen, which was documented by the two Loan Agreements which "*would be mere instruments to accomplish transfers of Mr Spiegel's funds to the companies owned by Mr Drukker as consideration for the 30% equity in [Bender Oil]*" (§5(b)), and (3) "*certain additional agreements*" (§7); (d) the "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013, i.e. after Mr Spiegel had satisfactorily completed his due diligence investigations into [Bender Oil]*" (§8); (e) Mr Drukker also invested over US$16 million into Bender Oil (§8); (f) neither Mr Drukker nor his wife ever agreed to provide, or ever signed, personal guarantees of the Respondents' liabilities under the Loan Agreements (§9); (g) as a result of the non-performance by certain Transdniestrian governmental authorities of various undertakings and guarantees they had given in a supplementary privatisation agreement signed with WJ Holding on 28 March 2012 ("**the 2012 Privatisation Agreement**"),[19] the Bender Oil project was not as successful as had been hoped (§10); (h) as he was aware of these developments, Mr Spiegel "*changed his tack*" and "*chose to disregard the real nature of the transaction and instead uphold the sham Loan Agreements of August 2012, as if these were genuine commercial transactions*" (§12); and (i) "*the Loan Agreements are null and void, that the arbitration agreements that are ostensibly included in these agreements are also null and void, and that instead, Mr Spiegel, through his affiliated companies, holds an equitable interest in 30% in the shares in [Bender Oil]*" (§15);

(ii)     offered a 'Presentation of Certain Legal Principles Affecting the Validity of the Loan Agreements and Arbitration Agreements' (§16–30), in which they submitted that (a) the Loan Agreements were 'shams' within the meaning of *Snook v. London & West Riding Investments Ltd* [1967] 2 QB 786, at 802 (§16); (b) the arbitration clauses could not be separated from the Loan Agreements in which they appeared and were accordingly also null and void (§17–18); (c) the principle of party autonomy in general, and Article V(1)(d) of the 1958 New York Convention in particular provide that an arbitral award cannot be enforceable unless the composition of the tribunal and the arbitral procedure are in accordance with the agreement of the parties, whereas in this case the Tribunal had been "*imposed on the parties at the sole demand of the Claimants*" (§19–20); (d) the Respondents did not consent to arbitration

---

[19] [2/343].

(§21);  (e) the Loan Agreements "*did not reflect genuine loans, but were part of a larger equity investment made by Mr Spiegel*" which were "*governed by other contracts (and other dispute resolution clauses)*" (§22);  (f) New York was "*the only proper forum*" for the resolution of the dispute (§23);  (g) the arbitration agreement was null and void within Article II(3) of the New York Convention having been induced by Mr Spiegel's fraud and/or was unconscionable (§24–25);  (h) the dispute did not fall within the arbitration clause (§27) and could not be resolved by arbitration (§28);  (i) the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*" (§29–30);

(iii)  in answer to the 5 questions posed by the Tribunal, the Respondents submitted that (a) there was no jurisdiction under the LCIA Rules to hear a combined claim by Mazlin and Shireen without the Respondents' consent, which was not forthcoming (§31–49);  (b) the existing Request for Arbitration could not be amended by removing one Claimant (§50–53);  (c) the third question accordingly did not arise (§54);  (d) the arbitration ought to be stayed in favour of the New York proceedings because (1) the arbitration did not properly reflect the wider dispute between the parties (§55); (2) the principle of *lis pendens* (§56) required the issues to be determined in the New York proceedings (§57–58), not least because the Agreement of Sale was subject to New York law and the "*equity related contracts were executed in New York*" and the "*dispute resolution clause in the last negotiated draft share sale agreement designates AAA arbitration with a seat in New York*" (§59); (3) both Mr Spiegel and Mr Drukker are citizens and residents of the USA (§60); (4) the factual circumstances central to the dispute are located in the USA (§60); (5) the power to compel disclosure in the arbitration would be inadequate when compared with the powers available in the New York proceedings (§60–62 & §64–65); and (6) the arbitration proceedings focused on the Loan Agreements, which were shams (§63); and

(iv)  in conclusion, the Respondents invited the Tribunal to give directions either (a) to discontinue the arbitration with immediate effect "*and the Claimants may be granted a leave [sic] to submit new requests for arbitration*" (§67), alternatively (b) the arbitration proceedings should be stayed until such time as discovery in the New York proceedings had taken place "*upon the reasonable expectation*" that the evidence obtained on discovery there "*will be relevant to the subsequent entertainment (by the Tribunal) of the*

*Respondents' principal claim"* that the Loan Agreements are shams, and the true dispute cannot be fully determined in the context of the arbitration (§68), (c) that the exchange of written submissions *"do not constitute determination of the jurisdictional issue at hand"* (§69–70), and (d) either the determination of costs should be deferred (§70) or the Claimants should be liable in costs for having improperly commenced proceedings in the joint names of Mazlin and Shireen under separate agreements (§71).

20.   Also on 11 April 2017, the LCIA issued a direction pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 20 April, a substitute payment of £10,000 in respect of the Respondents' share of the deposit.[20]

21.   On 21 April 2017, the Respondents' legal representatives provided to the Tribunal copies of four returns of service, one each in respect of Mr Spiegel, AMM Consulting, Mazlin and Shireen, as defendants in the New York proceedings commenced by WJ Holding and Stubrick on 7 April 2017.

22.   The preliminary oral hearing in the Mazlin claim was duly held in London on 24 April 2017, at which –

   (1)   the parties' respective legal representatives each made oral submissions in support of their arguments, as outlined above;

   (2)   the Respondents' legal representative also provided hard copies of a 25-page slide presentation headed 'The Respondents' Comments to Claimants' Submissions on 11 April 2017', which had not been supplied in advance;

   (3)   the Respondents' legal representative stated that the Respondents had no objection in principle (i) to two new and separate arbitration claims being made, one under each of the Loan Agreements, or (ii) to the appointment of identical arbitral tribunals in relation to each such claim, or (iii) to identical directions being given in each such arbitration, so that they could each be run and decided in parallel;

   (4)   however, (i) the Respondents refused to consent to the arbitration proceeding in its original form:  no reasoned explanation was offered for this approach (apart from the Respondents' reliance on the point of form under the LCIA Rules);  and (ii) the

----

[20] [1/23/243].

Respondents also refused to accept that one of the Claimants could be amended out of the arbitration.

23.     After careful consideration of the parties' respective written and oral submissions, the Tribunal issued Procedural Order № 1[21] ("Mazlin PO1") on 27 April 2017, determining that, on the correct interpretation of the LCIA Rules, (i) the Tribunal was precluded from proceeding with the arbitration in its then form (*i.e.* with both Mazlin and Shireen named as Claimants) by reason of the fact that the Request sought a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties did not consent to a consolidation, but (ii) the Tribunal could allow one Claimant to amend the Request so as to remove the other Claimant and its claim. The Tribunal directed (a) the Claimants to deliver an amended Request by 5:00 pm on 28 April 2017, deleting one of the Claimants and its claim and (b) the Respondents to deliver an amended Response within 28 days of the Tribunal's confirmation of its approval to the amended Request.

### A.5  The procedural history of the separate arbitration claims

24.     Under cover of a letter from the Claimants' legal representatives also dated 27 April 2017[22] –

  (1)     Mazlin duly delivered an Amended Request for Arbitration in the Mazlin claim,[23] deleting reference to Shireen and its claim, and seeking US$4,987,061 only under the Mazlin Loan Agreement, together with "*interest (including default interest) and its costs and expenses (including legal fees) of enforcing the Loan Agreements (plus interest on those costs and expenses)*" (§8);

  (2)     Shireen delivered a separate Request for Arbitration[24] in substantially identical terms to the Mazlin claim, save that the amount of the claim was US$3,786,500 under the Shireen Loan Agreement, together with an equivalent claim for interest, costs and expenses to that in the Mazlin claim;  and

  (3)     the Claimants' legal representatives submitted a suggested draft Procedural Order № 2 in the Mazlin claim, seeking directions leading to a determination of the merits of the claim together with the Shireen claim, and including (at §1) the following statement:

---

[21] [1/15].

[22] [1/23/249].

[23] [1/5].

[24] [1/6].

> *"The Parties confirm their acceptance that the Arbitral Tribunal comprising Mr Jonathan Crow QC, Mr Guy Pendell and Ms Kate Davies appointed by the London Court of International Arbitration ("LCIA") by notification to the Parties dated 23 February 2017 has been validly established in accordance with Clause 9 of the "Revolving Loan Agreement (Secured)" between Mazlin Trading Corp ("Mazlin") and (1) WJ Holding Ltd ("WJH") and (2) Stubrick Ltd ("Stubrick") made on 10 August 2012 (the "Agreement") and Article 5 of the LCIA Rules (as hereinafter defined)".*

25.   By email dated 28 April 2017,[25] the Tribunal –

    **(1)**   confirmed to the parties its approval of the Amended Request for Arbitration in the Mazlin claim pursuant to §13 of Mazlin PO1;

    **(2)**   directed the Respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed by the Claimants in their draft PO2 in relation to the Mazlin claim and, to the extent that they disagreed, the reasons for such disagreement;

    **(3)**   if and to the extent that the Respondents expressed any disagreement, the Tribunal directed that the Claimant in the Mazlin claim indicate in writing any response it might have by 5.00 pm on 10 May;

    **(4)**   indicated that the Tribunal would then determine whether to give any further directions in the Mazlin claim;  and

    **(5)**   stated that the Tribunal was not in a position to give any directions in relation to the Shireen claim unless and until the same panel had been appointed in relation to that arbitration.

26.   By letter dated 5 May 2017 from their legal representatives,[26] the Respondents –

    **(1)**   stated that they had no objection to the proposals set out in §1–16 of the Claimant's draft PO2 in relation to the Mazlin claim (*i.e.* including the paragraph quoted in §24(3) above),

    **(2)**   stated that they objected to any directions being given in relation to the Shireen claim;

---

[25] [1/23/251].

[26] [1/23/258].

(3)   proposed that the Respondents should deliver their Statement of Defence within four weeks after the close of discovery in the New York proceedings;  and

(4)   proposed that all other procedural directions in the Mazlin claim should be dependent on the completion of discovery in the New York proceedings.

27.   By email dated 9 May 2017,[27] the Claimants' legal representative provided a detailed response to the Respondents' letter of 5 May and –

(1)   accepted that no directions could be given in relation to the Shireen claim until such time as the LCIA appointed an arbitral tribunal, and

(2)   submitted that the procedural directions in the Mazlin claim should not be deferred pending discovery in the New York proceedings.

28.   On 24 May 2017, the Respondents delivered their Responses to Arbitration in each of the Mazlin and the Shireen claims,[28] making essentially the same case as in their original Response dated 13 January 2017[29] (outlined in §8 above) and in their written submissions of 11 April 2017[30] (outlined in §19(2) above).  In summary:

(1)   The Respondents maintained their position that (i) neither Loan Agreement is *"a genuine commercial transaction but constitutes a sham agreement that was part of an elaborate scheme to document an equity investment [in Bender Oil] made by ... Mr Alexander Spiegel"* and that *"the arbitration agreement in [each] Loan Agreement is also a sham"* (§9), (ii) the *"original agreement"* that governs *"the relationship between the parties"* was the March 2012 Agreement of Sale *"together with other ancillary agreements"* (§10),  (iii) those agreements are subject to New York law (§11), (iv) accordingly, the dispute that has arisen between Mr Spiegel and his *alter ego* companies (on the one hand) and WJ Holding and Stubrick (on the other) is subject to the exclusive jurisdiction of the courts of New York (§12), (v) proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§13) and (vi) since the beneficial owners of the Claimants and the Respondents respectively are based in New York *"the proper venue for any hearings should be New York"* (§14).

---

[27] [1/23/262].

[28] [1/7] and [1/8].

[29] [1/2].

[30] [1/4].

(2)     On that basis, the Respondents invited the Tribunal to find that (i) the Mazlin Loan Agreement "*is null and void*" being a "*sham*" (§40), (ii) the arbitration agreements in the Loan Agreements "*are also null and void*" (§41), (iii) the "*genuine dispute at hand ... involves an equity investment that was entered into by other parties and is governed by other contracts governed by New York law (and other dispute resolution arrangements)*" (§42), (iv) the 'genuine dispute' "*also involves a number of important oral arrangements between WJH and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*" (§43) and (v) "*since the issues, which the Claimant has referred to arbitration do not fall within the scope of the arbitration clause in the Loan Agreement, the Respondents are not bound by that arbitration clause*" (§46).

(3)     Finally, the Respondents indicated that they did not object to the identity of the arbitrators (§52) but that they "*object to the jurisdiction of the arbitral tribunal*" and on that basis they would "*seek the relevant ruling from the tribunal by way of an award on the question of jurisdiction*" (§53).

29.     On 25 May 2017, Mazlin lodged the substitute payment of £10,000 pursuant to the LCIA's direction on 11 April in relation to the Tribunal's costs and expenses of the Mazlin claim.[31]

30.     By an e-mail sent to the parties on 30 May 2017,[32] the LCIA directed Shireen and the Respondents (together) to pay £10,000 each as their shares of the first deposit on account of the costs of the Shireen claim.

31.     On 7 June 2017, the Tribunal issued Procedural Order № 2 in the Mazlin claim[33] ("Mazlin PO2") –

(1)     giving those directions to which the parties had agreed (§5 & §15(1)–(16)), and in particular recording the fact (as confirmed in the Claimant's draft PO2 and in the Respondents' response dated 5 May 2017[34]) that the parties had confirmed their acceptance that the arbitral Tribunal appointed by the LCIA by notification to the parties dated 23 February 2017 had been validly established in accordance with Clause 9 of the Mazlin Loan Agreement and Article 5 of the LCIA Rules (§15(1));

---

[31] [1/23/268].

[32] [1/23/272].

[33] [1/16].

[34] [1/23/258].

(2)    declining to give any directions in the Shireen claim (§7);

(3)    giving detailed reasons for declining to stay the Mazlin claim pending completion of disclosure in the New York proceedings (§8–9); and

(4)    giving directions for the further conduct of the arbitration, including an exchange of disclosure by lists (§15(22)) and witness statements of fact (§15(23)), and culminating in a substantive jurisdiction and merits hearing (§15(27)–(29)).

32.    By email dated 8 June 2017,[35] the Respondents' legal representatives notified the LCIA that the Respondents declined to fund the costs of the Shireen arbitration proceedings.

33.    By email dated 9 June 2017,[36] the Respondents' legal representatives invited the Tribunal to reconsider Mazlin PO2, and in particular its refusal to stay the Mazlin claim pending disclosure in the New York proceedings.

34.    By letter dated 12 June 2017,[37] the parties were informed that the LCIA had appointed the same members to the arbitral Tribunal in respect of the Shireen claim as in relation to the Mazlin claim.

35.    Also on 12 June 2017, Shireen lodged £20,000 with the LCIA, comprising £10,000 on its own behalf pursuant to the LCIA direction given on 30 May 2017 together with a substitute payment of £10,000 in respect of the Respondents' unpaid contribution towards the Tribunal's costs and expenses of the Shireen claim.[38]

36.    On 15 June 2017, each of Mazlin and Shireen served their Statements of Case in their respective arbitrations,[39] reflecting the claims outlined in their Requests for Arbitration (outlined in §24 above), together with a proposed procedural order in relation to the Shireen claim containing matching directions to those given in relation to the Mazlin claim, and including equivalent wording (in relation to the Shireen claim) to that quoted in §24(3) above (in relation to the Mazlin claim).

---

[35] [1/23/271].

[36] [1/23/274].

[37] [1/23/279].

[38] [1/23/277].

[39] [1/9] and [1/10].

37.  By email dated 16 June 2017, the Claimants' legal representatives invited the Tribunal to make matching procedural directions in each of the Mazlin and Shireen claims.

38.  By email from the Respondents' legal representatives dated 18 June 2017, a request was made to the Tribunal to reconsider certain timetable deadlines in Mazlin PO2.[40]

39.  By email dated 19 June 2017,[41] the Tribunal responded to the requests received from the Respondents' legal representatives dated 9 and 18 June in the following terms:

> *"In emails from their counsel dated 9 and 18 June, the respondents invited the Tribunal to revisit PO2, in particular with regard to the question whether further progress in this claim should be deferred pending disclosure in the NY proceedings, but also with regard to specific elements in the timetable.*
>
> *Before responding to the detail of the respondents' request, we would first make two important preliminary observations, after setting out the relevant procedural chronology:*
>
> > *1.  Under cover of an email dated 27 April, the claimant's solicitors provided a draft PO2.*
> >
> > *2.  In an email dated 28 April, the Tribunal said this: "we direct the respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agree or disagree with the directions proposed in [the claimant's draft PO2] and, to the extent that they disagree, the reasons for such disagreement. If and to the extent that they express any disagreement, we direct that the claimant ... indicate in writing any response it might have by 5.00 pm on 10 May."*
> >
> > *3.  In accordance with the Tribunal's direction, the respondents duly provided their Response to the Claimant's Proposed Procedural Order No. 2 in a letter from their counsel dated 5 May.*
> >
> > *4.  The claimant then provided its response in an email from its solicitors dated 9 May.*
> >
> > *5.  Having carefully considered the parties' submissions, the Tribunal issued PO2 on 7 June.*
>
> *Our first preliminary observation is this. From the foregoing chronology it will be apparent that both parties had a full opportunity to comment on the proposed content of PO2 before it was issued. As a general rule, the Tribunal considers that, in the interests of (i) fairness between the parties (ii) the expeditious progress of the arbitration and (iii) minimising costs, it is undesirable for either party to try reopening an issue that has already been fully debated and ruled on by the Tribunal. Absent any express agreement by the parties to the contrary on any particular issue, the Tribunal has broad powers to order whatever procedure is appropriate to the circumstances of the case. Against that background, we do not consider that the respondents are justified in inviting the Tribunal to reopen PO2 on this occasion.*

---

[40] [1/23/285].

[41] [1/23/286].

*Our second preliminary observation is this. The heart of the respondents' complaint is that the procedure for discovery available to it in the New York proceedings is more wide ranging and imposes greater obligations on the claimant than any disclosure procedure which might be available to it in these proceedings. In view of this, it seems to be the respondents' contention (previously raised and ruled on in PO2) that these proceedings should only progress once the discovery phase of the New York proceedings is complete because material disclosed in the course of discovery in New York will or may be used in this arbitration. Having carefully considered the points raised by the respondents in this regard, the Tribunal does not accept either the contention made or its premise. The respondents contractually agreed to arbitrate all disputes arising out of the agreements at issue in these proceedings in London. They therefore agreed to the various rules and procedures which govern and apply to such arbitrations – with all the benefits and, in some cases, limitations which such proceedings entail. There is not – nor could there be – any suggestion that disclosure is not available in this arbitration. It is and it will be. To the extent such disclosure is different from (and less than) the disclosure that may be available to the respondents in New York, that is a limitation the respondents accepted when they agreed to arbitrate disputes arising out of the agreements at issue in these proceedings.*

*For these reasons, the Tribunal does not accept that it is appropriate to revisit its decision in PO2. Nevertheless, having received the respondents' detailed comments in their counsels' email of 9 June, and their further request of 18 June, the Tribunal has on this occasion taken the exceptional course of clarifying the reasons for its decision in PO2 by addressing the points raised:-*

1. *In relation to paragraph 9(1) of PO2, the respondents object to any "implied criticism" regarding delay. The respondents need not be concerned: as the context of that paragraph makes clear, the Tribunal's remark about delay was neutral as to either party's responsibility.*

2. *In relation to paragraph 9(2) of PO2, the respondents say that it "seems to effectively prejudge the outcome of the proceedings without affording the Respondents the benefit of due process". The Tribunal assures the respondents that it has not prejudged the outcome of any aspect of the proceedings. To clarify, paragraph 9(2) of PO2 merely summarised the nature of the pleaded claim, just as paragraph 2 summarised the nature of the pleaded defence. In considering a request regarding the necessity for disclosure (in these proceedings or any other), the Tribunal is fully within its powers (and required) to summarise on a prima facie basis the nature of the claims and defences in order to decide on the appropriate procedure as regards disclosure (and the timetable) going forwards.*

3. *The respondents say in relation to paragraph 9(3) that "on the one hand the Tribunal implies that the Respondents do not hold sufficient information to convince it that the New York proceedings are necessary, and on the other hand it effectively precludes the Respondents from obtaining the relevant information via the only sufficient means available to it, i.e., through the New York discovery process". The Tribunal refers to its preliminary observations above. The Tribunal is concerned with the progress of and procedure for this arbitration. Under its broad procedural powers, the Tribunal has dismissed the respondents' contention that disclosure in the New York proceedings is necessary before this arbitration can progress at all. That decision does not preclude the respondents from obtaining discovery either in the New York proceedings or in this arbitration in due course, nor from using disclosure obtained from either process in these proceedings (to the extent that is permitted by law). It also*

*does not preclude the respondents from making any application in the future as regards the timing of any final determination of the issues in this arbitration.  In the meantime, the Tribunal has merely concluded in PO2 that service of the Defence and any Cross-claim should not be deferred until after completion of discovery in the New York proceedings.*

4. *The respondents say that paragraph 9(4) of PO2 "does not correspond to the facts" and they refer in particular to their submissions of 11 April 2017, sections 1-15, 18, 22, 55-65.  The respondents make a similar point in relation to paragraphs 9(7) of PO2.  The Tribunal was and is fully alive to the nature of the respondents' argument in this regard, and in particular paragraphs 55-65 of its 11 April submissions.  However, it remains unpersuaded that this arbitration should effectively be stalled pending the completion of disclosure in the New York proceedings.  The fact that Mr Spiegel and/or any corporate entities operated by him (rather than the claimants) may hold some documents which are relevant to the issues in dispute does not justify a complete standstill of these proceedings.  The Tribunal refers to its second preliminary observation above about any limitations which may apply to disclosure in these proceedings.  It also remains open to the respondents to utilise the procedures available to it in these proceedings.*

5. *In relation to paragraphs 9(5) and (6) of PO2, the respondents have now provided a fuller set of documents relating to the proceedings in New York.  Nevertheless, we have still seen nothing issued there on 8 December 2016, nor any filed application for discovery.  In any event, consistent with paragraphs 15(13), (14) and (16) of PO2, the Tribunal does not expect in future to receive information from the parties piecemeal in this fashion.  The respondents were directed, on 28 April, to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed in the claimant's draft PO2 and, to the extent that they disagreed, they were required to set out their reasons for such disagreement.  If and to the extent that they wished to bring the Tribunal's attention to the current state of the New York proceedings, they should have done so by 5 May by disclosing any relevant documents.  Having said that, and having now reviewed the latest materials submitted by the respondents, we have seen nothing to alter the directions given in PO2.*

6. *In relation to paragraph 9(8) of PO2, the respondents point out that various sanctions would be available in the New York proceedings against Mr Spiegel and his corporate vehicles for breach of their discovery obligations which are not available in these proceedings.  The Tribunal refers to its second preliminary observation above.*

7. *Finally, in relation to paragraphs 15(18), (22) and (23) of PO2, the respondents object that they are allowed only 14 days for the preparation of their Statement of Defence which, they say (in their email of 9 June) "seems very harsh on any standards (and is even harsher than the delay proposed by the Claimants in their draft of Procedural Order No 2 of 31 May 2015)".  They also say (in their email of 18 June) that it is inconsistent with Article 15.3 of the LCIA Rules, and on that basis they again invite the Tribunal to revisit PO2.  The Tribunal observes that the default timetable laid down in Article 15.3 is subject always to the Tribunal's discretion, as provided in Article 15.1 of the LCIA Rules.  Absent agreement of the parties or any alternative timetable proposed by the respondents, it is entirely within the Tribunal's powers to direct the filing of the Statement of Defence within 14 days (in particular since the respondents have been in possession of the original Request for Arbitration since November 2016).  In the*

> *meantime, it has always remained open to the respondents (i) to propose an alternative timetable (which, to date, they have not done), (ii) to seek to agree an extension pursuant to paragraph 15(13) of PO2, and/or (iii) to make a reasoned request for any extension pursuant to paragraph 15(1).*
>
> *For all these reasons, having carefully considered the respondents' latest submissions, we do not alter the directions set out in PO2 and in future we will require due compliance with its terms. We will also not entertain any similar attempts to re-open procedural decisions, absent a showing of exceptional circumstances. If the respondents propose that we should treat their counsel's email of 18 June as a request for an extension of time, we direct them to provide by 5.00 pm on Friday 23 June a reasoned request in writing within §15(14) of PO2 specifying the proposed revised date for delivery of the Defence and any consequential alterations to the timetable laid down in PO2."*

40.    By separate emails also dated 19 June 2017,[42] the Tribunal invited the Respondents' submissions in answer to the Claimants' proposal for matching directions in the two arbitrations.

41.    By emails from the LCIA dated 21 June 2017,[43] the parties in the Shireen claim were each directed to lodge a further £15,000 (*i.e.* a total of £30,000), and the parties in the Mazlin claim were each directed to lodge a further £20,000 (*i.e.* a total of £40,000), on account of the Tribunal's fees and expenses, in each case by 12 July 2017.

42.    By email dated 23 June 2017[44] in relation to the Shireen claim, the Respondents' legal representatives stated that the Respondents "*do not object to the issuance of matching directions with LCIA No 163503 [i.e. the Mazlin claim] and do not have any comments on the proposed Procedural Order No 1*" (*i.e.* the draft procedural order in relation to the Shireen claim provided by the Claimants' legal representatives, as mentioned in §36 above).

43.    On 29 June 2017 the Tribunal accordingly issued Procedural Order №3 in the Mazlin claim[45] ("**Mazlin PO3**"), directing that –

(1)    the purpose of the directions was to ensure that the Mazlin claim and the Shireen claim proceeded in parallel, with as little delay and added cost as reasonably practicable, with a view to any evidential hearing and any oral arguments being heard in each concurrently;

---

[42] [1/23/290] and [1/23/291].

[43] [1/23/293] and [1/23/294].

[44] [1/23/296].

[45] [1/17].

    (2)    to that end, the procedural timetable in each would thereafter be identical; and

    (3)    the Statements of Case, witness evidence and documents in one case should stand as part of the record in the other.

44.    On the same day, 29 June 2017, the Tribunal also issued Procedural Order № 1 ("**Shireen PO1**") in the Shireen claim,[46] (i) recording the parties' acceptance of the appointment of the Tribunal (§4) and (ii) tracking the equivalent directions as in Mazlin PO2 and Mazlin PO3 (§5–32).

45.    Also on 29 June 2017, the Respondents served their Statements of Defence in each of the Mazlin and Shireen claims[47] –

    (1)    making essentially the same case as they had made in their original Response dated 13 January 2017[48] (outlined in §8 above), in their written submissions dated 11 April 2017[49] (outlined in §19(2) above), and in their Responses dated 24 May 2017[50] (outlined in §28 above), and in addition –

    (2)    attaching numerous documents on which they relied in support of their case;

    (3)    specifically identifying an Operating Agreement[51] ("**the Operating Agreement**") and a Member Interest Purchase Agreement[52] ("**the MIPA**") as having been "*actively negotiated by the parties*" during 2013 and 2014 (§24 of the Defence to the Mazlin claim and §25 of the Defence to the Shireen claim);

    (4)    relying on certain health insurance agreements (§27), a Power of Attorney[53] (§28) executed by Mr Spiegel in favour of Sergey Rashkov ("**Mr Rashkov**"), and certain email exchanges on 23 September 2013[54] (§29) as evidence of the concluded nature of Mr Spiegel's agreement to acquire a 30% equity interest in Bender Oil;

---

[46] [1/18].

[47] [1/11] and [1/12].

[48] [1/2].

[49] [1/4].

[50] [1/7] and [1/8].

[51] [2/417].

[52] [2/456].

[53] [2/411].

[54] [2/409–410].

(5)   alleging that each Claimant was estopped from *"acting as if the Loan Agreement was a genuine document"* (§51 of the Defence to the Mazlin claim and §52 of the Defence to the Shireen claim);

(6)   denying that the Respondents are jointly and severally liable under the Loan Agreements (§52 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(7)   admitting that (i) *"On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000"* (§54 of the Defence to the Mazlin claim), (ii) *"On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000"* (§55 of the Defence to the Mazlin claim), and (iii) *"On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500"* (§53 of the Defence to the Shireen claim);

(8)   alleging that the sums transferred in Swiss Francs should be converted to US Dollars on the date of repayment, not on the date of transfer to the Respondents (§54 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(9)   disputing the Claimants' interest calculations (§56 of the Defence to the Mazlin claim and §54 of the Defence to the Shireen claim);

(10)  denying that certain relief allegedly obtained in Cyprus against the Respondents was binding (§81–84 of the Defence to the Mazlin claim, §79–82 of the Defence to the Shireen claim);

(11)  on that cumulative basis, alleging (in §38 of the Defence to the Mazlin claim and §37 of the Defence to the Shireen claim) that (i) the Loan Agreements were shams, (ii) the nullity of the Loan Agreements also affected the arbitration clauses, (iii) the actions of Mr Spiegel convinced the Respondents that the Bender Oil investment was an agreed joint equity investment, on which basis the Respondents entered into the Loan Agreements, and (iv) the New York proceedings were the only proper forum, because the arbitrations could not resolve the wider dispute involving other parties; and

(12)  in conclusion, seeking (i) a stay of the arbitrations in favour of the New York proceedings (§85 of the Defence to the Mazlin claim and §83 of the Defence to the Shireen claim); alternatively (ii) rejection by the Tribunal of each and every claim advanced by the Claimants and a declaration that the Loan Agreements (and the arbitration clauses contained therein) are null and void *ab initio* (§86 of the Defence to the Mazlin claim and §84 of the Defence to the Shireen claim), and in any event (iii) an

order for the Respondents' costs and expenses, including legal fees (§87 of the Defence to the Mazlin claim, §85 of the Defence to the Shireen claim).

46.   By email dated 7 July 2017,[55] the Respondents' legal representatives informed the Claimants' legal representatives that the Respondents were declining to fund the arbitration costs. By emails dated 13 July 2017,[56] the Respondents' legal representatives similarly informed the LCIA that the Respondents declined to fund the arbitration costs of either the Mazlin or the Shireen claims.

47.   On 20 July 2017, Mazlin and Shireen served their Statements of Reply in each of their respective claims[57] in which they (*inter alia*) -

   (1)   denied (i) that the Loan Agreements were shams (§8(a)), and (ii) that Mr Spiegel improperly induced the Respondents to enter into the Loan Agreements (§8(b));

   (2)   relied on the entire agreement clause in the Loan Agreements as raising an estoppel against the Respondents (§8(b));

   (3)   denied that the Loan Agreements were void for want of consideration (§8(c));

   (4)   agreed that, during 2012/13, Mr Spiegel had been contemplating the acquisition of a 30% interest in Bender Oil, but denied that there had been any concluded and unconditional agreement to that effect (§9–19); and

   (5)   asserted that it was the Respondents' case in related proceedings in Cyprus that the Transdniestrian government which was party to 2012 Privatisation Agreement[58] was "*in repeated breach of its obligations, and has refused to close the privatisations program and release the shares [in Bender Oil] from the lien. As long as the lien still exists, no transfer of the shares in [Bender Oil] to third parties can occur*" (§21).

---

[55] [1/23/298].

[56] [1/23/301] and [1/23/302].

[57] [1/13] and [1/14].

[58] [2/343].

48. On 28 July 2017, the Claimants lodged their due payments on account of arbitration costs of £15,000 in respect of the Shireen claim and £20,000 in respect of the Mazlin claim.[59]

49. By emails dated 1 August 2017 from the Respondents' legal representatives, they repeated that the Respondents declined to fund the arbitration costs of either the Mazlin claim or the Shireen claim.[60]

50. By emails dated 9 August 2017,[61] the LCIA issued directions pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 30 August, a substitute payment of £10,000 in respect of the Respondents' share of the arbitration costs in the Shireen claim and of £20,000 in respect of the Respondents' share of the arbitration costs in the Mazlin claim.

51. On 24 August 2017, Mazlin and Shireen each made an application pursuant to Article 24.5 of the LCIA Rules by which they each sought an award against the Respondents for payment of the £10,000 substitute deposits paid by them to the LCIA on account of arbitration costs on 25 May and 12 June 2017 respectively ("the 1st Article 24.5 Applications").

52. By emails dated 1 September 2017, the Tribunal invited the Respondents to make any submissions in answer to the 1st Article 24.5 Applications by 14 September 2017.

53. By emails dated 6 September 2017[62] (*i.e.* the day before disclosure was due under §15(22) of Mazlin PO2 and §25 of Shireen PO1) the Respondents' legal representatives stated as follows:

> *"We have been instructed to inform the Tribunal and the Claimant that the Respondents shall not be submitting any disclosure list, and that they will decline to produce any documents that might be requested by the Claimant in the context of these arbitration proceedings. The reason, as the Tribunal would hopefully appreciate, is that the disclosure of documents in these proceedings may cause irreparable harm to the position of the Respondents in the New York proceedings, which the Respondents believe are the only proper venue for this dispute.*
>
> *As regards the Claimant's application of 24 August 2017, the Respondents thank the Tribunal for its invitation to submit a response by 14 September. For the same reason as that stated above, i.e. the Respondents' view of New York* <u>*as prevailing venue*</u> *for the resolution of this dispute, they decline to submit any such response"* (emphasis added).

---

[59] [1/23/305] and [1/23/306].

[60] [1/23/307] and [1/23/308].

[61] [1/23/309] and [1/23/310].

[62] [1/23/313] and [1/23/314].

54. Under cover of emails dated 7 September 2017, the Claimants' legal representatives provided disclosure by lists.

55. By emails dated 21 September 2017, the parties were informed that unless the substitute deposits ordered on 9 August 2017 were received from the Claimants, the Tribunal would not be proceeding with the arbitrations.

56. By emails dated 5 October 2017 from the Claimants' legal representatives, the Tribunal was informed that the parties had agreed to defer exchange of witness statements to 16 October 2017.

57. On 6 October 2017, Mazlin and Shireen lodged substitute payments of £20,000 and £15,000 respectively pursuant to the LCIA's direction on 9 August 2017 in relation to the arbitration costs. Mazlin and Shireen also each made a further application that day pursuant to Article 24.5 of the LCIA Rules seeking an award against the Respondents for those payments ("the 2nd Article 24.5 Applications").

58. By email dated 10 October 2017, the Tribunal invited the Respondents to provide any submissions in answer to the 2nd Article 24.5 Applications by 18 October 2017.

59. On 16 October 2017 –

   (1) the Claimants served substantially identical witness statements from Mr Spiegel in respect of each arbitration;[63]

   (2) the Respondents' legal representatives informed the Tribunal by email[64] *"that the Respondents will not be submitting any witness statement of fact. The reason is the same as that expressed in our email of 6 September 2017, i.e. the Respondents wish to preserve their position in view of the New York proceedings"*; and

   (3) those emails also stated that the Respondents declined to file any response to the 2nd Article 24.5 Applications.

---

[63] [1/21] and [1/22].

[64] [1/23/323] and [1/23/324].

60. Later the same day, the Respondents' legal representatives sent another email to the Claimants' legal representatives,[65] stating that the Respondents "*reserve their right to appear at the November hearing (in both cases)*".

61. On 21 October 2017, the Tribunal issued Procedural Order № 4 in the Mazlin claim[66] and Procedural Order № 2 in the Shireen claim,[67] granting the orders sought by the Claimants in each of the 1st and 2nd Article 24.5 Applications, but in the form of orders rather than awards in light of the Respondents' outstanding challenge to the Tribunal's jurisdiction at that time.

62. By emails dated 14 November 2017,[68] the legal representatives of the Respondents stated as follows:

> "*On behalf of the Respondents, we inform the Tribunal and the legal representatives of the Claimant that the Respondents will not attend the hearing of 28/29 November, nor will they be represented.*
>
> *The position of the Respondents in relation to these proceedings and the underlying dispute remains that set forth in the Statement of Defence of 29 June 2017 (save in regard to costs, as set out below). We are informed that the status of the proceedings in the New York state court is as follows. Submissions were filed by both sides, the Respondents' submission of 22 June 2017 being attached as Exhibit 13 to the Statement of Defence. An oral hearing took place on 17 August, at which both sides were represented. The New York court has yet to render its decision regarding its jurisdiction and the Respondents' right to proceed with discovery. Until this decision is rendered the Respondents wish to preserve their position in the New York proceedings as a matter of priority over these proceedings.*
>
> *The Respondents will not be submitting their costs incurred in these proceedings and therefore withdraw their corresponding claim at Paragraph 87 of the Statement of Defence. As regards the costs that will be submitted by the Claimant, the Respondents wish to draw the Tribunal's attention to the circumstances that led to the hearing of 24 April 2017. That hearing took place to address the format of the Claimant's initial Request for Arbitration of 21 November 2016. In Procedural Order No 1, the Tribunal determined that it was precluded from proceeding on this arbitration in its then existing form, and the Claimant filed an Amended Request for Arbitration dated 27 April 2017. The issue of the format of the Request for Arbitration of 21 November 2017 [sic] was immediately raised by the Respondents in their Response of 13 January 2017 and this important procedural objection cannot be viewed as an unjustified attempt to delay or otherwise obstruct these proceedings. The Respondents believe that these circumstances should have bearing on the Tribunal's final decision in relation to costs*" (emphasis added).

---

[65] [1/23/325].

[66] [1/19].

[67] [1/20].

[68] [1/23/326] and [1/23/327].

63. By emails dated 16 November 2017,[69] the Respondents' legal representatives asked for permission to retain a transcriber at the concurrent oral jurisdiction and merits hearings on 28 & 29 November.

64. By emails also dated 16 November 2017,[70] the Tribunal informed the parties as follows:

> *"The Tribunal is in receipt of the email from the Respondents' representatives dated 14 November (i) indicating the Respondents' proposed non-attendance at the forthcoming oral hearing and (ii) containing the Respondents' submissions in relation to costs.*
>
> *Separately, the Tribunal is also in receipt of the Respondents' email dated 16 November 2017, requesting authorisation for a court reporter to be present at the oral hearing.*
>
> *It is convenient to deal with both at the same time.*
>
> **Email of 14 November 2017**
>
> *In light of (a) the agreed position of the parties, which is reflected in paragraph 15(1) of PO2, and (b) Articles 15.8, 15.10 and 19.1 of the LCIA Rules, the parties will be aware that the Tribunal is able to proceed with the arbitration and to make an award even if the Respondents choose not to participate in any stage of the proceedings and/or choose not to attend the oral hearing. In particular, and as noted in paragraphs 15 and 16 of PO4, the Tribunal has the jurisdiction conferred by Articles 23.1 and 23.4 of the LCIA Rules to rule on its own jurisdiction and, if it finds that it has jurisdiction, to make a pecuniary award under Article 26 notwithstanding the Respondents' non-attendance.*
>
> **Email of 16 November 2017**
>
> *The Tribunal has no objection to the presence of a court reporter at the forthcoming hearing. The Tribunal notes the agreement of the parties on the allocation between them of the attendant costs. The Tribunal would be grateful to receive copies of the transcript for their own use."*

65. On 23 November 2017, Mazlin's legal representatives served its Skeleton Argument, together with a Chronology, *Dramatis Personae*, List of Issues, Schedule of Costs and Submissions on Costs. It was disclosed in §7 of the Skeleton Argument that Shireen had apparently been dissolved on 30 October 2017, but that an application had been made for its restoration to the register in Liberia.

66. In response to this development, the Respondents' legal representatives circulated an email on 24 November 2017 in the Shireen claim saying this:

---

[69] [1/23/329] and [1/23/330].

[70] [1/23/331] and [1/23/332].

*"We write in connection with the above-referenced proceedings (the "Shireen Arbitration"). The elements set out below relate to procedural matters only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*We note that despite the Tribunal's directions, the Claimant has not filed any preparatory submissions for a hearing scheduled for 28/29 November. In its skeleton argument of 23 November 2017 in relation to concurrent proceedings No. 163503 (Mazlin Trading Corp v WJ Holding Limited and Stubrick Limited), the Claimant's counsel informed the Tribunal that the Claimant (Shireen) no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017 it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017. An application has or is imminently to be made to the Liberian registry of companies, based in Virginia, for Shireen to be immediately restored to the register in order that it can pursue the Shireen Arbitration."*

*It was then added that "Until such restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of the Claimant, in favour of Mazlin Trading Corporation as third party (following an assignment of debt that took place on 30 October 2017). It was suggested in this communication that "Given that the "third person" in question here is the Claimant in the linked arbitration (163503) and as the Tribunal is of course aware both claims share the same factual matrix, the same defences and are to be heard together on 28 November, we do not anticipate this presenting an issue and so should be most grateful if the Tribunal would confirm its agreement to the same."*

*This would appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of the Claimant's corporate existence during certain phases of this arbitration and absence of any pre-hearing submissions in accordance with the Tribunal's directions. These complex procedural manoeuvres cannot be properly understood or assessed in such a short time frame, and a hearing cannot validly take place on 28/29 November 2017 in the Shireen Arbitration. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing."*

67.   Later the same evening, the Respondents' legal representatives sent a further email in relation to the Mazlin claim saying this:

*"We write in connection with the above-referenced proceedings (the "Mazlin Arbitration"). The elements set out below relate to recent procedural developments only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

### Hearing of 28/29 November 2017

*In its skeleton argument submitted on 23 November 2017, the Claimant's counsel informed the Tribunal that claimant company Shireen Maritime Limited in concurrent proceedings No 173638 (Shireen Maritime Limited v WJ Holding Ltd and Stubrick Limited, the "Shireen Arbitration") no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017*

*it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017."*

*It was then added that "Until [Shireen's] restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of Shireen, in favour of Mazlin Trading Corp as third party (following an assignment of debt that took place on 30 October 2017). It was also suggested in this communication that the claims in the Shireen Arbitration and Mazlin Arbitration should be heard together on 28/29 November.*

*The Respondents' interpretation of these developments in the Shireen Arbitration is that they appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of Shireen's corporate existence during certain phases of the Shireen Arbitration and absence of any pre-hearing submissions. It was submitted by the Respondents that these complex procedural manoeuvres could not be properly understood or assessed in such a short time frame, and that a hearing could not validly take place on 28/29 November 2017 in the Shireen Arbitration.*

*Pursuant to Procedural Order No 3 in this Mazlin Arbitration, the Tribunal directed that proceedings in the Mazlin Arbitration and in the Shireen Arbitration should "proceed in parallel, with as little delay and added cost as practicable, with a view to any evidential hearing and oral arguments being heard in each concurrently" (par. 1), and that "the procedural timetable in each shall hereafter be identical" (par.2). It would therefore appear that the defect having affected the conduct of the Shireen Arbitration (i.e. the dissolution of the claimant even if subsequently restored) must also affect the conduct of the Mazlin Arbitration.*

*On behalf of the Respondents, it is accordingly submitted that the hearing cannot take place on 28/29 November 2017 in the Mazlin Arbitration either. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing.*

<u>*Claimant's Costs Submission*</u>

*On 23 November 2017 the Claimant filed a short schedule of costs amounting to $635,845. The Respondents note the following:*

> *1.    The costs submitted (under the sole auspices of this Mazlin Arbitration) are very significant and represent not 3% of the claims as averred, but 12% of the Mazlin claim (of principal amount in the vicinity of $4 million). This cannot be considered a proportionate amount.*

> *2.    The Claimant did not distinguish between the costs related to the Mazlin Arbitration and those related to the Shireen Arbitration, which cannot be correct.*

> *3.    The hours submitted are provided in large blocks, in some instance of up to 102 hours, instead of granular increments of not more than several hours at a time (as would be customary), together with corresponding detailed chronology.*

> *4.    The Claimant seeks recovery of costs incurred in foreign proceedings, to which the jurisdiction of the Tribunal does not extend. The recovery of such costs must be governed by cost recovery laws in those foreign jurisdictions and by the proper fora.*

*The Respondents are accordingly of the view that the Claimant's costs submission is inadequate.*

*As a final comment, the Respondents' decision not to participate in disclosure and in the hearings scheduled for 28/29 November was based not only their in-principle view that the New York proceedings should prevail, but also in order to mitigate costs related to these London proceedings, including costs incurred by the Claimant. It was not intended to encourage an uncontested accumulation of costs."*

68.   By email dated 24 November 2017, the Claimants' legal representatives –

   (1)   informed the Tribunal that Shireen had been restored to the register earlier that day, and provided a copy of the Proclamation of Rescission of Dissolution;

   (2)   provided a copy of a Deed of Assignment dated 30 October 2017 by which Shireen assigned absolutely to Mazlin all sums due and owing to Shireen under the Shireen Loan Agreement, including for the avoidance of doubt Shireen's claim in this arbitration and the benefit and proceeds of any award or order herein, including costs;

   (3)   provided a copy of a Confirmation of Consent to Joinder under Article 22.1(viii) of the LCIA Rules, dated 24 November 2017, signed by each of Shireen and Mazlin;  and

   (4)   invited the Tribunal to make an order under Article 22.1(viii) joining or substituting Mazlin as Claimant in the Shireen claim.

69.   By emails dated 25 November 2017, the Tribunal invited the Claimants to provide any responses to the Respondents' emails of 24 November by 10:00 am on 27 November.

70.   By email dated 27 November 2017, timed at 16:47, the Respondents' legal representatives indicated that they *"will not be making any submission in regard to the application"* under Article 22.1(viii).

### A.6  The oral jurisdiction and merits hearings

71.   The concurrent oral jurisdiction and merits hearings were conducted over 28 & 29 November 2017 at the IDRC, 70 Fleet Street, London EC4Y 1EU.  They were transcribed by Opus 2 International.

72.   As they had previously indicated, the Respondents did not appear and were not represented.

73.　The Claimants were represented by Anna Lintner, of counsel, and by Stevie Loughrey and James Hill of Onside Law.　Anya Freeman of Mr Spiegel's US attorneys was also in attendance, as was Mr Spiegel himself.

74.　At the commencement of the hearing the Tribunal indicated that, having considered the parties' submissions carefully, an order would be made, subsequently reflected in Procedural Order № 4 in the Shireen claim –

　　(1)　joining Mazlin Trading Corp as a claimant in the Shireen claim, and

　　(2)　providing that the Claimants are not required to serve an amended Request for Arbitration or any amended Statements of Case reflecting the addition of Mazlin as claimant.

75.　After the Claimants' counsel made certain opening submissions, Mr Spiegel gave oral evidence. He affirmed both of his witness statements.[71]　He was asked some further questions by his own counsel, and he was then examined robustly and at some length by the Tribunal throughout the afternoon of the first day of the hearing. In the course of that examination, the Tribunal put to Mr Spiegel the Respondents' case and the documents on which their Defences are based.

### A.7  After the hearings

76.　By email dated 29 November 2017, the Claimants' legal representatives provided copies of certain documents that had been mentioned or handed up during the hearing, and also provided some interest calculations.　By email dated 11 January 2018, the Tribunal invited the Respondents to provide any response to those materials.　The Respondents' legal representatives duly provided their response by email dated 15 January, taking issue with certain aspects of the Claimants' interest calculations.

---

[71] [1/21] and [1/22].

## B. THE FACTS

### B.1  The background

77.   It is common ground that –

  (1)   the beneficial owner of Shireen and of Mazlin is, and always has been, Mr Spiegel;

  (2)   the beneficial owner of WJ Holding and of Stubrick is, and always has been, Mr Drukker;  and

  (3)   Mr Spiegel and Mr Drukker were friends since childhood, having been brought up and gone to school in the same part of what is now west Ukraine.

78.   Mr Spiegel's evidence was, and the Tribunal accepts, that –

  (1)   he emigrated to the USA in 1972, after which he established a number of business ventures, specialising since the early 1990s in former Eastern bloc countries;  and

  (2)   Mr Drukker emigrated to the USA in about 1989, and he too has established a number of business ventures.

79.   It is common ground that Mr Spiegel has made, or caused to be made, a number of loans to companies owned and controlled by Mr Drukker over a period of at least 25 years.  This is admitted in §6 of the Respondents' Defences.[72]  The Respondents say that Mr Spiegel was a *"small bridge lender"*.  By contrast, Mr Spiegel says he lent in aggregate somewhere in the region of $40 million.  The Tribunal has no reason to doubt Mr Spiegel's evidence in this regard, and accepts it.

80.   Mr Spiegel's oral evidence at the hearing was that he also became a director of approximately three of the companies in which Mr Drukker had an interest.  There was, however, no established pattern of Mr Spiegel making equity investments in Mr Drukker's business ventures.

81.   Mr Drukker's ventures were for many years conducted in collaboration with a number of business partners (not including Mr Spiegel) under the umbrella of WJ Group.  One of its assets

---

[72] {1/11} and {1/12}

was the Bender Oil plant, a vegetable oil production facility in the Transdniestrian region of Moldova.

82.  It is not in dispute that Mr Drukker parted company from his former business partners in about 2011, after which he was left in sole ownership of WJ Holding, and through it the Bender Oil plant.  The plant had not been operational for about 6 years, but he had plans to revive its production and turn it to profit.  He approached Mr Spiegel to assist with the financing.

83.  The essential difference between the parties on the facts is this:  Mr Drukker's case is that the two of them agreed a binding and unconditional deal under which Mr Spiegel would acquire a 30% equity stake in Bender Oil for $7 million, and the Loan Agreements were a sham mechanism to give partial effect to that equity investment,  whereas Mr Spiegel's case is that the Loan Agreements reflected genuine loans, and although he spent a considerable amount of time and effort exploring the possibility of also making an equity investment, in the event there never was a concluded, unconditional agreement in that regard.

84.  That is the core factual issue on which both arbitrations turn.  Its resolution demands a careful review of the evidence, and in particular a detailed consideration of the contemporaneous documentary record.

### B.2  The valuations

85.  Chronologically, the first document the Tribunal has seen is an Appraisal Certificate forming part of a valuation given by Industrial Consult SRL as at 8 December 2011.[73]  It provides an appraisal of the market valuation of "*the properties (buildings and facilities) owned by [WJ Holding]*" comprising the tangible property of Bender Oil.  It states that the plant is "*Not in use (mothballed)*".  The Tribunal has not been shown the full valuation report, and does not know what information was provided to the valuer.  The Certificate does not attempt to assess the net present value of Bender Oil based on its anticipated future business operations, merely the current market value of its tangible assets.  Having said all that, it is the only valuation the Tribunal has been shown dating from 2011, and there are no apparent grounds for questioning its integrity.  The value given is $637,830.  The significance of this valuation is the light it casts on the parties' competing claims as to the nature of the deal between them.  The Claimants say that it supports their case – namely, that the only discussions regarding a possible equity

---

[73] [2/333].

investment by Mr Spiegel were reflected in the Agreement of Sale,[74] which valued a 30% equity stake at $210,000: that is in line with the Industrial Consult valuation. The Tribunal accepts that the valuation does lend at least some support to the Claimants' case in this regard, and that it is less consistent with the Respondents' case (which is that the parties put an enterprise value of about $20 million on Bender Oil, of which there is no contemporaneous evidence whatsoever).

86.   The next document is another valuation certificate, this time from Actimob Consulting Ltd giving a valuation as at 1 January 2012.[75] Once again, the Tribunal has only seen the certificate, not the underlying valuation report, and does not know what information was provided to the valuer. The report is again a property valuation, not an assessment of the potential development value of the plant as a going concern. Furthermore, the certificate states that "*we have not carried out building surveys, tests services, made independent site investigations, inspected woodwork, [or] exposed parts of the structure*". Nevertheless, it remains the only other independent piece of evidence regarding the value of the plant at the time, and the Tribunal has no reason to doubt its integrity. The valuation figure is $1,516,580. Mr Spiegel's evidence is that the reason for the increase in value over the month since the Industrial Consult valuation was that, in late 2011 the plant had no windows and no doors, the machinery had stood still for many years, and the grass was growing high all around the site. Mr Drukker was trying to raise finance, and he spent considerable efforts and resources in reinstating the doors and windows, cleaning the machinery and cutting the grass to make it look like a viable project, and he procured a new valuation in January 2012 to reflect the added value his input had produced. The Tribunal has no reason to doubt that evidence, and accepts it.

### B.3  The Agreement of Sale

87.   The next document is the Agreement of Sale dated "*as of*" 15 March 2012.[76] This is an agreement concluded between WJ Holding (*i.e.* Mr Drukker's company) and AMM Consulting (which, it is accepted by the Claimants, was one of Mr Spiegel's companies). It was signed by Mr Drukker on behalf of WJ Holding, and by Mr Spiegel on behalf of AMM Consulting.[77] The following provisions are relevant for present purposes:

---

[74] [2/376]

[75] [2/339].

[76] [2/376].

[77] [2/380].

(1)  The agreement recited that WJ Holding was the registered owner of 3,583 shares in Bender Oil, and that it wished to sell and AMM Consulting wished to buy 1,074 of those shares.

(2)  Clause 1 provided that WJ Holding agreed to sell, and AMM Consulting agreed to purchase, the 1,074 shares in Bender Oil "*upon the terms and conditions hereinafter set forth*".

(3)  Clause 2 referred to Exhibit A (comprising an 'Appraisal' of certain 'assets' owned by Bender Oil) and Exhibit B (containing a description of various 'Contracts' setting out Bender Oil's and WJ Holdings' privatisation obligations) which were ostensibly attached to the agreement, but neither document has been produced to the Tribunal.

(4)  Clause 3 provided that the purchase price was to be $210,000, with $100,000 payable on or before 31 December 2012, and $110,000 payable on or before 1 June 2013.

(5)  Clause 5 provided that, at closing, WJ Holding would execute and deliver to AMM Consulting transfer documents and deeds of title in respect of the shares in Bender Oil.

(6)  Under clause 6, headed 'Representations and Warranties of Seller', WJ Holding was recorded as having represented and warranted that it had full power and authority to carry out and perform its undertakings and obligation provided in the agreement –

> "*except the condition precedent to the sale is [WJ Holding's] fulfilment of the privatisation requirements and prior authorisation of the Pridnestrovian Moldavian Republic ("PMR") government authorizing the said sale and registration of the Shares. [AMM Consulting] acknowledges that [WJ Holding] is not giving any warranty or representation on [WJ Holding's] ability to fulfil the privatization requirements and to receive necessary government approvals. In the event, [WJ Holding] will not be able to obtain said governmental approval by the end of 2013, this Agreement shall be rescinded and all funds refunded to [AMM Consulting]*" (emphasis in the original).

The Claimants submit, and the Tribunal accepts, that this means that the Agreement of Sale was not unconditional. Rather, it was conditional on the fulfilment of certain privatisation conditions, and on the grant of certain governmental consents.

(7)  Clause 8 laid down certain 'Conditions to Closing'. In particular, clause 8.2 provided that the obligations of WJ Holding to close were subject, "*at the option of [WJ Holding], to the ... (b) Ability of [WJ Holding] to complete all privatisation requirements with the PMR Republic*". It is difficult to understand the intended effect of the words "*at the option of [WJ Holding]*" in this context, but the Tribunal considers it unnecessary to resolve that uncertainty.

(8)    Pursuant to clause 10, the parties agreed that "*the purchase price is based on the value of the Shares before [WJ Holding] will have invested additional funds to make the factory operational and to fulfil privatization requirements*". The Tribunal considers that this provision lends at least some further weight to the Claimants' case that the parties were proceeding on the basis that the value of Bender Oil was in the region of $630,000, not $20 million.

(9)    Clause 15 provided that the agreement was to be governed by, and construed in accordance with, the laws of the State of New York.

88.   Leaving aside the detailed terms of the agreement, it is also significant to note that it pre-dates by four months any document that has been produced discussing the possibility of a loan being made in relation to the Bender Oil plant. If, as the Respondents contend, there was a concluded, unconditional deal for Mr Spiegel to make an equity investment, and if the March 2012 Agreement of Sale was put in place as part of the mechanism for giving effect to that agreement, it is surprising that there is no documentary record at the same time of any loan being advanced or even discussed.

### B.4  The 2012 Privatisation Agreement and related agreements

89.   A fortnight after the Agreement of Sale was signed, the 2012 Privatisation Agreement[78] was signed on 28 March 2012 between the Transdniestrian Moldovan Republic ("the Moldovan government") and WJ Holding. Clause 1.1 provided that the agreement had been concluded "*with the aim of launching and conducting actual operations*" at the Bender Oil plant. Under clause 3, each of the Moldovan government and WJ Holding entered into a number of mutual obligations. The exact content and detail of those obligations is unimportant. What matters for present purposes is the fact that it is common ground between the parties that the Moldovan government failed to perform its obligations under this agreement.[79]

90.   On 3 May 2012, two further agreements were entered into:

(1)    The first was a loan agreement between Stubrick and Bender Oil in the sum of $1.5 million. The term of the loan expired on 10 December 2012.

---

[78] [2/343].

[79] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

(2)   The second was an Additional Agreement, made between Stubrick and WJ Holding, the effect of which appears to have been to treat the loan made by Stubrick to Bender Oil as if it had been a loan made by WJ Holding in discharge of part of its investment obligations under the 2012 Privatisation Agreement.

### B.5  The email of 11 July 2012

91.   On 11 July 2012, Mr Spiegel sent an email to William Schneider, who is a US attorney and also Mr Drukker's son-in-law.  The subject of the email was stated to be 'Credit Line'.  The relevant parts of the email said this:

> *"Dear Bill,*
>
> *As per our consulting agreement I have found 2 potential companies willing to extend the credit line in operation [sic] in Moldova-Transylvania.*
>
> *Here are the company details*
>
> *1. Shireen Maritime Limited (Republic of Liberia) 80 Broad Street, Monrovia, Republic of Liberia ...*
>
> *2. Terms: credit line up to 4 mill. Interest rate 6%, 3 years, with a option [sic] for extension for 2 more ...*
>
> *The Loan agreement has to be standard for 3-4 pages covering all concerns (pledges, guaranties etc.)*
>
> *The second company details you will receive directly from Arla Weber ... but the terms the same [sic] except the credit line is 9 mill and the first trans by mutual agreement both sides.*
>
> *Please put together ASAP."*

92.   In his oral evidence, Mr Spiegel explained that he had a consulting agreement with WJ Holding under which he would earn commission if he introduced third party finance.  That appears to explain the language he chose to use in this email, which was clearly intended to suggest (wrongly) that Shireen and the 'second company' were unconnected with him.  While Mr Spiegel confirmed in his oral evidence that he did not in fact receive any commission in connection with the loans ultimately advanced, the Tribunal regards this dissimulation on his part as being discreditable, and it makes the Tribunal cautious about accepting uncorroborated oral evidence from him.

93.   Nevertheless, in light of (i) the timing of this email, (ii) the reference to an operation in Moldova-Transylvania, (iii) the identity of at least one proposed lender mentioned in the email with one of the lenders under the Loan Agreements, (iv) the similarity in the amounts of the proposed loans, the interest rate and the potential extension of the loan period to those that ultimately appeared in the Loan Agreements and (v) the fact that the Respondents themselves

assert in their Defences that "*at the time Mr Spiegel maintained an appearance of being unaffiliated*" to the proposed lenders,[80] Tribunal is willing to and does infer that (a) this email was discussing proposed funding for the Bender Oil project, (b) Mr Spiegel was at the time discussing the possibility of procuring loans (not an equity investment) from Shireen and another company, and (c) Mr Schneider was being tasked with preparing the necessary loan documentation, including personal guarantees.

94.   Furthermore, it is significant that the first documented mention of any potential loan was made in connection with corporate lenders which were ostensibly unconnected with Mr Spiegel. Although (as we know) the lenders were in fact his companies, and although (as we have said) his initial dissimulation in this regard does him no credit in broader moral terms, nevertheless in the context of the present dispute it happens to support the Claimants' case. By contrast if, as the Respondents contend, the agreed deal in 2012 had been an equity investment by Mr Spiegel, disguised as a loan from companies owned and controlled by him, then it is difficult to see why he would have initially introduced those lenders to Mr Drukker under the pretence that they were not connected with him.

### B.6  The Loan Agreements

95.   The Loan Agreements themselves[81] are dated "*As of August 10, 2012*". They are in materially identical terms to each other, save for the amount of each loan and the terms for the draw-down. Save where otherwise indicated below, the terms identified in this Award are the same in each agreement.

   (1)   Clause 1.1 provides that the loan was made "*for the purpose of inventory financing for the edible oil crushing facility*".

   (2)   Clause 1.2 provides that the borrowing "*shall be secured pursuant to the Security Agreement attached hereto as Exhibit A*". There is no Exhibit A attached to either Loan Agreement. Mr Spiegel's evidence is that the parties agreed that the loans would be secured by personal guarantees provided by Mr and Mrs Drukker. The Respondents deny that there was any agreement for personal guarantees to be provided by Mr and Mrs Drukker, but they provide no alternative explanation nor any evidence of what the 'Security Agreement' referred to in the Loan Agreements might be.

---

[80] See §15 of their Defences [1/11] and [1/12].

[81] [2/366] and [2/371].

(3) Clause 1.3 provides that interest shall accrue at 6% on the outstanding principal balance of each advance.

(4) Clause 1.4 provides that each advance shall be made in certain fixed minimum amounts or multiples thereof, being $250,000 under the Shireen Loan Agreement and $1 million under the Mazlin Loan Agreement.

(5) Clause 1.7 provides that requests for advances would be made by written or telephone requests.

(6) Clause 1.9(a) provides that all payments by the borrower shall be made in US Dollars.

(7) Clause 1.9(c) provides that: "*All calculations of interest hereunder shall be made on the basis of a 360 day year for elapsed [sic]*".

(8) Clause 1.10 provides as follows: "*If any Advances is [sic] not paid when due, Borrower shall, on demand by Lender, pay interest thereon from its due date until paid in full at a rate of ten percent (10%) per annum*".

(9) Clause 2 provides that all advances "*shall be repaid in full together with all interest, fees, and other sums due Lender [sic] on September 30, 2015*" with the lender having an option to extend the loan period for a further year.

(10) Clause 3 contains certain representations and warranties on the part of the borrower.

(11) Clause 4 contains certain positive covenants on the part of the borrower.

(12) Clause 5 defines certain events of default.

(13) Under clause 6, each party agreed "*to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement and Notes [sic].*" No actual 'Notes' appear to form any part of the contract.

(14) The relevant part of clause 7 provides as follows:

> "*This Agreement and agreement [sic], document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto, and supersede all oral negotiations and prior writings in respect of the subject matter hereof.*"

(15) Clause 8 provides that the governing law shall be English law.

(16) Clause 9 is the arbitration agreement, quoted in §6 above.

96. There is some disagreement over the authorship of the Loan Agreements. Mr Spiegel's evidence is that the documents were drawn up by Mr Schneider, who borrowed from various precedents available to his law firm. The Respondents say that this is "*not [their] recollection*",[82] but they do not suggest who else might have drafted the documents. The Tribunal is not persuaded that much turns on this particular aspect of the factual dispute, but nevertheless it accepts Mr Spiegel's evidence in this regard:

    (1) Mr Spiegel is not himself a lawyer, and the Tribunal has seen no evidence to suggest that he instructed any lawyers to draft the Loan Agreements on his behalf.

    (2) By contrast, Mr Schneider is a lawyer and he is also Mr Drukker's son-in-law. He would have been well placed to draft the agreements.

    (3) The email from Mr Spiegel to Mr Schneider dated 11 July 2012 (referred to in §91–94 above) discussed the proposed contents of a loan agreement, and ended with the words "*Please put together ASAP*". There is no documentary record of Mr Schneider having declined to do so. This suggests he accepted the invitation from Mr Spiegel to draft the Loan Agreements.

    (4) For the reasons discussed in §107 below, the Tribunal finds that Mr Schneider drafted the guarantees. That makes it more likely that he also drafted the Loan Agreements.

    (5) The formatting of the Loan Agreements lends some inferential support to Mr Spiegel's evidence because it suggests that the content of the agreements was cut and pasted from other precedents. For example, the headings to clauses 1 to 7 inclusive are in capitals, whereas the headings to clauses 8 and 9 are in lower case. Furthermore, as mentioned above, clause 6 refers to 'the Notes', when no notes formed any part of the transaction.

    (6) There is a slight but noticeable difference between the Respondents' case in these proceedings and the evidence they have adduced in support of the New York proceedings. As noted above, the Respondents' Defences say no more than that they have no recollection of Mr Schneider drafting the Loan Agreements.[83] By contrast, in the New York proceedings Mr Drukker has sworn an affidavit dated 22 June 2017,[84] in which he says this: "*The two loan agreements were produced by Mr Spiegel.*"[85] It does

---

[82] See §20 of their Defences [1/11] and [1/12].

[83] *Ibid* §20 [1/11] and [1/12].

[84] [2/533].

[85] See §17 [2/536].

not encourage the Tribunal's confidence in the integrity of the Respondents' case to see slightly varying accounts of the same factual issue.

(7)   In any event, the Respondents have offered no witness evidence in these proceedings. By contrast, Mr Spiegel has made a witness statement setting out his evidence in this regard, and he has also tendered himself for cross-examination.

(8)   In particular, Mr Spiegel's evidence was that he met Mr Schneider in a coffee bar in mid-August 2012 when Mr Schneider handed over copies of the draft Loan Agreements which he (Mr Schneider) had prepared.  This evidence is to some extent corroborated by an exchange of emails between them on 10 August 2012[86] (which is the date of the Loan Agreements).  Although the subject line of the emails is *"Re: Bendery Valuation – Part 2"* it is common experience that the subject matter of an email chain may evolve without the parties necessarily up-dating the subject line of their communications.  In this instance, at 2:41 pm on 10 August 2012 Mr Spiegel was writing to Mr Schneider, asking: *"Then do we meet?"*  Mr Schneider replied: *"I have been working on our stuff all morning ... I will try to finish in the AM and lets [sic] meet around 2 tomorrow. Will it work for you?"*  Mr Spiegel replies at 3.22 pm *"Yes, Boss!!! anything good for you is good for me See you tomorrow at 2 (In Aroma?)"*.

97.   All of this tends to support Mr Spiegel's evidence that it was Mr Schneider who drafted the Loan Agreements.

### B.7   The Letter of Agreement

98.   On 17 August 2012, a Letter of Agreement between AMM Consulting and WJ Holding was executed ("the Letter of Agreement").[87]  The copy produced to the Tribunal is signed only by Mr Spiegel on behalf of AMM Consulting, but the Respondents state in their Defences that both parties executed the agreement.[88]  It refers to the Agreement of Sale, and it states that AMM Consulting acknowledges that valuable consideration for WJ Holding entering into that agreement *"is continued consulting provided by the managing member of [AMM Consulting], [Mr Spiegel]"*.  The agreement then continues as follows:

> *"Parties now agree that in the event [Mr Spiegel] stops providing consulting [WJ Holding], or any successor thereof, for any reason, including [WJ Holding] terminating [Mr Spiegel] for any reason at his sole and absolute discretion, [WJ*

---

[86] [2/580].

[87] [2/381].

[88] *Ibid* §22 [1/22] and [1/12].

*Holding] shall be entitled to terminate the [Agreement of Sale] and rescind the transaction by giving notice to [AMM Consulting] and paying a sum of two hundred and fifty thousand dollars ($250,000) within thirty days of the Notice. In the event of rescission hereunder the payment of $250,000 by [WJ Holding] to [AMM Consulting], [AMM Consulting] agrees to transfer any and all rights it may have had (including any rights to accrued dividends) back to [WJ Holding]".*

99.   It is common ground between the parties that the Letter of Agreement was intended to make provision for the re-transfer to WJ Holding of any equity in Bender Oil which had been acquired by AMM Consulting under the Agreement of Sale. On that basis, each side seeks to rely on the Letter of Agreement to support its case:

    (1)   For their part, the Respondents say that it supports their argument that Mr Spiegel agreed to acquire an equity interest in Bender Oil, otherwise there would have been no need to make provision for its re-transfer.

    (2)   In answer, the Claimants say that the consideration payable on re-transfer under the Letter of Agreement is consistent with the figure of $210,000 in the Agreement of Sale, and is inconsistent with the Respondents' case that Mr Spiegel agreed to acquire a 30% equity stake for $7 million.

100.   The Letter of Agreement provides at least some support for the Claimants' case, and it is less consistent with the Respondents' case, for a number of reasons:

    (1)   The Letter of Agreement talks only of the parties "*entering into*" the Agreement of Sale. It does not say either (i) that that agreement had been completed, or (ii) that AMM Consulting had in fact acquired any shares in Bender Oil, or (iii) that Mr Spiegel, through any corporate vehicle, had made an unconditional agreement to acquire an equity interest in Bender Oil. As such, it provides no support for the Respondents' case that there was an unconditional agreement for Mr Spiegel to enter into an equity purchase at all, let alone for $7 million.

    (2)   On rescission of the Agreement of Sale, the obligation on AMM Consulting under the Letter of Agreement is "*to transfer any and all rights it may have had*". The most natural interpretation of the Letter of Agreement is accordingly that it was intended to work prospectively, imposing an obligation on AMM Consulting (on the occurrence of some future contingency) to transfer back to WJ Holding rights in relation to Bender Oil which, as at the date of the Letter of Agreement, AMM Consulting had not yet acquired.

(3)    The consideration payable under the Letter of Agreement on re-transfer makes sense in the context of a potential 30% equity investment for $210,000. It makes no sense in the context of an equity investment for $7 million.

### B.8 The personal guarantees

101.    Although the Loan Agreements were signed in early August, it is common ground that no moneys were advanced for several months. Mr Spiegel's explanation is that he was waiting for the personal guarantees to be signed by Mr Drukker and his wife. The Respondents deny that there was any agreement for personal guarantees.

102.    On 5 September 2012, Mr Spiegel sent Mr Drukker an email in Russian which has been translated as follows:

> "I was very surprised that you still haven't talked to Marina. As I understood, the matter is urgent. We talked about it August 27. As you understand, until the documents are signed correctly, we won't be able to do anything."

103.    Mr Spiegel's explanation for this email is that Marina is Mr Drukker's wife, and that this email was referring to the fact that Mr Drukker urgently needed money for the Bender Oil project (hence "As I understood, the matter is urgent"), but Mr Spiegel was not going to advance any funds until the personal guarantees had been signed by Mr and Mrs Drukker (hence "until the documents are signed correctly, we won't be able to do anything").

104.    The next day, 6 September 2012, Mr Spiegel sent an email to Mr Schneider in Russian, the translation of which shows that the subject line was "Personal guarantee". The body of the email says that Mr Spiegel thought "we can mention Marina and Yura in one guarantee (without conditions and reservations) as the loan guarantors acting jointly and severally, and have it notarized in Moscow and sent to me by DHL". Mr Spiegel's evidence is that "Marina and Yura" was a reference to Mr and Mrs Drukker, and that he was talking in this email about the personal guarantees that Mr Schneider was meant to be drafting for them to sign in support of the loans to be made to WJ Holding and Stubrick under the Loan Agreements.

105.    The day after that, 7 September 2012, Mr Schneider sent Mr Spiegel an email under the subject line "Guaranty". He said this:

> "Attached please find the form of the guaranty. I have drafted this as a mere accommodation for WJ Holding, and do not represent any parties to the loan and guaranty agreements (neither Lenders nor Borrowers nor Marina Drukker nor

*Yuri Drukker).  I strongly recommend that you all review these documents with the counsel of your choice."*

106.  Attached to Mr Schneider's email were two draft guarantees in the names of Mr and Mrs Drukker, one in respect of WJ Holding's debt liability under the Shireen Loan Agreement, and one in respect of Stubrick's debt liability under the Mazlin Loan Agreement.

107.  The accumulation of evidence outlined above leads the Tribunal to accept Mr Spiegel's case in relation to these documents:

(1)  Mr Spiegel has given witness evidence which provides a coherent explanation of the documents, and the documents are consistent with his account.

(2)  It is particularly striking that Mr Schneider, who is Mr Drukker's son-in-law, drafted the relevant guarantees, and expressed no surprise at having been asked to do so.

(3)  The fact that Mr Schneider says he was not acting for any of the parties does not detract from this inference in any way.  Rather the reverse:  having referred to *"the loan and guaranty agreements"*, Mr Schneider specifically advises the parties to obtain independent legal advice, which strongly suggests that he regarded the Loan Agreements as being genuine, and that the guarantees would be legally binding on Mr and Mrs Drukker when executed.

(4)  The Respondents have offered no witness evidence to contradict Mr Spiegel's account.

108.  The existence of these draft guarantees, and the fact that Mr Spiegel was unwilling to allow any funds to be advanced under the Loan Agreements until the personal guarantees had been signed, provides further inferential support for the Claimants' case:  if the funds to be advanced under the Loan Agreements had in truth been an equity investment, there would have been no need to hold back payment from the 'lenders', and there would have been no commercial purpose in obtaining personal 'guarantees' from Mr and Mrs Drukker.

109.  As to subsequent events, Mr Spiegel's written evidence is that:  he met with Mr Drukker at a coffee shop in November 2012 where Mr Drukker signed the personal guarantees;  Mr Drukker then took the signed guarantees with him to procure his wife's signature;  Mr Spiegel did not keep a copy of the guarantee signed by Mr Drukker;  Mrs Drukker then refused to sign the guarantees;  and Mr Drukker and the Respondents have since denied that it formed any part of

the deal that Mr and Mrs Drukker would provide any guarantees, or that Mr Drukker ever signed them.

110. The Tribunal accepts Mr Spiegel's evidence in this regard, for a number of reasons:

    (1)    The Loan Agreements refer to a 'Security Agreement'. As noted above, no explanation has been offered for that term other than as a reference to the intended guarantees.

    (2)    The fact is that no funds were advanced under the Loan Agreements for several months after their execution. The timing of the emails in September, followed by Mr Spiegel's account of his meeting with Mr Drukker in November, followed by the first transfer of funds in late November 2012, lend support to the Claimants' case that they would not advance any money until Mr Drukker had agreed to give the personal guarantees.

    (3)    The Respondents' case is that there never was any agreement to provide personal guarantees. For the reasons outlined above, the Tribunal has rejected that case. The Tribunal infers that the reason why the Respondents were keen to deny the existence of any agreement to provide personal guarantees is that (i) the moving spirit behind the Respondents is plainly Mr Drukker, and Mr Drukker was keen to deny having incurred any potential personal liability under a guarantee and (ii) the existence of a personal guarantee would have been more consistent with a true loan, rather than an equity investment.

    (4)    Mr Spiegel has given witness evidence and submitted himself to cross-examination on this issue. The Tribunal found his testimony to be consistent with the documentary record and convincing on this point.

    (5)    By contrast, the Respondents have offered no witness testimony, despite having filed a lengthy Response and Statement of Defence.

111. For these reasons, the Tribunal is satisfied that Mr Drukker did sign the personal guarantees[89] in November 2012.

### B.9   Mr Spiegel's visits to the plant

112. The Respondents' case is that (i) the transfers of funds were made in late 2012 and early 2013 after Mr Spiegel had satisfactorily completed his due diligence investigations into Bender Oil,[90]

---

[89] [2/385] and [2/387].

(ii) Mr Spiegel conducted that due diligence on site at Bender Oil's premises, (iii) when he visited the Bender Oil plant he was introduced as Mr Drukker's partner and as a shareholder in Bender Oil, and (iv) he participated in management decisions. They rely on this as evidence of Mr Spiegel having agreed to acquire a 30% equity interest in Bender Oil.

113. The Respondents' case in this regard is said to be supported by a document dated 14 December 2016,[91] apparently signed by a Mr M.M. Gurduza as a director of Bender Oil. That document is addressed "*To whom it may concern*". The Tribunal has seen no witness statement from Mr Gurduza. Nevertheless, the Tribunal has no reason to doubt that he signed the document in question. It says this (with numbering inserted for ease of reference):

> "*[1] We hereby confirm that during the period since 2012, from the commencement of actions to relaunch the factory after seven years of standstill, namely rebuilding, renovation and modernisation of Bender Oil Extraction Plant, Mr Alex Spiegel repeatedly visited, together with Mr Y.P. Drukker ...*
>
> *[2] Mr Alex Spiegel was introduced to us as the partner of Mr Drukker – shareholder of [Bender Oil]. On numerous occasions, they noted that any actions regarding repair, installation and acquisition of equipment, and for the future and as far as was known, all matters concerning the procurement of raw materials, processing of such materials and sale of finished products, would have to be reported to both of them for their joint approval.*
>
> *[3] On numerous occasions since 2012, Mr Drukker gave formal instructions for all reports relating to the economic activity of [Bender Oil] to be presented to Mr Spiegel in his capacity as shareholder.*
>
> *[4] In addition, during his visits to the factory, Mr Alex Spiegel took part in management meetings of [Bender Oil], and held separate meetings with the deputy director of [Bender Oil] in charge of economic and financial affairs.*"

114. Mr Spiegel's evidence is that he did indeed visit the plant during 2012, because he was keen to find out about the progress of the venture. He says that his motivation was mixed: (i) as a trained mechanical engineer, he was curious, (ii) he was thinking of making an equity investment, and (iii) since he did not hold copies of any personal guarantees from Mr and Mrs Drukker, he was anxious to monitor progress at the plant, with a view to doing what he could to protect his companies' interests under the Loan Agreements. As such, he largely accepts the content of the document quoted above, with the exception of §3.

115. The Tribunal's conclusions in relation to this document, and to Mr Spiegel's visits to the plant generally, are as follows:

---

[90] See for example §8 of their submissions dated 11 April 2017 [1/4] and §23 of their Defences [1/11] and [1/12].

[91] [2/494–495].

(1)   To the extent that the document's content is admitted by Mr Spiegel, the Tribunal accepts it as accurate.

(2)   To the extent that its content is not accepted by Mr Spiegel, it contains contested evidence from Mr Gurduza which has not been verified by a witness statement or tested by cross-examination. To that extent, the Tribunal cannot place any reliance on it.

(3)   The fact that Mr Spiegel visited the plant and supervised some of its activities is consistent with each party's case: it is not consistent only with the Respondents' case that Mr Spiegel had entered into an unconditional agreement to take a 30% equity interest, whether for $7 million or at any other price; nor is it consistent only with the Claimants' case that the Loan Agreements genuinely reflected the bargain between the parties and that Mr Spiegel was merely exploring the possibility of making an equity investment.

(4)   For these reasons, the Tribunal considers that the document, and the evidence regarding Mr Spiegel's visits to the plant, assists neither party.

### B.10  Payments made by the Claimants to the Respondents

116.  The Respondents admit in their Statements of Defence that –

(1)   "On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000";[92]

(2)   "On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500";[93]

(3)   "On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000".[94]

117.  The Tribunal has also seen the following bank records:

(1)   an account statement from Eurobank Cyprus Ltd dated 7 December 2012 relating to WJ Holding's account № 001-2011-00140829, which shows an amount of CHF 1,900,000 being credited to the account from Mazlin on 30 November 2012;[95]

---

[92] See §54 of the Defence in the Mazlin claim [1/11].

[93] See §53 of the Defence in the Shireen claim [1/12].

[94] See §55 of the Defence in the Mazlin claim [1/11].

[95] [2/582].

    (2)    a Debit Advice from Bank Frey & Co AG dated 3 December 2012 reflecting a transfer of CHF 3,490,500 from Shireen to WJ Holding;[96]

    (3)    an Inward Swift statement from Eurobank, Nicosia Main Branch, dated 3 December 2012 reflecting the receipt by WJ Holding of the CHF 3,490,500:  against the line 'Details of Payment' it says "*Loan Agreement as per 10th of August 2012*";[97]

    (4)    a bank statement from Compagnie Bancaire Helvétique dated 12 May 2013 in relation to Mazlin reflecting a payment order dated 3 January 2013 to Stubrick in the sum of US$2,850,088.60.[98]

118.    Based on this material, the Tribunal finds that the following sums were received by the Respondents from the Claimants on the following dates:

    (1)    on 30 November 2012 WJ Holding received CHF 1,900,000 from Mazlin;[99]

    (2)    on 3 December 2012 WJ Holding received CHF 3,490,500 from Shireen;[100]  and

    (3)    on 3 January 2013 Stubrick received US$2,850,088.60 from Mazlin.[101]

119.    No evidence has been adduced of any requests having been made for draw-downs pursuant to the provisions of the Loan Agreements.  It is therefore apparent that there was no strict adherence to those provisions, either in terms of (i) the currency (clause 1.1), (ii) the stipulated amount of each advance (clause 1.4) or (iii) the specified method for requesting advances (clause 1.7).  The Respondents' case is that this non-compliance evidences the fact that the sums were advanced by way of an equity investment, and not as loans pursuant to the terms of the Loan Agreements.[102]  In response, it was Mr Spiegel's evidence that the parties' actual

---

[96] [2/583].

[97] [2/584].

[98] [2/585].

[99] §10(a)(i) of the Statement of Case in the Mazlin claim [1/9] erroneously states that the transfer was made on 11 November 2012. Having seen the banking documentation referred to in §117 of this Award, we are satisfied that the Respondents are correct in saying (as they do in §54 of their Defence to the Mazlin claim [1/11/86]) that the transfer was effected on 30 November 2012.

[100] There is no dispute about this figure.

[101] In §55 of the Defence in the Mazlin claim [1/11] the Respondents say that only $2,850,000 was received, not $2,850,088.  Nevertheless, having seen the bank statement at [2/585] we accept the Claimants' figure in this regard.

[102] See §21 of the Defences [1/11] and [1/12].

understanding was simply that he would advance the loan funds as and when they became available.

120.  Having considered these competing arguments, the Tribunal does not find that the obvious non-compliance with the terms of the Loan Agreements in this regard is significant in resolving the factual issues in dispute.  That non-compliance might be said to support the Respondents' case, but on the other hand it might be said simply to reflect the informal nature of the financial arrangements between two men who had known and trusted each other since childhood.

121.  It is also significant to note the terms in which the Respondents have on occasion acknowledged the fact that these payments were made.  For example, in §8 of their submissions dated 11 April 2017,[103] they admitted that "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013*" (emphasis added).

122.  For these reasons, the Tribunal is in no doubt that (i) money was in fact paid by the Claimants to the Respondents respectively on the dates and in the sums listed in §118 above, (ii) the payments were so made ostensibly under the terms of the Loan Agreements and (iii) in all the circumstances of this case, the question whether those sums are now repayable turns on the answer to the question whether the Loan Agreements were shams, in the sense that the parties in fact agreed (as the Respondents contend) that any sums advanced in purported compliance with their terms actually represented an equity investment by Mr Spiegel in Bender Oil and would therefore not be repayable according to the tenor of the agreements.

### B.11  The December 2012 draft Agreement of Sale

123.  The final agreement relevant to the issues in dispute is a draft Agreement of Sale dated December 2012.[104]  Like the executed Agreement of Sale from March 2012, it is concerned with an acquisition of a 30% equity interest in Bender Oil by AMM Consulting, but it differs from the earlier agreement in a number of respects:

    (1)   The seller is stated to be Mr Drukker personally, rather than WJ Holding.

    (2)   Clauses 2 and 6(a) recognise that WJ Holding may not be able to fulfil the privatisation requirements.

---

[103]  [1/4/21].  It is also worth noting that in §16 and §18 of the Complaint in the US proceedings mentioned in §19(2) above and §151 below, the Respondents describe these payments as having been made "*under the sham Loan Agreements*" [2/505].

[104]  [2/388].

(3)  Clause 3 provides that the purchase consideration shall be $500,000 (rather than the $210,000 stated in the March Agreement of Sale).

(4)  Under clause 7(e), AMM Consulting acknowledges that Mr Drukker and WJ Holding *"are not making and have not made any statement, representation or warranty to him or his advisors concerning (i) the fairness or adequacy of the Purchase Price"*.

124.  The existence of this draft document, together with the circumstances in which it was prepared, lend further support to the Claimants' case:

(1)  It is a fact that, by December 2012, no shares in Bender Oil had been transferred to AMM Consulting.

(2)  It is the Respondents' pleaded case that the Moldovan government was in breach of its obligations under the 2012 Privatisation Agreement.[105]

(3)  If Mr Spiegel had already committed unconditionally to acquire a 30% equity stake in Bender Oil, and if the March 2012 Agreement of Sale and the Loan Agreements had been created as the instruments ostensibly evidencing that agreement, there would have been no practical purpose in entering into another misleading Agreement of Sale.

(4)  If the agreed purchase price for the 30% equity stake had in truth been $7 million, there would have been no practical purpose in agreeing a variation of the purchase price from the $210,000 stated in the March Agreement of Sale to the $500,000 stated in the December draft.

(5)  The fact that a draft Agreement of Sale was being prepared in December 2012 supports the inference that the parties recognised that the March Agreement of Sale might expire pursuant to clause 6(a) without having been completed because the necessary governmental approvals were not forthcoming, and that as a result a replacement Agreement of Sale would need to be agreed if Mr Spiegel was to make an equity investment. That is inconsistent with the Respondents' case – namely, that Mr Spiegel had already concluded a binding and unconditional agreement to make an equity investment earlier in 2012.

(6)  Accordingly, both the existence and the contents of the December draft support Mr Spiegel's case that (i) he was considering and negotiating a possible equity investment, without having concluded any unconditional deal in that regard, and (ii) the plant was

[105] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

beginning to commence production and was, as a result, increasing in value as time passed, hence the proposed increase in price.

### B.12  Correspondence in early 2013

125. On 3 January 2013, Gerard Virga, of Finkelstein & Virga PC (a law firm representing Mr Spiegel's interests), wrote to Mr Schneider (representing Mr Drukker's interests).[106]  The first paragraph refers to "*the deal*", and paragraph number 1 states that "*AMM understands that it is purchasing a thirty (30%) percent interest in the entire operation*".  This wording might be taken to imply that a deal had already been concluded.  Furthermore, it is unlikely to have been a coincidence that the letter was written on the same day as the third and last transfer of funds was made (by Mazlin to Stubrick).  As such, it might be thought to provide support for the Respondents' case.

126. Nevertheless, it is apparent from a fair reading of the letter as a whole that it is discussing a potential deal which was still in the process of negotiation, and had not been concluded:

  (1)  In paragraph number 1, Mr Virga says this:  "*We suggest that Delta Agro be a holding company owning 100%, directly or indirectly, of each of the companies constituting the operating group*" (emphasis added).  Paragraph 5(A) says this:  "*AMM may form a wholly owned entity to own its membership interest in the holding company prior to contract execution*" (emphasis added).  It is therefore apparent that no agreement had even been reached as to the identity of the respective parties to any equity investment, or to the structure of the deal.  That is inconsistent with the Respondents' case that a binding equity investment deal had already been concluded in 2012.

  (2)  The second paragraph under numbered paragraph 1 says this:  "*Apparently, WJ Holding owns a fifty (50%) percent interest in [Bender Oil].  The other fifty (50%) percent interest is held by Kelley Oil Refinery Ltd.*"  It is therefore clear that the prospective purchaser was not even sure that the prospective seller was in full ownership of the target.

  (3)  The following paragraph says this:  "*Our understanding is that WJ Holding has an extensive history.  We should attempt to isolate that history from this transaction.  Please advise us of your thoughts on this area.*"  This may have been a reference to the circumstances in which Mr Drukker parted company from his former business partners.

---

[106] [2/394].

At all events, it further evidences the fact that the negotiations for any acquisition by Mr Spiegel of an equity interest in Bender Oil were still at an embryonic stage.

(4)     Paragraph number 2 contains a string of questions and requests for assurances regarding Bender Oil's financial position. Paragraph number 3 says this: "*AMM expects representations and warranties that confirm the concepts set forth above*" (emphasis added). Paragraph number 4 says this: "*The PMR consent needs to be a closing condition*" (emphasis added). Together, these paragraphs all demonstrate clearly that the parties were still exploring the possibility and the terms of an equity investment. As such, they are entirely inconsistent with any unconditional deal having already been concluded for an equity investment by Mr Spiegel.

(5)     Paragraphs 5(B) to (I) contain a number of detailed proposed terms which had clearly not yet been agreed. Again, this is all entirely inconsistent with an unconditional deal having already been agreed.

127.   Mr Schneider replied by letter on 19 February 2013.[107] He said that his understanding was "*that our respective clients had a number of follow up meetings*". That clearly suggests the parties were still in negotiation. The same inference is to be drawn from the letter as a whole. For example, it refers in numbered paragraph 1 to Mr Schneider's understanding "*that AMM is buying into a group of companies*" (emphasis added) – not that Mr Spiegel had already bought into Bender Oil. Mr Schneider refers later in the same paragraph to the "*draft agreements that I have provided in the past*" (emphasis added): if the March 2012 Agreement of Sale and the August 2012 Loan Agreements had in fact been intended by the parties to reflect a concluded and unconditional deal for an equity investment by Mr Spiegel, it is difficult to see why Mr Schneider would still have been providing draft agreements many months later. Having answered the various points raised in the letter from Finkelstein & Virga, Mr Schneider ends his letter by saying that he "*would be happy to sit-down with [Mr Virga] to discuss any remaining open items*" (emphasis added):[108] the fact that he expressly acknowledges that there were open items is inconsistent with the Respondents' case that a concluded, unconditional deal had been made some months earlier.

---

[107] [2/398].

[108] [2/400].

### B.13 Power of Attorney

128. There was an exchange of emails between Mr Rashkov and Mr Schneider on 23 September 2013,[109] and Mr Spiegel executed a Power of Attorney in favour of Mr Rashkov dated 27 September 2013.[110] The Respondents rely on these documents in support of their case.[111] They allege that the Power of Attorney was executed by Mr Spiegel in order to enable Mr Rashkov to execute the anticipated agreements for the equity investment by Mr Spiegel, and that the emails confirm their story. Mr Spiegel's evidence is that these documents were addressing other, unrelated prospective investments by him in the region.

129. The Power of Attorney[112] authorises Mr Rashkov to perform a number of actions on behalf of Mr Spiegel, including buying and selling "*shares or participation interest of any Moldovan enterprises*" (clause 1) and performing any actions and formalities "*related to the incorporation and registration of a limited liability company in the Republic of Moldova*" (clause 3). The emails comprise the following exchange.[113] Mr Rashkov emailed Mr Schneider saying this:

> "*Volodya, we also need:*
>
> *1. Certificate of registration of AMM*
>
> *2. Extract from the commercial register regarding AMM*
>
> *3. Document confirming the founders of the company all the way to physical persons (Beneficial owner)*
>
> *4. Decision of the competent body of AMM on the purchase of shares in Moldova*
>
> *5. Power of attorney or personal presence director [sic] of AMM*".

130. Mr Schneider emailed Mr Rashkov as follows:

> "*Sergey:*
>
> *See the attachments. Full package of documents for Mr Spiegel. He will purchase shares of the companies for AMM. Please organise the translation of these documents. The originals are on their way to you.*"

---

[109] [2/409–410].

[110] [2/411–414].

[111] See §28 of the Defence to the Mazlin claim [1/11/81] and §27 of the Defence to the Shireen claim [1/12/99]. See also §24 of Mr Drukker's affidavit in the New York proceedings [2/538].

[112] The Respondents have provided an English translation [2/411–412] of the Russian original [2/413–414].

[113] The Respondents have again provided an English translation [2/409] of the Russian original [2/410]. It is not entirely clear which of the two emails came first. Neither one obviously answers the other. Furthermore, each party may have been in a different time zone when the messages were sent, so the apparent time of sending is not necessarily determinative. Moreover, the subject lines of the two emails do not match: the message from Mr Schneider is written under the heading "*FW*:" whereas the message from Mr Rashkov is under the heading "*HA:*". We have accordingly set them out in the order in which they appear on the page as an exhibit to the Respondents' Defences.

131. Whilst these documents might appear to be consistent with the Respondents' case, the Tribunal finds it difficult to attach any weight to them, for a number of reasons:

    (1)  First, neither the Power of Attorney nor the emails make any specific reference to the Bender Oil project.

    (2)  Second, the Power of Attorney confers powers on Mr Rashkov well in excess of what would have been necessary simply in order to enable him to enter into a share acquisition agreement on behalf of Mr Spiegel.

    (3)  Third, as the Respondents have been at pains to point out, both Mr Drukker and Mr Spiegel are resident in the USA, and the terms of Mr Spiegel's prospective equity investment in Bender Oil were negotiated between them and their respective US lawyers.  In the circumstances, there is no obvious reason (and certainly none was suggested by the Respondents) why any share purchase agreement reflecting that equity investment would have had to be executed in Moldova.

    (4)  Fourth, it is apparent from Mr Schneider's email message that he was sending Mr Rashkov a "*package of documents*".  If those documents had supported the Respondents' case,  the Tribunal would have assumed that they would have been produced as an exhibit to the Defences, along with the covering email.  They were not.

    (5)  Fifth, Mr Schneider's email says that Mr Spiegel "*will purchase shares of the companies*" (plural).  None of the documents that have been produced relating to the Bender Oil project involved Mr Spiegel (or any company owned and controlled by him) acquiring shares in more than one company.

    (6)  Finally, even if the Tribunal had rejected Mr Spiegel's evidence in this regard, it would not have considered that either the Power of Attorney or the emails support the Respondents' case.  In particular, they do not demonstrate that a concluded, unconditional deal for an equity investment was ever made.  At most they might show that Mr Spiegel was putting in place a mechanism for executing the necessary documents if an investment deal were to be concluded.  But the fact that he was putting such a mechanism in place is not evidence that an unconditional deal was in the event concluded.

132. For these reasons, the Tribunal finds that the Power of Attorney of 27 September 2013 and the emails of 23 September 2013 do not assist the Respondents' case.

## B.14  Health insurance

133.  The Respondents allege that Mr Drukker arranged for health insurance for Mr Spiegel and his family (including his ex-wife), and that he paid them salaries through one of his New York companies, YD Export Import Inc.[114]  They have produced some Forms W-2[115] and a table prepared by Mr Drukker's accountant[116] both of which appear to evidence these payments.  The Respondents say that this is proof of the concluded nature of Mr Spiegel's agreement to acquire an equity interest in Bender Oil.[117]

134.  Mr Spiegel agrees that he and members of his family were indeed notionally employed by one of Mr Drukker's companies and that they were enrolled in a health insurance plan.  However, Mr Drukker's evidence is that these arrangements only lasted a matter of months, and also that any salary paid to him and to members of his family was reimbursed by them.

135.  The Tribunal accepts Mr Spiegel's evidence in this regard.  The accountant's table covers a period of less than a year during 2013, and the Forms W-2 appear to relate to the same payments.

136.  In any event, the Tribunal does not consider that these arrangements are relevant to, or provide any support for, the Respondents' case in relation to the issues that have to be decided.  The payments are not expressly referable to Bender Oil, nor do they involve any of the corporate vehicles which were involved in the attempted operation of the plant.  Furthermore, there is no obvious reason why an equity investment would necessarily also have involved an employment contract or a health insurance plan in the first place, nor do the Respondents seek to explain why the Tribunal should draw the inference they suggest from the bare documentation they have produced.

137.  For these reasons, the Tribunal does not consider that the evidence relating to health insurance assists the Respondents' case.

---

[114] See §27 of the Defence to the Mazlin claim [1/11/80] and §26 of the Defence to the Shireen claim [1/12/98]. See also §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

[115] [2/415–416].

[116] [2/401].

[117] See §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

**B.15  The failure of the Bender Oil project**

138.  It is common ground that the Bender Oil project was not a commercial success.   The Respondents attribute its failure to the non-performance by the Moldovan government of its various undertakings and guarantees under the 2012 Privatisation Agreement.[118]   For the purpose of these arbitration claims, it is unnecessary to make any findings as to the cause of the commercial failure. The fact is that the project was not a success.

139.  The Respondents' case is that in these "*changed circumstances*" Mr Spiegel decided to try relying on the Loan Agreements according to their tenor, and "*purposely delayed the efforts to finalize the corporate documentation*".[119]   This wording is almost an admission by the Respondents that, even on their own case, there was no concluded contract for an equity investment by Mr Spiegel. At all events, the Tribunal rejects the Respondents' argument that Mr Spiegel purposely delayed finalising any documentation. The record demonstrates that the negotiations drifted on inconclusively.

**B.16  The draft Operating Agreement & MIPA**

140.  Each of the parties has sought to rely on the draft Operating Agreement[120] and the draft MIPA,[121] which were prepared at some point during 2014.  Each draft is more than 30 pages long.

141.  For an accumulation of reasons, the Tribunal considers that both the existence and the content of these documents support the Claimants' case:

  (1)  Neither party contends that the Operating Agreement or the MIPA was ever executed as a binding agreement.  They both remained in draft.  If there had been a concluded, unconditional deal in 2012 for Mr Spiegel to acquire a 30% equity interest in Bender Oil (whether for $7 million or at any other price), there would have been no need for the parties still to be negotiating detailed contractual documents nearly 2 years later.

  (2)  The parties to the draft Operating Agreement and MIPA were different from those in the 2012 agreements.  The parties to the draft Operating Agreement and MIPA included

---

[118] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99]. The 2012 Privatisation Agreement is at [2/343].

[119] See §33 of the Defence to the Mazlin claim [1/11/82] and §32 of the Defence to the Shireen claim [1/12/100].

[120] [2/417].

[121] [2/456].

Mr Drukker personally, and also a company called AMM Bender Holdings LLC ("AMM Bender Holdings"), a Florida entity which is different from AMM Consulting (the party to the March 2012 Agreement of Sale). Furthermore, the subject matter of the agreements was another Florida entity, Delta Agro Holdings LLC, not Bender Oil or WJ Holding (as in the March 2012 Agreement of Sale). In other words, even the underlying structure of the deal had still not been concluded.

(3)  Clause 8 of the Operating Agreement refers to the 'Initial Capital Contributions' of the parties by reference to the figures set out in Schedule A. The column headed 'Capital Contributions' in Schedule A is in fact blank. This clearly shows that some of the most fundamental provisions of the deal were still under negotiation.

(4)  More generally, the detailed terms of the draft Operating Agreement broadly reflect the terms under negotiation between Mr Virga and Mr Schneider in early 2013. This reinforces the inference that the parties conducted lengthy negotiations, and had not concluded any deal.

(5)  The Purchase Price stipulated in the MIPA for a 30% equity stake was $500,000 (the same figure as in the draft December 2012 Agreement of Sale[122]). This is again inconsistent with any pre-existing deal having been concluded at $7 million. Conversely, it also lends inferential support to the Claimants' case that any potential equity investment by Mr Spiegel was to be measured in hundreds of thousands of dollars, not in millions. The increase in price from the $210,000 stipulated in the March 2012 Agreement of Sale to the $500,000 proposed in the MIPA some two years later was presumably attributable to the fact that the Bender Oil plant, albeit not as profitable as hoped, had at least entered into production.[123] At all events, if the Loan Agreements had been shams, and the true price for the equity investment had been $7 million, there would have been no need for the parties to have negotiated an upward lift in the purchase price in 2014 from $210,000 to $500,000.

142.  Each of the draft Operating Agreement and the draft MIPA provide for the application of New York law, and for disputes to be resolved by arbitration in New York under the Commercial Arbitration Rules of the American Arbitration Association. This may explain the Respondents'

---

[122] [2/388].

[123] In his letter of 19 February 2013 [2/398], Mr Schneider had said this: "*It is my understanding that [Bender Oil] is now reaching desired operational capacity*".

repeated reference to *"other ancillary agreements"*[124] which are said to be governed by New York law and by *"other dispute resolution clauses"*.[125] However, it is apparent that these drafts were never agreed or executed, and accordingly the Respondents' case in this regard cannot be sustained.

### B.17  Termination of the negotiations

143.  On 25 July 2014, Mr Virga wrote to Mr Schneider[126] saying that he represented AMM Bender Holdings, and continuing as follows:

> *"After attempting to negotiate the purchase of a thirty (30%) percent membership interest in Delta since December 2012, AMM has concluded that further efforts are futile.  AMM terminates negotiations.*
>
> *After approximately twenty (20) months of negotiations, basic issues are still not resolved.  The "Group" entities are not formed, or at least not disclosed to us.  A draft of the Disclosure Schedule has not been provided.  The Seller still insists on qualifying each and every representation by Seller's knowledge and information contained in documents outside of the Disclosure Schedule that may have been provided or seen by AMM.  The obligation to enforce the Privatization Agreements is so vague and discretionary that it is essentially meaningless.  The above items are not meant to be exhaustive."*

144.  This letter does not seem to have prompted any response from Mr Schneider either **(i)** denying any of the points made by Mr Virga or **(ii)** suggesting that Mr Spiegel (or AMM Consulting) had already entered into a binding deal in 2012.  As a result, and in light of all the other evidence, the Tribunal's conclusion is that **(a)** the existence of this letter and the apparent absence of any reply supports the Claimants' case that no unconditional deal was concluded in 2012 (or at any other time) for the acquisition by Mr Spiegel (or any company owned and controlled by him) of a 30% equity stake in Bender Oil and **(b)** by July 2014 the negotiations for such an acquisition had stalled for the reasons outlined by Mr Virga (and not because of any deliberate obstruction on Mr Spiegel's part).

145.  The Tribunal has also seen a similar letter from Mr Virga dated 12 January 2015, addressed *"To Whom It May Concern"*.[127]  It is unclear whether this later letter was in fact sent to anyone, so

---

[124] See for example §10 of the Response to Request for Arbitration [1/2/7].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[125] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[126] [2/492].

[127] [2/493].

neither its content nor the apparent absence of any reply assists the Tribunal in resolving these claims.

### B.18 Proceedings in Cyprus

146. In November 2016, Mazlin and Shireen apparently issued proceedings against WJ Holding and Stubrick in Cyprus, and on 30 March 2017 they obtained certain interim freezing and disclosure relief there.[128]  The interim nature of that relief meant that the Cypriot court did not conduct any substantive analysis of the merits of the underlying claim, and accordingly the Claimants cannot derive any support for their case in this Tribunal from the fact that such relief was granted.

147. In his evidence in the New York proceedings, Mr Drukker alleges that an order was made by the Cyprus court on 30 March 2017 but was never served on Stubrick or WJ Holding because of Mr Spiegel's failure to post the necessary bank guarantees requested by the Cyprus court as security.[129]  The Tribunal has seen no evidence that the Cypriot court order was served on WJ Holding or Stubrick, but it does not accept Mr Drukker's evidence regarding the alleged failure to provide security to the Cypriot court.  The Tribunal has seen a copy of the court's order dated 30 March 2017[130] which recites on the first page that it was made "*following the deposit by [Shireen and Mazlin] of €150,000 each in cash to the Registrar of the District Court of Nicosia for covering any potential damages that may be suffered by [WJ Holding and Stubrick] due to the erroneous obtaining of the orders*".  The Tribunal notes, however, that the order was only drawn up on 14 July 2017,[131] which was about three weeks after Mr Drukker had sworn his affidavit in the New York proceedings, so there may have been a delay in paying the necessary deposits.

148. The Tribunal notes that, in its summary interim judgment of 30 March 2017, the Cypriot court recorded that "*neither side disputed the signing of the [Loan Agreements], and therefore their existence*".[132]  That is consistent with the position taken by the Respondents in these proceedings.  The court also said this:

> "*On the basis of the submitted affidavit, and specifically, exhibit 9 (a letter sent by Mr Drukker's son in law which pertains to the form of the guaranty), the Court*

---

[128] Appl № 479/16 [2/496] and [2/569].

[129] See §32 of his affidavit in the New York proceedings [2/540].

[130] [2/569].

[131] [2/573].

[132] [2/498].

> *noted that the Respondents seem to admit the due amount and promise a repayment using damages from another action."*

149. The Tribunal does not seem to have been shown the letter to which the court was referring, and accordingly no significant weight can be placed on this passage from the court's ruling: but the least the Tribunal can conclude is that it certainly does not support the Respondents' case in these proceedings.

150. Separately, the Claimants have tried drawing attention to certain alleged breaches by the Respondents of the freezing relief granted by the court in Cyprus.[133] The Tribunal is not in a position to assess the evidence in that regard, it is not relevant to the findings in these proceedings and the allegations are discounted entirely.

### B.19  Proceedings in New York

151. As noted above, on 7 April 2017 WJ Holding and Stubrick commenced the New York proceedings[134] against Shireen, Mazlin, AMM Consulting and Mr Spiegel, seeking (among other things) "*a declaratory judgment that certain loan agreements between Plaintiffs and Defendants are not binding, and constitute unenforceable sham loan agreements*" and also "*a permanent injunction barring Defendants from continuing their efforts to enforce these sham loan agreements*" (§1 of the Complaint).  The Respondents' case in those proceedings is essentially the same as in these arbitration claims, namely that (i) "*[Mr Drukker] agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7,000,000*" (§12 of the Complaint); (ii) the investment was structured as a loan to suit Mr Spiegel's "*tax and estate planning objectives*" (§13 of the Complaint); (iii) the Bender Oil plant was not as successful as anticipated because the Moldovan Government failed to perform various undertakings and guarantees under the privatisation agreement, and also blocked WJ Holding from transferring any shares in Bender Oil to Mr Spiegel or his companies (§19 of the Complaint);  and (iv) Mr Spiegel thereafter started claiming that the Loan Agreements were genuine commercial transactions and purposefully delayed finalising the sale agreement (§20 of the Complaint).

152. It goes without saying that the resolution, as between the parties to the New York proceedings, of the various issues in those proceedings (including any question as to the court's jurisdiction)

---

[133] [2/512–532].

[134] Supreme Court of the State of New York, County of Kings, Index № 506949/2017 [2/501].

is a matter to be resolved only by the New York courts on the evidence adduced before them. It is equally stating the obvious to say that this Tribunal has jurisdiction to resolve the issues in these arbitral proceedings (including any question as to the Tribunal's jurisdiction[135]) as between the parties to these proceedings, on the evidence that has been adduced before the Tribunal. The only purpose in referring in this Award to the procedural steps taken and the evidence filed in the New York proceedings is to assess what light (if any) they throw on the determination by this Tribunal of the issues in these arbitral proceedings.

153. On or about 17 May 2017, the defendants in the New York proceedings (*i.e.* the Claimants in these arbitration proceedings, together with Mr Spiegel and AMM Consulting) appear to have filed a motion to dismiss the Complaint, although the Tribunal has not seen a copy of that motion.[136] What the Tribunal has seen is the affidavit sworn by Mr Drukker in response.[137] It tells essentially the same narrative and makes essentially the same allegations as the Respondents in this case, but there are some differences. In particular, in §14 Mr Drukker says this:

> "In or about early 2012 ... I agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7 million. [Mr Spiegel] also agreed to provide another $2 million in working capital."

154. The allegation regarding the agreement at $7 million is consistent with the case advanced by the Respondents in these proceedings. By contrast, the allegation regarding an agreement by Mr Spiegel to provide another $2 million in working capital has formed no part of the defence in these proceedings. Once again, the fact that the Respondents are advancing slightly different arguments in different proceedings does not inspire confidence in the integrity of their case. Having said that, the suggestion that Mr Spiegel agreed to provide $2 million in working capital might be said to go some way to provide an explanation on behalf of the Respondents as to why, according to their version of events, the agreed purchase price for the equity investment was $7 million, but in the event the Claimants between them transferred more than $8 million to the Respondents. That appears to be what Mr Drukker means in §21 of his affidavit, where he says that, between November 2012 and January 2013, "*Shireen and Mazlin transferred approximately $8 million under the sham Loan Agreements*" and adds this: "*The bulk of this amount was [Mr Spiegel's] equity investment*" (emphasis added). Nevertheless, the Tribunal considers that (i) the discrepancy between the Respondents' case in these proceedings and their

---

[135] See §164 below.

[136] It is mentioned in §25 of the affidavit of Frank R. Seddio dated 22 June 2017 [2/551].

[137] [2/533].

case in the New York proceedings, and (ii) the fact that there is indeed a significant difference between the alleged $7 million purchase price for the 30% stake and the amounts actually transferred by the Claimants further undermines the Respondents' case.

155.  In §15 of his affidavit, Mr Drukker also says this:

> "Mr Spiegel told me, however, that he initially needed to structure his equity investment as a loan in order to achieve certain tax and estate planning objectives. This would be achieved by [Mr Spiegel] routing ostensible loans for [Bender Oil] through offshore companies and then restructuring or offsetting the debt.  The parties were always clear that regardless of formal structure, the investment made by Mr Spiegel (through his companies) was an equity investment and the equity purchase price ... was $7 million" (emphasis added).

156.  This is again broadly similar to the defence advanced by the Respondents in these proceedings, but (i) it is unsupported by any contemporaneous documentary record and (ii) it is inconsistent on two grounds with the email of 11 July 2012 discussed above,[138] in which (a) the proposed advance of funds was clearly described as a loan (not an equity investment), and (b) Mr Spiegel was (at least initially) pretending that the lending companies were not even associated with him.

157.  In §16 of his affidavit, Mr Drukker states that Bender Oil "was worth in excess of $20 million" in March 2012.  That is again consistent with the case advanced by the Respondents in these proceedings, but (i) the Tribunal has seen no documentary evidence to support it, (ii) it seems unlikely in light of the two valuations that have been produced,[139] and (iii) it also seems optimistic in light of the fact that the facility had been inoperative for about 6 years, and the machinery was very dated.

158.  In §17 of his affidavit, Mr Drukker says that the Loan Agreements "were produced by Mr Spiegel".  That positive assertion is inconsistent with the neutral assertion in §20 of the Respondents' Defences that it is "not [their] recollection" that the Loan Agreements were drafted by Mr Schneider.  For the reasons discussed in §96 above, the Tribunal is satisfied that Mr Schneider did draft the Loan Agreements.

159.  The Tribunal has also seen an affirmation dated 22 June 2017 by Frank R. Seddio, co-counsel for WJ Holding and Stubrick in the New York proceedings.[140]  It tells essentially the same

---

[138] [2/365]:  see §§91–94 above.

[139] [2/333] and [2/339]:  see §85–86 above.

[140] [2/545].

narrative and makes essentially the same allegations as the Respondents in these proceedings. The Tribunal notes, however, that insufficient care seems to have been taken in preparing the affirmation, as Mr Seddio consistently misspells his own client's name as 'Drucker', and he also claims, for example, that "*Mr Spiegel was already a partner in my business*" and refers to "*a record prepared by my account*"[141] – neither of which makes any sense coming from Mr Seddio's mouth. Clearly the text has been cut and pasted from a document drafted for Mr Drukker. In any event, the affidavit does not contain any first-hand evidence concerning the disputed factual issues which have to be decided, and as a result its content is not of any further assistance in resolving these claims.

160. For these reasons the Tribunal has derived only limited assistance from the various materials disclosed from the New York proceedings in resolving the issues in these arbitral proceedings.

### B.20  Conclusions on the facts

161. It will be apparent that the Tribunal accepts the Claimants' case and rejects the Respondents' case on the main factual dispute between the parties. In short, the Loan Agreements were agreed and executed as loan agreements, and not as shams to disguise an equity investment by Mr Spiegel.

162. The Tribunal's principal reasons for reaching this conclusion may be summarised as follows:

(1) First, the Loan Agreements are clearly expressed as loan agreements, not as an equity investment. The starting point of any analysis is the assumption that the parties to any written contract intend to record in writing the bargain they have in fact made.

(2) Second, the Respondents have offered no witness or documentary evidence in support of their main contention, namely that the Loan Agreements were shams, having been agreed as 'loans' for tax and inheritance planning reasons.

(3) Even if the Loan Agreements had been structured as loans for tax and inheritance planning reasons, that in itself would not necessarily have rendered them shams, unless there had been some evidence that the purpose of the structure was to defraud relevant tax (or other) authorities. Structuring an investment to maximise its tax efficiency is entirely legitimate, assuming the structure is lawful. The Respondents have adduced no evidence of any unlawfulness.

---

[141] See §16 of the affidavit [2/548].

(4)   Mr Spiegel has given witness evidence and submitted himself to cross-examination (by the Tribunal) on these issues, whereas the Respondents, having made serious allegations of fraud against Mr Spiegel, have chosen to deploy no witness evidence at all, and to absent themselves from the hearing.

(5)   Having subjected Mr Spiegel to robust questioning, the Tribunal finds him to have been an essentially honest witness in relation to the issues in dispute (although not all of his conduct was necessarily creditable in a wider moral sense).

(6)   For the reasons outlined above, the Tribunal considers that Mr Spiegel's evidence is consistent with the contemporaneous documentation.

(7)   By contrast, there is not a single contemporaneous document which supports the Respondents' case either (i) that Bender Oil was valued at about $20 million in 2012, or (ii) that Mr Spiegel agreed to make an equity investment for $7 million, or (as noted above) (iii) that the investment was structured in the way it was to avoid (illegally) any tax obligations. Whilst the Respondents have made great play of the fact that they wish to pursue disclosure in the New York proceedings against Mr Spiegel personally and against AMM Consulting in order to verify their case, it is worth noting that neither of the Respondent companies, nor Mr Drukker nor Mr Schneider personally (both of whom could have been expected to assist the Respondents in any way available to them) has been able to produce a single document to support their primary case.

(8)   Furthermore, there is a significant discrepancy between the alleged agreement on which the Respondents seek to rely (i.e. an equity investment at $7 million) and (i) the aggregate amount of the loan facility under the two Loan Agreements (i.e. $17 million) and (ii) the amount of money actually transferred by the Claimant companies (i.e. over $8 million). Whilst there has been some suggestion from WJ Holding and Stubrick in the New York proceedings that they may seek to attribute this difference to a separate agreement by Mr Spiegel to make a further investment of $2 million by way of capital, (a) it is striking that that allegation has formed no part of the extensive pleadings and submissions made by the Respondents in these proceedings, (b) in any event it would not explain the difference between the combined value of the alleged equity and capital investments (i.e. $9 million) and the aggregate amount of the loan facilities (i.e. $17 million) and (c) it is again the case that there is no contemporaneous documentary support for the existence of any ancillary agreement by Mr Spiegel to advance a further $2 million. Furthermore, the Tribunal finds it undermines the Respondents' case that they have advanced varying arguments in these arbitration claims and in the New York proceedings.

(9) Moreover, the Respondents' case is on analysis positively inconsistent with the documentary record in a number of respects. In particular, the March 2012 Agreement of Sale[142] was plainly conditional, and it is common ground that the conditions to completion were never satisfied. Furthermore, the fact that lengthy draft contracts were subsequently being negotiated throughout 2013 and until July 2014, and that those drafts involved different parties from those in the 2012 agreements, strongly suggests that no concluded, unconditional deal for an equity investment was ever agreed.

(10) The Respondents have also made a number of other allegations which they have been unable to substantiate. For example, they have relied in their pleadings and submissions on "*other ancillary agreements*"[143] which they said were governed by New York law and by "*other dispute resolution clauses*".[144] They have also referred to "*a number of important oral arrangements between [WJ Holding] and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*".[145] However, on analysis it emerges that no written agreements (apart from the Loan Agreements and the March 2012 Agreement of Sale) were ever concluded; and the Tribunal has also seen no evidence to substantiate the allegation that there were any oral agreements that are inconsistent with the terms of the Loan Agreements and the March 2012 Agreement of Sale.

(11) There is no suggestion that AMM Consulting ever paid, or that WJ Holding ever demanded, the $100,000 due on 31 December 2012 under clause 3 of the March 2012 Agreement of Sale,[146] or the further instalment of $110,000 due on 1 June 2013. If that agreement had (as the Respondents contend) formed part of the concluded bargain for an equity investment, it is difficult to see why neither side sought either to comply with or to enforce its terms.

(12) As noted above, the sequence of events between the making of the March 2012 Agreement of Sale and the first documented mention of a loan in the 11 July 2012

---

[142] [2/376].

[143] See for example §10 of the Response to Request for Arbitration [1/2/7]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[144] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24]. See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[145] See §43 of their Responses to the Claimants' Requests for Arbitration [1/7] and [1/8].

[146] [2/376].

email[147] is striking, as is the fact that that email was discussing the possibility of loans being made by companies unconnected with Mr Spiegel.

(13)   For the reasons outlined in §101–111 above, the Tribunal finds that (i) there was an agreement that Mr and Mrs Drukker would provide personal guarantees, (ii) Mr Spiegel caused the Claimant companies not to advance any funds until late 2012 because the guarantees had not yet been signed, (iii) Mr Schneider drafted and Mr Drukker signed the guarantees in November 2012, and (iv) the Claimants thereafter advanced funds to the Respondents. All of this is consistent with the funds having been advanced by way of loan, not as an equity investment.

(14)   The Respondents admit that, for a period of about 25 years, (i) Mr Spiegel had periodically made loans to companies controlled by Mr Drukker, (ii) all such loans had been provided pursuant to written agreements and (iii) they had been secured by personal guarantees from Mr Drukker and his wife.[148]   That pattern of dealings is consistent with the Loan Agreements in these proceedings also being genuine loans.

(15)   The Respondents say that Mr Drukker injected about $15 million of his own money into the Bender Oil project.[149]   It is notable that his evidence in the New York proceedings is that he invested that money "*through loans which I personally extended*".[150]   Although Mr Drukker emphasises that he has not sought repayment, the fact remains that he provided funding by way of loans, whereas he claims that Mr Spiegel agreed to invest by way of equity. If this was (as the Respondents contend) a joint venture between the two men, there would have been no obvious commercial reason (and none has been suggested by the Respondents) why Mr Spiegel would have agreed to make an equity investment of several million Dollars, while Mr Drukker (the initiator of the project) was only making loans.

(16)   Finally, Mr Spiegel's evidence is that neither the Respondent companies nor Mr Drukker ever claimed that the Loan Agreements were shams until after these arbitration proceedings had been commenced. There is certainly no documented record of any such claim having been made, and the Respondents have not pleaded that any such

---

[147] [2/365].

[148] See §47–49 of the Defence to the Mazlin claim [1/11] and §46–48 of the Defence to the Shireen claim [1/12]. Similar admissions are made with less detail in §6 of the Statements of Defence, and also in §2 of the Respondents' submissions dated 11 April 2017 [1/4], and in §21 of their Response to the Claimant's Amended Request for Arbitration in the Mazlin claim [1/7].

[149] See §31 of the Defence to the Mazlin claim [1/11] and §30 of the Defence to the Shireen claim [1/12].

[150] See §26 of his affidavit in the New York proceedings [2/539].

claim was made before the Request for Arbitration in November 2016. In the circumstances, the Tribunal accepts Mr Spiegel's evidence in this regard. That provides further inferential support for the conclusion that the Respondents' argument that the Loan Agreements are shams is a recent invention by them which has been raised in an attempt to resist the claim for repayment.

163.   For the reasons set out in this Award, the Tribunal has no hesitation in holding that the Loan Agreements were true loan agreements, and they were not shams intended to disguise an equity investment by Mr Spiegel. The evidence is overwhelming and the Respondents' case is, based on the evidence put forward, hopeless.

## C. THE JURISDICTIONAL CHALLENGE

164.   By virtue of Article 23.1 of the LCIA Rules, the Tribunal plainly has power to rule on its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the arbitration agreement.

165.   As noted above, the Respondents have advanced their jurisdictional challenge to these arbitration proceedings on a number of different legal bases. Their principal case is that the arbitration agreements are null and void because the Loan Agreements are themselves null and void. They also contend that the true bargain between the relevant parties was an equity investment by Mr Spiegel through his corporate vehicles, and that that bargain is governed by New York law and should be resolved in the New York proceedings.

166.   Irrespective of the various different legal labels that are applied to the jurisdictional challenge, it all turns on essentially the same factual allegation. For the reasons set out in Section B of this Award, the Tribunal rejects the Respondents' factual case on that issue. The Loan Agreements are not shams, and there was no binding, unconditional agreement by Mr Spiegel or any of his creature companies (whether governed by New York or any other law) to make an equity investment in the Bender Oil project. For this fundamental reason, the Respondents' jurisdictional challenge, in all its various guises (including the argument based on estoppel), is dismissed.

167. It is also important to emphasise that there is no basis at all for the Respondents' allegation that this Tribunal has been *"imposed on the parties at the sole demand of the Claimants"*.[151]   The true position is that (i) the Tribunal has been duly appointed by the LCIA pursuant to the provisions of clause 9 of the Loan Agreements,[152] (ii) the Respondents admit that they executed the Loan Agreements,[153] and (iii) the Respondents accepted the Tribunal's appointment.[154]   The Tribunal having rejected the Respondents' evidential case that they only entered into the Loan Agreements on the understanding that they represented a cloak for an equity investment, there is no basis at all for the Respondents' challenge to the jurisdiction of this Tribunal.

168. In the circumstances, the Tribunal also rejects the Respondents' contention that New York (rather than these arbitration  proceedings) is the natural forum for the resolution of a dispute between the parties.  That argument was based on the same factual allegations as the sham argument, namely the Respondents' contention that (i) an equity investment was negotiated in New York, (ii) both Mr Drukker and Mr Spiegel have properties there, and Mr Spiegel's sons (who are co-owners of AMM Consulting) also reside there, (iii) the March 2012 Agreement of Sale was executed in New York and is governed by New York law, as is the draft December 2012 Agreement of Sale and the 2014 draft Operating Agreement and draft MIPA, (iv) the agreements were negotiated in New York and were drafted by lawyers based there (Mr Schneider and Mr Virga), (v) the deal is evidenced by the health insurance agreements with one of Mr Drukker's New York companies (YD Export Import Inc), (vi) relevant witnesses reside in New York, (vii) the true dispute includes parties who are not party to the Loan Agreements (Mr Spiegel and AMM Consulting), (viii) LCIA Arbitration does not allow disclosure to be ordered against non-parties, nor does it enable the Tribunal to compel witnesses to attend, and (ix) after the relationship between Mr Drukker and Mr Spiegel soured, they attended mediation in New York.[155]  None of that detracts in any way from the fact that (a) the Respondents agreed to the provisions set out in the Loan Agreements, which include the LCIA arbitration clause, and (b) the Tribunal has rejected the evidential allegations on which the Respondents have sought to evade the consequences of that agreement.

---

[151] See §19–20 of the Respondents' submissions dated 11 April 2017 [1/4].

[152] [2/369] and [2/374].

[153] See §19 of each Defence [1/11/79] and [1/12/97]: *"On or about 10 August 2012, the Respondents entered into the Loan Agreements"*.

[154] See §24(3), §26(1) & §31(1) above, and §15(1) of Mazlin PO2 [1/15];  and also §36, §42 & §44 above, and §4 of Shireen PO1 [1/18].

[155] See for example §34–47 of Mr Drukker's affidavit in the New York proceedings [2/540–542] and §32–36 of Mr Seddio's affirmation [2/553].

169. Finally, the Tribunal also rejects the Respondents' contention that the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*".[156]   The relevant consideration comprised each party's mutual promises to be bound by, and to comply with, the terms of the Loan Agreements.

## D. REMEDIES

### D.1  The capital sums

170. Since the Tribunal has held that the Loan Agreements were not shams, it follows that the monies advanced by the Claimants to the Respondents were due to be repaid in full, together with interest, on 30 September 2015, pursuant to clause 2.

171. The contractual currency of the loans was denominated in US Dollars.  The transfer made from Mazlin to Stubrick on 3 January 2013 was US$2,850,088.60.  However, the other two transfers were made in Swiss Francs.  It is accordingly necessary first to convert those two amounts to US Dollars.   That conversion should be effected at the applicable exchange rates on the respective dates when those sums were advanced, because those were the dates on which the contractual entitlement of the borrower to receive US Dollars was discharged.  Applying the live mid-market rates provided by the Claimants for exchanging Swiss Francs to US Dollars on 30 November and 3 December 2012 respectively produces the following figures (which are slightly different from the sums claimed by the Claimants):[157]

  - 30 November: CHF1,900,000 @ 1.0792647328 USD/CHF = US$2,050,602.99
  - 3 December 2012:  CHF 3,490,500 @ 1.0809434530 USD/CHF = US$3,773,033.12

### D.2  Interest

172. Pursuant to clause 1.3 of the Loan Agreements, the Claimants are entitled to simple interest at 6% *per annum* on "*the outstanding principal balance*" (emphasis added) of each of the sums advanced from the date of advance until 30 September 2015 (the due date for repayment under clause 2 of the Loan Agreements).  The Claimants' interest calculations, provided under cover of their email of 29 November 2017, reflected interest accruing in these years which had been

---

[156] See for example §29–30 of the Respondents' submissions dated 11 April 2017 [1/4].

[157] The Respondents' calculations, set out in their email of 15 January 2018, were fractionally different because they took the exchange rate only to 5 decimal places.  The Tribunal has adopted a more accurate calculation.

compounded annually. The Tribunal agrees with the Respondents' submissions that the terms of the contract do not provide for such compound interest. Clause 1.3 refers to interest accruing on the "*principal*" amount outstanding only.

173. On the true construction of clause 1.10 of the Loan Agreements, and in the events which have happened, each Claimant is also entitled to simple interest at 10% *per annum* on "*any Advances*", i.e. on the capital amount of each advance outstanding as at the due date (*i.e.* 30 September 2015) until payment in full. The 'Default Interest' under clause 1.10 is triggered by a 'demand'. For these purposes (and contrary to the submissions of the Respondents), the Tribunal holds that the requirement for a 'demand' is satisfied by the Request for Arbitration dated 21 November 2016. However, once a demand has been made, the contractual Default Interest accrues from the due date for payment, *i.e.* from 30 September 2015, not from the date of demand. The Claimants again provided calculations on 29 November 2017 in which the Default Interest is compounded annually. The Claimants also claim (without explanation) in their Skeleton that they are entitled to "*default interest ... on both the capital sums advanced pursuant to the Agreement <u>and the interest chargeable thereon</u>*" (emphasis added). The Tribunal disagrees. The express terms of the Loan Agreements make clear that Default Interest under clause 1.10 accrues on the outstanding amount of each 'Advance', not on the amount of that Advance plus accrued interest. The Tribunal has applied clause 1.9(c) of the Loan Agreements by using a notional 360 day year where less than a full year of interest is to be calculated, and in the calculation of ongoing daily interest.

174. Accordingly, the correct interest calculations may be summarised as follows:

| | Date | Days | Mazlin Loan 1 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 01/12/2012-30/11/2013 | 365 | 2,050,602.99 | 6% | 123,036.18 | 123,036.18 |
| 2 | 01/12/2013-30/11/2014 | 365 | 2,050,602.99 | 6% | 123,036.18 | 246,072.36 |
| 3 | 01/12/2014-30/09/2015 | 304 | 2,050,602.99 | 6% | 103,897.22 | 349,969.58 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,050,602.99 | 10% | 205,060.30 | 555,029.88 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,050,602.99 | 10% | 205,060.30 | 760,090.18 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,050,602.99 | 10% | 62,657.31 | 822,747.49 |



| | | | | | 822,737.49 | |
|---|---|---|---|---|---|---|

| | Date | Days | Mazlin Loan 2 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/01/2013-02/01/2014 | 365 | 2,850,088.60 | 6% | 171,005.32 | 171,005.32 |
| 2 | 03/01/2014-02/01/2015 | 365 | 2,850,088.60 | 6% | 171,005.32 | 342,010.63 |
| 3 | 03/01/2015-30/09/2015 | 271 | 2,850,088.60 | 6% | 128,729.00 | 470,739.63 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,850,088.60 | 10% | 285,008.86 | 755,748.49 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,850,088.60 | 10% | 285,008.86 | 1,040,757.35 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,850,088.60 | 10% | 87,086.04 | 1,127,843.39 |
| | | | | | 1,127,843.39 | |

| | Date | Days | Shireen Loan ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/12/2012-02/12/2013 | 365 | 3,773,033.12 | 6% | 226,381.99 | 226,381.99 |
| 2 | 03/12/2013-02/12/2014 | 365 | 3,773,033.12 | 6% | 226,381.99 | 452,763.97 |
| 3 | 03/12/2014-30/09/2015 | 302 | 3,773,033.12 | 6% | 189,909.33 | 642,673.31 |
| 4 | 01/10/2015-30/09/2016 | 366 | 3,773,033.12 | 10% | 377,303.31 | 1,019,976.62 |
| 5 | 01/10/2016-30/09/2017 | 365 | 3,773,033.12 | 10% | 377,303.31 | 1,397,279.93 |
| 6 | 01/10/2017-19/01/2018 | 110 | 3,773,033.12 | 10% | 115,287.12 | 1,512,567.06 |
| | | | | | 1,512,567.06 | |

### D.3  The appropriate creditor

175.  As noted above, on 30 October 2017 Shireen assigned the benefit of its claim to Mazlin, and Mazlin has been joined as a co-claimant in the Shireen claim.  In the circumstances, the appropriate award is to order all payments to be made by the Respondents to Mazlin.

### D.4  Joint, or joint and several liability

176.  The Respondents deny that they are jointly and severally liable under the Loan Agreements.[158] The Tribunal accepts that argument for the following reasons.

177.  The presumption under general law is that a promise made by two or more persons is joint, and that express words are necessary to make it joint and several.[159]  The opening words of each Loan Agreement in this case recite that the lender *"agrees to extend credit to [WJ Holding] and [Stubrick] (collectively the 'Borrower')"*.  Thereafter, all the obligations to repay capital and interest are expressed as obligations of 'Borrower'.[160]  No words are used to indicate that the liability of the two companies which constitute the 'Borrower' is several.

## E.  COSTS

### E.1  Introduction

178.  The Claimants have succeeded in their claims, and the Respondents have failed.  The starting point is accordingly a rebuttable presumption that the Claimants are entitled to their Legal Costs pursuant to Article 28.4 of the LCIA Rules, which provides as follows:

> *"The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay*

---

[158] See §53 of the Defence to the Mazlin claim [1/11/86] and §52 of the Defence to the Shireen claim [1/12/104].

[159] See *Chitty on Contract* (32[rd] ed.), §17-005.

[160] See in particular clauses 1.2, 1.9(a), 1.10, 2, and 5.1(a).

*and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."*

179. Article 28.3 also provides that *"the Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate."*[161] Accordingly, the Tribunal has a wide discretion subject to the presumption in Article 28.4. In making that determination, the Tribunal is entitled to take into account the parties' conduct in the arbitrations and, when making a determination as to the amount of Legal Costs to be awarded, to do so on such reasonable basis as the Tribunal thinks appropriate.

180. In addition, as noted in §95(13) above, by clause 6 of the Loan Agreements each party agreed *"to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement"*. Thus, in addition to the power to award Legal Costs pursuant to the LCIA Rules, the Tribunal also has a power to do so under the terms of the Loan Agreements themselves.

### E.2  The costs of the conjoinder issue

181. The Respondents objected to the original constitution of the Mazlin claim, in which both Mazlin and Shireen had been named as Claimants despite the fact that the claim was based on two separate arbitration agreements with non-identical parties. The Tribunal determined that the Claimants were not entitled to proceed with the claim in that form without the Respondents' consent, which was withheld.[162] It was accordingly the Claimants' own procedural error that provided the occasion for the Respondents to raise their procedural objection.

182. Nevertheless, there was plainly no compulsion on the Respondents to take that objection, and at the procedural hearing on 24 March 2017 their counsel was unable to articulate any practical reason why the Respondents should insist on separate arbitration proceedings being issued. The Tribunal was simply told that that was the Respondents' position. They were not, and did not claim to be in any way prejudiced by the composition of the Mazlin claim in its original form.

---

[161] The Tribunal adopts the term Legal Costs as it is used in Article 28.3 of the LCIA Rules, and also the term Arbitration Costs as defined in Article 28.1 as *"The costs of the arbitration other than the legal or other expenses incurred by the parties themselves"*.

[162] [1/15].

183. Furthermore, the Respondents argued strenuously, both at that hearing and in their written submissions, that the Tribunal did not have jurisdiction to allow the Mazlin claim to be amended by the deletion of one claimant. It was clearly the Respondents' objective to secure the dismissal of the arbitral proceedings in their entirety on purely procedural grounds. In the circumstances, and in the absence of any reasoned explanation from the Respondents as to why they chose to object to the original composition of the Mazlin claim, it would appear that the Respondents' strategy was prompted either (i) by a desire to make the whole recovery process as slow and expensive as possible for the Claimants, or (ii) by an opportunistic desire to try non-suiting the arbitral proceedings in London in their entirety, so that the Respondents could then issue the New York proceedings and claim that those proceedings should take priority as having been issued first,[163] or (iii) both.

184. Although the Respondents' position on the conjoinder issue was correct as a procedural matter, in terms of the interpretation of the LCIA Rules, nevertheless the Tribunal considers that the Respondents' conduct in withholding their consent to the conjoinder of both claims in one arbitration was unreasonable. In the event, the commencement of separate arbitration proceedings in the Shireen claim has achieved nothing other than additional inconvenience and expense. The Tribunal infers that that was the Respondents' intention.

### E.3  The parties' conduct generally

185. Having taken an unreasonable stance on the conjoinder issue, the Respondents then proceeded to conduct themselves in both arbitrations in a manner calculated to cause further inconvenience and expense to the Claimants:

    (1)    The Respondents have consistently refused to comply with the LCIA's directions to pay the advances to fund the Arbitration Costs. As a result, the Claimants have had to make substitute payments.

    (2)    After being given a full opportunity to respond to the Claimants' proposals for procedural directions in the Mazlin claim, the Respondents then sought unreasonably to invite the Tribunal to reopen the directions it had given in Mazlin PO2.[164]

---

[163] Although the strategy failed in its principal objective, we see a reflection of that argument in the affidavit evidence sworn in the New York proceedings by Mr Drukker and Mr Seddio, both of whom make a point of emphasising that the Shireen claim was issued after the New York proceedings had been commenced: see §30 of Mr Drukker's affidavit [2/530] and §22 of Mr Seddio's affidavit [2/550].

[164] See §25(2), §26, §33 & §38 above.

(3)   The Respondents have consistently sought to procure a dismissal or stay of these arbitration proceedings on the basis that the true agreement between the relevant parties is governed by New York law. For the reasons set out in detail in this Award, the Tribunal has rejected that case.   The Tribunal considers that the Respondents' allegations are unsustainable, and that their efforts to resist arbitration amount to forum-shopping.[165]

(4)   The Respondents' stated preference for the dispute to be resolved in the New York proceedings was ostensibly based on their contention that (i) the New York court has wider powers of disclosure against different parties from those available to this Tribunal in these arbitral proceedings, (ii) there was a "*reasonable expectation*" that the evidence obtained on discovery there "*will be relevant to the subsequent entertainment (by the Tribunal) of the Respondents' principal claim*"[166] and (iii) compliance by the Respondents with any disclosure order in these proceedings might cause "*irreparable harm to the position of the Respondents in the New York proceedings*".[167]   In the event, however, (a) the Respondents have never attempted to specify exactly what documents, or categories of document, they say will be disclosable in the New York proceedings to assist their case, (b) they have not produced any evidence before the Tribunal to suggest that any such documents exist, (c) they have not explained exactly what harm would be caused to their interests in the New York proceedings by complying with the directions for disclosure in these proceedings, and (d) they have not explained the apparent inconsistency between that assertion and the fact that they were content to exhibit over a dozen documents to their Statements of Defence without, apparently, causing irreparable harm to their position in the New York proceedings.

(5)   Although the Respondents were fully aware of the timetable laid down in the Procedural Orders that had been made in each arbitration, they waited until the last minute before notifying the Tribunal and the Claimants that they did not propose to offer any disclosure.[168]

---

[165] The Tribunal is also troubled not to have received a full explanation from the Respondents regarding the apparent discrepancies in their evidence regarding the commencement date of the New York proceedings:  see §8(5), §19(2) and §28(1) above.

[166] See §68 of the Respondents' submissions dated 11 April 2017 [1/4].

[167] [1/23/313] and [1/23/314].

[168] See §53 above.   The Tribunal also notes the relatively minor point in §13-15 above regarding the Respondents' failure to answer a simple question posed to them by the Tribunal.

186. For this accumulation of reasons, the Tribunal holds that the Respondents have conducted these proceedings unreasonably, and with the intention of being as obstructive as they can to the Claimants. The Tribunal accordingly proceeds on the basis that (i) the presumption mentioned in §178 above has not been rebutted but has been reinforced, and furthermore (ii) if costs have been incurred which might be considered higher than expected, that is likely to be a result of the Respondents' conduct.

### E.4  The Claimants' Schedule of Costs

187. On 23 November 2017, Mazlin filed a Claimant's Schedule of Costs ("**the Schedule of Costs**"), together with separate written submissions on costs ("**the Costs Submissions**"). The Schedule of Costs recorded costs under headings (a) to (f) in accordance with §30 of Mazlin PO2, together with three additional headings: (g) attendance on Counsel; (h) attendance on third parties; and (i) costs incurred in foreign proceedings. The Schedule of Costs sets out the costs that had been incurred jointly by the Claimants in both arbitrations, and Shireen adopted and relied on the same Schedule of Costs.

188. Although the Respondents declined to attend the hearing, the Respondents' legal representatives sent an email on 24 November 2017 which included the submissions on the Schedule of Costs and Costs Submissions quoted in §67 above.

189. As to the specific numbered submissions made by the Respondents in that email on the Claimants' costs submissions:

    (1) In the context of the amounts claimed in the Mazlin claim, and for that matter in the Shireen claim, the Tribunal does not consider the overall costs claimed to be disproportionate. Since the costs represent costs claimed in both proceedings, it is inappropriate to compare the costs against the debt claimed in the Mazlin claim only.

    (2) The Respondents' second observation is correct. However, directions were made in the proceedings, to which the Respondents did not object, that the Mazlin claim and the Shireen claim proceed in parallel to avoid delay and added costs and with a view to any evidential hearing and oral arguments being heard concurrently.[169] The proceedings did largely proceed on that basis and, of course, the hearings were concurrent. As a consequence, the Tribunal's view is that the Claimants have acted reasonably in incurring their costs in this manner which is likely to have resulted in an overall costs

---

[169] See Mazlin PO3 and Shireen PO1, discussed at §43 and §44 above.

saving. For the purposes of this award, the Tribunal has split the costs between the Mazlin claim and the Shireen claim in the proportions 55% and 45% respectively in order to reflect the additional time taken in the Mazlin claim to deal with the Respondents' initial procedural objections, and to reflect the fact that the costs attributable to the Mazlin claim (which was in essence the lead claim) might be slightly greater than those attributable to the Shireen claim.

(3)    The Costs Schedule was submitted in a form consistent with §30 of Mazlin PO2 and §33 of Shireen PO1, which did not specify the level of detail to be provided against each heading. The Tribunal finds that the level of detail provided by the Claimants is reasonable, particularly when taking into account the overall reasonable level of costs claimed.

(4)    The Tribunal deals with the Claimants' claims in respect of the costs of foreign proceedings in §193–195 below.

190. By two emails dated 27 November 2017, the Respondents' legal representatives made the following requests in relation to costs:

"(i) the question of costs be reserved during the hearing,

(ii) the Claimant be asked to provide a more detailed submission on costs that would inter alia provide:
-    a break-down between the two arbitrations;
-    copies of invoices and payments in relation to disbursements; and
-    detailed narratives and chronology for the hours incurred; and

(iii) that the Respondents be thereafter allowed a submission commenting on these costs."

191. There was no procedural timetable for submissions on costs to be made after the oral hearing. The Respondents themselves have withdrawn their own claims for costs and, accordingly, have filed no costs schedules themselves. For the reasons given above, the Tribunal finds that it is not necessary for further details to be provided by the Claimants.

192. Turning to the specifics of the Claimants' Schedule of Costs, the hourly rates applied by solicitors for the Claimants are reasonable. The costs claimed against headings (a) to (e), (g) and (h) are also reasonable in total and there are no individual amounts which appear unreasonable. Costs under heading (f) include the LCIA fees on filing the Requests for Arbitration, together with payments made by the Claimants on account of the Arbitration Costs. Accordingly, those items, in the amount of US$150,387.50 (GBP113,500) are excluded from

the Legal Costs and are dealt with separately below. The remainder of the Claimants' costs under heading (f), in the amount of US$70,945.32, are reasonable and allowed in full.

193. Costs under heading (i) set out the costs incurred in foreign proceedings in the total sum of US$182,167.40. By reference to the Costs Submissions, those costs were incurred in relation to:

    (1)  injunction proceedings issued in Cyprus to obtain a worldwide freezing order against the Respondents in the sum of US$76,098.77;

    (2)  Hungarian legal advice in relation to enforcement action in Hungary and in relation to the sale by Stubrick of a wholly-owned Hungarian company BVDH Ingatlanhasznosito Kft in the sum of US$10,000;

    (3)  defence of the proceedings in New York in the sum of US$96,068.63.

194. The Tribunal accepts that the legal costs incurred by the Claimants in Cyprus and Hungary are in connection with the enforcement of the Loan Agreements and are, therefore, recoverable under clause 6 of the Loan Agreements. They are also reasonable in their amounts.

195. The legal costs incurred in New York relate to the defence of proceedings brought against the Claimants and related entities. Based on the relief sought and the findings outlined above, those proceedings were brought intending to disrupt the enforcement of the Loan Agreements in these proceedings and as such those costs were (at least arguably) incurred "*in connection with the enforcement*" of those agreements for the purpose of clause 6. However, (i) there is not an identity of parties in these arbitrations and the New York proceedings, and (ii) the Tribunal understands that the New York proceedings are not concluded and, therefore, the outcome of those proceedings, including (if appropriate) the award by the court of costs against any party, is yet to be determined. For those reasons, the Tribunal concludes that it would not be appropriate in these arbitration proceedings to award to the Claimants any part of the costs of the New York proceedings claimed under heading (i).

196. Costs under heading (h) include the costs incurred by solicitors for the Claimants on attendance on counsel in foreign proceedings. Although the Tribunal disallows the third party costs in relation to the New York proceedings, it allows all the costs on attendance on foreign counsel as reasonable, and notes that only 0.4 hours were incurred on attendance on New York counsel. The Tribunal also allows the Claimants' costs of attendance on third party funders, since the

application was necessitated by the Respondents' refusal to pay their share of the advance on the Arbitration Costs (see §16 Costs Submissions).

197. In summary, therefore, the Tribunal allows the Claimants' Legal Costs as follows:

    (1)    Heading (a) – Preparation and drafting documents: allowed in full – US$69,875

    (2)    Heading (b) – Attendance on opponent: allowed in full – US$8,355

    (3)    Heading (c) – Attendance on client and witnesses: allowed in full – US$56,465

    (4)    Heading (d) – Attendance on LCIA and Tribunal: allowed in full – US$9,615

    (5)    Heading (e) – Preparation for and attendance at hearings: allowed in full – US$50,085

    (6)    Heading (f) – Disbursements and travel costs: Arbitration Costs excluded, otherwise allowed in full – US$70,945.32

    (7)    Heading (g) – Attendance on Counsel: allowed in full – US$21,790

    (8)    Heading (h) – Attendance on third parties: allowed in full – US$16,160

    (9)    Heading (i) – Costs incurred in foreign proceedings: partially allowed - US$86,098.77

198. The total costs awarded are US$389,389.09, of which 55% (US$214,164.00) is to be attributed to the Mazlin claim and 45% (US$175,225.09) is to be attributed to the Shireen claim.

### E.5 Arbitration Costs

199. The Arbitration Costs in the proceedings, having been determined by the LCIA Court pursuant to Article 28.1 of the LCIA Rules, are as follows:

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £11,447.15 |
| Tribunal's fees and expenses | £54,064.66 |
| **Final Costs of the Mazlin claim** | **£67,261.81** |

Any remaining deposits shall be returned to the Claimants.

200. The Tribunal finds that the Respondents shall bear the Arbitration Costs. On the basis that the Arbitration Costs have been funded by the Claimants, the Claimants are, therefore, entitled to an award that the Respondents shall be liable to the Claimants in respect of those amounts,

thereby replacing the Procedural Orders issued in the Mazlin claim and the Shireen claim, referred to in §61 above.

## F. THE AWARD

201. Accordingly, the Tribunal hereby awards as follows:

(1) Mazlin is entitled to repayment of the monies advanced under the Mazlin Loan Agreement in the amounts of US$2,050,602.99 and US$2,850,088.60;

(2) Mazlin is entitled to simple interest on US$2,050,602.99 at 6% per annum from 1 December 2013 to 30 September 2015 in the sum of US$349,969.58;

(3) Mazlin is entitled to simple interest on US$2,050,602.99 at 10% per annum from 1 October 2015 until payment in full. As at the date of this award, such interest is payable in the sum of US$472,777.91, and continues at a daily rate of US$569.61;

(4) Mazlin is entitled to simple interest on US$2,850,088.60 at 6% per annum from 3 January 2013 to 30 September 2015 in the sum of US$470,739.63;

(5) Mazlin is entitled to simple interest on US$2,850,088.60 at 10% per annum from 1 October 2015 until payment in full. As at the date of this award, interest is payable in the sum of US$657,103.76, and continues at a daily rate of US$791.69;

(6) Mazlin is entitled to Legal Costs of US$214,164.00; and

(7) Mazlin is entitled to Arbitration Costs of £67,261.81.

202. Any remaining applications, claims or counter-claims are hereby dismissed.

Place of arbitration: London

Date: 23 February 2018

Kate Davies

Jonathan Crow QC

Guy Pendell

78

"b"

LCIA ARBITRATION № 173638

(1) SHIREEN MARITIME LIMITED
(2) MAZLIN TRADING CORP

Claimants

- and -

(1)  WJ HOLDING LIMITED
(2) STUBRICK LIMITED

Respondents

---

**FINAL AWARD**
Dated 23 January 2018

---

The Arbitral Tribunal:

**Jonathan Crow QC**
**Kate Davies**
**Guy Pendell**

## CONTENTS

| | | | |
|---|---|---|---|
| **A.** | **Introduction** | | **p. 1** |
| | A.1 | The parties & their representatives | p. 1 |
| | A.2 | The arbitration agreements | p. 2 |
| | A.3 | The Awards | p. 2 |
| | A.4 | The procedural history of the conjoined claim | p. 2 |
| | A.5 | The procedural history of the separate arbitration claims | p. 10 |
| | A.6 | The oral jurisdiction and merits hearings | p. 28 |
| | A.7 | After the hearings | p. 29 |
| | | | |
| **B.** | **The Facts** | | **p. 30** |
| | B.1 | The background | p. 30 |
| | B.2 | The valuations | p. 31 |
| | B.3 | The Agreement of Sale | p. 32 |
| | B.4 | The 2012 Privatisation Agreement & related agreements | p. 34 |
| | B.5 | The email of 11 July 2012 | p. 35 |
| | B.6 | The Loan Agreements | p. 36 |
| | B.7 | The Letter of Agreement | p. 39 |
| | B.8 | The Personal Guarantees | p. 41 |
| | B.9 | Mr Spiegel's visits to the plant | p. 43 |
| | B.10 | Payments made by the Claimants to the Respondents | p. 45 |
| | B.11 | The December 2012 draft Agreement of Sale | p. 47 |
| | B.12 | Correspondence in early 2013 | p. 49 |
| | B.13 | Power of Attorney | p. 51 |
| | B.14 | Health insurance | p. 53 |
| | B.15 | The failure of the Bender Oil project | p. 54 |
| | B.16 | The draft Operating Agreement & MIPA | p. 54 |
| | B.17 | Termination of the negotiations | p. 56 |
| | B.18 | Proceedings in Cyprus | p. 57 |
| | B.19 | Proceedings in New York | p. 58 |
| | B.20 | Conclusions on the facts | p. 61 |
| | | | |
| **C.** | **The Juridictional Challenge** | | **p. 65** |
| | | | |
| **D.** | **Remedies** | | **p. 67** |
| | D.1 | The capital sums | p. 67 |
| | D.2 | Interest | p. 67 |
| | D.3 | The appropriate creditor | p. 70 |
| | D.4 | Joint, or joint & several liability | p. 70 |
| | | | |
| **E.** | **Costs** | | **p. 70** |
| | E.1 | Introduction | p. 70 |
| | E.2 | The costs of the conjoinder issue | p. 71 |
| | E.3 | The parties' conduct generally | p. 72 |
| | E.4 | The Claimants' Scehdule of Costs | p. 74 |
| | E.5 | The Arbitration Costs | p. 77 |
| | | | |
| **F.** | **The Award** | | **p. 78** |

A. INTRODUCTION

### A.1  The parties & their representatives

1.    Mazlin Trading Corp ("**Mazlin**") is a British Virgin Islands company, Company Number 1644425, with its registered office at Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands.  Mazlin is the Claimant in LCIA Arbitration № 163503 ("**the Mazlin claim**").

2.    Shireen Maritime Ltd ("**Shireen**") is a Liberian non-resident corporation, registration number C-112456, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia.  Shireen is the Claimant in LCIA Arbitration № 173638 ("**the Shireen claim**").

3.    The Claimants' representatives in these arbitrations are:
      - Mr Stevie Loughrey, Onside Law, 23 Elysium Gate, 126-128 New Kings Road, London, SW6 4LZ.  Mr. Loughrey's email address is: stevie.loughrey@onsidelaw.co.uk.  His telephone number is +44 20 7384 6920 and his fax number is + 44 20 7384 1575.
      - Ms Anna Lintner, Enterprise Chambers, 9 Old Square, Lincoln's Inn, London WC2A 3SR.

4.    The Respondents are:
      - WJ Holding Ltd ("**WJ Holding**") of Pamboridis Building, 45–47 Digenii Akrita Avenue, 1070 Nicosia, Cyprus, with registration number HE104090.
      - Stubrick Limited ("**Stubrick**"), also of Pamboridis Building, 45–47 Digenii Akrita Avenue, 1070 Nicosia, Cyprus, with registration number HE268820.

5.    The Respondents are jointly represented by:
      - Ms Delphine Nougayrède, Solicitor of the Senior Courts of England & Wales, c/o Schneider Law Group, 150 Broadway, Suite 900, New York NY 10038, USA. Her telephone number is +1 212 804 8400 and her email address is dn@lawoffice-avocats.com.
      - Norair Babadjanian, Advocate (Russia) and Solicitor (England & Wales), Redstone Chambers, Smolenskaya Embankment 2-33, Moscow 121099, Russian Federation. His telephone number is +7 499 248 7278. His email address is nb@redstonechambers.com.

### A.2  The arbitration agreements

6.    The Mazlin claim was commenced by a Request for Arbitration dated 21 November 2016[1]
made jointly by Mazlin and Shireen in relation to (i) a written 'Revolving Loan Agreement
(Secured)' between Mazlin and the Respondents dated as of 10 August 2012[2] ("**the Mazlin
Loan Agreement**") and (ii) a written 'Revolving Loan Agreement (Secured)' between Shireen
and the Respondents also dated as of 10 August 2012[3] ("**the Shireen Loan Agreement**" and,
together with the Mazlin Loan Agreement, "**the Loan Agreements**").   The relevant part of
clause 9 of each Loan Agreement provides as follows:

> *"Any dispute arising out of or in connection with the definitive agreements shall be
> referred to and finally resolved by arbitration under the LCIA Rules.  The number
> of arbitrators shall be three.   The seat, or legal place, of arbitration shall be
> London, the United Kingdom.  The language to be used in the arbitral proceedings
> shall be English."*

### A.3  The Awards

7.    Identical Awards are being made in each of the Mazlin claim and the Shireen claim, save for
the relief.  References in this Award in square brackets are to the documents contained in the
bundles used at the concurrent oral jurisdiction and merits hearings on 28 and 29 November
2017.  Bundle 1 references are to the [bundle number / tab number / page number].  Bundle 2
references are to the [bundle number / page number].

### A.4  The procedural history of the conjoined claim

8.    A Response to Request for Arbitration dated 13 January 2017[4] was submitted on behalf of WJ
Holding and Stubrick in which, without prejudice to their challenge to the validity of the
arbitration agreements and the jurisdiction of the Tribunal (§17), they *(inter alia)* –

    **(1)**    took issue with the ability of Mazlin and Shireen under the Rules of the London Court
of International Arbitration 2014 as amended ("**the LCIA Rules**") to bring a single
claim for arbitration in relation to the two separate Loan Agreements (§§8 & §11);

    **(2)**    asserted that "*the Loan Agreements are not genuine commercial transactions but
constitute sham agreements that were part of an elaborate scheme to document an
equity investment that was made by ... Mr Alexander Spiegel*" (§9);

---

[1] [1/1].

[2] [2/371].

[3] [2/366].

[4] [1/2].

     (3)    alleged that the "*original agreement*" that governs "*the real subject matter of this dispute*" was an Agreement of Sale dated 15 March 2012[5] ("**the Agreement of Sale**") made between WJ Holding and AMM Consulting and Management Group LLC ("**AMM Consulting**") "*together with other ancillary agreements*" which are subject to New York law (§10);

     (4)    contended that the dispute that has arisen between WJ Holding and Stubrick (of the one part) and Mr Spiegel and his *alter ego* companies (of the other) is accordingly subject to the exclusive jurisdiction of the courts of New York (§10);

     (5)    stated that proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§10);  and

     (6)    proposed that since the beneficial owner of the Claimants, Alexander Spiegel ("**Mr Spiegel**") and the beneficial owner of the Respondents, Yuri Drukker ("**Mr Drukker**") are both based in New York "*the proper venue for any arbitral hearings should be New York*" (§14).

9.    By email to the parties dated 23 January 2017, the LCIA required the Claimants and Respondents respectively to make a payment on account of costs in the sum of £10,000 each (*i.e.* a total of £20,000).

10.    By email dated 30 January 2017, the Respondents' legal representatives informed the LCIA that the Respondents declined to participate in funding the arbitration.

11.    By letter from the LCIA dated 23 February 2017,[6] the parties were notified of the identity of the Tribunal members who had been appointed.

12.    The Claimants replied to the Response to Request for Arbitration by letter dated 24 February 2017.[7] In that letter, they asserted that they were entitled to commence a single arbitration with both Mazlin and Shireen as Claimants.  This question came to be known as 'the conjoinder issue'.

---

[5] [2/376].

[6] [1/23/221].

[7] [1/23/225].

13. In light of the parties' respective positions in correspondence on the conjoinder issue, the Tribunal sent them an email on 1 March 2017[8] informing them that it was *"provisionally minded to give directions for the determination of the conjoinder issue as a preliminary issue"* and against that background invited the parties to discuss and if possible agree (i) whether it was expedient to determine the conjoinder issue first;  (ii) if so, what timetable should be laid down for the parties to present their full argument in that regard;  and (iii) whether the parties would wish the Tribunal to hold an oral hearing, or would be content for the matter to be determined on paper.

14. The Claimants' legal representatives sent an email to the Respondents' legal representatives on 7 March 2017[9] inviting them agree to the arbitration proceeding with both Claimants, on the basis either that the Claimants were entitled (under the LCIA Rules) to proceed in that manner or, if not, the only result would be the continuation of the original claim with only one Claimant and commencement of a parallel arbitration by the other Claimant.

15. The Respondents' legal representatives answered by email the same day,[10] saying that the Respondents' position remained as set forth in the Response, *i.e.* one of general jurisdictional challenge, and asserting that the two Loan Agreements formed part of a wider commercial dispute regarding an equity investment made by Mr Spiegel in a company called OJSC Bendersky Oil Extraction Plant ("**Bender Oil**"), a dispute in respect of which (the Respondents contended) the New York courts were the proper venue.  They also submitted that the Claimants themselves acknowledged that the commercial reality was that the dispute was actually one between Mr. Spiegel and Mr. Drukker, who are both resident in the USA.  They did not answer the Tribunal's question whether they were content for the conjoinder issue to be determined as a preliminary issue, either at an oral hearing or on paper.

16. The Claimants' legal representatives sent an email on 9 March 2017[11] reiterating that their clients were entitled to bring a single arbitration under both Loan Agreements simultaneously, and agreeing that the conjoinder issue should be determined on paper as a preliminary issue.

17. In light of the continuing disagreement between the parties on the conjoinder issue, and the Respondents' failure to explain whether they were content for the matter to be resolved as a

---

[8] [1/23/228].

[9] [1/23/230].

[10] [1/23/236].

[11] [1/23/235].

preliminary issue, the Tribunal sent the parties an email on 14 March 2017,[12] directing an oral hearing to be convened in London for the purpose of determining the following questions:

(1)   *Is the Tribunal precluded, by the LCIA Rules, from proceeding with this arbitration by reason of the fact that the claim seeks a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties do not consent to a consolidation?*

(2)   *If the answer to Question 1 is "yes", can the current claim be amended pursuant to Article 22.1(i) of the LCIA Rules by the deletion of one Claimant (and its claim), such that the amended claim would then proceed only in the name of the other Claimant and only in respect of that Claimant's claim?*

(3)   *If the answer to Question 2 is "yes", and if a separate arbitration claim were then also to be commenced by whichever Claimant had been amended out of the existing claim, would it be appropriate for the Tribunal to give matching procedural directions in both arbitrations, so that the common issues in each could be determined simultaneously?*

(4)   *In any event,*

(i)   *should the Tribunal give directions for the determination, as a preliminary issue, of the question whether the arbitration should be stayed pending the final determination of any legal proceedings in New York and*

(ii)   *if so, what directions should be given?*

(5)   *What, if any, further directions should be given for the efficient and final disposal of the issues between the parties?*

18.   By email dated 23 March 2017[13] the Tribunal was informed that the Respondents' legal representatives *"have requested and received [their] clients' instructions to present [their] case to the Tribunal, which of course does not imply that [they] consent to its jurisdiction"*. In a separate email the same day,[14] the Respondents' legal representatives repeated their assertion that legal proceedings *"have already been initiated against Mr Spiegel"* in New York.

19.   The parties' respective legal representatives each provided written submissions, as directed, on 11 April 2017.[15] In summary:

(1)   Mazlin and Shireen –

---

[12] [1/23/234].

[13] [1/23/239].

[14] [1/23/240].

[15] [1/3] and [1/4].

(i)    conceded that a joint claim by both companies could not proceed under the LCIA Rules without the Respondents' consent (§3–8),

(ii)    submitted that the Tribunal had jurisdiction to allow one Claimant to amend the Request for Arbitration by removing the other Claimant and proceeding with the amended claim alone (§9–10),

(iii)    confirmed that whichever Claimant was amended out of the joint claim would issue a separate Request for Arbitration, and invited the Tribunal to make matching procedural directions in each arbitration (§11–13), and

(iv)    submitted that the Tribunal should proceed to determine the arbitration claims, and not to stay them pending any determination of the proceedings apparently issued in New York (§14–19).

(2)    The Respondents not only served written submissions on the conjoinder issue[16] but also provided to the Tribunal an exhibit comprising a copy of certain legal proceedings between WJ Holding and Stubrick (plaintiffs) and Mazlin, Shireen, AMM Consulting and Mr Spiegel (defendants) apparently filed in the New York court, County of Kings, Index № 506949/2017 (**"the New York proceedings"**).  The New York proceedings did not appear to have been issued on 8 December 2016 in New York County (as stated in §10 of the Response to Request for Arbitration[17]) but on 7 April 2017 in Kings County.  The Respondents' written submissions –

(i)    offered a 'Summary Presentation of the Facts' (§1–15) in which they alleged that: (a) Mr Spiegel and Mr Drukker *"agreed that Mr Spiegel would take an equity stake of 30%"* in Bender Oil *"and that the value of this stake would be US$7 million, corresponding to an enterprise valuation for [Bender Oil] of approximately US$20 million"* (§3); (b) *"the equity investment would be documented in a manner that would achieve certain specific structuring objectives for Mr Spiegel"* which Mr Drukker believed *"reflected certain tax and family estate planning considerations"* (§4); (c) the agreed structure implemented by Mr Spiegel for the purpose of his equity investment in Bender Oil consisted of (1) the March 2012 Agreement of Sale,[18] which would be the *"core agreement"* under which AMM Consulting *"would obtain 30% of the shares of [Bender Oil], in return for payment of a nominal price of US$210,000"* (§5(a)), (2) the transfer of the remaining equity investment

---

[16] [1/4].

[17] [1/2/7].

[18] [2/376].

by Mazlin and Shireen, which was documented by the two Loan Agreements which "*would be mere instruments to accomplish transfers of Mr Spiegel's funds to the companies owned by Mr Drukker as consideration for the 30% equity in [Bender Oil]*" (§5(b)), and (3) "*certain additional agreements*" (§7); (d) the "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013, i.e. after Mr Spiegel had satisfactorily completed his due diligence investigations into [Bender Oil]*" (§8); (e) Mr Drukker also invested over US$16 million into Bender Oil (§8); (f) neither Mr Drukker nor his wife ever agreed to provide, or ever signed, personal guarantees of the Respondents' liabilities under the Loan Agreements (§9); (g) as a result of the non-performance by certain Transdniestrian governmental authorities of various undertakings and guarantees they had given in a supplementary privatisation agreement signed with WJ Holding on 28 March 2012 ("**the 2012 Privatisation Agreement**"),[19] the Bender Oil project was not as successful as had been hoped (§10); (h) as he was aware of these developments, Mr Spiegel "*changed his tack*" and "*chose to disregard the real nature of the transaction and instead uphold the sham Loan Agreements of August 2012, as if these were genuine commercial transactions*" (§12); and (i) "*the Loan Agreements are null and void, that the arbitration agreements that are ostensibly included in these agreements are also null and void, and that instead, Mr Spiegel, through his affiliated companies, holds an equitable interest in 30% in the shares in [Bender Oil]*" (§15);

(ii)    offered a 'Presentation of Certain Legal Principles Affecting the Validity of the Loan Agreements and Arbitration Agreements' (§16–30), in which they submitted that (a) the Loan Agreements were 'shams' within the meaning of *Snook v. London & West Riding Investments Ltd* [1967] 2 QB 786, at 802 (§16); (b) the arbitration clauses could not be separated from the Loan Agreements in which they appeared and were accordingly also null and void (§17–18); (c) the principle of party autonomy in general, and Article V(1)(d) of the 1958 New York Convention in particular provide that an arbitral award cannot be enforceable unless the composition of the tribunal and the arbitral procedure are in accordance with the agreement of the parties, whereas in this case the Tribunal had been "*imposed on the parties at the sole demand of the Claimants*" (§19–20); (d) the Respondents did not consent to arbitration

---

[19] [2/343].

(§21);  (e) the Loan Agreements "*did not reflect genuine loans, but were part of a larger equity investment made by Mr Spiegel*" which were "*governed by other contracts (and other dispute resolution clauses)*" (§22);  (f) New York was "*the only proper forum*" for the resolution of the dispute (§23);  (g) the arbitration agreement was null and void within Article II(3) of the New York Convention having been induced by Mr Spiegel's fraud and/or was unconscionable (§24–25);  (h) the dispute did not fall within the arbitration clause (§27) and could not be resolved by arbitration (§28);  (i) the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*" (§29–30);

(iii)    in answer to the 5 questions posed by the Tribunal, the Respondents submitted that (a) there was no jurisdiction under the LCIA Rules to hear a combined claim by Mazlin and Shireen without the Respondents' consent, which was not forthcoming (§31–49);  (b) the existing Request for Arbitration could not be amended by removing one Claimant (§50–53);  (c) the third question accordingly did not arise (§54);  (d) the arbitration ought to be stayed in favour of the New York proceedings because (1) the arbitration did not properly reflect the wider dispute between the parties (§55); (2) the principle of *lis pendens* (§56) required the issues to be determined in the New York proceedings (§57–58), not least because the Agreement of Sale was subject to New York law and the "*equity related contracts were executed in New York*" and the "*dispute resolution clause in the last negotiated draft share sale agreement designates AAA arbitration with a seat in New York*" (§59); (3) both Mr Spiegel and Mr Drukker are citizens and residents of the USA (§60); (4) the factual circumstances central to the dispute are located in the USA (§60); (5) the power to compel disclosure in the arbitration would be inadequate when compared with the powers available in the New York proceedings (§60–62 & §64–65);  and (6) the arbitration proceedings focused on the Loan Agreements, which were shams (§63);  and

(iv)    in conclusion, the Respondents invited the Tribunal to give directions either (a) to discontinue the arbitration with immediate effect "*and the Claimants may be granted a leave [sic] to submit new requests for arbitration*" (§67), alternatively (b) the arbitration proceedings should be stayed until such time as discovery in the New York proceedings had taken place "*upon the reasonable expectation*" that the evidence obtained on discovery there "*will be relevant to the subsequent entertainment (by the Tribunal) of the*

*Respondents' principal claim*" that the Loan Agreements are shams, and the true dispute cannot be fully determined in the context of the arbitration (§68), **(c)** that the exchange of written submissions "*do not constitute determination of the jurisdictional issue at hand*" (§69–70), and **(d)** either the determination of costs should be deferred (§70) or the Claimants should be liable in costs for having improperly commenced proceedings in the joint names of Mazlin and Shireen under separate agreements (§71).

20. Also on 11 April 2017, the LCIA issued a direction pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 20 April, a substitute payment of £10,000 in respect of the Respondents' share of the deposit.[20]

21. On 21 April 2017, the Respondents' legal representatives provided to the Tribunal copies of four returns of service, one each in respect of Mr Spiegel, AMM Consulting, Mazlin and Shireen, as defendants in the New York proceedings commenced by WJ Holding and Stubrick on 7 April 2017.

22. The preliminary oral hearing in the Mazlin claim was duly held in London on 24 April 2017, at which –

    (1) the parties' respective legal representatives each made oral submissions in support of their arguments, as outlined above;

    (2) the Respondents' legal representative also provided hard copies of a 25-page slide presentation headed 'The Respondents' Comments to Claimants' Submissions on 11 April 2017', which had not been supplied in advance;

    (3) the Respondents' legal representative stated that the Respondents had no objection in principle **(i)** to two new and separate arbitration claims being made, one under each of the Loan Agreements, or **(ii)** to the appointment of identical arbitral tribunals in relation to each such claim, or **(iii)** to identical directions being given in each such arbitration, so that they could each be run and decided in parallel;

    (4) however, **(i)** the Respondents refused to consent to the arbitration proceeding in its original form: no reasoned explanation was offered for this approach (apart from the Respondents' reliance on the point of form under the LCIA Rules); and **(ii)** the

---

[20] [1/23/243].

Respondents also refused to accept that one of the Claimants could be amended out of the arbitration.

23. After careful consideration of the parties' respective written and oral submissions, the Tribunal issued Procedural Order № 1[21] ("**Mazlin PO1**") on 27 April 2017, determining that, on the correct interpretation of the LCIA Rules, **(i)** the Tribunal was precluded from proceeding with the arbitration in its then form (*i.e.* with both Mazlin and Shireen named as Claimants) by reason of the fact that the Request sought a determination in relation to two separate arbitration agreements between non-identical parties in circumstances where those parties did not consent to a consolidation, but **(ii)** the Tribunal could allow one Claimant to amend the Request so as to remove the other Claimant and its claim. The Tribunal directed **(a)** the Claimants to deliver an amended Request by 5:00 pm on 28 April 2017, deleting one of the Claimants and its claim and **(b)** the Respondents to deliver an amended Response within 28 days of the Tribunal's confirmation of its approval to the amended Request.

### A.5 The procedural history of the separate arbitration claims

24. Under cover of a letter from the Claimants' legal representatives also dated 27 April 2017[22] –

   (1) Mazlin duly delivered an Amended Request for Arbitration in the Mazlin claim,[23] deleting reference to Shireen and its claim, and seeking US$4,987,061 only under the Mazlin Loan Agreement, together with "*interest (including default interest) and its costs and expenses (including legal fees) of enforcing the Loan Agreements (plus interest on those costs and expenses)*" (§8);

   (2) Shireen delivered a separate Request for Arbitration[24] in substantially identical terms to the Mazlin claim, save that the amount of the claim was US$3,786,500 under the Shireen Loan Agreement, together with an equivalent claim for interest, costs and expenses to that in the Mazlin claim; and

   (3) the Claimants' legal representatives submitted a suggested draft Procedural Order № 2 in the Mazlin claim, seeking directions leading to a determination of the merits of the claim together with the Shireen claim, and including (at §1) the following statement:

---

[21] [1/15].

[22] [1/23/249].

[23] [1/5].

[24] [1/6].

> "The Parties confirm their acceptance that the Arbitral Tribunal comprising Mr Jonathan Crow QC, Mr Guy Pendell and Ms Kate Davies appointed by the London Court of International Arbitration ("LCIA") by notification to the Parties dated 23 February 2017 has been validly established in accordance with Clause 9 of the "Revolving Loan Agreement (Secured)" between Mazlin Trading Corp ("Mazlin") and (1) WJ Holding Ltd ("WJH") and (2) Stubrick Ltd ("Stubrick") made on 10 August 2012 (the "Agreement") and Article 5 of the LCIA Rules (as hereinafter defined)".

25.   By email dated 28 April 2017,[25] the Tribunal –

   (1)   confirmed to the parties its approval of the Amended Request for Arbitration in the Mazlin claim pursuant to §13 of Mazlin PO1;

   (2)   directed the Respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agreed or disagreed with the directions proposed by the Claimants in their draft PO2 in relation to the Mazlin claim and, to the extent that they disagreed, the reasons for such disagreement;

   (3)   if and to the extent that the Respondents expressed any disagreement, the Tribunal directed that the Claimant in the Mazlin claim indicate in writing any response it might have by 5.00 pm on 10 May;

   (4)   indicated that the Tribunal would then determine whether to give any further directions in the Mazlin claim;  and

   (5)   stated that the Tribunal was not in a position to give any directions in relation to the Shireen claim unless and until the same panel had been appointed in relation to that arbitration.

26.   By letter dated 5 May 2017 from their legal representatives,[26] the Respondents –

   (1)   stated that they had no objection to the proposals set out in §1–16 of the Claimant's draft PO2 in relation to the Mazlin claim (*i.e.* including the paragraph quoted in §24(3) above);

   (2)   stated that they objected to any directions being given in relation to the Shireen claim;

---

[25] [1/23/251].

[26] [1/23/258].

11

(3)   proposed that the Respondents should deliver their Statement of Defence within four weeks after the close of discovery in the New York proceedings;  and

(4)   proposed that all other procedural directions in the Mazlin claim should be dependent on the completion of discovery in the New York proceedings.

27.   By email dated 9 May 2017,[27] the Claimants' legal representative provided a detailed response to the Respondents' letter of 5 May and –

(1)   accepted that no directions could be given in relation to the Shireen claim until such time as the LCIA appointed an arbitral tribunal, and

(2)   submitted that the procedural directions in the Mazlin claim should not be deferred pending discovery in the New York proceedings.

28.   On 24 May 2017, the Respondents delivered their Responses to Arbitration in each of the Mazlin and the Shireen claims,[28] making essentially the same case as in their original Response dated 13 January 2017[29] (outlined in §8 above) and in their written submissions of 11 April 2017[30] (outlined in §19(2) above).  In summary:

(1)   The Respondents maintained their position that (i) neither Loan Agreement is "*a genuine commercial transaction but constitutes a sham agreement that was part of an elaborate scheme to document an equity investment [in Bender Oil] made by ... Mr Alexander Spiegel*" and that "*the arbitration agreement in [each] Loan Agreement is also a sham*" (§9), (ii) the "*original agreement*" that governs "*the relationship between the parties*" was the March 2012 Agreement of Sale "*together with other ancillary agreements*" (§10), (iii) those agreements are subject to New York law (§11), (iv) accordingly, the dispute that has arisen between Mr Spiegel and his *alter ego* companies (on the one hand) and WJ Holding and Stubrick (on the other) is subject to the exclusive jurisdiction of the courts of New York (§12), (v) proceedings had been commenced by WJ Holding against Mr Spiegel in New York County on 8 December 2016 (§13) and (vi) since the beneficial owners of the Claimants and the Respondents respectively are based in New York "*the proper venue for any hearings should be New York*" (§14).

---

[27] [1/23/262].

[28] [1/7] and [1/8].

[29] [1/2].

[30] [1/4].

(2)     On that basis, the Respondents invited the Tribunal to find that **(i)** the Mazlin Loan Agreement "*is null and void*" being a "*sham*" (§40), **(ii)** the arbitration agreements in the Loan Agreements "*are also null and void*" (§41), **(iii)** the "*genuine dispute at hand ... involves an equity investment that was entered into by other parties and is governed by other contracts governed by New York law (and other dispute resolution arrangements)*" (§42), **(iv)** the 'genuine dispute' "*also involves a number of important oral arrangements between WJH and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*" (§43) and **(v)** "*since the issues, which the Claimant has referred to arbitration do not fall within the scope of the arbitration clause in the Loan Agreement, the Respondents are not bound by that arbitration clause*" (§46).

(3)     Finally, the Respondents indicated that they did not object to the identity of the arbitrators (§52) but that they "*object to the jurisdiction of the arbitral tribunal*" and on that basis they would "*seek the relevant ruling from the tribunal by way of an award on the question of jurisdiction*" (§53).

29.     On 25 May 2017, Mazlin lodged the substitute payment of £10,000 pursuant to the LCIA's direction on 11 April in relation to the Tribunal's costs and expenses of the Mazlin claim.[31]

30.     By an e-mail sent to the parties on 30 May 2017,[32] the LCIA directed Shireen and the Respondents (together) to pay £10,000 each as their shares of the first deposit on account of the costs of the Shireen claim.

31.     On 7 June 2017, the Tribunal issued Procedural Order № 2 in the Mazlin claim[33] ("**Mazlin PO2**") –

(1)     giving those directions to which the parties had agreed (§5 & §15(1)–(16)), and in particular recording the fact (as confirmed in the Claimant's draft PO2 and in the Respondents' response dated 5 May 2017[34]) that the parties had confirmed their acceptance that the arbitral Tribunal appointed by the LCIA by notification to the parties dated 23 February 2017 had been validly established in accordance with Clause 9 of the Mazlin Loan Agreement and Article 5 of the LCIA Rules (§15(1));

---

[31] [1/23/268].

[32] [1/23/272].

[33] [1/16].

[34] [1/23/258].

(2)    declining to give any directions in the Shireen claim (§7);

(3)    giving detailed reasons for declining to stay the Mazlin claim pending completion of disclosure in the New York proceedings (§8–9);  and

(4)    giving directions for the further conduct of the arbitration, including an exchange of disclosure by lists (§15(22)) and witness statements of fact (§15(23)), and culminating in a substantive jurisdiction and merits hearing (§15(27)–(29)).

32.    By email dated 8 June 2017,[35] the Respondents' legal representatives notified the LCIA that the Respondents declined to fund the costs of the Shireen arbitration proceedings.

33.    By email dated 9 June 2017,[36] the Respondents' legal representatives invited the Tribunal to reconsider Mazlin PO2, and in particular its refusal to stay the Mazlin claim pending disclosure in the New York proceedings.

34.    By letter dated 12 June 2017,[37] the parties were informed that the LCIA had appointed the same members to the arbitral Tribunal in respect of the Shireen claim as in relation to the Mazlin claim.

35.    Also on 12 June 2017, Shireen lodged £20,000 with the LCIA, comprising £10,000 on its own behalf pursuant to the LCIA direction given on 30 May 2017 together with a substitute payment of £10,000 in respect of the Respondents' unpaid contribution towards the Tribunal's costs and expenses of the Shireen claim.[38]

36.    On 15 June 2017, each of Mazlin and Shireen served their Statements of Case in their respective arbitrations,[39] reflecting the claims outlined in their Requests for Arbitration (outlined in §24 above), together with a proposed procedural order in relation to the Shireen claim containing matching directions to those given in relation to the Mazlin claim, and including equivalent wording (in relation to the Shireen claim) to that quoted in §24(3) above (in relation to the Mazlin claim).

---

[35] [1/23/271].

[36] [1/23/274].

[37] [1/23/279].

[38] [1/23/277].

[39] [1/9] and [1/10].

37.   By email dated 16 June 2017, the Claimants' legal representatives invited the Tribunal to make matching procedural directions in each of the Mazlin and Shireen claims.

38.   By email from the Respondents' legal representatives dated 18 June 2017, a request was made to the Tribunal to reconsider certain timetable deadlines in Mazlin PO2.[40]

39.   By email dated 19 June 2017,[41] the Tribunal responded to the requests received from the Respondents' legal representatives dated 9 and 18 June in the following terms:

> *"In emails from their counsel dated 9 and 18 June, the respondents invited the Tribunal to revisit PO2, in particular with regard to the question whether further progress in this claim should be deferred pending disclosure in the NY proceedings, but also with regard to specific elements in the timetable.*
>
> *Before responding to the detail of the respondents' request, we would first make two important preliminary observations, after setting out the relevant procedural chronology:*
>
> > *1.   Under cover of an email dated 27 April, the claimant's solicitors provided a draft PO2.*
> >
> > *2.   In an email dated 28 April, the Tribunal said this: "we direct the respondents to indicate in writing by 5.00 pm on 5 May the extent to which they agree or disagree with the directions proposed in [the claimant's draft PO2] and, to the extent that they disagree, the reasons for such disagreement. If and to the extent that they express any disagreement, we direct that the claimant ... indicate in writing any response it might have by 5.00 pm on 10 May."*
> >
> > *3.   In accordance with the Tribunal's direction, the respondents duly provided their Response to the Claimant's Proposed Procedural Order No. 2 in a letter from their counsel dated 5 May.*
> >
> > *4.   The claimant then provided its response in an email from its solicitors dated 9 May.*
> >
> > *5.   Having carefully considered the parties' submissions, the Tribunal issued PO2 on 7 June.*
>
> *Our first preliminary observation is this. From the foregoing chronology it will be apparent that both parties had a full opportunity to comment on the proposed content of PO2 before it was issued. As a general rule, the Tribunal considers that, in the interests of (i) fairness between the parties (ii) the expeditious progress of the arbitration and (iii) minimising costs, it is undesirable for either party to try reopening an issue that has already been fully debated and ruled on by the Tribunal. Absent any express agreement by the parties to the contrary on any particular issue, the Tribunal has broad powers to order whatever procedure is appropriate to the circumstances of the case. Against that background, we do not consider that the respondents are justified in inviting the Tribunal to reopen PO2 on this occasion.*

---

[40] [1/23/285].

[41] [1/23/286].

*Our second preliminary observation is this. The heart of the respondents' complaint is that the procedure for discovery available to it in the New York proceedings is more wide ranging and imposes greater obligations on the claimant than any disclosure procedure which might be available to it in these proceedings. In view of this, it seems to be the respondents' contention (previously raised and ruled on in PO2) that these proceedings should only progress once the discovery phase of the New York proceedings is complete because material disclosed in the course of discovery in New York will or may be used in this arbitration. Having carefully considered the points raised by the respondents in this regard, the Tribunal does not accept either the contention made or its premise. The respondents contractually agreed to arbitrate all disputes arising out of the agreements at issue in these proceedings in London. They therefore agreed to the various rules and procedures which govern and apply to such arbitrations – with all the benefits and, in some cases, limitations which such proceedings entail. There is not – nor could there be – any suggestion that disclosure is not available in this arbitration. It is and it will be. To the extent such disclosure is different from (and less than) the disclosure that may be available to the respondents in New York, that is a limitation the respondents accepted when they agreed to arbitrate disputes arising out of the agreements at issue in these proceedings.*

*For these reasons, the Tribunal does not accept that it is appropriate to revisit its decision in PO2. Nevertheless, having received the respondents' detailed comments in their counsels' email of 9 June, and their further request of 18 June, the Tribunal has on this occasion taken the exceptional course of clarifying the reasons for its decision in PO2 by addressing the points raised:-*

1. *In relation to paragraph 9(1) of PO2, the respondents object to any "implied criticism" regarding delay. The respondents need not be concerned: as the context of that paragraph makes clear, the Tribunal's remark about delay was neutral as to either party's responsibility.*

2. *In relation to paragraph 9(2) of PO2, the respondents say that it "seems to effectively prejudge the outcome of the proceedings without affording the Respondents the benefit of due process". The Tribunal assures the respondents that it has not prejudged the outcome of any aspect of the proceedings. To clarify, paragraph 9(2) of PO2 merely summarised the nature of the pleaded claim, just as paragraph 2 summarised the nature of the pleaded defence. In considering a request regarding the necessity for disclosure (in these proceedings or any other), the Tribunal is fully within its powers (and required) to summarise on a prima facie basis the nature of the claims and defences in order to decide on the appropriate procedure as regards disclosure (and the timetable) going forwards.*

3. *The respondents say in relation to paragraph 9(3) that "on the one hand the Tribunal implies that the Respondents do not hold sufficient information to convince it that the New York proceedings are necessary, and on the other hand it effectively precludes the Respondents from obtaining the relevant information via the only sufficient means available to it, i.e., through the New York discovery process". The Tribunal refers to its preliminary observations above. The Tribunal is concerned with the progress of and procedure for this arbitration. Under its broad procedural powers, the Tribunal has dismissed the respondents' contention that disclosure in the New York proceedings is necessary before this arbitration can progress at all. That decision does not preclude the respondents from obtaining discovery either in the New York proceedings or in this arbitration in due course, nor from using disclosure obtained from either process in these proceedings (to the extent that is permitted by law). It also*

does not preclude the respondents from making any application in the
future as regards the timing of any final determination of the issues in this
arbitration. In the meantime, the Tribunal has merely concluded in PO2
that service of the Defence and any Cross-claim should not be deferred
until after completion of discovery in the New York proceedings.

4.   The respondents say that paragraph 9(4) of PO2 "does not correspond to
the facts" and they refer in particular to their submissions of 11 April 2017,
sections 1-15, 18, 22, 55-65. The respondents make a similar point in
relation to paragraphs 9(7) of PO2. The Tribunal was and is fully alive to
the nature of the respondents' argument in this regard, and in particular
paragraphs 55-65 of its 11 April submissions. However, it remains
unpersuaded that this arbitration should effectively be stalled pending the
completion of disclosure in the New York proceedings. The fact that Mr
Spiegel and/or any corporate entities operated by him (rather than the
claimants) may hold some documents which are relevant to the issues in
dispute does not justify a complete standstill of these proceedings. The
Tribunal refers to its second preliminary observation above about any
limitations which may apply to disclosure in these proceedings. It also
remains open to the respondents to utilise the procedures available to it in
these proceedings.

5.   In relation to paragraphs 9(5) and (6) of PO2, the respondents have now
provided a fuller set of documents relating to the proceedings in New
York. Nevertheless, we have still seen nothing issued there on 8 December
2016, nor any filed application for discovery. In any event, consistent with
paragraphs 15(13), (14) and (16) of PO2, the Tribunal does not expect in
future to receive information from the parties piecemeal in this
fashion. The respondents were directed, on 28 April, to indicate in writing
by 5.00 pm on 5 May the extent to which they agreed or disagreed with the
directions proposed in the claimant's draft PO2 and, to the extent that they
disagreed, they were required to set out their reasons for such
disagreement. If and to the extent that they wished to bring the Tribunal's
attention to the current state of the New York proceedings, they should have
done so by 5 May by disclosing any relevant documents. Having said that,
and having now reviewed the latest materials submitted by the respondents,
we have seen nothing to alter the directions given in PO2.

6.   In relation to paragraph 9(8) of PO2, the respondents point out that
various sanctions would be available in the New York proceedings against
Mr Spiegel and his corporate vehicles for breach of their discovery
obligations which are not available in these proceedings. The Tribunal
refers to its second preliminary observation above.

7.   Finally, in relation to paragraphs 15(18), (22) and (23) of PO2, the
respondents object that they are allowed only 14 days for the preparation of
their Statement of Defence which, they say (in their email of 9 June) "seems
very harsh on any standards (and is even harsher than the delay proposed
by the Claimants in their draft of Procedural Order No 2 of 31 May
2015)". They also say (in their email of 18 June) that it is inconsistent with
Article 15.3 of the LCIA Rules, and on that basis they again invite the
Tribunal to revisit PO2. The Tribunal observes that the default timetable
laid down in Article 15.3 is subject always to the Tribunal's discretion, as
provided in Article 15.1 of the LCIA Rules. Absent agreement of the parties
or any alternative timetable proposed by the respondents, it is entirely
within the Tribunal's powers to direct the filing of the Statement of Defence
within 14 days (in particular since the respondents have been in possession
of the original Request for Arbitration since November 2016). In the

> *meantime, it has always remained open to the respondents (i) to propose an alternative timetable (which, to date, they have not done), (ii) to seek to agree an extension pursuant to paragraph 15(13) of PO2, and/or (iii) to make a reasoned request for any extension pursuant to paragraph 15(1).*
>
> *For all these reasons, having carefully considered the respondents' latest submissions, we do not alter the directions set out in PO2 and in future we will require due compliance with its terms. We will also not entertain any similar attempts to re-open procedural decisions, absent a showing of exceptional circumstances. If the respondents propose that we should treat their counsel's email of 18 June as a request for an extension of time, we direct them to provide by 5.00 pm on Friday 23 June a reasoned request in writing within §15(14) of PO2 specifying the proposed revised date for delivery of the Defence and any consequential alterations to the timetable laid down in PO2."*

40.  By separate emails also dated 19 June 2017,[42] the Tribunal invited the Respondents' submissions in answer to the Claimants' proposal for matching directions in the two arbitrations.

41.  By emails from the LCIA dated 21 June 2017,[43] the parties in the Shireen claim were each directed to lodge a further £15,000 (*i.e.* a total of £30,000), and the parties in the Mazlin claim were each directed to lodge a further £20,000 (*i.e.* a total of £40,000), on account of the Tribunal's fees and expenses, in each case by 12 July 2017.

42.  By email dated 23 June 2017[44] in relation to the Shireen claim, the Respondents' legal representatives stated that the Respondents "*do not object to the issuance of matching directions with LCIA No 163503 [i.e. the Mazlin claim] and do not have any comments on the proposed Procedural Order No 1*" (*i.e.* the draft procedural order in relation to the Shireen claim provided by the Claimants' legal representatives, as mentioned in §36 above).

43.  On 29 June 2017 the Tribunal accordingly issued Procedural Order №3 in the Mazlin claim[45] ("**Mazlin PO3**"), directing that –

(1)  the purpose of the directions was to ensure that the Mazlin claim and the Shireen claim proceeded in parallel, with as little delay and added cost as reasonably practicable, with a view to any evidential hearing and any oral arguments being heard in each concurrently;

---

[42] [1/23/290] and [1/23/291].

[43] [1/23/293] and [1/23/294].

[44] [1/23/296].

[45] [1/17].

(2)    to that end, the procedural timetable in each would thereafter be identical;  and

(3)    the Statements of Case, witness evidence and documents in one case should stand as part of the record in the other.

44.    On the same day, 29 June 2017, the Tribunal also issued Procedural Order № 1 ("**Shireen PO1**") in the Shireen claim,[46] (i) recording the parties' acceptance of the appointment of the Tribunal (§4) and (ii) tracking the equivalent directions as in Mazlin PO2 and Mazlin PO3 (§5–32).

45.    Also on 29 June 2017, the Respondents served their Statements of Defence in each of the Mazlin and Shireen claims[47] –

(1)    making essentially the same case as they had made in their original Response dated 13 January 2017[48] (outlined in §8 above), in their written submissions dated 11 April 2017[49] (outlined in §19(2) above), and in their Responses dated 24 May 2017[50] (outlined in §28 above), and in addition –

(2)    attaching numerous documents on which they relied in support of their case;

(3)    specifically identifying an Operating Agreement[51] ("**the Operating Agreement**") and a Member Interest Purchase Agreement[52] ("**the MIPA**") as having been "*actively negotiated by the parties*" during 2013 and 2014 (§24 of the Defence to the Mazlin claim and §25 of the Defence to the Shireen claim);

(4)    relying on certain health insurance agreements (§27), a Power of Attorney[53] (§28) executed by Mr Spiegel in favour of Sergey Rashkov ("**Mr Rashkov**"), and certain email exchanges on 23 September 2013[54] (§29) as evidence of the concluded nature of Mr Spiegel's agreement to acquire a 30% equity interest in Bender Oil;

---

[46] [1/18].

[47] [1/11] and [1/12].

[48] [1/2].

[49] [1/4].

[50] [1/7] and [1/8].

[51] [2/417].

[52] [2/456].

[53] [2/411].

[54] [2/409–410].

(5)    alleging that each Claimant was estopped from "*acting as if the Loan Agreement was a genuine document*" (§51 of the Defence to the Mazlin claim and §52 of the Defence to the Shireen claim);

(6)    denying that the Respondents are jointly and severally liable under the Loan Agreements (§52 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(7)    admitting that (i) "*On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000*" (§54 of the Defence to the Mazlin claim), (ii) "*On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000*" (§55 of the Defence to the Mazlin claim), and (iii) "*On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500*" (§53 of the Defence to the Shireen claim);

(8)    alleging that the sums transferred in Swiss Francs should be converted to US Dollars on the date of repayment, not on the date of transfer to the Respondents (§54 of the Defence to the Mazlin claim and §53 of the Defence to the Shireen claim);

(9)    disputing the Claimants' interest calculations (§56 of the Defence to the Mazlin claim and §54 of the Defence to the Shireen claim);

(10)    denying that certain relief allegedly obtained in Cyprus against the Respondents was binding (§81–84 of the Defence to the Mazlin claim, §79–82 of the Defence to the Shireen claim);

(11)    on that cumulative basis, alleging (in §38 of the Defence to the Mazlin claim and §37 of the Defence to the Shireen claim) that (i) the Loan Agreements were shams, (ii) the nullity of the Loan Agreements also affected the arbitration clauses, (iii) the actions of Mr Spiegel convinced the Respondents that the Bender Oil investment was an agreed joint equity investment, on which basis the Respondents entered into the Loan Agreements, and (iv) the New York proceedings were the only proper forum, because the arbitrations could not resolve the wider dispute involving other parties; and

(12)    in conclusion, seeking (i) a stay of the arbitrations in favour of the New York proceedings (§85 of the Defence to the Mazlin claim and §83 of the Defence to the Shireen claim); alternatively (ii) rejection by the Tribunal of each and every claim advanced by the Claimants and a declaration that the Loan Agreements (and the arbitration clauses contained therein) are null and void *ab initio* (§86 of the Defence to the Mazlin claim and §84 of the Defence to the Shireen claim), and in any event (iii) an

order for the Respondents' costs and expenses, including legal fees (§87 of the Defence to the Mazlin claim, §85 of the Defence to the Shireen claim).

46. By email dated 7 July 2017,[55] the Respondents' legal representatives informed the Claimants' legal representatives that the Respondents were declining to fund the arbitration costs. By emails dated 13 July 2017,[56] the Respondents' legal representatives similarly informed the LCIA that the Respondents declined to fund the arbitration costs of either the Mazlin or the Shireen claims.

47. On 20 July 2017, Mazlin and Shireen served their Statements of Reply in each of their respective claims[57] in which they (inter alia) –

   (1) denied (i) that the Loan Agreements were shams (§8(a)), and (ii) that Mr Spiegel improperly induced the Respondents to enter into the Loan Agreements (§8(b));

   (2) relied on the entire agreement clause in the Loan Agreements as raising an estoppel against the Respondents (§8(b));

   (3) denied that the Loan Agreements were void for want of consideration (§8(c));

   (4) agreed that, during 2012/13, Mr Spiegel had been contemplating the acquisition of a 30% interest in Bender Oil, but denied that there had been any concluded and unconditional agreement to that effect (§9–19); and

   (5) asserted that it was the Respondents' case in related proceedings in Cyprus that the Transdniestrian government which was party to 2012 Privatisation Agreement[58] was *"in repeated breach of its obligations, and has refused to close the privatisations program and release the shares [in Bender Oil] from the lien. As long as the lien still exists, no transfer of the shares in [Bender Oil] to third parties can occur"* (§21).

---

[55] [1/23/298].

[56] [1/23/301] and [1/23/302].

[57] [1/13] and [1/14].

[58] [2/343].

48.   On 28 July 2017, the Claimants lodged their due payments on account of arbitration costs of £15,000 in respect of the Shireen claim and £20,000 in respect of the Mazlin claim.[59]

49.   By emails dated 1 August 2017 from the Respondents' legal representatives, they repeated that the Respondents declined to fund the arbitration costs of either the Mazlin claim or the Shireen claim.[60]

50.   By emails dated 9 August 2017,[61] the LCIA issued directions pursuant to Article 24.4 of the LCIA Rules requiring the Claimants to lodge, by 30 August, a substitute payment of £10,000 in respect of the Respondents' share of the arbitration costs in the Shireen claim and of £20,000 in respect of the Respondents' share of the arbitration costs in the Mazlin claim.

51.   On 24 August 2017, Mazlin and Shireen each made an application pursuant to Article 24.5 of the LCIA Rules by which they each sought an award against the Respondents for payment of the £10,000 substitute deposits paid by them to the LCIA on account of arbitration costs on 25 May and 12 June 2017 respectively ("**the 1st Article 24.5 Applications**").

52.   By emails dated 1 September 2017, the Tribunal invited the Respondents to make any submissions in answer to the 1st Article 24.5 Applications by 14 September 2017.

53.   By emails dated 6 September 2017[62] (*i.e.* the day before disclosure was due under §15(22) of Mazlin PO2 and §25 of Shireen PO1) the Respondents' legal representatives stated as follows:

> *"We have been instructed to inform the Tribunal and the Claimant that the Respondents shall not be submitting any disclosure list, and that they will decline to produce any documents that might be requested by the Claimant in the context of these arbitration proceedings. The reason, as the Tribunal would hopefully appreciate, is that the disclosure of documents in these proceedings may cause irreparable harm to the position of the Respondents in the New York proceedings, which the Respondents believe are the only proper venue for this dispute.*
>
> *As regards the Claimant's application of 24 August 2017, the Respondents thank the Tribunal for its invitation to submit a response by 14 September. For the same reason as that stated above, i.e. the Respondents' view of New York <u>as prevailing venue</u> for the resolution of this dispute, they decline to submit any such response"* (emphasis added).

---

[59] [1/23/305] and [1/23/306].

[60] [1/23/307] and [1/23/308].

[61] [1/23/309] and [1/23/310].

[62] [1/23/313] and [1/23/314].

54.    Under cover of emails dated 7 September 2017, the Claimants' legal representatives provided disclosure by lists.

55.    By emails dated 21 September 2017, the parties were informed that unless the substitute deposits ordered on 9 August 2017 were received from the Claimants, the Tribunal would not be proceeding with the arbitrations.

56.    By emails dated 5 October 2017 from the Claimants' legal representatives, the Tribunal was informed that the parties had agreed to defer exchange of witness statements to 16 October 2017.

57.    On 6 October 2017, Mazlin and Shireen lodged substitute payments of £20,000 and £15,000 respectively pursuant to the LCIA's direction on 9 August 2017 in relation to the arbitration costs.  Mazlin and Shireen also each made a further application that day pursuant to Article 24.5 of the LCIA Rules seeking an award against the Respondents for those payments ("**the 2nd Article 24.5 Applications**").

58.    By email dated 10 October 2017, the Tribunal invited the Respondents to provide any submissions in answer to the 2nd Article 24.5 Applications by 18 October 2017.

59.    On 16 October 2017 –

    (1)    the Claimants served substantially identical witness statements from Mr Spiegel in respect of each arbitration;[63]

    (2)    the Respondents' legal representatives informed the Tribunal by email[64] *"that the Respondents will not be submitting any witness statement of fact. The reason is the same as that expressed in our email of 6 September 2017, i.e. the Respondents wish to preserve their position in view of the New York proceedings"*;  and

    (3)    those emails also stated that the Respondents declined to file any response to the 2nd Article 24.5 Applications.

---

[63] [1/21] and [1/22].

[64] [1/23/323] and [1/23/324].

60.   Later the same day, the Respondents' legal representatives sent another email to the Claimants' legal representatives,[65] stating that the Respondents "*reserve their right to appear at the November hearing (in both cases)*".

61.   On 21 October 2017, the Tribunal issued Procedural Order № 4 in the Mazlin claim[66] and Procedural Order № 2 in the Shireen claim,[67] granting the orders sought by the Claimants in each of the 1ˢᵗ and 2ⁿᵈ Article 24.5 Applications, but in the form of orders rather than awards in light of the Respondents' outstanding challenge to the Tribunal's jurisdiction at that time.

62.   By emails dated 14 November 2017,[68] the legal representatives of the Respondents stated as follows:

> "*On behalf of the Respondents, we inform the Tribunal and the legal representatives of the Claimant that the Respondents will not attend the hearing of 28/29 November, nor will they be represented.*
>
> *The position of the Respondents in relation to these proceedings and the underlying dispute remains that set forth in the Statement of Defence of 29 June 2017 (save in regard to costs, as set out below). We are informed that the status of the proceedings in the New York state court is as follows. Submissions were filed by both sides, the Respondents' submission of 22 June 2017 being attached as Exhibit 13 to the Statement of Defence. An oral hearing took place on 17 August, at which both sides were represented. The New York court has yet to render its decision regarding its jurisdiction and the Respondents' right to proceed with discovery. Until this decision is rendered the Respondents wish to preserve their position in the New York proceedings as a matter of priority over these proceedings.*
>
> *The Respondents will not be submitting their costs incurred in these proceedings and therefore withdraw their corresponding claim at Paragraph 87 of the Statement of Defence. As regards the costs that will be submitted by the Claimant, the Respondents wish to draw the Tribunal's attention to the circumstances that led to the hearing of 24 April 2017. That hearing took place to address the format of the Claimant's initial Request for Arbitration of 21 November 2016. In Procedural Order No 1, the Tribunal determined that it was precluded from proceeding on this arbitration in its then existing form, and the Claimant filed an Amended Request for Arbitration dated 27 April 2017. The issue of the format of the Request for Arbitration of 21 November 2017 [sic] was immediately raised by the Respondents in their Response of 13 January 2017 and this important procedural objection cannot be viewed as an unjustified attempt to delay or otherwise obstruct these proceedings. The Respondents believe that these circumstances should have bearing on the Tribunal's final decision in relation to costs*" (emphasis added).

---

[65] [1/23/325].

[66] [1/19].

[67] [1/20].

[68] [1/23/326] and [1/23/327].

63. By emails dated 16 November 2017,[69] the Respondents' legal representatives asked for permission to retain a transcriber at the concurrent oral jurisdiction and merits hearings on 28 & 29 November.

64. By emails also dated 16 November 2017,[70] the Tribunal informed the parties as follows:

> *"The Tribunal is in receipt of the email from the Respondents' representatives dated 14 November (i) indicating the Respondents' proposed non-attendance at the forthcoming oral hearing and (ii) containing the Respondents' submissions in relation to costs.*
>
> *Separately, the Tribunal is also in receipt of the Respondents' email dated 16 November 2017, requesting authorisation for a court reporter to be present at the oral hearing.*
>
> *It is convenient to deal with both at the same time.*
>
> *Email of 14 November 2017*
>
> *In light of (a) the agreed position of the parties, which is reflected in paragraph 15(1) of PO2, and (b) Articles 15.8, 15.10 and 19.1 of the LCIA Rules, the parties will be aware that the Tribunal is able to proceed with the arbitration and to make an award even if the Respondents choose not to participate in any stage of the proceedings and/or choose not to attend the oral hearing. In particular, and as noted in paragraphs 15 and 16 of PO4, the Tribunal has the jurisdiction conferred by Articles 23.1 and 23.4 of the LCIA Rules to rule on its own jurisdiction and, if it finds that it has jurisdiction, to make a pecuniary award under Article 26 notwithstanding the Respondents' non-attendance.*
>
> *Email of 16 November 2017*
>
> *The Tribunal has no objection to the presence of a court reporter at the forthcoming hearing. The Tribunal notes the agreement of the parties on the allocation between them of the attendant costs. The Tribunal would be grateful to receive copies of the transcript for their own use."*

65. On 23 November 2017, Mazlin's legal representatives served its Skeleton Argument, together with a Chronology, *Dramatis Personae*, List of Issues, Schedule of Costs and Submissions on Costs. It was disclosed in §7 of the Skeleton Argument that Shireen had apparently been dissolved on 30 October 2017, but that an application had been made for its restoration to the register in Liberia.

66. In response to this development, the Respondents' legal representatives circulated an email on 24 November 2017 in the Shireen claim saying this:

---

[69] [1/23/329] and [1/23/330].

[70] [1/23/331] and [1/23/332].

*"We write in connection with the above-referenced proceedings (the "Shireen Arbitration"). The elements set out below relate to procedural matters only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*We note that despite the Tribunal's directions, the Claimant has not filed any preparatory submissions for a hearing scheduled for 28/29 November. In its skeleton argument of 23 November 2017 in relation to concurrent proceedings No. 163503 (Mazlin Trading Corp v WJ Holding Limited and Stubrick Limited), the Claimant's counsel informed the Tribunal that the Claimant (Shireen) no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017 it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017. An application has or is imminently to be made to the Liberian registry of companies, based in Virginia, for Shireen to be immediately restored to the register in order that it can pursue the Shireen Arbitration."*

*It was then added that "Until such restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of the Claimant, in favour of Mazlin Trading Corporation as third party (following an assignment of debt that took place on 30 October 2017). It was suggested in this communication that "Given that the "third person" in question here is the Claimant in the linked arbitration (163503) and as the Tribunal is of course aware both claims share the same factual matrix, the same defences and are to be heard together on 28 November, we do not anticipate this presenting an issue and so should be most grateful if the Tribunal would confirm its agreement to the same."*

*This would appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of the Claimant's corporate existence during certain phases of this arbitration and absence of any pre-hearing submissions in accordance with the Tribunal's directions. These complex procedural manoeuvres cannot be properly understood or assessed in such a short time frame, and a hearing cannot validly take place on 28/29 November 2017 in the Shireen Arbitration. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing."*

67.   Later the same evening, the Respondents' legal representatives sent a further email in relation to the Mazlin claim saying this:

*"We write in connection with the above-referenced proceedings (the "Mazlin Arbitration"). The elements set out below relate to recent procedural developments only and are without prejudice to the Respondents' position that the New York proceedings must prevail as regards the questions of jurisdiction and merits in this dispute.*

*<u>Hearing of 28/29 November 2017</u>*

*In its skeleton argument submitted on 23 November 2017, the Claimant's counsel informed the Tribunal that claimant company Shireen Maritime Limited in concurrent proceedings No 173638 (Shireen Maritime Limited v WJ Holding Ltd and Stubrick Limited, the "Shireen Arbitration") no longer existed as a legal person at that time. According to Par. 7 of the argument: "On 22 November 2017*

*it came to the attention of Shireen's legal representatives in London that Shireen had been erroneously dissolved on 31 October 2017."*

*It was then added that "Until [Shireen's] restoration no further steps can be taken in the Shireen Arbitration [...]."*

*A request for joinder in the Shireen Arbitration was then submitted by the Claimant's solicitors, on this day of 24 November 2017, concurrently with the apparent restoration of Shireen, in favour of Mazlin Trading Corp as third party (following an assignment of debt that took place on 30 October 2017). It was also suggested in this communication that the claims in the Shireen Arbitration and Mazlin Arbitration should be heard together on 28/29 November.*

*The Respondents' interpretation of these developments in the Shireen Arbitration is that they appear to be a last minute attempt to preserve an oral hearing for the Shireen Arbitration on 28/29 November, despite the disappearance of Shireen's corporate existence during certain phases of the Shireen Arbitration and absence of any pre-hearing submissions. It was submitted by the Respondents that these complex procedural manoeuvres could not be properly understood or assessed in such a short time frame, and that a hearing could not validly take place on 28/29 November 2017 in the Shireen Arbitration.*

*Pursuant to Procedural Order No 3 in this Mazlin Arbitration, the Tribunal directed that proceedings in the Mazlin Arbitration and in the Shireen Arbitration should "proceed in parallel, with as little delay and added cost as practicable, with a view to any evidential hearing and oral arguments being heard in each concurrently" (par. 1), and that "the procedural timetable in each shall hereafter be identical" (par.2). It would therefore appear that the defect having affected the conduct of the Shireen Arbitration (i.e. the dissolution of the claimant even if subsequently restored) must also affect the conduct of the Mazlin Arbitration.*

*On behalf of the Respondents, it is accordingly submitted that the hearing cannot take place on 28/29 November 2017 in the Mazlin Arbitration either. The Respondents reserve the right to challenge any award that might be issued pursuant to such a hearing.*

*Claimant's Costs Submission*

*On 23 November 2017 the Claimant filed a short schedule of costs amounting to $635,845. The Respondents note the following:*

*1.    The costs submitted (under the sole auspices of this Mazlin Arbitration) are very significant and represent not 3% of the claims as averred, but 12% of the Mazlin claim (of principal amount in the vicinity of $4 million). This cannot be considered a proportionate amount.*

*2.    The Claimant did not distinguish between the costs related to the Mazlin Arbitration and those related to the Shireen Arbitration, which cannot be correct.*

*3.    The hours submitted are provided in large blocks, in some instance of up to 102 hours, instead of granular increments of not more than several hours at a time (as would be customary), together with corresponding detailed chronology.*

*4.    The Claimant seeks recovery of costs incurred in foreign proceedings, to which the jurisdiction of the Tribunal does not extend. The recovery of such costs must be governed by cost recovery laws in those foreign jurisdictions and by the proper fora.*

*The Respondents are accordingly of the view that the Claimant's costs submission is inadequate.*

*As a final comment, the Respondents' decision not to participate in disclosure and in the hearings scheduled for 28/29 November was based not only their in-principle view that the New York proceedings should prevail, but also in order to mitigate costs related to these London proceedings, including costs incurred by the Claimant. It was not intended to encourage an uncontested accumulation of costs."*

68. By email dated 24 November 2017, the Claimants' legal representatives –

    (1) informed the Tribunal that Shireen had been restored to the register earlier that day, and provided a copy of the Proclamation of Rescission of Dissolution;

    (2) provided a copy of a Deed of Assignment dated 30 October 2017 by which Shireen assigned absolutely to Mazlin all sums due and owing to Shireen under the Shireen Loan Agreement, including for the avoidance of doubt Shireen's claim in this arbitration and the benefit and proceeds of any award or order herein, including costs;

    (3) provided a copy of a Confirmation of Consent to Joinder under Article 22.1(viii) of the LCIA Rules, dated 24 November 2017, signed by each of Shireen and Mazlin; and

    (4) invited the Tribunal to make an order under Article 22.1(viii) joining or substituting Mazlin as Claimant in the Shireen claim.

69. By emails dated 25 November 2017, the Tribunal invited the Claimants to provide any responses to the Respondents' emails of 24 November by 10:00 am on 27 November.

70. By email dated 27 November 2017, timed at 16:47, the Respondents' legal representatives indicated that they "*will not be making any submission in regard to the application*" under Article 22.1(viii).

### A.6 The oral jurisdiction and merits hearings

71. The concurrent oral jurisdiction and merits hearings were conducted over 28 & 29 November 2017 at the IDRC, 70 Fleet Street, London EC4Y 1EU. They were transcribed by Opus 2 International.

72. As they had previously indicated, the Respondents did not appear and were not represented.

73.  The Claimants were represented by Anna Lintner, of counsel, and by Stevie Loughrey and James Hill of Onside Law.  Anya Freeman of Mr Spiegel's US attorneys was also in attendance, as was Mr Spiegel himself.

74.  At the commencement of the hearing the Tribunal indicated that, having considered the parties' submissions carefully, an order would be made, subsequently reflected in Procedural Order № 4 in the Shireen claim –

   (1)  joining Mazlin Trading Corp as a claimant in the Shireen claim, and

   (2)  providing that the Claimants are not required to serve an amended Request for Arbitration or any amended Statements of Case reflecting the addition of Mazlin as claimant.

75.  After the Claimants' counsel made certain opening submissions, Mr Spiegel gave oral evidence. He affirmed both of his witness statements.[71]  He was asked some further questions by his own counsel, and he was then examined robustly and at some length by the Tribunal throughout the afternoon of the first day of the hearing.  In the course of that examination, the Tribunal put to Mr Spiegel the Respondents' case and the documents on which their Defences are based.

### A.7  After the hearings

76.  By email dated 29 November 2017, the Claimants' legal representatives provided copies of certain documents that had been mentioned or handed up during the hearing, and also provided some interest calculations.  By email dated 11 January 2018, the Tribunal invited the Respondents to provide any response to those materials   The Respondents' legal representatives duly provided their response by email dated 15 January, taking issue with certain aspects of the Claimants' interest calculations.

---

[71] [1/21] and [1/22].

## B. THE FACTS

### B.1  The background

77.   It is common ground that –

(1)   the beneficial owner of Shireen and of Mazlin is, and always has been, Mr Spiegel;

(2)   the beneficial owner of WJ Holding and of Stubrick is, and always has been, Mr Drukker;  and

(3)   Mr Spiegel and Mr Drukker were friends since childhood, having been brought up and gone to school in the same part of what is now west Ukraine.

78.   Mr Spiegel's evidence was, and the Tribunal accepts, that –

(1)   he emigrated to the USA in 1972, after which he established a number of business ventures, specialising since the early 1990s in former Eastern bloc countries;  and

(2)   Mr Drukker emigrated to the USA in about 1989, and he too has established a number of business ventures.

79.   It is common ground that Mr Spiegel has made, or caused to be made, a number of loans to companies owned and controlled by Mr Drukker over a period of at least 25 years.  This is admitted in §6 of the Respondents' Defences.[72]  The Respondents say that Mr Spiegel was a *"small bridge lender"*.  By contrast, Mr Spiegel says he lent in aggregate somewhere in the region of \$40 million.  The Tribunal has no reason to doubt Mr Spiegel's evidence in this regard, and accepts it.

80.   Mr Spiegel's oral evidence at the hearing was that he also became a director of approximately three of the companies in which Mr Drukker had an interest.  There was, however, no established pattern of Mr Spiegel making equity investments in Mr Drukker's business ventures.

81.   Mr Drukker's ventures were for many years conducted in collaboration with a number of business partners (not including Mr Spiegel) under the umbrella of WJ Group.  One of its assets

---

[72] [1/11] and [1/12].

was the Bender Oil plant, a vegetable oil production facility in the Transdniestrian region of Moldova.

82.   It is not in dispute that Mr Drukker parted company from his former business partners in about 2011, after which he was left in sole ownership of WJ Holding, and through it the Bender Oil plant.  The plant had not been operational for about 6 years, but he had plans to revive its production and turn it to profit.  He approached Mr Spiegel to assist with the financing.

83.   The essential difference between the parties on the facts is this:  Mr Drukker's case is that the two of them agreed a binding and unconditional deal under which Mr Spiegel would acquire a 30% equity stake in Bender Oil for $7 million, and the Loan Agreements were a sham mechanism to give partial effect to that equity investment,  whereas Mr Spiegel's case is that the Loan Agreements reflected genuine loans, and although he spent a considerable amount of time and effort exploring the possibility of also making an equity investment, in the event there never was a concluded, unconditional agreement in that regard.

84.   That is the core factual issue on which both arbitrations turn.  Its resolution demands a careful review of the evidence, and in particular a detailed consideration of the contemporaneous documentary record.

### B.2  The valuations

85.   Chronologically, the first document the Tribunal has seen is an Appraisal Certificate forming part of a valuation given by Industrial Consult SRL as at 8 December 2011.[73]  It provides an appraisal of the market valuation of "*the properties (buildings and facilities) owned by [WJ Holding]*" comprising the tangible property of Bender Oil.  It states that the plant is "*Not in use (mothballed)*".  The Tribunal has not been shown the full valuation report, and does not know what information was provided to the valuer.  The Certificate does not attempt to assess the net present value of Bender Oil based on its anticipated future business operations, merely the current market value of its tangible assets.  Having said all that, it is the only valuation the Tribunal has been shown dating from 2011, and there are no apparent grounds for questioning its integrity.  The value given is $637,830.  The significance of this valuation is the light it casts on the parties' competing claims as to the nature of the deal between them.  The Claimants say that it supports their case – namely, that the only discussions regarding a possible equity

---

[73] [2/333].

investment by Mr Spiegel were reflected in the Agreement of Sale,[74] which valued a 30% equity stake at $210,000: that is in line with the Industrial Consult valuation. The Tribunal accepts that the valuation does lend at least some support to the Claimants' case in this regard, and that it is less consistent with the Respondents' case (which is that the parties put an enterprise value of about $20 million on Bender Oil, of which there is no contemporaneous evidence whatsoever).

86.    The next document is another valuation certificate, this time from Actimob Consulting Ltd giving a valuation as at 1 January 2012.[75]  Once again, the Tribunal has only seen the certificate, not the underlying valuation report, and does not know what information was provided to the valuer.  The report is again a property valuation, not an assessment of the potential development value of the plant as a going concern.  Furthermore, the certificate states that "*we have not carried out building surveys, tests services, made independent site investigations, inspected woodwork, [or] exposed parts of the structure*".  Nevertheless, it remains the only other independent piece of evidence regarding the value of the plant at the time, and the Tribunal has no reason to doubt its integrity.  The valuation figure is $1,516,580.  Mr Spiegel's evidence is that the reason for the increase in value over the month since the Industrial Consult valuation was that, in late 2011 the plant had no windows and no doors, the machinery had stood still for many years, and the grass was growing high all around the site.  Mr Drukker was trying to raise finance, and he spent considerable efforts and resources in reinstating the doors and windows, cleaning the machinery and cutting the grass to make it look like a viable project, and he procured a new valuation in January 2012 to reflect the added value his input had produced.  The Tribunal has no reason to doubt that evidence, and accepts it.

### B.3  The Agreement of Sale

87.    The next document is the Agreement of Sale dated "*as of*" 15 March 2012.[76]  This is an agreement concluded between WJ Holding (*i.e.* Mr Drukker's company) and AMM Consulting (which, it is accepted by the Claimants, was one of Mr Spiegel's companies).  It was signed by Mr Drukker on behalf of WJ Holding, and by Mr Spiegel on behalf of AMM Consulting.[77]  The following provisions are relevant for present purposes:

---

[74] [2/376]

[75] [2/339].

[76] [2/376].

[77] [2/380].

(1)     The agreement recited that WJ Holding was the registered owner of 3,583 shares in Bender Oil, and that it wished to sell and AMM Consulting wished to buy 1,074 of those shares.

(2)     Clause 1 provided that WJ Holding agreed to sell, and AMM Consulting agreed to purchase, the 1,074 shares in Bender Oil *"upon the terms and conditions hereinafter set forth"*.

(3)     Clause 2 referred to Exhibit A (comprising an 'Appraisal' of certain 'assets' owned by Bender Oil) and Exhibit B (containing a description of various 'Contracts' setting out Bender Oil's and WJ Holdings' privatisation obligations) which were ostensibly attached to the agreement, but neither document has been produced to the Tribunal.

(4)     Clause 3 provided that the purchase price was to be $210,000, with $100,000 payable on or before 31 December 2012, and $110,000 payable on or before 1 June 2013.

(5)     Clause 5 provided that, at closing, WJ Holding would execute and deliver to AMM Consulting transfer documents and deeds of title in respect of the shares in Bender Oil.

(6)     Under clause 6, headed 'Representations and Warranties of Seller', WJ Holding was recorded as having represented and warranted that it had full power and authority to carry out and perform its undertakings and obligation provided in the agreement –

> *"**except the condition precedent to the sale is [WJ Holding's] fulfilment of the privatisation requirements and prior authorisation of the Pridnestrovian Moldavian Republic ("PMR") government authorizing the said sale and registration of the Shares. [AMM Consulting] acknowledges that [WJ Holding] is not giving any warranty or representation on [WJ Holding's] ability to fulfil the privatization requirements and to receive necessary government approvals.**  In the event, [WJ Holding] will not be able to obtain said governmental approval by the end of 2013, this Agreement shall be rescinded and all funds refunded to [AMM Consulting]"* (emphasis in the original).

The Claimants submit, and the Tribunal accepts, that this means that the Agreement of Sale was not unconditional.  Rather, it was conditional on the fulfilment of certain privatisation conditions, and on the grant of certain governmental consents.

(7)     Clause 8 laid down certain 'Conditions to Closing'.  In particular, clause 8.2 provided that the obligations of WJ Holding to close were subject, *"at the option of [WJ Holding], to the ... (b) Ability of [WJ Holding] to complete all privatisation requirements with the PMR Republic"*.  It is difficult to understand the intended effect of the words *"at the option of [WJ Holding]"* in this context, but the Tribunal considers it unnecessary to resolve that uncertainty.

(8)   Pursuant to clause 10, the parties agreed that *"the purchase price is based on the value of the Shares before [WJ Holding] will have invested additional funds to make the factory operational and to fulfil privatization requirements"*. The Tribunal considers that this provision lends at least some further weight to the Claimants' case that the parties were proceeding on the basis that the value of Bender Oil was in the region of $630,000, not $20 million.

(9)   Clause 15 provided that the agreement was to be governed by, and construed in accordance with, the laws of the State of New York.

88.   Leaving aside the detailed terms of the agreement, it is also significant to note that it pre-dates by four months any document that has been produced discussing the possibility of a loan being made in relation to the Bender Oil plant.  If, as the Respondents contend, there was a concluded, unconditional deal for Mr Spiegel to make an equity investment, and if the March 2012 Agreement of Sale was put in place as part of the mechanism for giving effect to that agreement, it is surprising that there is no documentary record at the same time of any loan being advanced or even discussed.

### B.4  The 2012 Privatisation Agreement and related agreements

89.   A fortnight after the Agreement of Sale was signed, the 2012 Privatisation Agreement[78] was signed on 28 March 2012 between the Transdniestrian Moldovan Republic ("**the Moldovan government**") and WJ Holding.  Clause 1.1 provided that the agreement had been concluded *"with the aim of launching and conducting actual operations"* at the Bender Oil plant.  Under clause 3, each of the Moldovan government and WJ Holding entered into a number of mutual obligations.  The exact content and detail of those obligations is unimportant.  What matters for present purposes is the fact that it is common ground between the parties that the Moldovan government failed to perform its obligations under this agreement.[79]

90.   On 3 May 2012, two further agreements were entered into:

(1)   The first was a loan agreement between Stubrick and Bender Oil in the sum of $1.5 million.  The term of the loan expired on 10 December 2012.

---

[78] [2/343].

[79] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

(2)   The second was an Additional Agreement, made between Stubrick and WJ Holding, the effect of which appears to have been to treat the loan made by Stubrick to Bender Oil as if it had been a loan made by WJ Holding in discharge of part of its investment obligations under the 2012 Privatisation Agreement.

### B.5   The email of 11 July 2012

91.   On 11 July 2012, Mr Spiegel sent an email to William Schneider, who is a US attorney and also Mr Drukker's son-in-law.  The subject of the email was stated to be 'Credit Line'.  The relevant parts of the email said this:

> "Dear Bill,
>
> As per our consulting agreement I have found 2 potential companies willing to extend the credit line in operation [sic] in Moldova-Transylvania.
>
> Here are the company details
>
> 1. Shireen Maritime Limited (Republic of Liberia) 80 Broad Street, Monrovia, Republic of Liberia ...
>
> 2. Terms: credit line up to 4 mill. Interest rate 6%, 3 years, with a option [sic] for extension for 2 more ...
>
> The Loan agreement has to be standard for 3-4 pages covering all concerns (pledges, guaranties etc.)
>
> The second company details you will receive directly from Arla Weber ... but the terms the same [sic] except the credit line is 9 mill and the first trans by mutual agreement both sides.
>
> Please put together ASAP."

92.   In his oral evidence, Mr Spiegel explained that he had a consulting agreement with WJ Holding under which he would earn commission if he introduced third party finance.  That appears to explain the language he chose to use in this email, which was clearly intended to suggest (wrongly) that Shireen and the 'second company' were unconnected with him.  While Mr Spiegel confirmed in his oral evidence that he did not in fact receive any commission in connection with the loans ultimately advanced, the Tribunal regards this dissimulation on his part as being discreditable, and it makes the Tribunal cautious about accepting uncorroborated oral evidence from him.

93.   Nevertheless, in light of (i) the timing of this email, (ii) the reference to an operation in Moldova-Transylvania, (iii) the identity of at least one proposed lender mentioned in the email with one of the lenders under the Loan Agreements, (iv) the similarity in the amounts of the proposed loans, the interest rate and the potential extension of the loan period to those that ultimately appeared in the Loan Agreements and (v) the fact that the Respondents themselves

assert in their Defences that "*at the time Mr Spiegel maintained an appearance of being unaffiliated*" to the proposed lenders,[80] Tribunal is willing to and does infer that **(a)** this email was discussing proposed funding for the Bender Oil project, **(b)** Mr Spiegel was at the time discussing the possibility of procuring loans (not an equity investment) from Shireen and another company, and **(c)** Mr Schneider was being tasked with preparing the necessary loan documentation, including personal guarantees.

94. Furthermore, it is significant that the first documented mention of any potential loan was made in connection with corporate lenders which were ostensibly unconnected with Mr Spiegel. Although (as we know) the lenders were in fact his companies, and although (as we have said) his initial dissimulation in this regard does him no credit in broader moral terms, nevertheless in the context of the present dispute it happens to support the Claimants' case. By contrast if, as the Respondents contend, the agreed deal in 2012 had been an equity investment by Mr Spiegel, disguised as a loan from companies owned and controlled by him, then it is difficult to see why he would have initially introduced those lenders to Mr Drukker under the pretence that they were not connected with him.

### B.6  The Loan Agreements

95. The Loan Agreements themselves[81] are dated "*As of August 10, 2012*". They are in materially identical terms to each other, save for the amount of each loan and the terms for the draw-down. Save where otherwise indicated below, the terms identified in this Award are the same in each agreement.

   **(1)** Clause 1.1 provides that the loan was made "*for the purpose of inventory financing for the edible oil crushing facility*".

   **(2)** Clause 1.2 provides that the borrowing "*shall be secured pursuant to the Security Agreement attached hereto as Exhibit A*". There is no Exhibit A attached to either Loan Agreement. Mr Spiegel's evidence is that the parties agreed that the loans would be secured by personal guarantees provided by Mr and Mrs Drukker. The Respondents deny that there was any agreement for personal guarantees to be provided by Mr and Mrs Drukker, but they provide no alternative explanation nor any evidence of what the 'Security Agreement' referred to in the Loan Agreements might be.

---

[80] See §15 of their Defences [1/11] and [1/12].

[81] [2/366] and [2/371].

(3)     Clause 1.3 provides that interest shall accrue at 6% on the outstanding principal balance of each advance.

(4)     Clause 1.4 provides that each advance shall be made in certain fixed minimum amounts or multiples thereof, being $250,000 under the Shireen Loan Agreement and $1 million under the Mazlin Loan Agreement.

(5)     Clause 1.7 provides that requests for advances would be made by written or telephone requests.

(6)     Clause 1.9(a) provides that all payments by the borrower shall be made in US Dollars.

(7)     Clause 1.9(c) provides that: *"All calculations of interest hereunder shall be made on the basis of a 360 day year for elapsed [sic]"*.

(8)     Clause 1.10 provides as follows: *"If any Advances is [sic] not paid when due, Borrower shall, on demand by Lender, pay interest thereon from its due date until paid in full at a rate of ten percent (10%) per annum"*.

(9)     Clause 2 provides that all advances *"shall be repaid in full together with all interest, fees, and other sums due Lender [sic] on September 30, 2015"* with the lender having an option to extend the loan period for a further year.

(10)    Clause 3 contains certain representations and warranties on the part of the borrower.

(11)    Clause 4 contains certain positive covenants on the part of the borrower.

(12)    Clause 5 defines certain events of default.

(13)    Under clause 6, each party agreed *"to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement and Notes [sic]."* No actual 'Notes' appear to form any part of the contract.

(14)    The relevant part of clause 7 provides as follows:

> *"This Agreement and agreement [sic], document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto, and supersede all oral negotiations and prior writings in respect of the subject matter hereof."*

(15)    Clause 8 provides that the governing law shall be English law.

(16)    Clause 9 is the arbitration agreement, quoted in §6 above.

96. There is some disagreement over the authorship of the Loan Agreements.  Mr Spiegel's evidence is that the documents were drawn up by Mr Schneider, who borrowed from various precedents available to his law firm.  The Respondents say that this is "*not [their] recollection*",[82] but they do not suggest who else might have drafted the documents.  The Tribunal is not persuaded that much turns on this particular aspect of the factual dispute, but nevertheless it accepts Mr Spiegel's evidence in this regard:

    (1) Mr Spiegel is not himself a lawyer, and the Tribunal has seen no evidence to suggest that he instructed any lawyers to draft the Loan Agreements on his behalf.

    (2) By contrast, Mr Schneider is a lawyer and he is also Mr Drukker's son-in-law.  He would have been well placed to draft the agreements.

    (3) The email from Mr Spiegel to Mr Schneider dated 11 July 2012 (referred to in §91–94 above) discussed the proposed contents of a loan agreement, and ended with the words "*Please put together ASAP*".  There is no documentary record of Mr Schneider having declined to do so.  This suggests he accepted the invitation from Mr Spiegel to draft the Loan Agreements.

    (4) For the reasons discussed in §107 below, the Tribunal finds that Mr Schneider drafted the guarantees.  That makes it more likely that he also drafted the Loan Agreements.

    (5) The formatting of the Loan Agreements lends some inferential support to Mr Spiegel's evidence because it suggests that the content of the agreements was cut and pasted from other precedents.  For example, the headings to clauses 1 to 7 inclusive are in capitals, whereas the headings to clauses 8 and 9 are in lower case.  Furthermore, as mentioned above, clause 6 refers to 'the Notes', when no notes formed any part of the transaction.

    (6) There is a slight but noticeable difference between the Respondents' case in these proceedings and the evidence they have adduced in support of the New York proceedings.  As noted above, the Respondents' Defences say no more than that they have no recollection of Mr Schneider drafting the Loan Agreements.[83]  By contrast, in the New York proceedings Mr Drukker has sworn an affidavit dated 22 June 2017,[84] in which he says this: "*The two loan agreements were produced by Mr Spiegel.*"[85]  It does

---

[82] See §20 of their Defences [1/11] and [1/12].

[83] *Ibid* §20 [1/11] and [1/12].

[84] [2/533].

[85] See §17 [2/536].

not encourage the Tribunal's confidence in the integrity of the Respondents' case to see slightly varying accounts of the same factual issue.

(7)    In any event, the Respondents have offered no witness evidence in these proceedings. By contrast, Mr Spiegel has made a witness statement setting out his evidence in this regard, and he has also tendered himself for cross-examination.

(8)    In particular, Mr Spiegel's evidence was that he met Mr Schneider in a coffee bar in mid-August 2012 when Mr Schneider handed over copies of the draft Loan Agreements which he (Mr Schneider) had prepared.  This evidence is to some extent corroborated by an exchange of emails between them on 10 August 2012[86] (which is the date of the Loan Agreements).  Although the subject line of the emails is *"Re: Bendery Valuation – Part 2"* it is common experience that the subject matter of an email chain may evolve without the parties necessarily up-dating the subject line of their communications.  In this instance, at 2:41 pm on 10 August 2012 Mr Spiegel was writing to Mr Schneider, asking: *"Then do we meet?"* Mr Schneider replied: *"I have been working on our stuff all morning … I will try to finish in the AM and lets [sic] meet around 2 tomorrow. Will it work for you?"* Mr Spiegel replies at 3.22 pm *"Yes, Boss!!! anything good for you is good for me See you tomorrow at 2 (In Aroma?)"*.

97.   All of this tends to support Mr Spiegel's evidence that it was Mr Schneider who drafted the Loan Agreements.

### B.7  The Letter of Agreement

98.   On 17 August 2012, a Letter of Agreement between AMM Consulting and WJ Holding was executed (**"the Letter of Agreement"**).[87]  The copy produced to the Tribunal is signed only by Mr Spiegel on behalf of AMM Consulting, but the Respondents state in their Defences that both parties executed the agreement.[88]  It refers to the Agreement of Sale, and it states that AMM Consulting acknowledges that valuable consideration for WJ Holding entering into that agreement *"is continued consulting provided by the managing member of [AMM Consulting], [Mr Spiegel]"*.  The agreement then continues as follows:

> *"Parties now agree that in the event [Mr Spiegel] stops providing consulting [WJ Holding], or any successor thereof, for any reason, including [WJ Holding] terminating [Mr Spiegel] for any reason at his sole and absolute discretion, [WJ*

---

[86] [2/580].

[87] [2/381].

[88] *Ibid* §22 [1/22] and [1/12].

> *Holding] shall be entitled to terminate the [Agreement of Sale] and rescind the*
> *transaction by giving notice to [AMM Consulting] and paying a sum of two*
> *hundred and fifty thousand dollars ($250,000) within thirty days of the Notice. In*
> *the event of rescission hereunder the payment of $250,000 by [WJ Holding] to*
> *[AMM Consulting], [AMM Consulting] agrees to transfer any and all rights it may*
> *have had (including any rights to accrued dividends) back to [WJ Holding]".*

99.    It is common ground between the parties that the Letter of Agreement was intended to make provision for the re-transfer to WJ Holding of any equity in Bender Oil which had been acquired by AMM Consulting under the Agreement of Sale. On that basis, each side seeks to rely on the Letter of Agreement to support its case:

    (1)    For their part, the Respondents say that it supports their argument that Mr Spiegel agreed to acquire an equity interest in Bender Oil, otherwise there would have been no need to make provision for its re-transfer.

    (2)    In answer, the Claimants say that the consideration payable on re-transfer under the Letter of Agreement is consistent with the figure of $210,000 in the Agreement of Sale, and is inconsistent with the Respondents' case that Mr Spiegel agreed to acquire a 30% equity stake for $7 million.

100.    The Letter of Agreement provides at least some support for the Claimants' case, and it is less consistent with the Respondents' case, for a number of reasons:

    (1)    The Letter of Agreement talks only of the parties "*entering into*" the Agreement of Sale. It does not say either (i) that that agreement had been completed, or (ii) that AMM Consulting had in fact acquired any shares in Bender Oil, or (iii) that Mr Spiegel, through any corporate vehicle, had made an unconditional agreement to acquire an equity interest in Bender Oil. As such, it provides no support for the Respondents' case that there was an unconditional agreement for Mr Spiegel to enter into an equity purchase at all, let alone for $7 million.

    (2)    On rescission of the Agreement of Sale, the obligation on AMM Consulting under the Letter of Agreement is "*to transfer any and all rights it may have had*". The most natural interpretation of the Letter of Agreement is accordingly that it was intended to work prospectively, imposing an obligation on AMM Consulting (on the occurrence of some future contingency) to transfer back to WJ Holding rights in relation to Bender Oil which, as at the date of the Letter of Agreement, AMM Consulting had not yet acquired.

(3)     The consideration payable under the Letter of Agreement on re-transfer makes sense in
the context of a potential 30% equity investment for $210,000. It makes no sense in the
context of an equity investment for $7 million.

### B.8  The personal guarantees

101.  Although the Loan Agreements were signed in early August, it is common ground that no
moneys were advanced for several months. Mr Spiegel's explanation is that he was waiting for
the personal guarantees to be signed by Mr Drukker and his wife. The Respondents deny that
there was any agreement for personal guarantees.

102.  On 5 September 2012, Mr Spiegel sent Mr Drukker an email in Russian which has been
translated as follows:

> "I was very surprised that you still haven't talked to Marina. As I understood, the
> matter is urgent. We talked about it August 27. As you understand, until the
> documents are signed correctly, we won't be able to do anything."

103.  Mr Spiegel's explanation for this email is that Marina is Mr Drukker's wife, and that this email
was referring to the fact that Mr Drukker urgently needed money for the Bender Oil project
(hence "As I understood, the matter is urgent"), but Mr Spiegel was not going to advance any
funds until the personal guarantees had been signed by Mr and Mrs Drukker (hence "until the
documents are signed correctly, we won't be able to do anything").

104.  The next day, 6 September 2012, Mr Spiegel sent an email to Mr Schneider in Russian, the
translation of which shows that the subject line was "Personal guarantee". The body of the
email says that Mr Spiegel thought "we can mention Marina and Yura in one guarantee
(without conditions and reservations) as the loan guarantors acting jointly and severally, and ,
have it notarized in Moscow and sent to me by DHL". Mr Spiegel's evidence is that "Marina
and Yura" was a reference to Mr and Mrs Drukker, and that he was talking in this email about
the personal guarantees that Mr Schneider was meant to be drafting for them to sign in support
of the loans to be made to WJ Holding and Stubrick under the Loan Agreements.

105.  The day after that, 7 September 2012, Mr Schneider sent Mr Spiegel an email under the subject
line "Guaranty". He said this:

> "Attached please find the form of the guaranty. I have drafted this as a mere
> accommodation for WJ Holding, and do not represent any parties to the loan and
> guaranty agreements (neither Lenders nor Borrowers nor Marina Drukker nor

*Yuri Drukker).   I strongly recommend that you all review these documents with the counsel of your choice."*

106. Attached to Mr Schneider's email were two draft guarantees in the names of Mr and Mrs Drukker, one in respect of WJ Holding's debt liability under the Shireen Loan Agreement, and one in respect of Stubrick's debt liability under the Mazlin Loan Agreement.

107. The accumulation of evidence outlined above leads the Tribunal to accept Mr Spiegel's case in relation to these documents:

    (1) Mr Spiegel has given witness evidence which provides a coherent explanation of the documents, and the documents are consistent with his account.

    (2) It is particularly striking that Mr Schneider, who is Mr Drukker's son-in-law, drafted the relevant guarantees, and expressed no surprise at having been asked to do so.

    (3) The fact that Mr Schneider says he was not acting for any of the parties does not detract from this inference in any way.  Rather the reverse:  having referred to *"the loan and guaranty agreements"*, Mr Schneider specifically advises the parties to obtain independent legal advice, which strongly suggests that he regarded the Loan Agreements as being genuine, and that the guarantees would be legally binding on Mr and Mrs Drukker when executed.

    (4) The Respondents have offered no witness evidence to contradict Mr Spiegel's account.

108. The existence of these draft guarantees, and the fact that Mr Spiegel was unwilling to allow any funds to be advanced under the Loan Agreements until the personal guarantees had been signed, provides further inferential support for the Claimants' case:  if the funds to be advanced under the Loan Agreements had in truth been an equity investment, there would have been no need to hold back payment from the 'lenders', and there would have been no commercial purpose in obtaining personal 'guarantees' from Mr and Mrs Drukker.

109. As to subsequent events, Mr Spiegel's written evidence is that:  he met with Mr Drukker at a coffee shop in November 2012 where Mr Drukker signed the personal guarantees;  Mr Drukker then took the signed guarantees with him to procure his wife's signature;  Mr Spiegel did not keep a copy of the guarantee signed by Mr Drukker;  Mrs Drukker then refused to sign the guarantees;  and Mr Drukker and the Respondents have since denied that it formed any part of

the deal that Mr and Mrs Drukker would provide any guarantees, or that Mr Drukker ever signed them.

110. The Tribunal accepts Mr Spiegel's evidence in this regard, for a number of reasons:

   (1) The Loan Agreements refer to a 'Security Agreement'. As noted above, no explanation has been offered for that term other than as a reference to the intended guarantees.

   (2) The fact is that no funds were advanced under the Loan Agreements for several months after their execution. The timing of the emails in September, followed by Mr Spiegel's account of his meeting with Mr Drukker in November, followed by the first transfer of funds in late November 2012, lend support to the Claimants' case that they would not advance any money until Mr Drukker had agreed to give the personal guarantees.

   (3) The Respondents' case is that there never was any agreement to provide personal guarantees. For the reasons outlined above, the Tribunal has rejected that case. The Tribunal infers that the reason why the Respondents were keen to deny the existence of any agreement to provide personal guarantees is that (i) the moving spirit behind the Respondents is plainly Mr Drukker, and Mr Drukker was keen to deny having incurred any potential personal liability under a guarantee and (ii) the existence of a personal guarantee would have been more consistent with a true loan, rather than an equity investment.

   (4) Mr Spiegel has given witness evidence and submitted himself to cross-examination on this issue. The Tribunal found his testimony to be consistent with the documentary record and convincing on this point.

   (5) By contrast, the Respondents have offered no witness testimony, despite having filed a lengthy Response and Statement of Defence.

111. For these reasons, the Tribunal is satisfied that Mr Drukker did sign the personal guarantees[89] in November 2012.

### B.9  Mr Spiegel's visits to the plant

112. The Respondents' case is that (i) the transfers of funds were made in late 2012 and early 2013 after Mr Spiegel had satisfactorily completed his due diligence investigations into Bender Oil,[90]

---

[89] [2/385] and [2/387].

(ii) Mr Spiegel conducted that due diligence on site at Bender Oil's premises, (iii) when he visited the Bender Oil plant he was introduced as Mr Drukker's partner and as a shareholder in Bender Oil, and (iv) he participated in management decisions. They rely on this as evidence of Mr Spiegel having agreed to acquire a 30% equity interest in Bender Oil.

113. The Respondents' case in this regard is said to be supported by a document dated 14 December 2016,[91] apparently signed by a Mr M.M. Gurduza as a director of Bender Oil. That document is addressed "*To whom it may concern*". The Tribunal has seen no witness statement from Mr Gurduza. Nevertheless, the Tribunal has no reason to doubt that he signed the document in question. It says this (with numbering inserted for ease of reference):

> "*[1] We hereby confirm that during the period since 2012, from the commencement of actions to relaunch the factory after seven years of standstill, namely rebuilding, renovation and modernisation of Bender Oil Extraction Plant, Mr Alex Spiegel repeatedly visited, together with Mr Y.P. Drukker ...*
>
> *[2] Mr Alex Spiegel was introduced to us as the partner of Mr Drukker – shareholder of [Bender Oil]. On numerous occasions, they noted that any actions regarding repair, installation and acquisition of equipment, and for the future and as far as was known, all matters concerning the procurement of raw materials, processing of such materials and sale of finished products, would have to be reported to both of them for their joint approval.*
>
> *[3] On numerous occasions since 2012, Mr Drukker gave formal instructions for all reports relating to the economic activity of [Bender Oil] to be presented to Mr Spiegel in his capacity as shareholder.*
>
> *[4] In addition, during his visits to the factory, Mr Alex Spiegel took part in management meetings of [Bender Oil], and held separate meetings with the deputy director of [Bender Oil] in charge of economic and financial affairs.*"

114. Mr Spiegel's evidence is that he did indeed visit the plant during 2012, because he was keen to find out about the progress of the venture. He says that his motivation was mixed: (i) as a trained mechanical engineer, he was curious, (ii) he was thinking of making an equity investment, and (iii) since he did not hold copies of any personal guarantees from Mr and Mrs Drukker, he was anxious to monitor progress at the plant, with a view to doing what he could to protect his companies' interests under the Loan Agreements. As such, he largely accepts the content of the document quoted above, with the exception of §3.

115. The Tribunal's conclusions in relation to this document, and to Mr Spiegel's visits to the plant generally, are as follows:

---

[90] See for example §8 of their submissions dated 11 April 2017 [1/4] and §23 of their Defences [1/11] and [1/12].

[91] [2/494–495].

(1)    To the extent that the document's content is admitted by Mr Spiegel, the Tribunal accepts it as accurate.

(2)    To the extent that its content is not accepted by Mr Spiegel, it contains contested evidence from Mr Gurduza which has not been verified by a witness statement or tested by cross-examination.  To that extent, the Tribunal cannot place any reliance on it.

(3)    The fact that Mr Spiegel visited the plant and supervised some of its activities is consistent with each party's case:  it is not consistent only with the Respondents' case that Mr Spiegel had entered into an unconditional agreement to take a 30% equity interest, whether for $7 million or at any other price;  nor is it consistent only with the Claimants' case that the Loan Agreements genuinely reflected the bargain between the parties and that Mr Spiegel was merely exploring the possibility of making an equity investment.

(4)    For these reasons, the Tribunal considers that the document, and the evidence regarding Mr Spiegel's visits to the plant, assists neither party.

### B.10  Payments made by the Claimants to the Respondents

116.  The Respondents admit in their Statements of Defence that –

(1)    *"On 30 November 2012, [WJ Holding] received from [Mazlin] an amount of CHF 1,900,000"*;[92]

(2)    *"On 3 December 2012, [WJ Holding] received from [Shireen] an amount of CHF 3,490,500"*;[93]

(3)    *"On 3 January 2013, Stubrick received from [Mazlin] an amount of USD 2,850,000"*.[94]

117.  The Tribunal has also seen the following bank records:

(1)    an account statement from Eurobank Cyprus Ltd dated 7 December 2012 relating to WJ Holding's account № 001-2011-00140829, which shows an amount of CHF 1,900,000 being credited to the account from Mazlin on 30 November 2012;[95]

---

[92] See §54 of the Defence in the Mazlin claim [1/11].

[93] See §53 of the Defence in the Shireen claim [1/12].

[94] See §55 of the Defence in the Mazlin claim [1/11].

[95] [2/582].

(2)   a Debit Advice from Bank Frey & Co AG dated 3 December 2012 reflecting a transfer of CHF 3,490,500 from Shireen to WJ Holding;[96]

(3)   an Inward Swift statement from Eurobank, Nicosia Main Branch, dated 3 December 2012 reflecting the receipt by WJ Holding of the CHF 3,490,500: against the line 'Details of Payment' it says *Loan Agreement as per 10th of August 2012*";[97]

(4)   a bank statement from Compagnie Bancaire Helvétique dated 12 May 2013 in relation to Mazlin reflecting a payment order dated 3 January 2013 to Stubrick in the sum of US$2,850,088.60.[98]

118.  Based on this material, the Tribunal finds that the following sums were received by the Respondents from the Claimants on the following dates:

(1)   on 30 November 2012 WJ Holding received CHF 1,900,000 from Mazlin;[99]

(2)   on 3 December 2012 WJ Holding received CHF 3,490,500 from Shireen;[100] and

(3)   on 3 January 2013 Stubrick received US$2,850,088.60 from Mazlin.[101]

119.  No evidence has been adduced of any requests having been made for draw-downs pursuant to the provisions of the Loan Agreements. It is therefore apparent that there was no strict adherence to those provisions, either in terms of (i) the currency (clause 1.1), (ii) the stipulated amount of each advance (clause 1.4) or (iii) the specified method for requesting advances (clause 1.7). The Respondents' case is that this non-compliance evidences the fact that the sums were advanced by way of an equity investment, and not as loans pursuant to the terms of the Loan Agreements.[102] In response, it was Mr Spiegel's evidence that the parties' actual

---

[96] [2/583].

[97] [2/584].

[98] [2/585].

[99] §10(a)(i) of the Statement of Case in the Mazlin claim [1/9] erroneously states that the transfer was made on 11 November 2012. Having seen the banking documentation referred to in §117 of this Award, we are satisfied that the Respondents are correct in saying (as they do in §54 of their Defence to the Mazlin claim [1/11/86]) that the transfer was effected on 30 November 2012.

[100] There is no dispute about this figure.

[101] In §55 of the Defence in the Mazlin claim [1/11] the Respondents say that only $2,850,000 was received, not $2,850,088. Nevertheless, having seen the bank statement at [2/585] we accept the Claimants' figure in this regard.

[102] See §21 of the Defences [1/11] and [1/12].

understanding was simply that he would advance the loan funds as and when they became available.

120. Having considered these competing arguments, the Tribunal does not find that the obvious non-compliance with the terms of the Loan Agreements in this regard is significant in resolving the factual issues in dispute. That non-compliance might be said to support the Respondents' case, but on the other hand it might be said simply to reflect the informal nature of the financial arrangements between two men who had known and trusted each other since childhood.

121. It is also significant to note the terms in which the Respondents have on occasion acknowledged the fact that these payments were made. For example, in §8 of their submissions dated 11 April 2017,[103] they admitted that "*transfers of funds under the Loan Agreements were made by the Claimants between November 2012 and January 2013*" (emphasis added).

122. For these reasons, the Tribunal is in no doubt that (i) money was in fact paid by the Claimants to the Respondents respectively on the dates and in the sums listed in §118 above, (ii) the payments were so made ostensibly under the terms of the Loan Agreements and (iii) in all the circumstances of this case, the question whether those sums are now repayable turns on the answer to the question whether the Loan Agreements were shams, in the sense that the parties in fact agreed (as the Respondents contend) that any sums advanced in purported compliance with their terms actually represented an equity investment by Mr Spiegel in Bender Oil and would therefore not be repayable according to the tenor of the agreements.

B.11  The December 2012 draft Agreement of Sale

123. The final agreement relevant to the issues in dispute is a draft Agreement of Sale dated December 2012.[104] Like the executed Agreement of Sale from March 2012, it is concerned with an acquisition of a 30% equity interest in Bender Oil by AMM Consulting, but it differs from the earlier agreement in a number of respects:

(1) The seller is stated to be Mr Drukker personally, rather than WJ Holding.

(2) Clauses 2 and 6(a) recognise that WJ Holding may not be able to fulfil the privatisation requirements.

---

[103] [1/4/21]. It is also worth noting that in §16 and §18 of the Complaint in the US proceedings mentioned in §19(2) above and §151 below, the Respondents describe these payments as having been made "*under the sham Loan Agreements*" [2/505].

[104] [2/388].

(3)    Clause 3 provides that the purchase consideration shall be $500,000 (rather than the $210,000 stated in the March Agreement of Sale).

(4)    Under clause 7(e), AMM Consulting acknowledges that Mr Drukker and WJ Holding "*are not making and have not made any statement, representation or warranty to him or his advisors concerning (i) the fairness or adequacy of the Purchase Price*".

124.    The existence of this draft document, together with the circumstances in which it was prepared, lend further support to the Claimants' case:

(1)    It is a fact that, by December 2012, no shares in Bender Oil had been transferred to AMM Consulting.

(2)    It is the Respondents' pleaded case that the Moldovan government was in breach of its obligations under the 2012 Privatisation Agreement.[105]

(3)    If Mr Spiegel had already committed unconditionally to acquire a 30% equity stake in Bender Oil, and if the March 2012 Agreement of Sale and the Loan Agreements had been created as the instruments ostensibly evidencing that agreement, there would have been no practical purpose in entering into another misleading Agreement of Sale.

(4)    If the agreed purchase price for the 30% equity stake had in truth been $7 million, there would have been no practical purpose in agreeing a variation of the purchase price from the $210,000 stated in the March Agreement of Sale to the $500,000 stated in the December draft.

(5)    The fact that a draft Agreement of Sale was being prepared in December 2012 supports the inference that the parties recognised that the March Agreement of Sale might expire pursuant to clause 6(a) without having been completed because the necessary governmental approvals were not forthcoming, and that as a result a replacement Agreement of Sale would need to be agreed if Mr Spiegel was to make an equity investment. That is inconsistent with the Respondents' case – namely, that Mr Spiegel had already concluded a binding and unconditional agreement to make an equity investment earlier in 2012.

(6)    Accordingly, both the existence and the contents of the December draft support Mr Spiegel's case that (i) he was considering and negotiating a possible equity investment, without having concluded any unconditional deal in that regard, and (ii) the plant was

---

[105] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99].

beginning to commence production and was, as a result, increasing in value as time passed, hence the proposed increase in price.

### B.12  Correspondence in early 2013

125. On 3 January 2013, Gerard Virga, of Finkelstein & Virga PC (a law firm representing Mr Spiegel's interests), wrote to Mr Schneider (representing Mr Drukker's interests).[106]  The first paragraph refers to "*the deal*", and paragraph number 1 states that "*AMM understands that it is purchasing a thirty (30%) percent interest in the entire operation*".  This wording might be taken to imply that a deal had already been concluded.  Furthermore, it is unlikely to have been a coincidence that the letter was written on the same day as the third and last transfer of funds was made (by Mazlin to Stubrick).  As such, it might be thought to provide support for the Respondents' case.

126. Nevertheless, it is apparent from a fair reading of the letter as a whole that it is discussing a potential deal which was still in the process of negotiation, and had not been concluded:

   (1)  In paragraph number 1, Mr Virga says this: "*We suggest that Delta Agro be a holding company owning 100%, directly or indirectly, of each of the companies constituting the operating group*" (emphasis added).  Paragraph 5(A) says this: "*AMM may form a wholly owned entity to own its membership interest in the holding company prior to contract execution*" (emphasis added).  It is therefore apparent that no agreement had even been reached as to the identity of the respective parties to any equity investment, or to the structure of the deal.  That is inconsistent with the Respondents' case that a binding equity investment deal had already been concluded in 2012.

   (2)  The second paragraph under numbered paragraph 1 says this: "*Apparently, WJ Holding owns a fifty (50%) percent interest in [Bender Oil].  The other fifty (50%) percent interest is held by Kelley Oil Refinery Ltd.*"  It is therefore clear that the prospective purchaser was not even sure that the prospective seller was in full ownership of the target.

   (3)  The following paragraph says this: "*Our understanding is that WJ Holding has an extensive history.  We should attempt to isolate that history from this transaction.  Please advise us of your thoughts on this area.*"  This may have been a reference to the circumstances in which Mr Drukker parted company from his former business partners.

---

[106] [2/394].

At all events, it further evidences the fact that the negotiations for any acquisition by Mr Spiegel of an equity interest in Bender Oil were still at an embryonic stage.

(4)     Paragraph number 2 contains a string of questions and requests for assurances regarding Bender Oil's financial position.  Paragraph number 3 says this: "*AMM expects representations and warranties that confirm the concepts set forth above*" (emphasis added).  Paragraph number 4 says this: "*The PMR consent needs to be a closing condition*" (emphasis added).  Together, these paragraphs all demonstrate clearly that the parties were still exploring the possibility and the terms of an equity investment.  As such, they are entirely inconsistent with any unconditional deal having already been concluded for an equity investment by Mr Spiegel.

(5)     Paragraphs 5(B) to (I) contain a number of detailed proposed terms which had clearly not yet been agreed.  Again, this is all entirely inconsistent with an unconditional deal having already been agreed.

127.  Mr Schneider replied by letter on 19 February 2013.[107]  He said that his understanding was "*that our respective clients had a number of follow up meetings*".  That clearly suggests the parties were still in negotiation.  The same inference is to be drawn from the letter as a whole.  For example, it refers in numbered paragraph 1 to Mr Schneider's understanding "*that AMM is buying into a group of companies*" (emphasis added) – not that Mr Spiegel had already bought into Bender Oil.  Mr Schneider refers later in the same paragraph to the "*draft agreements that I have provided in the past*" (emphasis added):  if the March 2012 Agreement of Sale and the August 2012 Loan Agreements had in fact been intended by the parties to reflect a concluded and unconditional deal for an equity investment by Mr Spiegel, it is difficult to see why Mr Schneider would still have been providing draft agreements many months later.  Having answered the various points raised in the letter from Finkelstein & Virga, Mr Schneider ends his letter by saying that he "*would be happy to sit-down with [Mr Virga] to discuss any remaining open items*" (emphasis added):[108] the fact that he expressly acknowledges that there were open items is inconsistent with the Respondents' case that a concluded, unconditional deal had been made some months earlier.

---

[107] [2/398].

[108] [2/400].

**B.13  Power of Attorney**

128.   There was an exchange of emails between Mr Rashkov and Mr Schneider on 23 September 2013,[109] and Mr Spiegel executed a Power of Attorney in favour of Mr Rashkov dated 27 September 2013.[110]   The Respondents rely on these documents in support of their case.[111]   They allege that the Power of Attorney was executed by Mr Spiegel in order to enable Mr Rashkov to execute the anticipated agreements for the equity investment by Mr Spiegel, and that the emails confirm their story.   Mr Spiegel's evidence is that these documents were addressing other, unrelated prospective investments by him in the region.

129.   The Power of Attorney[112] authorises Mr Rashkov to perform a number of actions on behalf of Mr Spiegel, including buying and selling "*shares or participation interest of any Moldovan enterprises*" (clause 1) and performing any actions and formalities "*related to the incorporation and registration of a limited liability company in the Republic of Moldova*" (clause 3).   The emails comprise the following exchange.[113]   Mr Rashkov emailed Mr Schneider saying this:

> "*Volodya, we also need:*
>
> *1. Certificate of registration of AMM*
>
> *2. Extract from the commercial register regarding AMM*
>
> *3. Document confirming the founders of the company all the way to physical persons (Beneficial owner)*
>
> *4. Decision of the competent body of AMM on the purchase of shares in Moldova*
>
> *5. Power of attorney or personal presence director [sic] of AMM*".

130.   Mr Schneider emailed Mr Rashkov as follows:

> "*Sergey:*
>
> *See the attachments.  Full package of documents for Mr Spiegel.  He will purchase shares of the companies for AMM.  Please organise the translation of these documents.  The originals are on their way to you.*"

---

[109] [2/409–410].

[110] [2/411–414].

[111] See §28 of the Defence to the Mazlin claim [1/11/81] and §27 of the Defence to the Shireen claim [1/12/99]. See also §24 of Mr Drukker's affidavit in the New York proceedings [2/538].

[112] The Respondents have provided an English translation [2/411–412] of the Russian original [2/413–414].

[113] The Respondents have again provided an English translation [2/409] of the Russian original [2/410]. It is not entirely clear which of the two emails came first. Neither one obviously answers the other. Furthermore, each party may have been in a different time zone when the messages were sent, so the apparent time of sending is not necessarily determinative. Moreover, the subject lines of the two emails do not match:  the message from Mr Schneider is written under the heading "*FW:*" whereas the message from Mr Rashkov is under the heading "*HA:*".  We have accordingly set them out in the order in which they appear on the page as an exhibit to the Respondents' Defences.

131. Whilst these documents might appear to be consistent with the Respondents' case, the Tribunal finds it difficult to attach any weight to them, for a number of reasons:

(1) First, neither the Power of Attorney nor the emails make any specific reference to the Bender Oil project.

(2) Second, the Power of Attorney confers powers on Mr Rashkov well in excess of what would have been necessary simply in order to enable him to enter into a share acquisition agreement on behalf of Mr Spiegel.

(3) Third, as the Respondents have been at pains to point out, both Mr Drukker and Mr Spiegel are resident in the USA, and the terms of Mr Spiegel's prospective equity investment in Bender Oil were negotiated between them and their respective US lawyers. In the circumstances, there is no obvious reason (and certainly none was suggested by the Respondents) why any share purchase agreement reflecting that equity investment would have had to be executed in Moldova.

(4) Fourth, it is apparent from Mr Schneider's email message that he was sending Mr Rashkov a "*package of documents*". If those documents had supported the Respondents' case, the Tribunal would have assumed that they would have been produced as an exhibit to the Defences, along with the covering email. They were not.

(5) Fifth, Mr Schneider's email says that Mr Spiegel "*will purchase shares of the companies*" (plural). None of the documents that have been produced relating to the Bender Oil project involved Mr Spiegel (or any company owned and controlled by him) acquiring shares in more than one company.

(6) Finally, even if the Tribunal had rejected Mr Spiegel's evidence in this regard, it would not have considered that either the Power of Attorney or the emails support the Respondents' case. In particular, they do not demonstrate that a concluded, unconditional deal for an equity investment was ever made. At most they might show that Mr Spiegel was putting in place a mechanism for executing the necessary documents if an investment deal were to be concluded. But the fact that he was putting such a mechanism in place is not evidence that an unconditional deal was in the event concluded.

132. For these reasons, the Tribunal finds that the Power of Attorney of 27 September 2013 and the emails of 23 September 2013 do not assist the Respondents' case.

**B.14  Health insurance**

133.  The Respondents allege that Mr Drukker arranged for health insurance for Mr Spiegel and his family (including his ex-wife), and that he paid them salaries through one of his New York companies, YD Export Import Inc.[114]  They have produced some Forms W-2[115] and a table prepared by Mr Drukker's accountant[116] both of which appear to evidence these payments.  The Respondents say that this is proof of the concluded nature of Mr Spiegel's agreement to acquire an equity interest in Bender Oil.[117]

134.  Mr Spiegel agrees that he and members of his family were indeed notionally employed by one of Mr Drukker's companies and that they were enrolled in a health insurance plan.  However, Mr Drukker's evidence is that these arrangements only lasted a matter of months, and also that any salary paid to him and to members of his family was reimbursed by them.

135.  The Tribunal accepts Mr Spiegel's evidence in this regard.  The accountant's table covers a period of less than a year during 2013, and the Forms W-2 appear to relate to the same payments.

136.  In any event, the Tribunal does not consider that these arrangements are relevant to, or provide any support for, the Respondents' case in relation to the issues that have to be decided.  The payments are not expressly referable to Bender Oil, nor do they involve any of the corporate vehicles which were involved in the attempted operation of the plant.  Furthermore, there is no obvious reason why an equity investment would necessarily also have involved an employment contract or a health insurance plan in the first place, nor do the Respondents seek to explain why the Tribunal should draw the inference they suggest from the bare documentation they have produced.

137.  For these reasons, the Tribunal does not consider that the evidence relating to health insurance assists the Respondents' case.

---

[114] See §27 of the Defence to the Mazlin claim [1/11/80] and §26 of the Defence to the Shireen claim [1/12/98]. See also §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

[115] [2/415–416].

[116] [2/401].

[117] See §23 of Mr Drukker's affidavit in the New York proceedings [2/538].

### B.15  The failure of the Bender Oil project

138.  It is common ground that the Bender Oil project was not a commercial success.   The Respondents attribute its failure to the non-performance by the Moldovan government of its various undertakings and guarantees under the 2012 Privatisation Agreement.[118]   For the purpose of these arbitration claims, it is unnecessary to make any findings as to the cause of the commercial failure.  The fact is that the project was not a success.

139.  The Respondents' case is that in these "*changed circumstances*" Mr Spiegel decided to try relying on the Loan Agreements according to their tenor, and "*purposely delayed the efforts to finalize the corporate documentation*".[119]   This wording is almost an admission by the Respondents that, even on their own case, there was no concluded contract for an equity investment by Mr Spiegel.  At all events, the Tribunal rejects the Respondents' argument that Mr Spiegel purposely delayed finalising any documentation.  The record demonstrates that the negotiations drifted on inconclusively.

### B.16  The draft Operating Agreement & MIPA

140.  Each of the parties has sought to rely on the draft Operating Agreement[120] and the draft MIPA,[121] which were prepared at some point during 2014.  Each draft is more than 30 pages long.

141.  For an accumulation of reasons, the Tribunal considers that both the existence and the content of these documents support the Claimants' case:

    (1)   Neither party contends that the Operating Agreement or the MIPA was ever executed as a binding agreement.  They both remained in draft.  If there had been a concluded, unconditional deal in 2012 for Mr Spiegel to acquire a 30% equity interest in Bender Oil (whether for $7 million or at any other price), there would have been no need for the parties still to be negotiating detailed contractual documents nearly 2 years later.

    (2)   The parties to the draft Operating Agreement and MIPA were different from those in the 2012 agreements.  The parties to the draft Operating Agreement and MIPA included

---

[118] See §32 of the Defence to the Mazlin claim [1/11/81] and §31 of the Defence to the Shireen claim [1/12/99]. The 2012 Privatisation Agreement is at [2/343].

[119] See §33 of the Defence to the Mazlin claim [1/11/82] and §32 of the Defence to the Shireen claim [1/12/100].

[120] [2/417].

[121] [2/456].

Mr Drukker personally, and also a company called AMM Bender Holdings LLC ("**AMM Bender Holdings**"), a Florida entity which is different from AMM Consulting (the party to the March 2012 Agreement of Sale). Furthermore, the subject matter of the agreements was another Florida entity, Delta Agro Holdings LLC, not Bender Oil or WJ Holding (as in the March 2012 Agreement of Sale). In other words, even the underlying structure of the deal had still not been concluded.

(3)    Clause 8 of the Operating Agreement refers to the 'Initial Capital Contributions' of the parties by reference to the figures set out in Schedule A. The column headed 'Capital Contributions' in Schedule A is in fact blank. This clearly shows that some of the most fundamental provisions of the deal were still under negotiation.

(4)    More generally, the detailed terms of the draft Operating Agreement broadly reflect the terms under negotiation between Mr Virga and Mr Schneider in early 2013. This reinforces the inference that the parties conducted lengthy negotiations, and had not concluded any deal.

(5)    The Purchase Price stipulated in the MIPA for a 30% equity stake was $500,000 (the same figure as in the draft December 2012 Agreement of Sale[122]). This is again inconsistent with any pre-existing deal having been concluded at $7 million. Conversely, it also lends inferential support to the Claimants' case that any potential equity investment by Mr Spiegel was to be measured in hundreds of thousands of dollars, not in millions. The increase in price from the $210,000 stipulated in the March 2012 Agreement of Sale to the $500,000 proposed in the MIPA some two years later was presumably attributable to the fact that the Bender Oil plant, albeit not as profitable as hoped, had at least entered into production.[123] At all events, if the Loan Agreements had been shams, and the true price for the equity investment had been $7 million, there would have been no need for the parties to have negotiated an upward lift in the purchase price in 2014 from $210,000 to $500,000.

142.   Each of the draft Operating Agreement and the draft MIPA provide for the application of New York law, and for disputes to be resolved by arbitration in New York under the Commercial Arbitration Rules of the American Arbitration Association. This may explain the Respondents'

---

[122] [2/388].

[123] In his letter of 19 February 2013 [2/398], Mr Schneider had said this: "*It is my understanding that [Bender Oil] is now reaching desired operational capacity*".

repeated reference to "*other ancillary agreements*"[124] which are said to be governed by New York law and by "*other dispute resolution clauses*".[125] However, it is apparent that these drafts were never agreed or executed, and accordingly the Respondents' case in this regard cannot be sustained.

### B.17  Termination of the negotiations

143.   On 25 July 2014, Mr Virga wrote to Mr Schneider[126] saying that he represented AMM Bender Holdings, and continuing as follows:

> "*After attempting to negotiate the purchase of a thirty (30%) percent membership interest in Delta since December 2012, AMM has concluded that further efforts are futile.  AMM terminates negotiations.*
>
> *After approximately twenty (20) months of negotiations, basic issues are still not resolved.  The "Group" entities are not formed, or at least not disclosed to us.  A draft of the Disclosure Schedule has not been provided.  The Seller still insists on qualifying each and every representation by Seller's knowledge and information contained in documents outside of the Disclosure Schedule that may have been provided or seen by AMM.  The obligation to enforce the Privatization Agreements is so vague and discretionary that it is essentially meaningless.  The above items are not meant to be exhaustive.*"

144.   This letter does not seem to have prompted any response from Mr Schneider either (i) denying any of the points made by Mr Virga or (ii) suggesting that Mr Spiegel (or AMM Consulting) had already entered into a binding deal in 2012.  As a result, and in light of all the other evidence, the Tribunal's conclusion is that (a) the existence of this letter and the apparent absence of any reply supports the Claimants' case that no unconditional deal was concluded in 2012 (or at any other time) for the acquisition by Mr Spiegel (or any company owned and controlled by him) of a 30% equity stake in Bender Oil and (b) by July 2014 the negotiations for such an acquisition had stalled for the reasons outlined by Mr Virga (and not because of any deliberate obstruction on Mr Spiegel's part).

145.   The Tribunal has also seen a similar letter from Mr Virga dated 12 January 2015, addressed "*To Whom It May Concern*".[127]  It is unclear whether this later letter was in fact sent to anyone, so

---

[124] See for example §10 of the Response to Request for Arbitration [1/2/7].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[125] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[126] [2/492].

[127] [2/493].

neither its content nor the apparent absence of any reply assists the Tribunal in resolving these claims.

### B.18 Proceedings in Cyprus

146. In November 2016, Mazlin and Shireen apparently issued proceedings against WJ Holding and Stubrick in Cyprus, and on 30 March 2017 they obtained certain interim freezing and disclosure relief there.[128] The interim nature of that relief meant that the Cypriot court did not conduct any substantive analysis of the merits of the underlying claim, and accordingly the Claimants cannot derive any support for their case in this Tribunal from the fact that such relief was granted.

147. In his evidence in the New York proceedings, Mr Drukker alleges that an order was made by the Cyprus court on 30 March 2017 but was never served on Stubrick or WJ Holding because of Mr Spiegel's failure to post the necessary bank guarantees requested by the Cyprus court as security.[129] The Tribunal has seen no evidence that the Cypriot court order was served on WJ Holding or Stubrick, but it does not accept Mr Drukker's evidence regarding the alleged failure to provide security to the Cypriot court. The Tribunal has seen a copy of the court's order dated 30 March 2017[130] which recites on the first page that it was made "*following the deposit by [Shireen and Mazlin] of €150,000 each in cash to the Registrar of the District Court of Nicosia for covering any potential damages that may be suffered by [WJ Holding and Stubrick] due to the erroneous obtaining of the orders*". The Tribunal notes, however, that the order was only drawn up on 14 July 2017,[131] which was about three weeks after Mr Drukker had sworn his affidavit in the New York proceedings, so there may have been a delay in paying the necessary deposits.

148. The Tribunal notes that, in its summary interim judgment of 30 March 2017, the Cypriot court recorded that "*neither side disputed the signing of the [Loan Agreements], and therefore their existence*".[132]  That is consistent with the position taken by the Respondents in these proceedings. The court also said this:

> "*On the basis of the submitted affidavit, and specifically, exhibit 9 (a letter sent by Mr Drukker's son in law which pertains to the form of the guaranty), the Court*

---

[128] Appl № 479/16 [2/496] and [2/569].

[129] See §32 of his affidavit in the New York proceedings [2/540].

[130] [2/569].

[131] [2/573].

[132] [2/498].

> *noted that the Respondents seem to admit the due amount and promise a repayment using damages from another action."*

149.  The Tribunal does not seem to have been shown the letter to which the court was referring, and accordingly no significant weight can be placed on this passage from the court's ruling: but the least the Tribunal can conclude is that it certainly does not support the Respondents' case in these proceedings.

150.  Separately, the Claimants have tried drawing attention to certain alleged breaches by the Respondents of the freezing relief granted by the court in Cyprus.[133]  The Tribunal is not in a position to assess the evidence in that regard, it is not relevant to the findings in these proceedings and the allegations are discounted entirely.

### B.19  Proceedings in New York

151.  As noted above, on 7 April 2017 WJ Holding and Stubrick commenced the New York proceedings[134] against Shireen, Mazlin, AMM Consulting and Mr Spiegel, seeking (among other things) *"a declaratory judgment that certain loan agreements between Plaintiffs and Defendants are not binding, and constitute unenforceable sham loan agreements"* and also *"a permanent injunction barring Defendants from continuing their efforts to enforce these sham loan agreements"* (§1 of the Complaint).  The Respondents' case in those proceedings is essentially the same as in these arbitration claims, namely that **(i)** *"[Mr Drukker] agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7,000,000"* (§12 of the Complaint); **(ii)** the investment was structured as a loan to suit Mr Spiegel's *"tax and estate planning objectives"* (§13 of the Complaint); **(iii)** the Bender Oil plant was not as successful as anticipated because the Moldovan Government failed to perform various undertakings and guarantees under the privatisation agreement, and also blocked WJ Holding from transferring any shares in Bender Oil to Mr Spiegel or his companies (§19 of the Complaint);  and **(iv)** Mr Spiegel thereafter started claiming that the Loan Agreements were genuine commercial transactions and purposefully delayed finalising the sale agreement (§20 of the Complaint).

152.  It goes without saying that the resolution, as between the parties to the New York proceedings, of the various issues in those proceedings (including any question as to the court's jurisdiction)

---

[133] [2/512–532].

[134] Supreme Court of the State of New York, County of Kings, Index № 506949/2017 [2/501].

is a matter to be resolved only by the New York courts on the evidence adduced before them. It is equally stating the obvious to say that this Tribunal has jurisdiction to resolve the issues in these arbitral proceedings (including any question as to the Tribunal's jurisdiction[135]) as between the parties to these proceedings, on the evidence that has been adduced before the Tribunal. The only purpose in referring in this Award to the procedural steps taken and the evidence filed in the New York proceedings is to assess what light (if any) they throw on the determination by this Tribunal of the issues in these arbitral proceedings.

153. On or about 17 May 2017, the defendants in the New York proceedings (*i.e.* the Claimants in these arbitration proceedings, together with Mr Spiegel and AMM Consulting) appear to have filed a motion to dismiss the Complaint, although the Tribunal has not seen a copy of that motion.[136] What the Tribunal has seen is the affidavit sworn by Mr Drukker in response.[137] It tells essentially the same narrative and makes essentially the same allegations as the Respondents in this case, but there are some differences. In particular, in §14 Mr Drukker says this:

> "In or about early 2012 ... I agreed to sell [to Mr Spiegel] and his entities a 30 percent stake in [Bender Oil] in exchange for $7 million. [Mr Spiegel] also agreed to provide another $2 million in working capital."

154. The allegation regarding the agreement at $7 million is consistent with the case advanced by the Respondents in these proceedings. By contrast, the allegation regarding an agreement by Mr Spiegel to provide another $2 million in working capital has formed no part of the defence in these proceedings. Once again, the fact that the Respondents are advancing slightly different arguments in different proceedings does not inspire confidence in the integrity of their case. Having said that, the suggestion that Mr Spiegel agreed to provide $2 million in working capital might be said to go some way to provide an explanation on behalf of the Respondents as to why, according to their version of events, the agreed purchase price for the equity investment was $7 million, but in the event the Claimants between them transferred more than $8 million to the Respondents. That appears to be what Mr Drukker means in §21 of his affidavit, where he says that, between November 2012 and January 2013, "*Shireen and Mazlin transferred approximately $8 million under the sham Loan Agreements*" and adds this: "*The bulk of this amount was [Mr Spiegel's] equity investment*" (emphasis added). Nevertheless, the Tribunal considers that (i) the discrepancy between the Respondents' case in these proceedings and their

---

[135] See §164 below.

[136] It is mentioned in §25 of the affidavit of Frank R. Seddio dated 22 June 2017 [2/551].

[137] [2/533].

case in the New York proceedings, and **(ii)** the fact that there is indeed a significant difference between the alleged $7 million purchase price for the 30% stake and the amounts actually transferred by the Claimants further undermines the Respondents' case.

155.   In §15 of his affidavit, Mr Drukker also says this:

> "*Mr Spiegel told me, however, that he initially needed to structure his equity investment as a loan in order to achieve certain tax and estate planning objectives. This would be achieved by [Mr Spiegel] routing ostensible loans for [Bender Oil] through offshore companies and then restructuring or offsetting the debt. The parties were <u>always</u> clear that regardless of formal structure, the investment made by Mr Spiegel (through his companies) was an equity investment and the equity purchase price ... was $7 million*" (emphasis added).

156.   This is again broadly similar to the defence advanced by the Respondents in these proceedings, but **(i)** it is unsupported by any contemporaneous documentary record and **(ii)** it is inconsistent on two grounds with the email of 11 July 2012 discussed above,[138] in which **(a)** the proposed advance of funds was clearly described as a loan (not an equity investment), and **(b)** Mr Spiegel was (at least initially) pretending that the lending companies were not even associated with him.

157.   In §16 of his affidavit, Mr Drukker states that Bender Oil "*was worth in excess of $20 million*" in March 2012.   That is again consistent with the case advanced by the Respondents in these proceedings, but **(i)** the Tribunal has seen no documentary evidence to support it, **(ii)** it seems unlikely in light of the two valuations that have been produced,[139] and **(iii)** it also seems optimistic in light of the fact that the facility had been inoperative for about 6 years, and the machinery was very dated.

158.   In §17 of his affidavit, Mr Drukker says that the Loan Agreements "*were produced by Mr Spiegel*".   That positive assertion is inconsistent with the neutral assertion in §20 of the Respondents' Defences that it is "*not [their] recollection*" that the Loan Agreements were drafted by Mr Schneider.   For the reasons discussed in §96 above, the Tribunal is satisfied that Mr Schneider did draft the Loan Agreements.

159.   The Tribunal has also seen an affirmation dated 22 June 2017 by Frank R. Seddio, co-counsel for WJ Holding and Stubrick in the New York proceedings.[140]   It tells essentially the same

---

[138] [2/365]:  see §91–94 above.

[139] [2/333] and [2/339]:  see §85–86 above.

[140] [2/545].

narrative and makes essentially the same allegations as the Respondents in these proceedings. The Tribunal notes, however, that insufficient care seems to have been taken in preparing the affirmation, as Mr Seddio consistently misspells his own client's name as 'Drucker', and he also claims, for example, that "*Mr Spiegel was already a partner in my business*" and refers to "*a record prepared by my account*"[141] – neither of which makes any sense coming from Mr Seddio's mouth.  Clearly the text has been cut and pasted from a document drafted for Mr Drukker.  In any event, the affidavit does not contain any first-hand evidence concerning the disputed factual issues which have to be decided, and as a result its content is not of any further assistance in resolving these claims.

160.  For these reasons the Tribunal has derived only limited assistance from the various materials disclosed from the New York proceedings in resolving the issues in these arbitral proceedings.

### B.20  Conclusions on the facts

161.  It will be apparent that the Tribunal accepts the Claimants' case and rejects the Respondents' case on the main factual dispute between the parties.  In short, the Loan Agreements were agreed and executed as loan agreements, and not as shams to disguise an equity investment by Mr Spiegel.

162.  The Tribunal's principal reasons for reaching this conclusion may be summarised as follows:

(1)  First, the Loan Agreements are clearly expressed as loan agreements, not as an equity investment.  The starting point of any analysis is the assumption that the parties to any written contract intend to record in writing the bargain they have in fact made.

(2)  Second, the Respondents have offered no witness or documentary evidence in support of their main contention, namely that the Loan Agreements were shams, having been agreed as 'loans' for tax and inheritance planning reasons.

(3)  Even if the Loan Agreements had been structured as loans for tax and inheritance planning reasons, that in itself would not necessarily have rendered them shams, unless there had been some evidence that the purpose of the structure was to defraud relevant tax (or other) authorities.  Structuring an investment to maximise its tax efficiency is entirely legitimate, assuming the structure is lawful.  The Respondents have adduced no evidence of any unlawfulness.

---

[141] See §16 of the affidavit [2/548].

(4)     Mr Spiegel has given witness evidence and submitted himself to cross-examination (by the Tribunal) on these issues, whereas the Respondents, having made serious allegations of fraud against Mr Spiegel, have chosen to deploy no witness evidence at all, and to absent themselves from the hearing.

(5)     Having subjected Mr Spiegel to robust questioning, the Tribunal finds him to have been an essentially honest witness in relation to the issues in dispute (although not all of his conduct was necessarily creditable in a wider moral sense).

(6)     For the reasons outlined above, the Tribunal considers that Mr Spiegel's evidence is consistent with the contemporaneous documentation.

(7)     By contrast, there is not a single contemporaneous document which supports the Respondents' case either (i) that Bender Oil was valued at about $20 million in 2012, or (ii) that Mr Spiegel agreed to make an equity investment for $7 million, or (as noted above) (iii) that the investment was structured in the way it was to avoid (illegally) any tax obligations. Whilst the Respondents have made great play of the fact that they wish to pursue disclosure in the New York proceedings against Mr Spiegel personally and against AMM Consulting in order to verify their case, it is worth noting that neither of the Respondent companies, nor Mr Drukker nor Mr Schneider personally (both of whom could have been expected to assist the Respondents in any way available to them) has been able to produce a single document to support their primary case.

(8)     Furthermore, there is a significant discrepancy between the alleged agreement on which the Respondents seek to rely (*i.e.* an equity investment at $7 million) and (i) the aggregate amount of the loan facility under the two Loan Agreements (*i.e.* $17 million) and (ii) the amount of money actually transferred by the Claimant companies (*i.e.* over $8 million). Whilst there has been some suggestion from WJ Holding and Stubrick in the New York proceedings that they may seek to attribute this difference to a separate agreement by Mr Spiegel to make a further investment of $2 million by way of capital, (a) it is striking that that allegation has formed no part of the extensive pleadings and submissions made by the Respondents in these proceedings, (b) in any event it would not explain the difference between the combined value of the alleged equity and capital investments (*i.e.* $9 million) and the aggregate amount of the loan facilities (*i.e.* $17 million) and (c) it is again the case that there is no contemporaneous documentary support for the existence of any ancillary agreement by Mr Spiegel to advance a further $2 million. Furthermore, the Tribunal finds it undermines the Respondents' case that they have advanced varying arguments in these arbitration claims and in the New York proceedings.

(9)    Moreover, the Respondents' case is on analysis positively inconsistent with the documentary record in a number of respects. In particular, the March 2012 Agreement of Sale[142] was plainly conditional, and it is common ground that the conditions to completion were never satisfied. Furthermore, the fact that lengthy draft contracts were subsequently being negotiated throughout 2013 and until July 2014, and that those drafts involved different parties from those in the 2012 agreements, strongly suggests that no concluded, unconditional deal for an equity investment was ever agreed.

(10)   The Respondents have also made a number of other allegations which they have been unable to substantiate.   For example, they have relied in their pleadings and submissions on "*other ancillary agreements*"[143] which they said were governed by New York law and by "*other dispute resolution clauses*".[144]   They have also referred to "*a number of important oral arrangements between [WJ Holding] and Mr Spiegel that are fundamental to the entire construction of the dispute between the parties*".[145]   However, on analysis it emerges that no written agreements (apart from the Loan Agreements and the March 2012 Agreement of Sale) were ever concluded;   and the Tribunal has also seen no evidence to substantiate the allegation that there were any oral agreements that are inconsistent with the terms of the Loan Agreements and the March 2012 Agreement of Sale.

(11)   There is no suggestion that AMM Consulting ever paid, or that WJ Holding ever demanded, the $100,000 due on 31 December 2012 under clause 3 of the March 2012 Agreement of Sale,[146] or the further instalment of $110,000 due on 1 June 2013.  If that agreement had (as the Respondents contend) formed part of the concluded bargain for an equity investment, it is difficult to see why neither side sought either to comply with or to enforce its terms.

(12)   As noted above, the sequence of events between the making of the March 2012 Agreement of Sale and the first documented mention of a loan in the 11 July 2012

---

[142] [2/376].

[143] See for example §10 of the Response to Request for Arbitration [1/2/7].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[144] See for example §22 of the Respondents' submissions dated 11 April 2017 [1/4/24].  See also §10 of the Responses to Arbitration dated 24 May 2017 [1/7] & [1/8].

[145] See §43 of their Responses to the Claimants' Requests for Arbitration [1/7] and [1/8].

[146] [2/376].

email[147] is striking, as is the fact that that email was discussing the possibility of loans being made by companies unconnected with Mr Spiegel.

(13)   For the reasons outlined in §101–111 above, the Tribunal finds that (i) there was an agreement that Mr and Mrs Drukker would provide personal guarantees, (ii) Mr Spiegel caused the Claimant companies not to advance any funds until late 2012 because the guarantees had not yet been signed, (iii) Mr Schneider drafted and Mr Drukker signed the guarantees in November 2012, and (iv) the Claimants thereafter advanced funds to the Respondents.  All of this is consistent with the funds having been advanced by way of loan, not as an equity investment.

(14)   The Respondents admit that, for a period of about 25 years, (i) Mr Spiegel had periodically made loans to companies controlled by Mr Drukker, (ii) all such loans had been provided pursuant to written agreements and (iii) they had been secured by personal guarantees from Mr Drukker and his wife.[148]   That pattern of dealings is consistent with the Loan Agreements in these proceedings also being genuine loans.

(15)   The Respondents say that Mr Drukker injected about $15 million of his own money into the Bender Oil project.[149]   It is notable that his evidence in the New York proceedings is that he invested that money *"through loans which I personally extended"*.[150]   Although Mr Drukker emphasises that he has not sought repayment, the fact remains that he provided funding by way of loans, whereas he claims that Mr Spiegel agreed to invest by way of equity.  If this was (as the Respondents contend) a joint venture between the two men, there would have been no obvious commercial reason (and none has been suggested by the Respondents) why Mr Spiegel would have agreed to make an equity investment of several million Dollars, while Mr Drukker (the initiator of the project) was only making loans.

(16)   Finally, Mr Spiegel's evidence is that neither the Respondent companies nor Mr Drukker ever claimed that the Loan Agreements were shams until after these arbitration proceedings had been commenced.  There is certainly no documented record of any such claim having been made, and the Respondents have not pleaded that any such

---

[147] [2/365].

[148] See §47–49 of the Defence to the Mazlin claim [1/11] and §46–48 of the Defence to the Shireen claim [1/12]. Similar admissions are made with less detail in §6 of the Statements of Defence, and also in §2 of the Respondents' submissions dated 11 April 2017 [1/4], and in §21 of their Response to the Claimant's Amended Request for Arbitration in the Mazlin claim [1/7].

[149] See §31 of the Defence to the Mazlin claim [1/11] and §30 of the Defence to the Shireen claim [1/12].

[150] See §26 of his affidavit in the New York proceedings [2/539].

claim was made before the Request for Arbitration in November 2016.  In the circumstances, the Tribunal accepts Mr Spiegel's evidence in this regard.  That provides further inferential support for the conclusion that the Respondents' argument that the Loan Agreements are shams is a recent invention by them which has been raised in an attempt to resist the claim for repayment.

163. For the reasons set out in this Award, the Tribunal has no hesitation in holding that the Loan Agreements were true loan agreements, and they were not shams intended to disguise an equity investment by Mr Spiegel.  The evidence is overwhelming and the Respondents' case is, based on the evidence put forward, hopeless.

## C. THE JURISDICTIONAL CHALLENGE

164. By virtue of Article 23.1 of the LCIA Rules, the Tribunal plainly has power to rule on its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the arbitration agreement.

165. As noted above, the Respondents have advanced their jurisdictional challenge to these arbitration proceedings on a number of different legal bases.  Their principal case is that the arbitration agreements are null and void because the Loan Agreements are themselves null and void.  They also contend that the true bargain between the relevant parties was an equity investment by Mr Spiegel through his corporate vehicles, and that that bargain is governed by New York law and should be resolved in the New York proceedings.

166. Irrespective of the various different legal labels that are applied to the jurisdictional challenge, it all turns on essentially the same factual allegation.  For the reasons set out in Section B of this Award, the Tribunal rejects the Respondents' factual case on that issue.  The Loan Agreements are not shams, and there was no binding, unconditional agreement by Mr Spiegel or any of his creature companies (whether governed by New York or any other law) to make an equity investment in the Bender Oil project.  For this fundamental reason, the Respondents' jurisdictional challenge, in all its various guises (including the argument based on estoppel), is dismissed.

167. It is also important to emphasise that there is no basis at all for the Respondents' allegation that this Tribunal has been *"imposed on the parties at the sole demand of the Claimants"*.[151] The true position is that **(i)** the Tribunal has been duly appointed by the LCIA pursuant to the provisions of clause 9 of the Loan Agreements,[152] **(ii)** the Respondents admit that they executed the Loan Agreements,[153] and **(iii)** the Respondents accepted the Tribunal's appointment.[154] The Tribunal having rejected the Respondents' evidential case that they only entered into the Loan Agreements on the understanding that they represented a cloak for an equity investment, there is no basis at all for the Respondents' challenge to the jurisdiction of this Tribunal.

168. In the circumstances, the Tribunal also rejects the Respondents' contention that New York (rather than these arbitration proceedings) is the natural forum for the resolution of a dispute between the parties. That argument was based on the same factual allegations as the sham argument, namely the Respondents' contention that **(i)** an equity investment was negotiated in New York, **(ii)** both Mr Drukker and Mr Spiegel have properties there, and Mr Spiegel's sons (who are co-owners of AMM Consulting) also reside there, **(iii)** the March 2012 Agreement of Sale was executed in New York and is governed by New York law, as is the draft December 2012 Agreement of Sale and the 2014 draft Operating Agreement and draft MIPA, **(iv)** the agreements were negotiated in New York and were drafted by lawyers based there (Mr Schneider and Mr Virga), **(v)** the deal is evidenced by the health insurance agreements with one of Mr Drukker's New York companies (YD Export Import Inc), **(vi)** relevant witnesses reside in New York, **(vii)** the true dispute includes parties who are not party to the Loan Agreements (Mr Spiegel and AMM Consulting), **(viii)** LCIA Arbitration does not allow disclosure to be ordered against non-parties, nor does it enable the Tribunal to compel witnesses to attend, and **(ix)** after the relationship between Mr Drukker and Mr Spiegel soured, they attended mediation in New York.[155] None of that detracts in any way from the fact that **(a)** the Respondents agreed to the provisions set out in the Loan Agreements, which include the LCIA arbitration clause, and **(b)** the Tribunal has rejected the evidential allegations on which the Respondents have sought to evade the consequences of that agreement.

---

[151] See §19–20 of the Respondents' submissions dated 11 April 2017 [1/4].

[152] [2/369] and [2/374].

[153] See §19 of each Defence [1/11/79] and [1/12/97]: *"On or about 10 August 2012, the Respondents entered into the Loan Agreements"*.

[154] See §24(3), §26(1) & §31(1) above, and §15(1) of Mazlin PO2 [1/15]; and also §36, §42 & §44 above, and §4 of Shireen PO1 [1/18].

[155] See for example §34–47 of Mr Drukker's affidavit in the New York proceedings [2/540–542] and §32–36 of Mr Seddio's affirmation [2/553].

169. Finally, the Tribunal also rejects the Respondents' contention that the Loan Agreements (and the arbitration clauses in them) are unenforceable "*due to lack of consideration*".[156] The relevant consideration comprised each party's mutual promises to be bound by, and to comply with, the terms of the Loan Agreements.

## D. REMEDIES

### D.1 The capital sums

170. Since the Tribunal has held that the Loan Agreements were not shams, it follows that the monies advanced by the Claimants to the Respondents were due to be repaid in full, together with interest, on 30 September 2015, pursuant to clause 2.

171. The contractual currency of the loans was denominated in US Dollars. The transfer made from Mazlin to Stubrick on 3 January 2013 was US$2,850,088.60. However, the other two transfers were made in Swiss Francs. It is accordingly necessary first to convert those two amounts to US Dollars. That conversion should be effected at the applicable exchange rates on the respective dates when those sums were advanced, because those were the dates on which the contractual entitlement of the borrower to receive US Dollars was discharged. Applying the live mid-market rates provided by the Claimants for exchanging Swiss Francs to US Dollars on 30 November and 3 December 2012 respectively produces the following figures (which are slightly different from the sums claimed by the Claimants):[157]

- 30 November: CHF1,900,000 @ 1.0792647328 USD/CHF = US$2,050,602.99
- 3 December 2012: CHF 3,490,500 @ 1.0809434530 USD/CHF = US$3,773,033.12

### D.2 Interest

172. Pursuant to clause 1.3 of the Loan Agreements, the Claimants are entitled to simple interest at 6% *per annum* on "*the outstanding principal balance*" (emphasis added) of each of the sums advanced from the date of advance until 30 September 2015 (the due date for repayment under clause 2 of the Loan Agreements). The Claimants' interest calculations, provided under cover of their email of 29 November 2017, reflected interest accruing in these years which had been

---

[156] See for example §29–30 of the Respondents' submissions dated 11 April 2017 [1/4].

[157] The Respondents' calculations, set out in their email of 15 January 2018, were fractionally different because they took the exchange rate only to 5 decimal places. The Tribunal has adopted a more accurate calculation.

compounded annually. The Tribunal agrees with the Respondents' submissions that the terms of the contract do not provide for such compound interest. Clause 1.3 refers to interest accruing on the "*principal*" amount outstanding only.

173. On the true construction of clause 1.10 of the Loan Agreements, and in the events which have happened, each Claimant is also entitled to simple interest at 10% *per annum* on "*any Advances*", *i.e.* on the capital amount of each advance outstanding as at the due date (*i.e.* 30 September 2015) until payment in full. The 'Default Interest' under clause 1.10 is triggered by a 'demand'. For these purposes (and contrary to the submissions of the Respondents), the Tribunal holds that the requirement for a 'demand' is satisfied by the Request for Arbitration dated 21 November 2016. However, once a demand has been made, the contractual Default Interest accrues from the due date for payment, *i.e.* from 30 September 2015, not from the date of demand. The Claimants again provided calculations on 29 November 2017 in which the Default Interest is compounded annually. The Claimants also claim (without explanation) in their Skeleton that they are entitled to "*default interest … on both the capital sums advanced pursuant to the Agreement _and the interest chargeable thereon_*" (emphasis added). The Tribunal disagrees. The express terms of the Loan Agreements make clear that Default Interest under clause 1.10 accrues on the outstanding amount of each 'Advance', not on the amount of that Advance plus accrued interest. The Tribunal has applied clause 1.9(c) of the Loan Agreements by using a notional 360 day year where less than a full year of interest is to be calculated, and in the calculation of ongoing daily interest.

174. Accordingly, the correct interest calculations may be summarised as follows:

| | Date | Days | Mazlin Loan 1 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 01/12/2012- 30/11/2013 | 365 | 2,050,602.99 | 6% | 123,036.18 | 123,036.18 |
| 2 | 01/12/2013- 30/11/2014 | 365 | 2,050,602.99 | 6% | 123,036.18 | 246,072.36 |
| 3 | 01/12/2014- 30/09/2015 | 304 | 2,050,602.99 | 6% | 103,897.22 | 349,969.58 |
| 4 | 01/10/2015- 30/09/2016 | 366 | 2,050,602.99 | 10% | 205,060.30 | 555,029.88 |
| 5 | 01/10/2016- 30/09/2017 | 365 | 2,050,602.99 | 10% | 205,060.30 | 760,090.18 |
| 6 | 01/10/2017- 19/01/2018 | 110 | 2,050,602.99 | 10% | 62,657.31 | 822,747.49 |

|  |  |  |  |  | 822,747.49 |  |
|---|---|---|---|---|---|---|

|  | Date | Days | Mazlin Loan 2 ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/01/2013-02/01/2014 | 365 | 2,850,088.60 | 6% | 171,005.32 | 171,005.32 |
| 2 | 03/01/2014-02/01/2015 | 365 | 2,850,088.60 | 6% | 171,005.32 | 342,010.63 |
| 3 | 03/01/2015-30/09/2015 | 271 | 2,850,088.60 | 6% | 128,729.00 | 470,739.63 |
| 4 | 01/10/2015-30/09/2016 | 366 | 2,850,088.60 | 10% | 285,008.86 | 755,748.49 |
| 5 | 01/10/2016-30/09/2017 | 365 | 2,850,088.60 | 10% | 285,008.86 | 1,040,757.35 |
| 6 | 01/10/2017-19/01/2018 | 110 | 2,850,088.60 | 10% | 87,086.04 | 1,127,843.39 |
|  |  |  |  |  | 1,127,843.39 |  |

|  | Date | Days | Shireen Loan ($) | Rate | Interest calculation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 1 | 03/12/2012-02/12/2013 | 365 | 3,773,033.12 | 6% | 226,381.99 | 226,381.99 |
| 2 | 03/12/2013-02/12/2014 | 365 | 3,773,033.12 | 6% | 226,381.99 | 452,763.97 |
| 3 | 03/12/2014-30/09/2015 | 302 | 3,773,033.12 | 6% | 189,909.33 | 642,673.31 |
| 4 | 01/10/2015-30/09/2016 | 366 | 3,773,033.12 | 10% | 377,303.31 | 1,019,976.62 |
| 5 | 01/10/2016-30/09/2017 | 365 | 3,773,033.12 | 10% | 377,303.31 | 1,397,279.93 |
| 6 | 01/10/2017-19/01/2018 | 110 | 3,773,033.12 | 10% | 115,287.12 | 1,512,567.06 |
|  |  |  |  |  | 1,512,567.06 |  |

### D.3  The appropriate creditor

175. As noted above, on 30 October 2017 Shireen assigned the benefit of its claim to Mazlin, and Mazlin has been joined as a co-claimant in the Shireen claim.  In the circumstances, the appropriate award is to order all payments to be made by the Respondents to Mazlin.

### D.4  Joint, or joint and several liability

176. The Respondents deny that they are jointly and severally liable under the Loan Agreements.[158] The Tribunal accepts that argument for the following reasons.

177. The presumption under general law is that a promise made by two or more persons is joint, and that express words are necessary to make it joint and several.[159]  The opening words of each Loan Agreement in this case recite that the lender *"agrees to extend credit to [WJ Holding] and [Stubrick] (collectively the 'Borrower')"*.  Thereafter, all the obligations to repay capital and interest are expressed as obligations of 'Borrower'.[160]  No words are used to indicate that the liability of the two companies which constitute the 'Borrower' is several.

## E.  COSTS

### E.1  Introduction

178. The Claimants have succeeded in their claims, and the Respondents have failed.  The starting point is accordingly a rebuttable presumption that the Claimants are entitled to their Legal Costs pursuant to Article 28.4 of the LCIA Rules, which provides as follows:

> *"The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay*

---

[158] See §53 of the Defence to the Mazlin claim [1/11/86] and §52 of the Defence to the Shireen claim [1/12/104].

[159] See *Chitty on Contract* (32nd ed.), §17-005.

[160] See in particular clauses 1.2, 1.9(a), 1.10, 2, and 5.1(a).

*and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."*

179. Article 28.3 also provides that *"the Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party. The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate."*[161]   Accordingly, the Tribunal has a wide discretion subject to the presumption in Article 28.4.   In making that determination, the Tribunal is entitled to take into account the parties' conduct in the arbitrations and, when making a determination as to the amount of Legal Costs to be awarded, to do so on such reasonable basis as the Tribunal thinks appropriate.

180. In addition, as noted in §95(13) above, by clause 6 of the Loan Agreements each party agreed *"to pay prevailing party's [sic] all reasonable cost [sic] and expenses (including reasonable counsel fees) in connection with the enforcement of this Agreement"*. Thus, in addition to the power to award Legal Costs pursuant to the LCIA Rules, the Tribunal also has a power to do so under the terms of the Loan Agreements themselves.

### E.2  The costs of the conjoinder issue

181. The Respondents objected to the original constitution of the Mazlin claim, in which both Mazlin and Shireen had been named as Claimants despite the fact that the claim was based on two separate arbitration agreements with non-identical parties.  The Tribunal determined that the Claimants were not entitled to proceed with the claim in that form without the Respondents' consent, which was withheld.[162]  It was accordingly the Claimants' own procedural error that provided the occasion for the Respondents to raise their procedural objection.

182. Nevertheless, there was plainly no compulsion on the Respondents to take that objection, and at the procedural hearing on 24 March 2017 their counsel was unable to articulate any practical reason why the Respondents should insist on separate arbitration proceedings being issued. The Tribunal was simply told that that was the Respondents' position.  They were not, and did not claim to be in any way prejudiced by the composition of the Mazlin claim in its original form.

---

[161] The Tribunal adopts the term Legal Costs as it is used in Article 28.3 of the LCIA Rules, and also the term Arbitration Costs as defined in Article 28.1 as *"The costs of the arbitration other than the legal or other expenses incurred by the parties themselves"*.

[162] [1/15].

183. Furthermore, the Respondents argued strenuously, both at that hearing and in their written submissions, that the Tribunal did not have jurisdiction to allow the Mazlin claim to be amended by the deletion of one claimant. It was clearly the Respondents' objective to secure the dismissal of the arbitral proceedings in their entirety on purely procedural grounds. In the circumstances, and in the absence of any reasoned explanation from the Respondents as to why they chose to object to the original composition of the Mazlin claim, it would appear that the Respondents' strategy was prompted either (i) by a desire to make the whole recovery process as slow and expensive as possible for the Claimants, or (ii) by an opportunistic desire to try non-suiting the arbitral proceedings in London in their entirety, so that the Respondents could then issue the New York proceedings and claim that those proceedings should take priority as having been issued first,[163] or (iii) both.

184. Although the Respondents' position on the conjoinder issue was correct as a procedural matter, in terms of the interpretation of the LCIA Rules, nevertheless the Tribunal considers that the Respondents' conduct in withholding their consent to the conjoinder of both claims in one arbitration was unreasonable. In the event, the commencement of separate arbitration proceedings in the Shireen claim has achieved nothing other than additional inconvenience and expense. The Tribunal infers that that was the Respondents' intention.

### E.3   The parties' conduct generally

185. Having taken an unreasonable stance on the conjoinder issue, the Respondents then proceeded to conduct themselves in both arbitrations in a manner calculated to cause further inconvenience and expense to the Claimants:

   (1)   The Respondents have consistently refused to comply with the LCIA's directions to pay the advances to fund the Arbitration Costs. As a result, the Claimants have had to make substitute payments.

   (2)   After being given a full opportunity to respond to the Claimants' proposals for procedural directions in the Mazlin claim, the Respondents then sought unreasonably to invite the Tribunal to reopen the directions it had given in Mazlin PO2.[164]

---

[163] Although the strategy failed in its principal objective, we see a reflection of that argument in the affidavit evidence sworn in the New York proceedings by Mr Drukker and Mr Seddio, both of whom make a point of emphasising that the Shireen claim was issued after the New York proceedings had been commenced: see §30 of Mr Drukker's affidavit [2/530] and §22 of Mr Seddio's affidavit [2/550].

[164] See §25(2), §26, §33 & §38 above.

(3)   The Respondents have consistently sought to procure a dismissal or stay of these arbitration proceedings on the basis that the true agreement between the relevant parties is governed by New York law.  For the reasons set out in detail in this Award, the Tribunal has rejected that case.  The Tribunal considers that the Respondents' allegations are unsustainable, and that their efforts to resist arbitration amount to forum-shopping.[165]

(4)   The Respondents' stated preference for the dispute to be resolved in the New York proceedings was ostensibly based on their contention that (i) the New York court has wider powers of disclosure against different parties from those available to this Tribunal in these arbitral proceedings, (ii) there was a "*reasonable expectation*" that the evidence obtained on discovery there "*will be relevant to the subsequent entertainment (by the Tribunal) of the Respondents' principal claim*"[166] and (iii) compliance by the Respondents with any disclosure order in these proceedings might cause "*irreparable harm to the position of the Respondents in the New York proceedings*".[167]  In the event, however, (a) the Respondents have never attempted to specify exactly what documents, or categories of document, they say will be disclosable in the New York proceedings to assist their case, (b) they have not produced any evidence before the Tribunal to suggest that any such documents exist, (c) they have not explained exactly what harm would be caused to their interests in the New York proceedings by complying with the directions for disclosure in these proceedings, and (d) they have not explained the apparent inconsistency between that assertion and the fact that they were content to exhibit over a dozen documents to their Statements of Defence without, apparently, causing irreparable harm to their position in the New York proceedings.

(5)   Although the Respondents were fully aware of the timetable laid down in the Procedural Orders that had been made in each arbitration, they waited until the last minute before notifying the Tribunal and the Claimants that they did not propose to offer any disclosure.[168]

---

[165] The Tribunal is also troubled not to have received a full explanation from the Respondents regarding the apparent discrepancies in their evidence regarding the commencement date of the New York proceedings:  see §8(5), §19(2) and §28(1) above.

[166] See §68 of the Respondents' submissions dated 11 April 2017 [1/4].

[167] [1/23/313] and [1/23/314].

[168] See §53 above.  The Tribunal also notes the relatively minor point in §13–15 above regarding the Respondents' failure to answer a simple question posed to them by the Tribunal.

186. For this accumulation of reasons, the Tribunal holds that the Respondents have conducted these proceedings unreasonably, and with the intention of being as obstructive as they can to the Claimants. The Tribunal accordingly proceeds on the basis that (i) the presumption mentioned in §178 above has not been rebutted but has been reinforced, and furthermore (ii) if costs have been incurred which might be considered higher than expected, that is likely to be a result of the Respondents' conduct.

### E.4  The Claimants' Schedule of Costs

187. On 23 November 2017, Mazlin filed a Claimant's Schedule of Costs ("**the Schedule of Costs**"), together with separate written submissions on costs ("**the Costs Submissions**"). The Schedule of Costs recorded costs under headings (a) to (f) in accordance with §30 of Mazlin PO2, together with three additional headings: (g) attendance on Counsel; (h) attendance on third parties; and (i) costs incurred in foreign proceedings. The Schedule of Costs sets out the costs that had been incurred jointly by the Claimants in both arbitrations, and Shireen adopted and relied on the same Schedule of Costs.

188. Although the Respondents declined to attend the hearing, the Respondents' legal representatives sent an email on 24 November 2017 which included the submissions on the Schedule of Costs and Costs Submissions quoted in §67 above.

189. As to the specific numbered submissions made by the Respondents in that email on the Claimants' costs submissions:

    (1)    In the context of the amounts claimed in the Mazlin claim, and for that matter in the Shireen claim, the Tribunal does not consider the overall costs claimed to be disproportionate. Since the costs represent costs claimed in both proceedings, it is inappropriate to compare the costs against the debt claimed in the Mazlin claim only.

    (2)    The Respondents' second observation is correct. However, directions were made in the proceedings, to which the Respondents did not object, that the Mazlin claim and the Shireen claim proceed in parallel to avoid delay and added costs and with a view to any evidential hearing and oral arguments being heard concurrently.[169] The proceedings did largely proceed on that basis and, of course, the hearings were concurrent. As a consequence, the Tribunal's view is that the Claimants have acted reasonably in incurring their costs in this manner which is likely to have resulted in an overall costs

---

[169] See Mazlin PO3 and Shireen PO1, discussed at §43 and §44 above.

saving. For the purposes of this award, the Tribunal has split the costs between the Mazlin claim and the Shireen claim in the proportions 55% and 45% respectively in order to reflect the additional time taken in the Mazlin claim to deal with the Respondents' initial procedural objections, and to reflect the fact that the costs attributable to the Mazlin claim (which was in essence the lead claim) might be slightly greater than those attributable to the Shireen claim.

(3)   The Costs Schedule was submitted in a form consistent with §30 of Mazlin PO2 and §33 of Shireen PO1, which did not specify the level of detail to be provided against each heading. The Tribunal finds that the level of detail provided by the Claimants is reasonable, particularly when taking into account the overall reasonable level of costs claimed.

(4)   The Tribunal deals with the Claimants' claims in respect of the costs of foreign proceedings in §193–195 below.

190.   By two emails dated 27 November 2017, the Respondents' legal representatives made the following requests in relation to costs:

*"(i)  the question of costs be reserved during the hearing,*

*(ii)  the Claimant be asked to provide a more detailed submission on costs that would inter alia provide:*
- *a break-down between the two arbitrations;*
- *copies of invoices and payments in relation to disbursements; and*
- *detailed narratives and chronology for the hours incurred; and*

*(iii)  that the Respondents be thereafter allowed a submission commenting on these costs."*

191.   There was no procedural timetable for submissions on costs to be made after the oral hearing. The Respondents themselves have withdrawn their own claims for costs and, accordingly, have filed no costs schedules themselves. For the reasons given above, the Tribunal finds that it is not necessary for further details to be provided by the Claimants.

192.   Turning to the specifics of the Claimants' Schedule of Costs, the hourly rates applied by solicitors for the Claimants are reasonable. The costs claimed against headings (a) to (e), (g) and (h) are also reasonable in total and there are no individual amounts which appear unreasonable. Costs under heading (f) include the LCIA fees on filing the Requests for Arbitration, together with payments made by the Claimants on account of the Arbitration Costs. Accordingly, those items, in the amount of US$150,387.50 (GBP113,500) are excluded from

the Legal Costs and are dealt with separately below.  The remainder of the Claimants' costs under heading (f), in the amount of US$70,945.32, are reasonable and allowed in full.

193. Costs under heading (i) set out the costs incurred in foreign proceedings in the total sum of US$182,167.40.  By reference to the Costs Submissions, those costs were incurred in relation to:

   (1)   injunction proceedings issued in Cyprus to obtain a worldwide freezing order against the Respondents in the sum of US$76,098.77;

   (2)   Hungarian legal advice in relation to enforcement action in Hungary and in relation to the sale by Stubrick of a wholly-owned Hungarian company BVDH Ingatlanhasznosito Kft in the sum of US$10,000;

   (3)   defence of the proceedings in New York in the sum of US$96,068.63.

194. The Tribunal accepts that the legal costs incurred by the Claimants in Cyprus and Hungary are in connection with the enforcement of the Loan Agreements and are, therefore, recoverable under clause 6 of the Loan Agreements.  They are also reasonable in their amounts.

195. The legal costs incurred in New York relate to the defence of proceedings brought against the Claimants and related entities.  Based on the relief sought and the findings outlined above, those proceedings were brought intending to disrupt the enforcement of the Loan Agreements in these proceedings and as such those costs were (at least arguably) incurred "*in connection with the enforcement*" of those agreements for the purpose of clause 6.  However, (i) there is not an identity of parties in these arbitrations and the New York proceedings, and (ii) the Tribunal understands that the New York proceedings are not concluded and, therefore, the outcome of those proceedings, including (if appropriate) the award by the court of costs against any party, is yet to be determined.  For those reasons, the Tribunal concludes that it would not be appropriate in these arbitration proceedings to award to the Claimants any part of the costs of the New York proceedings claimed under heading (i).

196. Costs under heading (h) include the costs incurred by solicitors for the Claimants on attendance on counsel in foreign proceedings.  Although the Tribunal disallows the third party costs in relation to the New York proceedings, it allows all the costs on attendance on foreign counsel as reasonable, and notes that only 0.4 hours were incurred on attendance on New York counsel.  The Tribunal also allows the Claimants' costs of attendance on third party funders, since the

application was necessitated by the Respondents' refusal to pay their share of the advance on the Arbitration Costs (see §16 Costs Submissions).

197. In summary, therefore, the Tribunal allows the Claimants' Legal Costs as follows:

    (1)    Heading (a) – Preparation and drafting documents: allowed in full – US$69,875

    (2)    Heading (b) – Attendance on opponent: allowed in full – US$8,355

    (3)    Heading (c) – Attendance on client and witnesses: allowed in full – US$56,465

    (4)    Heading (d) – Attendance on LCIA and Tribunal: allowed in full – US$9,615

    (5)    Heading (e) – Preparation for and attendance at hearings: allowed in full – US$50,085

    (6)    Heading (f) – Disbursements and travel costs: Arbitration Costs excluded, otherwise allowed in full – US$70,945.32

    (7)    Heading (g) – Attendance on Counsel: allowed in full – US$21,790

    (8)    Heading (h) – Attendance on third parties: allowed in full – US$16,160

    (9)    Heading (i) – Costs incurred in foreign proceedings: partially allowed – US$86,098.77

198. The total costs awarded are US$389,389.09, of which 55% (US$214,164) is to be attributed to the Mazlin claim and 45% (US$175,225.09) is to be attributed to the Shireen claim.

### E.5  Arbitration Costs

199. The Arbitration Costs in the proceedings, having been determined by the LCIA Court pursuant to Article 28.1 of the LCIA Rules, are as follows:

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £8,372.21 |
| Tribunal's fees and expenses | £43,429.74 |
| **Final Costs of the Shireen claim** | **£53,551.95** |

Any remaining deposits shall be returned to the Claimants.

200. The Tribunal finds that the Respondents shall bear the Arbitration Costs. On the basis that the Arbitration Costs have been funded by the Claimants, the Claimants are, therefore, entitled to an award that the Respondents shall be liable to the Claimants in respect of those amounts,

thereby replacing the Procedural Orders issued in the Mazlin claim and the Shireen claim, referred to in §61 above.

### F. The Award

201.   Accordingly, the Tribunal hereby awards as follows:

(1)   Mazlin is entitled to repayment of the monies advanced under the Shireen Loan Agreement in the sum of US$3,773,033.12;

(2)   Mazlin is entitled to simple interest at 6% per annum from 3 December 2012 to 30 September 2015 in the sum of US$642,673.31;

(3)   Mazlin is entitled to simple interest at 10% per annum from 1 October 2015 until payment in full.   As at the date of this award, interest is payable in the sum of US$869,893.75, and continues at a daily rate of US$1,048.07;

(4)   Mazlin is entitled to Legal Costs of US$175,225.09;  and

(5)   Mazlin is entitled to Arbitration Costs of £53,551.95.

202.   Any remaining applications, claims or counter-claims are hereby dismissed.

**Place of arbitration:**  London
**Date:** 23. January 2018

**Kate Davies**

**Jonathan Crow QC**

**Guy Pendell**