# EXHIBIT 3

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION
RULES OF THE INTERNATIONAL COURT OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE

## ICC Case No 21717/MHM

BETWEEN:

### WJ HOLDING LIMITED

### (CYPRUS)

<u>Claimant</u>

and

### TRANSDNIESTRIAN MOLDOVIAN REPUBLIC

### (MOLDOVA)

<u>Respondent</u>

---

## FINAL AWARD

## 6 June 2018

---

Before the Arbitral Tribunal:

Noah Rubins
Sophie Nappert
Galina Zukova

# Table of Contents

I.      OVERVIEW ................................................................................................. 1

II.     THE PROCEEDINGS................................................................................ 10

III.    APPLICABLE PROCEDURAL RULES ................................................. 16

IV.     LANGUAGE OF THE ARBITRATION................................................. 17

V.      APPLICABLE LAW ................................................................................. 17

    A.   THE PARTIES' POSITIONS ............................................................................ 17

    B.   DECISION OF THE TRIBUNAL....................................................................... 19

VI.     JURISDICTION ....................................................................................... 21

    A.   ARBITRATION UNDER THE 2012 AGREEMENT ............................................ 22
        1.      The Parties' positions ................................................................. 22
        2.      Decision of the Tribunal ............................................................ 23

    B.   ARBITRABILITY............................................................................................ 24
        1.      The Parties' positions ................................................................. 24
        2.      Decision of the Tribunal ............................................................ 24

    C.   SOVEREIGN IMMUNITY ............................................................................... 28
        1.      The Parties' positions ................................................................. 28
        2.      Decision of the Tribunal ............................................................ 28

VII.    MERITS...................................................................................................... 30

    A.   THE VALIDITY OF THE 2012 AGREEMENT .................................................. 30
        1.      Nature of the 2012 Agreement – Preliminary or Final? ................. 30
        2.      The Authority of the TMR Government to conclude the 2012
                Agreement.................................................................................... 35
        3.      Lack of Notarization of the 2012 Agreement ................................ 39

    B.   FAILURE TO IMPLEMENT AGREED EXPORT DUTY ...................................... 41
        1.      Claimant's position...................................................................... 41
        2.      Respondent's position................................................................... 42
        3.      Decision of the Tribunal ............................................................. 42

    C.   REFUSAL TO RECOGNIZE COMPLETION OF THE INVESTMENT PROGRAM.................. 46
        1.      Claimant's position...................................................................... 46
        2.      Respondent's position................................................................... 46
        3.      Decision of the Tribunal ............................................................. 47

    D.   BREACH OF STABILIZATION CLAUSE ........................................................... 52
        1.      Claimant's position...................................................................... 52
        2.      Respondent's position................................................................... 52
        3.      Decision of the Tribunal ............................................................. 53

    E.   IMPROPER ENCUMBRANCE OF SHARES ....................................................... 56

| | | | |
|---|---|---|---|
| | 1. | Claimant's Position ................................................................ | 56 |
| | 2. | Respondent's Position ............................................................ | 57 |
| | 3. | Decision of the Tribunal ........................................................ | 57 |
| F. | PRESSURE TO MODIFY THE 2003 AGREEMENT ARBITRATION CLAUSE .................... | | 62 |
| | 1. | Claimant's Position ................................................................ | 62 |
| | 2. | Respondent's Position ............................................................ | 63 |
| | 3. | Decision of the Tribunal ........................................................ | 63 |
| VIII. | **REMEDIES** .......................................................................... | | **64** |
| A. | DECLARATORY RELIEF ............................................................ | | 64 |
| B. | TERMINATION OF THE AGREEMENTS ......................................... | | 65 |
| C. | COMPENSATION ....................................................................... | | 66 |
| | 1. | Contractual limitation of liability ...................................... | 67 |
| | 2. | Heads of Loss ......................................................................... | 68 |
| D. | TRANSFERABILITY OF AWARD .................................................. | | 92 |
| IX. | **COSTS** ............................................................................... | | **95** |
| X. | **ORDER** .............................................................................. | | **97** |

## I.   OVERVIEW

1.   The Claimant, WJ Holding Limited (Cyprus) (Claimant or WJ Holding) is a company incorporated in Cyprus and engaged in grain trade and vegetable oil production in the Black Sea region of the former USSR.  The Claimant is the remaining parent holding company of the WJ group of companies.   The Respondent in these Proceedings is the Transdniestrian Moldovian Republic (*Respondent* or *TMR*).[1]

2.   The Claimant's contact details are:

WJ Holding Limited
45 Digenis Akritas, Pamboridis Building, 1070
Nicosia
Cyprus

The Claimant was represented in the arbitration by:

William Z. Scheider
Schneider Law Group
150 Broadway, Suite 900
New York, NY 10038
United States of America
Email: wzs@wzslaw.com

Delphine Nougayrède
Avocat à la Cour
82 Boulevard Flandrin
75116 Paris
France
Email: dn@lawoffice-avocats.com

3.   The Respondent's contact details are:

Transdniestrian Moldavian Republic
President of the TMR
Minister of Economic Development

---

[1]   The Tribunal agrees with the Claimant that, the question of the international status of TMR, a self-governing territorial entity which is not recognised as a sovereign state by other states, is not relevant for the adjudication of the Parties' dispute, see Request for Arbitration, para. 8.1, and Statement of Claim, para. 10.  The Claimant asserts that the TMR has legal standing to be sued, and the Respondent has never contested this.  It is also relevant that the TMR has itself previously initiated ICC arbitration, as discussed further below.  ICC Request for Arbitration dated 21 October 2011, C-21, p. 11.  The Tribunal is satisfied that this is sufficient to provide it with jurisdiction to decide the Claimant's claims against the Respondent, and to proceed on the basis that the Respondent has legal standing.

57 Sverdlova St
3300 Tiraspol
Moldova
Email: economy.pmr@gmail.com; boltrushko@mer.gospmr.org
Chairman of the Government of the TMR
45 25th October St
3300 Tiraspol
Moldova
Email: ud.pmr@gov-pmr.org; office@gov-pmr.org

The Respondent was not represented by external counsel.

4.      The arbitrators are:

Noah Rubins (President)
Freshfields Bruckhaus Deringer LLP
2 rue Paul Cézanne
75008 Paris
France
noah.rubins@freshfields.com

Sophie Nappert (co-arbitrator)
3 Verulam Buildings
Gray's Inn
London WC1R 5NT
United Kingdom
snappert@3vb.com

Galina Zukova (co-arbitrator)
Bélot Malan et Associés
60 avenue Raymond Poincaré
75116 Paris
France
g.zukova@bmavocats.com

5.      This dispute arose out of an agreement to acquire 100 per cent of the shares in
        the OJSC Bender Seed Crushing Plant, a Transdniestrian company that owned a
        large industrial facility located in the city of Bender in the TMR (the **Bender
        Plant**), which was previously owned by the TMR government.   The Bender
        Plant's primary activity is the conversion of seeds and other agricultural products
        into oil.

6.      Although the TMR is not recognized by any state, it exercises authority over the area between Moldova's border with Ukraine and the Dniester River.[2] Following a period of armed conflict that began in 1992, in 1997 the governments of Moldova and TMR signed a Memorandum for the Normalization of Relations aimed at better defining the status of the TMR within Moldova. Under the Memorandum, TMR is entitled to "independently establish and maintain international contacts in the economic scientific or technological and cultural sphere."[3]

7.      In the early 2000s, the TMR government launched a privatization program that included the Bender Plant.[4] On 23 June 2003, the President of the TMR signed Decree No. 316 outlining the privatization program, including the obligations of prospective investors who might acquire the Bender facility.[5]

8.      The Claimant is the parent holding company of WJ, an international group of companies that was founded by four US citizens and had significant operations in Eastern Europe and former Soviet Union. As submitted by the Claimant, over the last twenty-five years WJ was a well-known regional leader in grain trading and vegetables oils. It owned production facilities, elevators and port infrastructure in more than twenty locations throughout the region. After several of the original founders of the group retired in 2011, the Claimant is now the sole remaining parent holding company. It is wholly owned by Mr. Yuri Drukker – one of the original founders.[6]

9.      In light of its prior success in the region,[7] the Claimant decided to expand operations into TMR, and submitted a bid to purchase the Bender Plant. The TMR authorities, represented by the Commission on the Destatisation and Privatisation of Bender Oil Extraction Plant accepted the bid in August 2003,

---

[2]   C-1 [seems like reference to C-1 is a mistake.] See Statement of Claim, para. 10 *et seq.*

[3]   CL-2.

[4]   2003 Agreement, C-13, Arts. 1.1.-1.2.

[5]   C-17.

[6]   RfA, paras 1.1.-1.2; Statement of Claim, paras 6-7.

[7]   Drukker Witness Statement, para 8.

and a share purchase agreement was signed shortly thereafter (the *2003 Agreement*).[8]

10.  In addition to paying the purchase price of US$1.05 million, the Claimant was obligated under the 2003 Agreement to make certain investments based upon Decree No. 316.[9] As a condition for the final transfer of shares, WJ Holding was to improve the Bender Plant and maintain an agreed salary level for local employees, as well as attaining an agreed level of production.[10] These requirements were listed in an appendix to the 2003 Agreement entitled "Investment Program".[11]

11.  The Bender plant was in operation until August 2003, when the Chisinau-Odessa railway line was closed down due to escalating tensions between Moldova and the TMR. Having lost railway access, WJ Holding was unable to procure seeds for the Bender Plant and notified the TMR that it planned to cease operations.[12] On 15 April 2005 and 1 June 2006 Claimant obtained certificates of *force majeure* from the Transdniestrian Chamber of Commerce attesting to its inability to maintain production at the Bender Plant. WJ Holding obtained a third such certificate on 30 May 2007.[13]

12.  The Respondent twice challenged the validity of these certificates in the Tiraspol Arbitrazh Court.[14] On both occasions the court declined jurisdiction based upon the arbitration clause in the 2003 Agreement. TMR then filed for ICC arbitration.[15] According to the Claimant, the case was later closed for failure to pay the requisite deposit to the ICC.[16]

---

[8]   2003 Agreement, C-13.

[9]   2003 Agreement, C-13, Art. 1.1.

[10]  2003 Agreement, C-13, Art. 4.2.3.

[11]  2003 Agreement, C-13, Appendix.

[12]  RfA, para. 1.4; Statement of Claim, para 31.

[13]  C-18.

[14]  C-19, C-20.

[15]  C-21.

[16]  Statement of Claim, para 33.

13.     The Chisinau-Odessa railway connection reopened in late 2010.[17]  In 2011, the Parties started negotiations regarding the possible re-launch of the Bender Plant.

14.     An agreement was concluded on 28 March 2012 (the ***2012 Agreement***), describing the Parties' plans for the re-opening of the Bender Plant.  The 2012 Agreement included an updated Investment Program.  Pursuant to the 2012 Agreement, the TMR created a Commission for Monitoring OJSC Bendery Seed Crushing Plant (the ***Monitoring Commission***).  The Claimant undertook to provide the Monitoring Commission with reports concerning the implementation of the investment program on a monthly basis and concerning other provisions of the 2012 Agreement on a quarterly basis.[18]

15.     Most of the companies of the WJ Group were sold in 2011, leaving the Bender Plant as the Claimant's primary activity from early 2012.[19]  Several other remaining group companies were also involved in the project.  These included Stubrick Limited, a Cypriot company entrusted with marketing and, together WJ Holding, obtaining outside finance; ICS Agro-Leon Consulting SRL, a Moldovian company that engaged in tolling with WJ Holding to crush the seeds; FLLC Grain Oil, a Transdniestrian company that acquired grain from producers in Moldova and Transdniestria and crushed them at Bender under tolling arrangements;[20] and ICS Cusnir Agro, a Moldovian company.[21]

16.     Under the 2012 Investment Program, WJ Holding was obligated to process 400 tons of oil seeds per day.[22]  For its part, the TMR undertook to introduce a 10% export duty on oil seeds, with a minimum of €30 per ton, for five years from 1 August 2012.[23]  This was intended to ensure an adequate raw material supply for the Bender Plant at a reasonable price.

---

[17]   Statement of Claim, para 30.

[18]   2012 Agreement, C-14, Clause 3.2.

[19]   Second Drukker Witness Statement, para 6.

[20]   Second Drukker Witness Statement, paras 3-4.

[21]   Claimant's opening statement slides from hearing, p. 27; C-90.

[22]   2012 Agreement, C-14.

[23]   2012 Agreement, C-14, clause 3.3; Statement of Claim, para 153; Hearing Transcript, pp 33-34.

17.     In May 2012 the TMR adopted Decree No. 364, providing for a 10% duty as of 1 August 2012 on sunflower seed, soybean and rape seed, with a minimum duty of 30 euros per ton for certain forms of rape seed and 10 euros for other seeds.[24] The Bender Plant was re-opened in November 2012.[25] Decree No. 364 was repealed on 28 September 2012,[26] replaced with Decree No. 668 of 3 October 2012 establishing identical duties.  Decree No. 668 did not specify the period of its validity.[27]  In February 2013, Decree No. 668 was repealed.  It was replaced by Decree No. 436 in September 2013.[28]  Decree No. 436 re-established an export duty, but only at a level of 5% with a minimum of €10 per ton.  It was to remain in force for four months from 21 September 2013.  On 27 September 2013, Decree No. 448 lowered the duty to US$5 per ton.[29]

18.     WJ Holding wrote to the President of the TMR on 7 December 2012, urging him to extend the 10%/€10 per ton minimum, as "a 5% import duty on oilseeds [...] deters Transdniestrian and foreign investors [...] and makes it more difficult to obtain funding for procurement of raw materials" by the Claimant.[30]

19.     On 4 April 2013, the Claimant wrote to the Monitoring Commission, urging it to consider the introduction of the 10% export duty with a minimum duty of €30 per ton as agreed under the 2012 Agreement.[31]  Similar letters were also sent by Claimant's chairman, Mr. Drukker to the President of the TMR on April 8 2013,[32] and on the same date to Mr. Piotr Stepanov, then the Chairman of the TMR government.[33]  On 15 May 2013, the TMR government replied to the letter

---

[24]   C-26; Statement of Claim, para 159.

[25]   C-45; Statement of Claim, para 116.

[26]   C-27.

[27]   C-28.

[28]   C-30.

[29]   C-31; Statement of Claim, para 162.

[30]   C-33.

[31]   C-34.

[32]   C-35.

[33]   C-36.

of April 4 and stated that the seasonal export duties of maximum 6 month in duration would remain in place in 2013 and in the years to come.[34]

20.     Meanwhile, at the end of 2013 the Claimant became aware that utility costs for the Bender Plant were about to increase.[35]  Government Decree No 44 of 12 March 2013 had established particular status for offshore companies from certain "tax haven" jurisdictions doing business in the TMR.[36]  Such companies (of which the Claimant was one, being incorporated in Cyprus) were subjected to substantially increased utility prices in accordance with separate Government Decree No 93 of 30 May 2013.[37]  Gas and electricity costs effectively doubled.[38]

21.     On 27 January 2014, the Chairman of WJ Holdings, Mr. Drukker, wrote to the TMR Prime Minister, Ms Tatiana Turanskaya.  In respect of the changes in gas and electricity prices, the Claimant asked that the TMR provide utilities at the subsidized level of municipal enterprises.[39]  Mr Drukker also explained the possible consequences of a raw material shortage for the Bender Plant, and urged the government to adopt a higher export duty, and to reduce income tax to facilitate bank financing.  He further asked the government to confirm that the Claimant had carried out the 2012 Investment Program.[40]  Mr Drukker appended to the 27 January letter data outlining the profitability of the Bender Plant.  In the Claimant's opinion, these figures reflected that the facility would operate at a loss in the absence of a 10% export duty.[41]

22.     The request for preferential utility prices having been rejected, the Claimant asked the TMR for permission to shift the Bender Plant to the ownership of one of its Russian subsidiaries, since such a company would not be subject to unfavourable status under Government Decree No 44.  However, it soon

---

[34]   C-44.

[35]   Statement of Claim on Jurisdiction and Merits, para 225.

[36]   C-50.

[37]   C-49.

[38]   Statement of Claim on Jurisdiction and Merits, para 228.

[39]   C-43.

[40]   C-43.

[41]   C-43.

transpired that shares in the Bender Plant were encumbered subject to completion of the Investment Program, and could not be transferred until all investment obligations had been confirmed to be satisfied.[42]

23. On 20 December 2013, the CEO of Bender Plant, Mr Mikhail Gurduza, wrote separately to the TMR President and the Chairman of the Government, urging them to introduce duties in accordance with the 2012 Agreement.[43]

24. On 23 December 2013, Ms. Turanskaya wrote to Mr. Gurduza noting that the TMR had introduced a seasonal export duty for up to six months in 2012 and 2013. She explained that the reduction of import duty during the rest of the relevant time had been necessary to support local seed producers. The letter enclosed a draft Supplemental Agreement (the *Supplemental Agreement*), proposing amendments to the 2012 Agreement.[44] The Supplemental Agreement contained an amended Clause 6.2. providing for the submission of all disputes to arbitration in Transdniestria and for the application of Transdniestrian law.[45] The Supplemental Agreement also contained a new investment program.

25. Throughout 2014 the Parties engaged in correspondence related to the closure of the Investment Program, but no agreement was reached in this regard.[46]

26. On 13 March 2014, Mr Gurduza wrote to the TMR Minister of Economic Development noting that the Plant had not been operating for one month due to a shortage of seeds to crush. The CEO asked the Minister formally to approve completion of the Investment Program and to transfer the Bender Plant shares to the Claimant. He insisted that WJ Holding had fully performed its investment obligations, including the achievement of target production volumes and significant progress on the construction of a new boiler facility.[47]

---

[42] Statement of Claim, para.226.

[43] C-37, C-38.

[44] C-54.

[45] C-54.

[46] C-51, C-52, C-53.

[47] C-51.

27.    Mr Gurduza wrote a few days later to the Prime Minister, again affirming that WJ
       Holding had fully performed the Investment Program and asking the government
       to facilitate its formal closing.  Mr Gurduza warned that absent such steps, WJ
       Holding would have difficulty obtaining financing, which would "further
       aggravate the Plant's financial difficulties".[48]

28.    On 31 December 2014, the TMR reduced the export duty on oil seeds to 1.5%,
       capped at US$2 per ton, by way of Presidential Decree No 434.[49]

29.    The TMR proposed further amendments to the 2003 Agreement.   Those
       amendments related in particular to the dispute resolution clause.  A draft sent to
       WJ Holding on 27 January 2015 provided that all disputes except those relating
       to Clause 4.2.3 (Claimant's duty to fulfil the "Investment Program") would be
       submitted to ICC arbitration in Paris, and decided "based on the norms of
       international private law".[50]  Disputes relating to clause 4.2.3 would be decided in
       the commercial courts of Transdniestria in accordance with Transdniestrian law.

30.    WJ Holding replied on 4 February 2015, sending modifications to the draft
       Supplemental Agreement.   The corrections included a clause entitling WJ
       Holding to cancel the Supplemental Agreement at any time subject to delivery of
       notice in writing.[51]

31.    WJ Holding sent another proposed revision on 5 August 2015,[52] in which all
       disputes except matters concerning the amendment of Clauses 4.2 and 4.2.3 were
       to be submitted to ICC arbitration in Paris.  Disputes relating to clauses 4.2 and
       4.2.3 were to be submitted to the Transdniestrian courts in accordance with
       Transdniestrian law.  The Ministry of Economic Development later rejected the
       Claimant's proposal on grounds that it was contrary to the law of the TMR.[53]

---

[48]   C-52.

[49]   C-32.

[50]   C-56; Statement of Claim, para 241.

[51]   C-61; clause 2 of the Supplemental Agreement.

[52]   C-62.

[53]   C-60.

32.   On 6 October 2015, WJ Holding chairman wrote to the TMR stating that the Bender Plant would not reopen, due to the government's failure to maintain export duties.  The Claimant also confirmed the Parties' failure to agree on the terms of the Supplemental Agreement, and notified the Respondent of its intention to initiate arbitration.[54]

## II.   THE PROCEEDINGS

33.   The Claimant submitted its request for arbitration to the ICC on 26 February 2016.  The ICC notified the Respondent in a letter dated 7 April 2016, delivered by international courier, that the deadline for submission of an Answer to the Request for Arbitration was 30 days from receipt.  According to information provided by the international courier service, the letter was received by the Respondent on 11 April 2016.  The TMR did not submit an Answer, nor did it nominate an arbitrator.

34.   As Respondent did not file an Answer, a decision was taken pursuant to Article 6(3) of the Rules.  On 7 June 2016, the matter was referred to the Court.

35.   At its session of 7 July 2016, the ICC Court fixed Paris as the place of arbitration; confirmed Ms Sophie Nappert as co-arbitrator upon Claimant's nomination (Article 13(1) of the ICC Rules); directly appointed Dr Galina Zukova as co-arbitrator on behalf of Respondent, which had failed to nominate a co-arbitrator (Article 13(3) of the ICC Rules); and fixed the advance on costs at US$410,000 subject to later readjustments (Article 36(2) of the ICC Rules). The decision of the ICC Court was notified by the Secretariat to the Parties on 7 July 2016 (including to the Respondent by international courier).

36.   On 28 July 2016, the ICC Court directly appointed Mr Noah Rubins as President of the Tribunal (13(4)(a) of the ICC Rules).

37.   The file was transmitted to the Arbitral Tribunal on 4 August 2016 with notification of the Parties by the Secretariat (including to the Respondent by international courier).

---

[54]   C-63.

38.     On 12 August 2016, the President of the Tribunal wrote to the Parties proposing a timetable for the arbitration and attaching a draft of the Terms of Reference. The Chairman requested that the Parties comment by 26 August 2016. On that date, the Claimant submitted comments on the timetable and Terms of Reference. In particular, the Claimant requested additional time to submit its Statement of Claim on Jurisdiction and Merits.

39.     On 31 August 2016 the TMR Minister of Economic Development, Mr. Dmitriy Boltrushko, wrote personally to the President of the Tribunal by email. He confirmed the receipt of the initial procedural documentation, and indicated the Respondent's intention to participate in the arbitration. Mr Boltrushko requested further information on the nature of the claims before any procedural conference would be scheduled.

40.     The President of the Tribunal wrote to the Respondent on 1 September 2016, directing its attention to the Request for Arbitration and supporting materials that had been previously forwarded to the Respondent by courier. The President asked whether the Respondent needed to receive the same material in electronic form, and wrote with respect to the scheduling of the initial procedural conference that "the Arbitral Tribunal is inclined to provide additional time, such that the TMR and/or the Ministry is able to provide any comments it may have on the draft Terms of Reference that were sent before the conference takes place." The President requested that the Claimant indicate if it opposed this approach. By email of 2 September 2016, the Claimant consented to an initial procedural conference to be held by telephone on 19 September 2016.

41.     By email of 9 September 2016, the Respondent confirmed its readiness to participate in the procedural conference on 19 September 2016. At the same time, it indicated that it had not yet received "all necessary documents" to respond to the claims presented. It asked to receive electronic copies of the Request for Arbitration and supporting documentation. On 13 September 2016, the President of the Tribunal sent the Request for Arbitration to the Respondent by email, along with the Claimant's comments to the draft Terms of Reference. The President asked the Claimant to forward to the Respondent separately in

electronic form all of the exhibits to the Request for Arbitration. The Claimant confirmed on the same day that it had done so.

42. On 19 September 2016, the Tribunal held a procedural conference by telephone with the Parties (Art. 22(1) of the ICC Rules) that lasted approximately one hour. Both Parties proposed certain modifications to the draft Terms of Reference and the Respondent undertook to provide a statement of its position in writing for inclusion. The Tribunal established a deadline of 23 September 2016 for the Parties to provide their final comments on the draft Terms of Reference. On 23 September 2016, the Claimant submitted further written suggestions for modifications to the Terms of Reference. On the same day, the Respondent requested an extension of time until 27 September 2016 to provide its final comments. The Claimant consented to this request, but asked that "the procedural timetable proposed by the Tribunal during the case management conference call of 19 September be reopened for consultation once the Terms of Reference are signed or approved."

43. No communication was received from the Respondent on 27 September 2016. Two days later, the Respondent wrote to the Tribunal that it was currently unable to provide its statement of position for the Terms of Reference, but confirmed its "interest in providing the required position in the near future, as soon as possible." The Respondent apologized for the delay and reiterated its "readiness to engage to the extent possible and reasonable." Also on 29 September 2016, the President of the Tribunal solicited the Claimant's comments on this message, stating that "[i]n the meantime, the Tribunal will proceed towards finalization of the Terms of Reference." On 3 October 2016, the Claimant consented to a further extension of time for the Respondent to provide its statement of position. On 29 September 2016, the ICC Court extended the time accorded for the finalization of the Terms of Reference until 31 October 2016.

44. By email of 10 October 2016, the Respondent provided its statement of position for inclusion in the Terms of Reference. The President of the Tribunal circulated a revised version of the Terms of Reference to the Parties on 11 October 2016, requesting that any final comments be made no later than 13 October 2016. On 12 October 2016, the Claimant confirmed that it had no further comments. The

Respondent remained silent.  On 16 October 2016, the President of the Tribunal sent a finalized version of the Terms of Reference to the Parties and directed the Respondent to sign the relevant pages and forward to the Claimant for further execution. On 24 October 2016, the Claimant wrote to the Respondent asking whether it intended to sign the Terms of Reference, having not received the signed pages in accordance with the Tribunal's instructions.  On the same day, in light of the Respondent's silence, the President of the Tribunal instructed the Claimant to sign the Terms of Reference and to send the document to the Tribunal for finalization without the Respondent's signature.

45.   On 26 October 2016, the Claimant wrote to the Tribunal proposing a new procedural schedule.   In particular, the Claimant proposed to submit its Statement of Claim on Jurisdiction and Merits two weeks later than previously scheduled, and that this first submission would deal only with issues of jurisdiction and the merits.   The Claimant's Statement of Claim on Damages would follow two months later (on 17 January 2017).   The Claimant proposed that the Respondent would then have an opportunity to answer each of its submissions separately.  According to this schedule, the Respondent's last filing would take place on 19 April 2017.  The Tribunal accorded the Respondent until 4 November 2016 to respond to the Claimant's proposal.  No comments were received from the Respondent on the procedural timetable advanced by the Claimant.

46.   On 27 October 2016, the ICC Court extended the time to finalize the Terms of Reference until 30 November 2016.   On 10 November 2016, the Claimant informed the Tribunal that it had just received copies of the Terms of Reference signed by the Respondent.  These signed documents were forwarded to the ICC to complete the executed Terms of Reference, now approved by both Parties.  In the same communication, the Claimant modified its proposal to accord itself additional time to prepare its Statement of Claim on Damages.  According to the new timetable, the Respondent's final submission would be due on 3 May 2017. The Tribunal accorded the Respondent until 15 November 2016 to respond to the Claimant's proposal.  No comments were received from the Respondent on

the procedural timetable advanced by the Claimant.  On 20 November 2016, the Tribunal issued Procedural Order No. 1, which included a procedural timetable.

47.     In accordance with Procedural Order No. 1, the Claimant submitted its Statement of Claim on Jurisdiction and Merits on 21 November 2016.

48.     In December 2016 elections took place in the TMR, and on 17 December 2016 a new President and government took office.  On 9 January 2017, the Claimant wrote to the new Prime Minister, Mr Alexander Martynov, as well as the new Minister of Economic Development, Mr Sergei Obolonik, describing the course of the arbitration proceedings and explaining the next steps according to Procedural Order No. 1.

49.     On 17 January 2017, the President of the Tribunal wrote to the Parties, reminding them of the upcoming deadlines established in Procedural Order No. 1.  In particular, the President noted that the Claimant was to submit its Statement of Claim on Damages on 31 January 2017, and the Respondent was to submit its Statement of Defence on Jurisdiction and the Merits on 10 February 2017.  The Tribunal expressed its expectation that this schedule be observed, "absent a request for extension that is duly justified."

50.     In accordance with Procedural Order No. 1, the Claimant provided its Statement of Claim on Damages on 31 January 2017.  10 February 2017 passed, with no submission from the Respondent in response to the Statement of Claim on Jurisdiction and Merits as envisaged in the timetable.

51.     On 17 February 2017, the Claimant requested that the Tribunal close the written phase of the proceedings by 28 February 2017 if no submission was made by the Respondent before then.  On 6 March 2017, the Tribunal decided that it would be inappropriate to close the written proceedings, despite Respondent's failure to observe the time limit for submission of its Statement of Defence on Jurisdiction and Merits, since the Respondent was still accorded by Procedural Order No. 1 until 28 March 2017 to submit its Statement of Defence on Damages.

52.     No submission was received from the Respondent on 28 March 2017.  On 30 March 2017, the Tribunal invited the Parties to comment on 18 May as a possible

hearing date, by 7 April 2017.  On 25 April 2017, the Tribunal notified the Parties that a hearing would take place in Paris on 18 May 2017.  On 15 May 2017, the Respondent informed the President of the Tribunal by letter from its Minister of Foreign Affairs that it would participate in what it called the "preliminary" oral hearing in Paris.  On 16 May 2017, the Claimant sent its opening statement PowerPoint slides to the Tribunal, and in its covering email expressed concern about the Respondent's characterization of the hearing as "preliminary."  It requested that the Tribunal close the written phase of the arbitration, and declare that "[n]o further written submissions are possible, save for post-hearing submissions regarding costs."  On 17 May 2017, the Tribunal wrote to the Parties confirming that the upcoming hearing would not be preliminary in nature, and would deal with all outstanding issues of jurisdiction, merits and damages.  The Tribunal further noted the Claimant's procedural requests and undertook to address them during the hearing.

53.  An oral hearing took place on 18 May 2017 at the offices of Freshfields Bruckhaus Deringer LLP in Paris.  In attendance for the Claimant were Ms Delphine Nougarède and Mr William Schneider as counsel, Mr Yuri Drukker, and the Claimant's former CFO Mr Szabolcs Baranyai.  In attendance for the Respondent were Mr Denis Buraga, a lawyer of the TMR Ministry of Economic Development, and Mr Dmitry Kambur of the TMR Ministry of Foreign Affairs.  At the outset of the hearing, the Claimant reiterated its request that the written phase of the arbitration be closed.  The Respondent opposed this request, and asked for the opportunity after the hearing to express its position in writing in response to the Claimant's case.  The Tribunal deferred decision on this point until the end of the hearing.  The Claimant then presented its case, and responded to questions from the Tribunal.  The Respondent subsequently explained its position on a range of issues in the case, including aspects of jurisdiction, merits and damages.  It then answered questions from the Tribunal, which also posed additional questions to the Claimant.  Mr Drukker was then called to testify.  He was cross-examined by the Respondent and then answered questions posed by the Tribunal.  At the close of the hearing, the Claimant proposed and the Respondent accepted that the Parties would make a final simultaneous written submission on 19 June 2017, including a statement of costs.

54.    The Claimant wrote to the Tribunal on 14 June 2017 requesting a two-month extension for the exchange of final submissions (until 14 August 2017). The Claimant expressed its view that such an extension was "necessary to provide the Tribunal with all of the necessary elements." The Respondent did not comment, and the extension was granted. On 20 July 2017, the Claimant again wrote to the Tribunal seeking an additional two months to prepare its final submission (until 13 October 2017), explaining that accounting procedures then underway would "require more time than initially anticipated." On 26 July 2017, the Respondent consented to the extension of time.

55.    On 13 August 2017, the ICC Court extended the time limit for rendering an award until 30 November 2017.

56.    On 13 October 2017, the Respondent made its closing written submission (***Respondent's Final Submission***), accompanied by a Report on Fulfilment of Investment Conditions. On the same day, the Claimant made its closing written submission (***Claimant's Final Submission***).

57.    On 10 November 2017, the Tribunal declared the proceedings closed (Article 27 of the Rules).

58.    On 30 November 2017, the ICC Court extended the time limit for rendering an award until 30 March 2018. On 22 March 2018, the ICC Court extended the time limit for rendering an award until 31 May 2018.

59.    On 31 May 2018, the ICC Court extended the time limit for rendering an award until 31 July 2018.

## III.    APPLICABLE PROCEDURAL RULES

60.    This arbitration is governed by the ICC Rules, in force as from 1 January 2012, and, where these rules are silent, by any rules which the Parties or, failing them, the Arbitral Tribunal may settle, and in all cases, subject to any mandatory requirement of the procedural laws of France applicable to international arbitration (Article 19 of the ICC Rules).

## IV.   LANGUAGE OF THE ARBITRATION

61.   In accordance with Article 6.2 of the 2003 Agreement, the language of the arbitration is English.

## V.   APPLICABLE LAW

62.   The dispute resolution clause contained in Article 6.2 of the 2003 Agreement includes a stipulation of applicable law:

> *Disputes arising out of this Agreement, which fail to be resolved through negotiations shall be examined [...] on the basis of the provisions of this Agreement, rules of international private law. In the event of a conflict between the rules of law of the Transdniestrian Moldavian Republic, Russia, and the rules of international private law, the rules of international private law shall apply.*

The 2012 Agreement includes no provision specifically dealing with applicable law. However, Article 5.2 of the later contract stipulates that "All other liabilities of the Parties and other provisions are regulated according to" the 2003 Agreement.

## A.   THE PARTIES' POSITIONS

63.   For the avoidance of doubt, the descriptions of the Parties' positions presented here are exclusively for the purposes of summarizing the main elements of argumentation. The Tribunal has examined all of the Parties' submissions, written and oral, and considered each argument made by both sides regardless of whether it has been included in the summaries of position below.

64.   The Claimant contends that the present dispute should be resolved according to the terms of the applicable Agreement, and that the contractual text forms a "supreme law between the parties."[55] To the extent that no answer to a particular question can be found in the text, the Claimant argues that "norms of international private law" apply, and that this should be taken to mean transnational rules accepted in international commerce, including *lex mercatoria*. Its interpretation would exclude the application of conflict-of-laws rules, despite

---

[55]   Statement of Claim, para 77.

the fact that "private international law" normally encompasses precisely those rules.[56]

65.     The Claimant further takes the position that specific rules of "international investment law" should be applied in addition to internationally-accepted commercial practices.  This contention is based primarily on Article 6.5 of the 2003 Agreement, which provides that "[a]ll privileges applicable to foreign investors set out in international conventions, and also in the legislation of the Transdniestrian Moldavian Republic in the field of foreign investments, shall prevail over this Agreement and shall apply without limitation."[57]  More broadly, the Claimant has advanced the proposition that State contracts such as those at issue here are "hybrid" instruments that are naturally governed in part by international investment law.[58]  However, in its Final Submission, the Claimant has accepted that so long as the provisions of the 2003 and 2012 Agreements are valid and binding regardless of the stipulations of TMR law, "it is not necessary for it to claim rights that it may hold under 'international investment law'".[59]

66.     According to Claimant, TMR and Russian law have only residual application, in light of Article 6.2 of the 2003 Agreement, which expressly gives precedence to private international law in case of conflict.[60]  As between these two systems of municipal law, the Claimant contends that Russian law should be more influential, given the more detailed elaboration and application of its provisions.[61]

67.     According to the Respondent, the present dispute is to be resolved exclusively in accordance with the law of the TMR.[62]  In particular, it argues, the Bender project was effectively a privatization, and such matters are subject to the mandatory application of the TMR Law on Privatisation.

---

[56]   Statement of Claim, para 81; Claimant's Final Submission, para 11.

[57]   Statement of Claim, paras 86-87.

[58]   Statement of Claim, para 87.

[59]   Claimant's Final Submission, para 11.

[60]   Statement of Claim, para 94.

[61]   Claimant's Final Submission, para 9.

[62]   Email from the Respondent of 10 October 2016, C-24, para 4.

**B.    DECISION OF THE TRIBUNAL**

68.    The Claimant takes the position that the applicable law clause of the 2003 Agreement applies equally to the 2012 Agreement. The Respondent has not specifically taken issue with this contention. Given that the 2012 Agreement is silent on the law governing its application and interpretation, such matters logically fall within the scope of "other provisions" caught by the referral clause, Article 5.2 of the 2012 Agreement. Indeed, the governing law would appear to be one of the more obvious areas in which the Parties in their later contract (subject to the contentions as to its validity, addressed further below) chose not to re-negotiate terms but to extend the detailed provisions of the 2003 Agreement. Therefore, the Tribunal finds that the governing law clause found in Article 6.2 of the 2003 Agreement was incorporated by reference into the 2012 Agreement.

69.    It is beyond cavil that the terms of the relevant agreement form the primary rule of law for resolving disputes between the Parties. That was the clear stipulation in Article 6.2 of the 2003 Agreement. A less straightforward issue is the legal system upon which the Tribunal should draw where the contractual text is silent or ambiguous, or otherwise requires supplement or interpretation. Immediately following the reference to the terms of the agreement, Article 6.2 refers to "rules of international private law". In legal parlance, private international law usually refers to the municipal-law systems regulating the conflict between legal norms of various countries. This is not a system of law that could provide useful guidance to commercial parties in informing their rights and obligations under a contract. Moreover, the following phrase describes a situation where international private law would "conflict" with municipal law systems (TMR and/or Russian) – a circumstance that, to the Tribunal's mind, undermines the view that the Parties intended to apply private international law in the usual meaning of the term to their contractual relationship.

70.    It is not unheard-of for contracting parties to use the words "private international law" to refer to the customs and practices accepted as binding rules in international commerce. The Tribunal concludes in light of the textual analysis above and the circumstances of the transaction – in particular the investment of

capital by a foreign private company in the TMR – that this was indeed the Parties' intention here.   This does not necessarily entail the wholesale incorporation of *lex mercatoria* (if such a body of law exists and can be articulated) or the UNIDROIT Principles.[63]   It is reasonable to assume that, had they envisaged that any specific system should apply to their agreement, the Parties would have so indicated in the text.   Rather, the Tribunal will have reference as necessary to basic rules of transnational business as can be identified on a case-by-case basis.

71.   The question remains as to the role of TMR and Russian law.   The reference in Article 6.2 to these municipal systems is indirect.   Nowhere does the contract stipulate that either TMR or Russian law shall apply, or in which circumstances. Nevertheless, the governing law clause indicates that in case of conflict between either of these systems of law and international private law, the latter is to prevail. This could be interpreted as a reference to the situation where mandatory norms of TMR or Russian law apply.   But such a stipulation would be ineffective by definition; either a norm is mandatory, in which case it automatically prevails over other competing rules of law, or it is not mandatory, in which case no conflict could possibly arise.   The only other reasonable interpretation of the phrase in question is that the Parties intended to use TMR and Russian law as a further source of legal rules to govern their relationship.   By referring to these systems as subordinate to "international private law", it appears to the Tribunal that the Parties sought to limit their application to providing substance and content where the primary sources (the contract and international rules of commerce) offer no assistance.   This is the role that the Tribunal will attribute to TMR and Russian law, subject to the remaining issue of mandatory norms, addressed further below.

72.   As between TMR and Russian law, the Parties have not indicated that either should take precedence.   Yet, TMR law is listed first, and it is also of the closest connection.   Matters are somewhat simplified by the strong similarity between the legal systems of Transdniestria and the Russian Federation.   Should the two systems yield different results, the Tribunal considers itself free to choose

---

[63] Claimant referred to the UNIDROIT Principles in the Statement of Claim on Damages, paras 63-64.

between them based on the totality of the circumstances and the expectations of the Parties.

## VI.    JURISDICTION

73.    Jurisdiction is based upon the arbitration clause contained in the 2003 Agreement. The arbitration clause (Article 6.2) provides, in the original Russian (including the governing law provision detailed in the section immediately above):

> *6.2. Споры, вытекающие их [sic] настоящего Договора, которые не будут разрешены путем переговоров, подлежат рассмотрению в Арбитражном суде Международной торговой палаты в г. Париже и будут разрешены в соответствии с Регламентом о применении и Арбитражном суде Международной торговой палаты в г. Париже, исходя из положений настоящего Договора, норм международного частного права. В случае противоречия норм права Приднестровской Молдавской Республики, России, нормам международного частного права применяются нормы международного частного права.*

> *Споры будут разрешены судом в составе 3 (трех) судей, каждая Сторона назначают по одному судье, третьего судью назначает Арбитражный суд Международной торговой палаты в г. Париже.*

> *Стороны договариваются, что языком рассмотрения спора является английский язык.*

> *В целях рассмотрения спора с [sic] Арбитражном суде Международной торговой палаты в г. Париже пошлины и другие обязательные платежи осуществляет Сторона настоящего Договора, обратившаяся в данный суд.*

74.    In the English translation provided by the Claimant (which has not specifically. been contested by the Respondent), Clause 6.2 provides:

> *6.2.    Disputes arising out of this Agreement, which fail to be resolved through negotiations, shall be examined by the Arbitration Court of the International Chamber of Commerce in Paris and shall be resolved in accordance with the applicable Rules and by the Arbitration Court of the International Chamber of Commerce in Paris, on the basis of the provisions of this Agreement, rules of international private law.  In the event of a conflict between the rules of law of the Transdniestrian Moldavian Republic, Russia, and the rules of international private law, the rules of international private law shall apply.*

> *Disputes shall be resolved by a tribunal of 3 (three) arbitrators, each Party shall appoint one arbitrator, the third arbitrator shall be appointed by the Arbitration Court of the International Chamber of Commerce in Paris.*

> *The Parties agree that the language of adjudication of the dispute shall be English.*

> *For the purpose of examination of a dispute by the Arbitration Court of the International Chamber of Commerce in Paris, any charges and other obligatory payments shall be effected by the Party to this Agreement that filed claim before such court.*

75. The 2012 Agreement contains no dispute resolution provision. According to the Claimant, this arbitration clause was imported into the 2012 Agreement by operation of the referral provision in Article 5.2 of that contract.[64] As noted above in relation to governing law, Article 5.2 stipulates that "[a]ll other liabilities of the Parties and other provisions are regulated according to" the 2003 Agreement."

## A.   ARBITRATION UNDER THE 2012 AGREEMENT

## 1.   The Parties' positions

76. For the avoidance of doubt, the descriptions of the Parties' positions presented here are exclusively for the purposes of summarizing the main elements of argumentation. The Tribunal has examined all of the Parties' submissions, written and oral, and considered each argument made by both sides regardless of whether it has been included in the summaries of position below.

77. The Respondent contends that disputes arising under the 2012 Agreement are not subject to arbitration, because that contract does not contain an arbitration clause and is unrelated to the 2003 Agreement, from which the Claimant draws the TMR's consent to arbitration. The Respondent points out that different government entities signed the two agreements, and different regulatory regimes applied to each: privatization in the case of the 2003 Agreement and investment for the 2012 Agreement.[65]

78. The Claimant insists that the 2003 and 2012 Agreements are closely intertwined. In the first instance it contends that the 2012 Agreement constituted a revision of the 2003 Agreement, such that any provisions not superseded (such as governing law and arbitration) remained in force with respect to the new 2012 terms. In the alternative, the Claimant argues that through Article 5.2 of the 2012 Agreement,

---

[64]   RfA, para 4.2.

[65]   Email from the Respondent of 10 October 2016, C-24.

the Parties incorporated Article 6.2 of the 2003 Agreement (including the arbitration clause) into the 2012 Agreement by reference. Either way, according to the Claimant, the present dispute about the implementation of the 2012 Agreement falls properly within the scope of the arbitration clause found in the 2003 Agreement.[66]

## 2.    Decision of the Tribunal

79.    For the Tribunal, the extent to which the 2003 and 2012 Agreements are interrelated is somewhat beside the point. The Claimant does not contend that a dispute arising under a distinct and separate 2012 Agreement is so closely related to the 2003 Agreement that it falls within the scope of Article 6.2 of the earlier contract. Rather, the contention is either that the two contracts are in fact one, or that Article 6.2 of the 2003 Agreement was incorporated into the 2012 Agreement by reference. Either way, the answer can be found in the text of the contracts, and there is no need for recourse to their interconnectedness (or lack thereof).

80.    As noted above in relation to governing law, Article 5.2 of the 2012 Agreement expressly incorporates certain provisions of the 2003 Agreement by direct and explicit reference. Specifically, any "liabilities" or "provisions" not elaborated in the 2012 Agreement are to be drawn from the 2003 Agreement. Given the absence of any dispute resolution clause in the 2012 Agreement, it seems very probable that the Parties viewed Article 6.2 of the 2003 Agreement as one of the "other" provisions (or "liabilities", as the case may be) that would be adopted from their earlier contract (indeed, as discussed in Section VII.F further below, the Respondent made proposals in 2014 and 2015 to modify the arbitration agreement, which were rejected by the Claimant). This would have permitted them to avoid negotiating and re-drafting an important but potentially contentious provision of the new agreement. The Respondent has not indicated any rule of applicable law that would prevent such an agreement to arbitrate by reference from being effective.

---

[66]    Request for Arbitration, paras 4.1-4.4; Statement of Claim on Jurisdiction and Merits, para 48(b).

81.   On this basis, the Tribunal concludes that Article 6.2 of the 2003 Agreement is incorporated into the 2012 Agreement, and provides a valid basis for jurisdiction over the present dispute (subject to the Respondent's other objections to jurisdiction, canvassed further below).

## B.   ARBITRABILITY

### 1.   The Parties' positions

82.   The Respondent challenges the validity of the arbitration agreement contained in Article 6.2 of the 2003 Agreement.   It submits that disputes arising out of contracts concerning privatisation are subject to the exclusive jurisdiction of TMR commercial courts.[67]  The Respondent cites in this regard Article 42 of the TMR Privatisation Law, which provides:

> *The resolution of disputes between legal entities and citizens, and bodies of authority and management regarding matters related to sale of state ownership and privatization, involving termination of a contract for the sale and purchase of state or municipal property and payment of penalties in accordance with Article 40-1 of this Law, shall be carried out in the Arbitrazh Court of the Transdniestrian Moldavian Republic.*

83.   The Claimant takes the position that the Parties' agreement to arbitration in the 2003 Agreement displaced application of the dispute resolution provision in the Privatisation Law, because Article 42 is not mandatory in nature.   It cites two TMR court decisions to that effect involving this very contract.[68]

### 2.   Decision of the Tribunal

84.   The Respondent's objection on grounds of arbitrability is fundamentally misplaced.   Whether or not the TMR legislator has decided to allow privatisation-related disputes to be arbitrated is a question with bearing only upon arbitral processes taking place within the TMR, or those in which the agreement to arbitrate is governed by TMR law.[69]  This is reflected in the text of the New York Convention, which allows national courts to refuse enforcement of a foreign

---

[67]  Email from the Respondent of 10 October 2016, C-24, para 11.

[68]  C-19, C-20.

[69]  Piero Bernardini, *The Problem of Arbitrability in General*, in ENFORCEMENT OF ARBITRATION AGREEMENTS AND INTERNATIONAL ARBITRAL AWARDS 503, 510-514 (2008).

arbitral award where the subject matter of the dispute was not capable of resolution by arbitration under the law of that country.[70]

85.     Since it is the Tribunal's obligation to make every effort to ensure that the award is enforceable at law,[71] a full examination of the Respondent's arbitrability objection to jurisdiction as a matter of TMR law is required.

86.     The Tribunal begins from the statute upon which the Respondent relies, the TMR Privatization Law.   The jurisdiction of the local courts (and on the Respondent's view, the restriction upon arbitrability) is tightly circumscribed. Only disputes related to (i) the sale of State assets, (ii) the termination of privatization contracts, and (iii) the payment of statutory penalties fall within the scope of the legislative mandate.   The only one of these three categories that implicates the present dispute is the termination of the 2003 Agreement, given that the Claimant now seeks this relief.[72]   Even the 2012 Agreement cannot be characterized as a "privatization agreement", since the Bender Plant had already been transferred to the Claimant many years before its conclusion.   Statutory penalties are not at issue here, nor are any of the claims directly related to the sale of State assets.   Therefore, the objection based upon arbitrability could in any event affect only the Claimant's request to terminate the 2003 Agreement.   All other claims and requests for relief fall outside the express scope of Article 42 of the Privatization Law.

87.     In any event, while the language of Article 42 could be interpreted to be mandatory in nature (the English translation includes the words "shall be submitted"), this is not unambiguous.   In the original Russian, the law provides literally that the resolution of such disputes *is carried out* ("осуществляется") in the State court.   This could also reasonably be construed to create court jurisdiction, but not to require it.   If the legislator had wanted to exclude any other dispute resolution mechanism, he could have added clear language to that effect, indicating that such disputes are *exclusively* to be submitted to court.

---

[70]   Art V.2(a) of the New York Convention.

[71]   Art. 41 of the ICC Rules.

[72]   Claimant's Final Submission, paras 13-14.

88.     Meanwhile, other TMR legislation supports the view that Article 42 of the Privatization Law does not impose any limit on arbitrability. Article 22 of the TMR Arbitrazh Procedural Code (such code having been cited generally by the Claimant[73]) provides the participants in civil law relationships the broadest possible freedom to agree to resolve their disputes by arbitration.[74] The Arbitrazh Procedural Code itself does not appear to impose any mandatory limits on arbitrability. Moreover, this dispute seems clearly to fall within the express scope of arbitrable differences established in Article 37 of the Foreign Investment Law:

> *1. Disputes of foreign investors with state organs regarding the implementation of this Law and provisions of other legislative acts of the Transdniestrian Moldavian Republic shall be adjudicated by the Arbitrazh Court or courts of the Transdniestrian Moldavian Republic.*
>
> *The parties may agree that the dispute shall be examined by conciliation bodies.*
> *...*
>
> *2. Other disputes between enterprises with foreign investments on the one hand and other physical and legal persons, state bodies and public organizations on the other hand, having entered in civil law legal relations, and also disputes between the founders of these enterprises shall be adjudicated by the Arbitrazh Court or courts of the Transdniestrian Moldavian Republic. The disputing parties may refer to an arbitral tribunal or conciliation bodies for the resolution of disputes.*[75]

89.     The TMR itself has already taken a position supporting the Claimant's jurisdictional case here and undermining its own. First, on two occasions the TMR initiated proceedings in its own *arbitrazh* courts under the 2003 Agreement. In each instance (in 2006 and 2009), the TMR Arbitrazh Court rendered a decision dismissing the government's case against the Claimant on grounds that the dispute was subject to ICC arbitration pursuant to Article 6.2 of the 2003

---

[73]   Statement of Claim on Jurisdiction and Merits, para 12.

[74]   TMR Arbitrazh Procedural Code, Art 22 ("By agreement of the parties, a dispute that has arisen or may arise in future out of civil law relations and which is subject to the jurisdiction of the arbitrazh court can be submitted to arbitration before the court has adopted a decision"), http://www.vspmr.org/legislation/laws/zakonodateljnie-akti-pridnestrovskoy-moldavskoy-respubliki-v-sfere-sudoustroystva-i-protsessualjnogo-prava/arbitrajniy-protsessualjniy-kodeks-pridnestrovskoy-moldavskoy-respubliki.html.

[75]   Exhibit CLT-14, p. 14, discussed in Claimant's Final Submission, para 60.

Agreement.[76]   In neither case did the court make any reference to the Privatization Law or any limits on arbitrability based upon mandatory norms of TMR law.  Regardless of the relief requested in those attempts at litigation, if the TMR's objection to jurisdiction here were correct, the TMR courts would not have referred the disputes to ICC arbitration.

90.   Second, the TMR subsequently followed the directions of its courts in this regard, and itself initiated ICC arbitration against the Claimant in 2011.  In its Request for Arbitration, the TMR advanced a range of assertions and claims in relation to the 2003 Agreement, relying expressly on the arbitration clause found in Article 6.2.[77]   In particular, the TMR asserted violations of the investment program by the Claimant, and requested that an arbitral tribunal *terminate the 2003 Agreement*.[78]   If the Respondent's current position were correct, this request for relief (as well as the entire application to the ICC) would have been directly contrary to the stipulated allocation of exclusive jurisdiction to the TMR courts. It is irrelevant that the 2011 ICC arbitration was closed without prejudice due to non-payment of the advance on costs.[79]   The TMR should be taken to know the effect of its own legislation, and its conduct in the prior arbitration confirms that its arbitrability objection is unfounded.  Moreover, good faith is one principle that undisputedly forms part of transnational business practices, and therefore part of the law applicable to this dispute.  A party cannot in good faith take an affirmative position to its own advantage in one proceeding, and then reverse position to gain further advantage against the same party in another.

91.   For the reasons set out above, the Respondent's objection based on arbitrability is rejected.

---

[76]   C-19, C-20.

[77]   C-21.

[78]   C-21, p. 6 (point 1 of request for relief).

[79]   Statement of Claim on Jurisdiction and Merits, para 33.

C.    SOVEREIGN IMMUNITY

1.    **The Parties' positions**

92.    The Respondent contends that it cannot be compelled to arbitrate the present dispute because it enjoys sovereign immunity.   It denies having waived its immunity in writing or otherwise.[80]  In particular, it argues that the arbitration clauses in the 2003 and 2012 Agreements cannot be construed as a waiver of immunity from jurisdiction.[81]  On this basis, the Respondent submits that the Tribunal lacks jurisdiction.

93.    In response, the Claimant argues that "freely entering into the arbitration clause at Article 6.2, the Respondent has irrevocably waived any sovereign immunity.[82] Its position is that a waiver of sovereign immunity can be implicit, for example in an express submission to arbitration in a contract.   Under French law, the *lex arbitri,* when a State concludes an arbitration agreement, it is deemed to have waived immunity from both jurisdictions over the relevant dispute and in the courts for subsequent enforcement proceedings.[83]  The Claimant adds that in any event the Respondent does not enjoy sovereign immunity, because it is not recognized as a State by the international community.[84]

2.    **Decision of the Tribunal**

94.    As noted earlier, the Tribunal need not take a position as to whether the Respondent is a State as a matter of international law.   Here the question is not whether other States recognize the TMR, but rather whether the Tribunal must decline jurisdiction due to sovereign immunity from suit that would arise from TMR law as governing law.

95.    In most jurisdictions, it is accepted that a State may waive its sovereign immunity to jurisdiction, allowing itself to be sued in foreign courts or in arbitration

---

[80]    Email from the Respondent of 10 October 2016, C-24, para 10.

[81]    Email from the Respondent of 10 October 2016, C-24, para 10.

[82]    Statement of Claim on Jurisdiction and Merits, title of section 3.4.

[83]    Statement of Claim on Jurisdiction and Merits, para 68.

[84]    Statement of Claim on Jurisdiction and Merits, para 69.

proceedings.[85]  Indeed, the State would be incapable of carrying out commercial activities effectively without such a power, since private parties would be unwilling to subject themselves to the risk of contractual breach without the assurance of some form of binding dispute resolution by a neutral decision-maker.

96.   The question is whether the agreement to submit disputes to international arbitration, contained in Article 6.2 of the 2003 Agreement, constituted a waiver of the TMR's sovereign immunity (to the extent it enjoys any, an issue put to one side for present purposes).  No doubt the position would have been clearer if the parties had included an express waiver of immunity clause in their contract.  The absence of such language cannot be dispositive, however.  What matters is the parties' common intention, which can be expressed directly or by implication.  It would be very odd indeed for parties to agree to a dispute resolution forum in their contract, but for them to reserve to one side the unilateral right to refuse to submit to that forum once a dispute arises.  Such would be the situation if the TMR enjoyed sovereign immunity from jurisdiction and did not waive it.  It is for this reason that under many legal systems, including French law (the *lex arbitri* here), the conclusion of an arbitration agreement by a State is assumed to entail the waiver of any sovereign immunity from the jurisdiction of the resulting tribunal.[86]

97.   Once again, the TMR has by its conduct spoken on this issue in the past.  As noted, in 2011 the Respondent initiated ICC arbitration against WJ Holding in relation to the 2003 Agreement.  By doing so, the TMR affirmatively placed itself within the jurisdiction of an arbitral agreement that is identical to the one at issue in this arbitration.  By doing so it either confirmed its understanding that it had no sovereign immunity by operation of the arbitration clause, or it waived any remaining immunity by its conduct.  Once the TMR had taken action in

---

[85]  See, e.g., *Creighton* v. *Ministère des Finances de l'Etat du Qatar*, Cass. Civ I., 6 July 2000, J.D.I., N°127, pp.1054-1055, 2000, also cited by the Claimant in its Statement of Claim on Jurisdiction and Merits, para 68.

[86]  The above cited case *Creighton* v. *Ministère des Finances de l'Etat du Qatar*, Cass. Civ I., 6 July 2000, J.D.I., N°127, pp.1054-1055, 2000, also cited by the Claimant in its Statement of Claim on Jurisdiction and Merits, para 68.

arbitration under the 2003 Agreement, it would have been eminently clear to any reasonable contracting party that the 2012 Agreement's importation of the same dispute resolution clause implicated the removal of any possible immunity defence to jurisdiction for the State party. Any contrary conclusion would be to presume bad faith on the part of the TMR, which would be inconsistent with the transnational business practices that the Parties chose to govern their relationship.

98.   For these reasons, the Tribunal rejects the Respondent's objection to jurisdiction based on sovereign immunity.

## VII.   MERITS

99.   The Tribunal now turns to the Parties' claims and defences on the merits.

## A.   THE VALIDITY OF THE 2012 AGREEMENT

### 1.   Nature of the 2012 Agreement – Preliminary or Final?

#### (a)   Respondent's position

100.   The Respondent submits that the 2012 Agreement was not a binding contract but merely "an agreement of intent and therefore it precedes the conclusion of the main agreement."[87] In this regard, the Respondent relies upon Article 446 of the TMR Civil Code, which establishes a specific contract type of "Preliminary Agreement," which depends for its enforceability upon the conclusion of a subsequent contract. The Respondent says that since the Parties never concluded any subsequent agreement, the 2012 Agreement is not binding on the parties.[88]

#### (b)   Claimant's position

101.   According to the Claimant, the 2012 Agreement is not a preliminary agreement but a binding contract.[89] The Claimant recognises that the concept of preliminary agreement exists under both TMR and Russian law, as well as pursuant to the laws of certain other post-Soviet states. Such an instrument is a binding contract

---

[87]   Email from the Respondent of 10 October 2016, C-24, para 4.

[88]   Email from the Respondent of 10 October 2016, C-24, paras 4-5.

[89]   Statement of Claim on Jurisdiction and Merits, para 106 *et seq.*

to enter into a further agreement in the future.  However, the Claimant points out that the expression "preliminary agreement" is nowhere found in the 2012 Agreement.  Neither is there any indication that a binding final agreement was to be concluded at some point in the future.[90]

102.   Nor is the 2012 Agreement a mere "agreement to agree".  Although similar expressions appear twice in the 2012 Agreement, elsewhere in the document the phrase "the present agreement" is used.[91]  Moreover, Article 5.3 of the 2012 Agreement states that it was to become immediately binding upon the Parties.[92]

103.   According to the Claimant, when construed in its entirety the 2012 Agreement establishes specific obligations for each party.  Article 4 further sets out the consequences that failing to perform would have for the breaching party.[93]

104.   Finally, the fact that the agreement was intended immediately to be binding can be inferred from the Parties' conduct, such as the adoption of export duties by the TMR, significant investment of money in the Plant's operations by the Claimant and subsequent monitoring of investments by the TMR.  The Claimant contends that the Respondent, through its officials, acknowledged the binding nature of the 2012 Agreement.[94]

### (c)   Decision of the Tribunal

105.   The Tribunal has determined that the law applicable to the substance of the 2012 Agreement is the body of international commercial practices.  TMR law and Russian law come into play in the interpretation of the contract only to the extent necessary, and only to the extent not contradicted by the primary source of law.

106.   International commercial practices do not recognize any particular category of "preliminary agreement".  While the concept of an "agreement to agree" is widely recognized, the force of such a preliminary understanding (in the nature of a

---

[90]   Statement of Claim on Jurisdiction and Merits, para 111.

[91]   Statement of Claim on Jurisdiction and Merits, para 112.

[92]   Statement of Claim on Jurisdiction and Merits, para 113.

[93]   Statement of Claim on Jurisdiction and Merits, para 114.

[94]   Statement of Claim on Jurisdiction and Merits, para 117.

memorandum of understanding or "heads of terms") is by no means uniform. It is a fundamental principle of commercial dealing that an agreement is binding if the parties to that agreement intended that it be so, and it is not binding if this was not the parties' intention. In the first instance, therefore, it is essential for the Tribunal to examine the terms of the 2012 Agreement and other surrounding circumstances to ascertain whether the Claimant and TMR understood the document to represent a binding contract.[95]

107.    It should be noted that Article 446 of the TMR Civil Code provides the rules of construction and effect that apply to preliminary agreements, but does not offer any criteria or clues as to which contracts should be placed in that category.[96] The analysis would therefore begin from the same place even if TMR law were to be the rule of decision.

108.    The 2012 Agreement is entitled simply "Agreement." There are no words of qualification used. Similarly, in its introductory paragraph, the parties recited that they "have concluded this agreement." In its statement of position, the Respondent referred to the document alternatively as the "agreement of intent" or "preliminary agreement".[97] Although it is by no means dispositive, one would indeed expect the parties to use precisely such words in their agreement if they viewed it as an agreement to agree. The words "agreement of intent" do appear once in the document, at the end of Article 3.4 (right column). There the

---

[95]    This interpretative approach would be the same pursuant to TMR law. TMR Civil Code, Art. 448 ("In interpreting the provisions of a contract, the court shall take into consideration the literal meaning of the words and expressions it contains. If it is unclear, the literal meaning of the provisions of the contract is established by comparison with the other provisions and meaning of the contract as a whole. ... If the rules contained in the first paragraph of this article do not allow to determine the content of the contract, the actual common will of the parties must be clarified, taking into consideration the objectives of the contract. This takes into consideration all relevant circumstances, including pre-contract negotiations and correspondence, established practices in mutual relations, usual business activity and the subsequent conduct of the parties", CLT-3).

[96]    TMR Civil Code, Art. 446 ("By a preliminary agreement, the parties commit to enter into a contract in the future for the transfer of property, execution of works or performance of services (the main contract), on the terms stipulated by the preliminary contract. [...] The preliminary contract is concluded in the form established for the main contract, and if the form of the main contract is not established, then in writing. Failure to comply with the rules on the form of the preliminary contract shall entail its invalidity", CLT-3).

[97]    Respondent's 10 October 2017 email, paras 4-5.

Claimant undertook to carry out capital investments "in accordance with Annex No 1 to this agreement of intent." This single reference cannot be determinative of the parties' intentions. It is isolated and placed in such a way that it appears to be a simple reference to the contract as a whole, rather than a characterization of the agreement. Moreover, as explained further below, the words "agreement of intent" seem inconsistent with the very obligation to which they are attached, ie, the compulsory fulfilment of specific investment obligations. Therefore, the Tribunal must review the agreement as a whole to determine its nature.

109.   The objectives of the parties in concluding the 2012 Agreement are set out in Article 1. The first goal is stated to be "launching and conducting actual operations at OJSC Bender Oil Extraction Plant."[98] This seems active in tone, and suggests an agreement on concrete terms has been agreed. However, the second purpose is stated to be "to set forth mutual intentions" in relation to the investment plan and the operations at the Bender plant.[99] These words are more consistent with a preliminary understanding than a binding contract. The preamble is thus inconclusive.

110.   Turning to the substantive provisions of the contract, Article 3 imposed a range of "obligations" on each of the parties. The article is clearly titled "Obligations of the Parties" with no indication of conditionality or intent further to define the obligations in future.[100] Among other things, the TMR "undertakes" to create a monitoring commission, to monitor performance of the Project, and to offset investments against the privatisation conditions of the 2003 Agreement, to instruct the Antimonopoly Service to investigate seed producers' contracting practices.[101] Similarly, the Claimant "undertook" a variety of specific duties, including cooperation with the monitoring committee, provision of information, fulfilment of the investment plan, and so on.[102] Most importantly, the TMR undertook to introduce a seed export duty in a specific minimum threshold

---

[98]   2012 Agreement, C-14, Art. 1(1).

[99]   2012 Agreement, C-14, Art. 3.

[100]   2012 Agreement, C-14, Art. 3.

[101]   2012 Agreement, C-14, Art. 3.1-3.7, left column.

[102]   2012 Agreement, C-14, Art. 3.1-3.7, right column.

amount.[103] This obligation was not conditional on the conclusion of any further agreement, and was to take effect eight months from signature of the 2012 Agreement.

111.   Article 4 deals with the "Responsibility of the Parties," and establishes grounds for termination. It is notable that each party has the right to terminate the 2012 Agreement immediately on breach of certain of the "essential conditions" found in Article 3. This confirms that immediate action was required of the parties based upon the 2012 Agreement alone.

112.   Also of importance is the repeated incorporation by reference of the 2003 Agreement's terms where the 2012 Agreement is silent. As explained elsewhere in the award, these stipulations are sweeping in effect, such that provisions on damages, arbitration, and governing law are all carried over from the earlier agreement to the later. To the Tribunal's mind, this is an indication that the Parties viewed the two contracts as being of a similar nature, and binding to the same degree. Had the 2012 Agreement been nothing but a statement of intent, it would have been entirely unnecessary for the parties to draw upon another agreement to fill in its terms. Those more specific provisions would have been left to the subsequent final agreement, to be negotiated in due course.

113.   The overall indication from the agreement text that the contract was intended to be binding is supported by the Parties' subsequent conduct. For its part, the Claimant appears to have made investments in the Bender Plant that were focused on satisfying the Investment Plan attached to the 2012 Agreement.[104] This confirms that it viewed the contract as binding.[105] Meanwhile, the TMR in fact introduced export duties on oil seeds shortly after the 2012 Agreement was concluded.[106] There is a close correspondence between the terms of the new export duty and the "undertaking" of the TMR in the 2012 Agreement. The implementing Presidential Decree was published on 30 May 2012, which was not

---

[103]   2012 Agreement, C-14, Art. 3.3, left column.

[104]   See Statement of Claim on Jurisdiction and Merits, paras 203, 205.

[105]   Statement of Claim on Jurisdiction and Merits, para 106.

[106]   C-26.

long after the agreed contractual date of 1 May 2012.[107]  The duty was to take effect on 1 August 2012, just as the parties stipulated.[108]  And the magnitude of this initial duty was 10%, with a minimum of €30 per ton – precisely the level that appears in the 2012 Agreement.[109]

114.    The Tribunal views this as no coincidence, and considers that the TMR was motivated in the promulgation of this Presidential Decree by terms of the 2012 Agreement, and the understanding that they were obligatory.  The Presidential Decree cites in its final provision that the purpose of the duty is "to provide raw materials to OJSC 'Bender Oil Extraction Plant' for its production needs in accordance with the Agreement between the Government of the Transdniestrian Moldavian Republic and company 'WJ Holding Limited' dated 28 March 2012"..  Also relevant is the acting Prime Minister's letter to the Claimant of 3 November 2014, which stated that "the Government of the TMR and WJ Holding Limited concluded an Agreement on 28 March 2012, which established an investment period up until the year 2017."[110]

115.    Considering all of the circumstances, and in particular having regard to the express terms of the contract, the Tribunal finds that the 2012 Agreement was not preliminary in nature, but rather that it was final and binding upon its signature.  Since it is not a "preliminary agreement", there is no need further to consider the applicability or effect of Article 446 of the TMR Civil Code.

## 2.    The Authority of the TMR Government to conclude the 2012 Agreement

### (a)    Respondent's position

116.    It is the Respondent's contention that the 2012 Agreement is not binding because it was concluded by the TMR Government, which had no authority to sign.  The Respondent notes that the 2003 Agreement was entered into by the Ministry of Economic Development.    The 2012 Agreement was concluded by the Government (and in particular by the acting Prime Minister).

---

[107]  C-26, preamble.

[108]  C-26, Art. 3.

[109]  C-26, annex.

[110]  C-47.

117.    It follows, according to the Respondent, that the 2003 and 2012 Agreements
        were entered into by different entities, only one of which had the authority to
        conclude a contract with WJ Holding.[111]   The Ministry of Economic
        Development had not delegated authority to the Government to amend or
        modify its contract.[112] The Ministry of Economic Development was authorised
        to conclude the 2003 Agreement, but the Government was not.   Respondent
        cites the Civil Code of the TMR Articles 399 and 408 in support of the argument
        that no valid transfer took place. On this basis, the TMR insists that the 2012
        Agreement is invalid for lack of authority.[113]

**(b)     Claimant's position**

118.    WJ Holding insists that the 2012 Agreement is a valid contract.  It points to the
        fact that in matters relating to the 2012 Agreement, TMR was represented by the
        Chairman of the Government (Prime Minister), who had the power to represent
        the TMR in accordance with its own domestic law.[114] The Claimant underlines
        that the Government was not signing on its own behalf, but rather as a
        representative of the TMR, the same entity represented by the Ministry of
        Economic Development in concluding the 2003 Agreement.[115]

119.    Further, as a matter of general principle, a foreign government cannot renege
        contractual obligations based on the violations of internal rules allocating
        bureaucratic authority.[116]

120.    To the extent that there were irregularities as to the allocation of power internally
        within the Respondent's government, it was the Respondent's duty to inform the
        Claimant and to undertake remedial action.[117]   Moreover, the Claimant argues

---

[111]   Respondent 10 October 2017 email, C-24, para 5; Respondent's Final Submission, para 2.

[112]   Hearing Transcript pp 78-79.

[113]   Hearing Transcript, p. 85.

[114]   Statement of Claim on Jurisdiction and Merits, para 142.

[115]   Statement of Claim on Jurisdiction and Merits, para 142.

[116]   Statement of Claim on Jurisdiction and Merits, para 143.

[117]   Statement of Claim on Jurisdiction and Merits, para 147.

that in any event the Respondent ratified the 2012 Agreement by its subsequent conduct.

**(c)    Decision of the Tribunal**

121.    The Tribunal notes at the outset, as indicated in the prior section, that the Respondent on at least one occasion appears to have recognized the validity of the 2012 Agreement.[118] This fact is telling in the context of several years of intense correspondence between the Parties in which the TMR did not indicate that the 2012 Agreement was a nullity for lack of authority.  Given the pressure that WJ Holdings attempted to bring to bear on the government in the period 2013-2015, and the various justifications that the government used in response, it is surprising that such a fundamental issue as the validity of the 2012 Agreement did not surface, if it were indeed a concern.

122.    The starting point is the 2003 Agreement.  The TMR does not contest the validity of this earlier contract.[119]  The 2003 Agreement was signed by the Minister of Economic Development "on behalf of the state."[120]  It is undisputed that the TMR was capable of signing such a contract, and of delegating its contracting authority to the Ministry of Economic Development.

123.    The Respondent argues that the Government (and therefore its Chairman) lacked authority to assume obligations under agreements concluded by another person unless it complied with Articles 399 and 408 of the TMR Civil Code, which deal with the registration of assignments or transfers of rights and obligations.[121]

124.    But the 2012 Agreement was signed by the Chairman of the TMR Government (the Prime Minister equivalent) as the *representative* of the TMR.[122]  The party to

---

[118]  C-47.

[119]  Respondent's 10 October 2017 email, C-24, para 2 ("The Claimant indeed acquired shares of [the Bender Plant] under the relevant agreement for sale and purchase dated August 22, 2003 [...]").

[120]  2003 Agreement, C-13, preamble ("The Ministry of Economy of the Transdniestrian Moldavian Republic, an authorized body of state power and administration, exercising the right to sell *on behalf of the state* (hereinafter referred to as the Seller" (emphasis added).

[121]  Respondent's 10 October 2017 email, para 5.

[122]  2003 Agreement, C-14, preamble ("The Transdniestrian Moldavian Republic, hereinafter referred to as Party 1, represented by Mr. Stepanov Pyotr Petrovich, Chairman of the Government of the TMR, and

the contract is expressly designated as the TMR, and not the Prime Minister or the Government. Since the TMR was undisputedly able to enter into the 2003 Agreement, it must also have been capable of validly concluding the 2012 Agreement. Since the parties to the two instruments were the same, the issue of assignment or transfer of rights simply does not arise. The question is only whether the Chairman of the TMR Government had the authority to represent the TMR in relation to the contract, as the Minister of Economic Development had in relation to the prior agreement.

125. Regardless of the law applicable to the contract, questions of capacity are normally resolved by application of the law at the place of origin of the person in question.[123] Here the issue of capacity is exclusively in relation to TMR entities, namely the TMR itself and its Prime Minister. Therefore in the first instance the tribunal will examine the relevant provisions of TMR law.

126. In November 2011 the TMR adopted "Constitutional Law" No. 224-KZ-V on the functions of the TMR government, which came into force on 30 December 2011.[124] This law must have been in force when the 2012 Agreement was signed less than three months later. This law designates the Chairman of the Government (the Prime Minister) as the person who "represents the Government of the Transdniestrian Moldavian Republic within the TMR and outside of its territory".[125] Constitutional Law No. 224 grants a wide range of powers to the Government of the TMR. Most salient are the conduct of economic policy,[126] the signing of all international agreements,[127] and the conduct of foreign economic relations.[128] The conclusion of the 2012 Agreement, an

the company WJ Holding Limited, hereinafter referred to as Party 2, represented by M. Yuri Drukker, Chairman of the Board of Directors, acting under the Articles of Association, have concluded this agreement as follows …").

[123] See, e.g., Nigel Blackaby, Constantine Partasides, et al., *Redfern and Hunter on International Arbitration*, (Sixth Edition), (© Kluwer Law International; Oxford University Press 2015), Chapter 2, paras 2.12, 2.34, 2.35.

[124] CLT-10.

[125] CLT-10, Art. 26(2)(a).

[126] CLT-10, Art. 14.

[127] CLT-10, Art. 23.

[128] CLT-10, Art. 23(e).

international contract dealing with both economic policy and foreign economic relations, was clearly an activity that fell squarely within this broad scope of authority. Indeed, the fact that Constitutional Law No. 224 was adopted only in 2011 helpfully clarifies why the signatories of the 2003 and 2012 Agreements were different (although the TMR *party* was the same).

127.  No contrary argument or evidence has been advanced by the TMR as to why its law would not permit the Prime Minister (Chairman of the Government) to conclude a contract with the Claimant on behalf of the TMR. Based upon the considerations set out above, it is unnecessary to reach the subsidiary issues of ostensible authority and ratification raised by the Claimant.[129] The Tribunal concludes that the Chairman of the Government was authorized to conclude the 2012 Agreement on behalf of the TMR, and the contract is not invalid for lack of authority to sign.

## 3.  Lack of Notarization of the 2012 Agreement

### (a)  Respondent's position

128.  While the position is not entirely clear in the Respondent's submissions, the argument appears to be advanced that the 2012 Agreement was in any event invalid because it was not notarized. It points to Article 7.2 of the 2003 Agreement, which requires that any amendments to that contract be notarized to be valid.[130]

129.  The Respondent argues that it was Claimant's obligation to ensure that the agreement it concluded satisfied all of the relevant formal requirements, including notarisation.[131]

### (b)  Claimant's position

130.  In the Claimant's view the validity of 2012 Agreement was unaffected by the fact that it was not notarized, although the 2003 Agreement was itself notarized, and provided that all amendments would also be notarized. It was the Respondent's

---

[129] Statement of Claim on Jurisdiction and Merits, paras 143-147.

[130] Hearing Transcript, p. 91.

[131] Hearing Transcript, p. 93.

obligation to ensure that the agreement was notarized, if this was necessary for its validity.[132]

**(c)   Decision of the Tribunal**

131.   Article 7.2 of the 2003 Agreement provides:

> *Any amendment of, addition to or termination of a provision of this Agreement shall be possible only by agreement between the Parties. Any amendments of or additions to this Agreement shall enter into force only if they are made in writing, signed by both Parties and certified by a notary.*

132.   In Section IV.A. above, the Tribunal determined that the 2012 Agreement was not a continuation or amendment of the 2003 Agreement, but rather that it is a self-standing contract that establishes rights and obligations of the parties that are independent of the 2003 Agreement.   The only reference in the 2012 Agreement to the 2003 Agreement is to *incorporate by reference* its provisions.   This is not equivalent to amending, supplementing or terminating any provision of the 2003 Agreement.   Indeed, this is at the core of the Respondent's own case.   According to its statement of position in the Terms of Reference:

> *the Agreement of 28 March 2012, concluded between the Transdniestrian Moldavian Republic and the Claimant is not a supplemental agreement to the agreement for sale and purchase of shares of OJSC Bender Oil Extraction Plant. It is of a different legal nature and is not associated with the Claimant's obligations under the agreement for sale and purchase of shares.[133]*

As a result, the 2012 Agreement cannot be an "amendment or addition" to the 2003 Agreement, such that it would contractually depend upon notarization for its validity.

133.   The intent of the parties that the 2012 Agreement did not need to be notarized is reflected in the text of that contract as well.   By contrast to the 2003 Agreement's final provisions, which as noted earlier dealt specifically with notarization, Article 5.3 of the 2012 Agreement provided simply that "This agreement shall enter into force upon its signature."[134]

---

[132]   Statement of Claim on Jurisdiction and Merits, para 127.

[133]   Terms of Reference, para 32.

[134]   2012 Agreement, C-14, Art. 5.3.

134.   Based upon the foregoing considerations, the Tribunal concludes that the validity of the 2012 Agreement did not depend upon notarization, and the absence of notary verification of the contract did not in fact undermine its validity.

## B.   FAILURE TO IMPLEMENT AGREED EXPORT DUTY

### 1.   Claimant's position

135.   WJ Holding argues that a series of decrees reducing the export duty on sunflower seeds constituted a breach by the Respondent of Article 3.3 of the 2012 Agreement.   According to the Claimant, Article 3.3 required the TMR to maintain an export duty of 10% of the seed value, at an absolute level of not less than €30 per ton. A duty was to be maintained at this minimum level for at least five years from 1 August 2012.[135]

136.   The Claimant rejects the Respondent's justification of the lesser and sporadic duties that were actually imposed, and contends that such post-hoc explanations are in bad faith and cannot change the nature of the obligation under the 2012 Agreement.[136]   No mention of strategic goods or for seasonality were ever mentioned during the negotiation of the 2012 Agreement.   The export duty was understood by both parties to be neither qualified nor conditional.[137]

137.   Nor does TMR customs law excuse the Respondent's failure to perform.   In particular, the TMR Customs Code does not contain the term "strategic goods". In any event, the Respondent had full authority to implement any regulatory changes necessary, for example to include sunflower seeds within the definition of strategic goods.[138]   The TMR has previously included various goods in the list to accommodate the needs of other large businesses operating in its territory.[139]

---

[135]   See Request for Arbitration, para 1.9; Statement of Claim on Jurisdiction and Merits, para 153.

[136]   Statement of Claim on Jurisdiction and Merits, paras 182-183.

[137]   Statement of Claim on Jurisdiction and Merits, para 174.

[138]   Statement of Claim on Jurisdiction and Merits, para 184.

[139]   Statement of Claim on Jurisdiction and Merits, para 185.

**2.      Respondent's position**

138.    The Respondent has said relatively little with respect to the primary claim on the merits.   In its view, the TMR Government had no authority to establish the export duties when the 2012 Agreement was signed, as this could be done only by the President of the Republic.[140]   The only remedy available to the Claimant for the alleged breach of Article 3.3 of the 201 Agreement was the termination of the contract, pursuant to its Article 4.2.[141]   It appears to contend that its obligation to impose the export duty was negated by concurrent breach of the 2012 Agreement investment obligations by the Claimant.

139.    The Respondent has also taken that the only goods defined by TMR law as "strategic" can be subject to export duties.[142]   Since sunflower seeds were not included in a list of strategic goods promulgated by the government, it had no ability or obligation to impose the export duty with respect to those goods. Finally, the Respondent contends that only a six-month "seasonal duty" could be applied to sunflower seeds.[143]

**3.      Decision of the Tribunal**

140.    Article 3.3 of the 2012 Agreement provides that, among other requirements, the TMR is obligated:

> *To introduce an export duty on marketable sunflower, soybean and rape seed in the amount of 10% of the contract value of raw materials, but not less than EUR 30 per 1 ton of raw materials, including the export of raw materials under contracts of tolling processing outside of the Transdniestrian Moldavian Republic, starting from 1 August 2012 with publication of the decree on introduction of export duties not later than on 1 May 2012 for a term of 5 years with possibility of extension subject to the fulfilment of the investment program.*

141.    The TMR introduced export duties on oil seeds by Presidential Decree No. 364 "On the Introduction of Seasonal Export Duties on Sunflower, Soybean and

---

[140]   Respondent's 10 October 2016 email, C-24, para 6, and Hearing Transcript, p. 86.

[141]   Respondent's 10 October 2016 email, C-24, para 12.

[142]   Letter from TMR Government Chairman to Claimant of 15 May 2013, C-44.

[143]   See Letter from TMR Government Chairman to Claimant of 15 May 2013, C-44.

Rape", which was published on 30 May 2012.[144]  The duty was to take effect on 1 August 2012, just as the parties stipulated.[145]  The magnitude of the duty was 10%, with a minimum of €30 per ton.[146]  Decree No. 364 was replaced at the beginning of October 2012 with Decree No. 668, but the export duty in the new regulation was substantially identical.[147]  Thus, in relation to most aspects, the TMR initially complied with Article 3.3 of the 2012 Agreement.

142.    However, Decree No. 668 was repealed on 12 February 2013 by Decree No. 62.[148]  At this point, there were no export duties in place for oil seeds.  Over the course of 2013 and 2015, the TMR implemented sporadic export duties, but of decreasing magnitude and limited duration.  For about four months at the end of 2013 and the beginning of 2014, a duty was imposed of 5% with a minimum of US$5 per ton.[149]  For three months at the beginning of 2015, the duty was 1% with a minimum of US$2 per ton.[150]  And after March 2015, there is no evidence that any export duties were ever imposed.  The Respondent does not contest this sequence of events.

143.    Article 3.3 required the TMR to impose a duty on the export of oil seeds at a 10% rate with a minimum of €30.  This duty was to be maintained for five years.  That duration was unconditional.  The operative Russian text is clearer than the English translation in relation in this regard: it stipulates that the duty will last five years, subject to extension on condition that the investment plan is fulfilled.[151]  Thus, the allegations by the Respondent that the Claimant fell short on the investment plan (dealt with in detail further below) can have no impact on the

---

[144]  C-26, preamble.

[145]  C-26, Art. 3.

[146]  C-26, annex.

[147]  C-27, C-28.

[148]  C-29.

[149]  C-30, C-31.

[150]  C-32.

[151]  2012 Agreement, C-14, Art. 3.3, left column (duty to be imposed "со сроком на 5 лет с возможностью последующей пролонгации при условии выполнения инвестиционной программы…").

TMR's obligation to maintain the duty until August 2017.  It could only have been relevant to a request by the Claimant to extend the duty beyond 2017.

144.   The TMR actually imposed a duty for just 20% of the period of time stipulated in the 2012 Agreement (twelve of 60 months), out of which the agreed duty of 10% - only in 12% of the five-year period (about five of 60 months).  A duty of approximately the corresponding magnitude and scope was implemented for just over 10% of the required five-month period.  It is therefore evident that the TMR did not conduct itself in compliance with Article 3.3, and its breach of the agreement was serious.[152]

145.   The remaining defences of the Respondent rely upon various provisions of TMR law that it insists limited its ability to implement and maintain the required duty and effectively excused the failure to comply with Article 3.3 of the 2012 Agreement.

146.   First, the Respondent argues that the Government of the TMR had no authority under TMR to implement customs duties under local law.[153]  However, as noted above, the Government was *not* the signatory to the 2012 Agreement.  The TMR itself concluded the agreement, and it seems to the Tribunal inconceivable that the TMR, through whatever organ of state power, was unable to impose a customs duty.  The fact that an appropriate customs duty was in fact adopted in 2012 – with reference to the 2012 Agreement – proves that the TMR had the ability to effect the changes in the regulatory regime necessary to comply with the contract.  In any event, the TMR guaranteed in the 2012 Agreement itself that it had "the right to enter into this Agreement and to procure its fulfilment."[154]  By this provision, the TMR assumed the risk that it would be unable to perform the contract due to provisions of local law.  The parties cannot have contemplated that a lack of governmental authority would excuse a failure on the Respondent's part to perform the contract.   On this basis, the Tribunal rejects the Respondent's defence based upon lack of authority.

---

[152] Percentages derived by dividing the number of weeks the relevant duty was in place by 260, the five-year stipulated duty duration.

[153] Hearing Transcript, p. 86.

[154] 2012 Agreement, C-14, Art. 2.1.

147.    A similar defence is raised based upon an alleged limitation on the TMR's ability to impose export duties on goods that are not "strategic", and have not been listed as such in an appendix to the TMR Customs Law.[155] The TMR explained in correspondence that any non-listed goods (such as agricultural products) could only be subject to seasonal tariffs of no more than six months in duration.[156]

148.    The Tribunal finds that this argument fails in the first instance for the same reason as does the defence based on an alleged lack of authority of the Government to change customs regulations, decided above.   In the 2012 Agreement the TMR undertook to impose a tariff of a stipulated magnitude for a stipulated duration.   It confirmed its ability to take the actions necessary to carry out the contract.   If it has failed to perform, an inability to act according to local law would not excuse the TMR from liability for breach of contract.

149.    Moreover, the TMR Customs Law does not support the arguments raised.   The Customs Law refers to the list of goods to which export duties will apply, at Annex 2 to the legislation.[157]   This list, as well as the list of goods itself, are "established by the President of the Transdniestrian Moldavian Republic."[158] This indicates that oil seeds could have been added to the list of goods subject to tariff by Presidential Decree, an instrument that the TMR in fact used on multiple occasions to implement temporary customs duties on oil seeds in 2012-2015. Seasonal tariffs, meanwhile, appear to be designed for entirely different purposes – particularly for retaliation against dumping from foreign sources.[159]   There is no suggestion anywhere in the Customs Law that agricultural products could only be subject to temporary seasonal tariffs, and could not readily have been added to the list in Annex 2.

---

[155]   Letter from TMR Government Chairman to Claimant of 15 May 2013, C-44.

[156]   Letter from TMR Government Chairman to Claimant of 15 May 2013, C-44.

[157]   TMR Customs Law, CLT-15, Art. 5.

[158]   TMR Customs Law, C-44, Art. 5.

[159]   TMR Customs Law, C-44, Art. 6.

150.    Based on the considerations explained above, the Tribunal concludes that the TMR breached the 2012 Agreement by failing to impose an export duty on oil seeds of the appropriate magnitude until August 2017.

## C.    REFUSAL TO RECOGNIZE COMPLETION OF THE INVESTMENT PROGRAM

### 1.    Claimant's position

151.    The Claimant submits that by the end of 2012 it had fulfilled all of the investment obligations under the 2012 Agreement.[160]  Any shortcomings in this regard were due to the Respondent's own breaches.  The Claimant points out a discrepancy in the Respondent's own calculations between the amounts invested.  In a letter sent to the Claimant on 3 November 2014, the Chairman of the TMR Government indicated that investments made totalled US$2,768,684.40.[161]  At the same time, the Respondent's own statement of claim in the 2011 ICC arbitration presented a figure of US$3,136,103.17.[162]

152.    WJ Holding  contends that it has satisfactorily performed under each line of the Investment Program disputed by Respondent, and has made specific submissions with respect to each line item.

153.    In the Claimant's submission, the Respondent's refusal to recognize that the Investment Program had been fulfilled was wrongful, and resulted in the inability to restructure the Bender Plant's ownership through Russia to obtain more advantageous utility prices.[163]

### 2.    Respondent's position

154.    The Respondent has made no specific submissions with respect to its alleged failure to recognize completion of the investment program established in the 2012 Agreement.  It does take the position that the Claimant was in breach of its

---

[160]   Statement of Claim on Jurisdiction and Merits, para 197.

[161]   C-47.

[162]   Statement of Claim on Jurisdiction and Merits, para 201; TMR's 2011 Request for Arbitration, C-21, para 12.

[163]   Statement of Claim on Jurisdiction and Merits, para 215.

investment obligations under the 2003 Agreement. The TMR submitted a 2011 report on investment at the Bender Plant in this regard.[164]

**3.        Decision of the Tribunal**

155.    The Claimant relies primarily on Article 4.2.3 of the 2003 Agreement. This provision stipulates on the one hand that WJ Holding (as "purchaser") "shall be governed" by (among other things) the "Investment Program" that was attached to the 2003 Agreement, and on the other hand that

> *the Purchaser shall independently determine the directions of reconstruction, development and improvement of OJSC Bender Oil Extraction Plant, its production process, the priority types of products manufactures and services, as well as the timelines for their implementation.*

According to the Claimant, Article 4.2.3 was incorporated into the 2012 Agreement, and gave it wide discretion and flexibility to invest as it saw fit. In particular, it contends that it could "adapt the timing of its investments to economic circumstances and constraints."[165]

156.    The Claimant does *not* invoke the provisions of the 2012 Agreement dealing with the implementation of the Investment Program and the TMR's obligation to confirm those investments. Most importantly, under this latter Agreement the Claimant undertook as one of its core obligations to "perform capital investments in accordance with the approved new Investment Program."[166] A more specific obligation can also be found in the 2012 Agreement, whereby the Claimant undertook to "carry out investments in fixed assets of OJSC Bender Oil Extraction Plant in the amount stipulated by the approved business plan for the launch and conduct of actual operations at OJSC Bender Oil Extraction Plant according to Annex No. 1 to this Agreement of Intent."[167]

157.    The Tribunal concludes that the Parties intended to incorporate Article 4.2.3 of the 2003 Agreement into the 2012 Agreement. Although the modalities of

---

[164]    Respondent's Final Submission, point 1 and accompanying Investment Report of 27 June 2011.

[165]    Statement of Claim on Jurisdiction and Merits, para 217.

[166]    2012 Agreement, C-14, Art. 3.7 (right column).

[167]    2012 Agreement, C-14, Art. 3.4 (right column).

investment were not specifically elaborated in the latter contract, and, as emphasized earlier (see para 62 above), Article 5.2 of the 2012 Agreement imported "all other responsibilities" of the parties from the 2003 Agreement. Article 4.2.3 clearly imposed an obligation on the Claimant to implement the investment program. This requirement was reinforced by Article 3.4 of the 2012 Agreement. The investment obligation is neither qualified nor conditioned. Given that the investment program in Annex 1 imposed deadlines as well as amounts, to say that the final paragraph of Article 4.2.3 of the 2003 Agreement gave the Claimant flexibility to choose the timing of its investment commitments is to deprive these core provisions of all meaning.

158.    The Claimant concedes that it did not strictly observe the investment schedule after 2012. [168] The question is whether "the Respondent failed to take … flexibility into account … in the conduct of its monitoring mission, therefore breaching the Claimant's rights … ."[169] The Tribunal does not consider there to have been an obligation on the Respondent to be flexible. According to the 2012 Agreement, it had the right to monitor fulfilment of the Investment Program as it was set out in Annex 1. The Claimant may have had a valid excuse not to complete investments on schedule (an issue to be addressed further below). However to the Tribunal's mind the Respondent was not contractually required to recognize the program as having been completed if in fact it was not.

159.    An additional claim is advanced that the Respondent's conduct breached the duty of good faith, incorporated in the contract by operation of the applicable law.[170] The Tribunal accepts that the parties were required to carry out the contract in good faith, not least because such a principle is part of nearly every civil law system including the TMR and the Russian Federation,[171] and of international commercial law, the application of which was agreed by the parties.[172]

---

[168]   Statement of Claim on Jurisdiction and Merits, para 215.

[169]   Statement of Claim on Jurisdiction and Merits, para 217.

[170]   Statement of Claim on Jurisdiction and Merits, paras 167-179.

[171]   TMR Civil Code, Art. 10, CLT-3; Russian Civil Code, Art. 10.

[172]   See, e.g., Art. 1.7 of the UNIDROIT Principles of International Commercial Contracts.

160.    The allegation advanced is that the TMR knew that the Claimant was in compliance with its investment obligations under the 2012 Agreement, but refused to recognize this.[173] Bad faith is a serious accusation. Making out such a claim requires proof of intent, or absent such proof there must be substantial evidence that no reasonable person could have sincerely taken the accused's position.[174] Otherwise, the situation must be considered one of differing opinions, a common occurrence in commercial relations.

161.    The investment program in question was set out in Annex 1 to the 2012 Agreement as a series of line items with corresponding deadlines and amounts.[175] It is clear from the record that the TMR, through its Monitoring Commission and in later correspondence, reviewed the various elements of the investment plan over time, and communicated its positions regarding compliance and fulfilment with the Claimant in detail.[176] There is no written record in evidence of the Claimant specifically disputing the findings of the Monitoring Commission, or of the TMR government more broadly, in relation to the fulfilment of the 2012 investment program.[177]

162.    Of particular note in this regard is the Prime Minister's letter to the President of the Republic dated 3 November 2014, which was conveyed by the President's office to the Claimant by letter of 13 November 2014.[178] In this letter, the Prime Minister summarized the TMR's view of investments made at Bender to date, and the corresponding progress towards fulfilment of each line of the investment plan.

---

[173]   Statement of Claim on Jurisdiction and Merits, 199-200.

[174]   See, e.g., Stefan Vogenauer, *Commentary on the UNIDROIT Principles of International Commercial Contracts (PICC)*, 225 (2015), 2nd ed. ("In those cases where the focus is explicitly on the bad faith of one party […], the other party has to prove that state of mind, which is very usually difficult to achieve)."

[175]   2012 Agreement, C-15, Annex 1.

[176]   See, e.g., C-46; Statement of Claim on Jurisdiction and Merits, para 196. This monitoring process was in accordance with the parties' respective obligations under the 2012 Agreement. C-15, Art. 3.1 (left column) and 3.2 (right column).

[177]   Nor is there any suggestion that such a document exists in the Statement of Claim on Jurisdiction and Merits or the witness statement of Mr Drukker.

[178]   C-47.

163.   In this arbitration, the Claimant accuses the President and Prime Minister of obstruction and bad faith, so far from the facts were their conclusions in that letter.[179]   However, the Claimant appears not to have raised its indignation contemporaneously in response to the Prime Minister's letter.  This is in contrast to the prolific correspondence from the Claimant to the TMR in relation to a range of issues that arose over the course of the Bender project.[180]   Indeed, the Claimant wrote letters to the Prime Minister, the Minister of Economic Development, and the head of the monitoring commission asking for confirmation that the investment program had been fulfilled.  Each of these letters simply stated that WJ Holding had carried out all of its obligations, without any detail or supporting evidence.[181]   Thus, the Claimant's accusation that the Respondent acted in "bad faith" by refusing to close the investment program seems to have appeared only in this arbitration.

164.   Still more important is that the Claimant has not provided the Tribunal with any evidence demonstrating the rectitude of its positions with respect to each of the line items.  Rather, its position is set out in the form of argument.  For example, in relation to line items 7 and 8 of the 2012 investment program, the Claimant says that "investments made in 2012 in fact exceed the annual figure".[182] No evidence at all is provided in support of that statement.  Moreover, some of the alleged "bad faith" positions of the TMR appear in the Claimant's telling to have been based on a misallocation of investments between categories.[183]  At the same time, the Claimant admits that it was "very difficult, in fact, to allocate much of the general infrastructure investments that were made by the Claimant."[184]  Other disputed conclusions are presented as incorrect because the Respondent did not take into account that its own breach of contract had made further investment

---

[179]   Statement of Claim on Jurisdiction and Merits, para 199.

[180]   C-61, C-62, C-63.

[181]   C-41, C-42, C-43.

[182]   Statement of Claim on Jurisdiction and Merits, para 208.

[183]   See, e.g., Statement of Claim on Jurisdiction and Merits, para 207 (with respect to Line 6 of the 2012 investment program).

[184]   Statement of Claim on Jurisdiction and Merits, para 200.

impossible.  But this is a legal conclusion that was not established before the Tribunal was seized of the matter.

165.    The Tribunal notes that the Claimant has made no attempt to link documentary evidence of expenditure to the various line items of the investment program.  In its Statement of Claim on Jurisdiction and Merits, the Claimant informed the Tribunal that "[a]ccounting work is presently being conducted at OJSC Bendery, in Chisinau (Moldova) and Cyprus in order to reconcile the amounts that were invested by the Claimant in the period 2012-2014 in reliance on the 2003 Agreement and 2012 Agreement. These amounts will be set forth in the upcoming Statement of Damages Claim".[185]  Nevertheless the Statement of Claim on Damages did not include any evidence regarding the allocation of expenditures by the Claimant and its affiliates to the various investment obligations set out in Annex 1 to the 2012 Agreement.

166.    As noted earlier, the Tribunal is not called upon to determine whether the Claimant fulfilled its obligations under the 2012 investment program, but only whether the Respondent acted in bad faith by refusing to confirm that the investment program had been fulfilled.[186]

167.    In light of the above considerations, the Tribunal concludes that the Claimant has failed to establish that the TMR acted in bad faith in declining to close the 2012 investment program.  Accordingly, this claim is dismissed.

---

[185]  Statement of Claim on Jurisdiction and Merits, para 200.

[186]  The Claimant argues that bad faith was reflected also in the TMR's proposal to amend the 2003 Agreement and 2012 investment program, such that the target investment indicators would match the amounts that had already been recognized as invested, in exchange for a modification of the arbitration and governing law clause.  Statement of Claim on Jurisdiction and the Merits, paras 238-239.  This argument is misplaced.  It could have been an indicator of bad faith if the TMR had proposed to modify the amounts it was ready to recognize as invested in exchange for contract amendments (which would suggest that it did not really believe its own conclusions).  But here the TMR appears to have been ready to concede that what had (in its view) been done at the Bender plant would be "good enough" if WJ Holdings made concessions of its own.  C-54.  That is the opposite of bad faith: it is compromise in the interest of dispute resolution.

**D.    BREACH OF STABILIZATION CLAUSE**

**1.    Claimant's position**

168.    Government Decree No 44 of 12 March 2013 established particular status for offshore companies from certain "tax haven" jurisdictions doing business in the TMR.[187] Such companies (of which the Claimant was one, being incorporated in Cyprus) were subjected to substantially increased utility prices in accordance with separate Government Decree No 93 of 30 May 2013.[188] Because the Claimant was registered in Cyprus, the price of natural gas was to increase from US$169 to US$349 per cubic meter, whereas companies with more advantageous status would be paying at least 15% less.[189]

169.    The Claimant contends that the imposition of increased utility charges was a breach of the stabilisation clause contained in Article 6.4 of the 2003 Agreement. According to the Claimant, even a modification in the interpretation or application of existing law (or lower ranked legal instruments such as government orders) fall afoul of contractual stabilisation.[190]

170.    In addition, the Claimant contends that the imposition of higher utility prices was discriminatory, in breach of "international investment law". The Claimant contends that international law prohibits discrimination against investors on the basis of their nationality. The introduction of tariffs that were as much as double those for state-owned companies, and about 15% higher than for private domestic companies violates the principle of non-discrimination.[191]

**2.    Respondent's position**

171.    The Respondent has advanced no specific arguments with respect to the alleged breach of the stabilization clause.

---

[187]  C-50.

[188]  C-49.

[189]  Statement of Claim on Jurisdiction and Merits, paras 225-229; C-49.

[190]  Request for Arbitration, para 1.10; Statement of Claim on Jurisdiction and Merits, para 232.

[191]  Statement of Claim on Jurisdiction and Merits, paras 229-230.

3.      **Decision of the Tribunal**

172.    The claim requires the Tribunal to analyse the relevant contractual provision, Article 6.4 of the 2003 Agreement:

> *If any of the provisions herein is found to be invalid under the legislation of the Transdniestrian Moldavian Republic, Russia, the other provisions shall remain unchanged and in force. Provisions arising in connection with changes in the legislation of the country of the Seller after the conclusion of this Agreement and aggravating the position of the Purchaser as set out in this Agreement shall not apply to the relations between the Parties under this Agreement.*

173.    In interpreting the effect of this clause, the applicable law is in the first instance the contract itself.[192] If the meaning of the clause is clear from a close reading of Article 6.4 and the contract as a whole, then there is no need to have recourse to any other source of law.

174.    The first point of note is that the stabilization provision is placed at the end of a clause which apparently deals with an entirely different matter. The first sentence of Article 6.4 is a typical severability provision, whereby the parties make clear their intention that the contract should remain valid to the greatest possible extent, even if certain clauses fall away by operation of mandatory norms of law. This does suggest that the parties considered these terms together, and they are linked in their purpose to preserve the agreement and resulting rights and obligations against a changing legislative framework in future.

175.    The Tribunal's reading of the wording of Article 6.4 is that it is not sweeping in scope. To the contrary, there are at least two express limitations to its application and effect. First, the clause captures only legislation that is "aggravating the position of the Purchaser *as set out in this Agreement*" (emphasis added). The Tribunal's reading of this clause is that these final words would have been omitted had the parties intended to stabilize all laws that negatively affect WJ Holding's position. Instead they targeted only the deterioration of the Claimant's position based upon the rights and obligations found in the 2003 Agreement itself. Second, the *effect* of stabilization is to preserve unchanged "the relations between the Parties under this Agreement" in the face of adverse new laws.

---

[192]   2003 Agreement, C-13, Art. 6.2 (disputes to be resolved in the first instance "on the basis of the provisions of this Agreement").

Once again, it appears to the Tribunal that the parties would not have referred to the Agreement if they had intended that new laws would not apply to the Claimant *at all*, or even to the *entire* relationship between the parties. The central question is therefore whether the adoption of Decrees 44 and 93, taken separately or together, deteriorated the Claimant's position under the 2003 Agreement, and whether the Respondent consequently failed to insulate the relationship between the parties under the 2003 Agreement from their effects.

176.    Decree No. 44 is a general instrument entitled "approving the list of states and territories that offer preferential tax treatment and/or do not provide for disclosure and provision of information on financial transactions."[193]  It has two operative provisions.   The first approves the attached list of "tax havens" comprising more than 50 countries and territories.[194]  In addition to Cyprus, the list includes the Channel Islands, Switzerland, and the US state of Delaware.[195]  The second provision directs TMR authorities, including the Central Bank, to take the list into account in carrying out their functions.[196]  In the entire 2003 Agreement there is only one provision potentially dealing with the status of the Claimant under TMR law.   That is the guarantee from the TMR that "the asset being sold [the Bender plant] falls within the tax and customs privilege regime existing under applicable legislation of the country of the Seller."[197]  However, Decree No. 44 did not affect the status of the Bender plant; indeed, by itself the instrument did not affect the status of WJ Holding but only designated the Claimant's country of origin as a tax haven.   In any event, the "guarantee" of the Respondent in the 2003 Agreement was given as of the date of the contract, and like typical representations and warrantees did not represent that the situation would not be different subsequently.   Otherwise, Decree No. 44 simply did not impact the Claimant's position "as set out in this Agreement."

---

[193]   C-50, title.

[194]   C-50, Art. 1.

[195]   C-50, annex.

[196]   C-50, Art. 2.

[197]   2003 Agreement, C-13, Art. 1.3 (last bullet point).

177.    Decree No. 93 expressly relied upon Decree No. 44, and established a maximum
        gas tariff that was substantially higher for entities owned by companies from "tax
        haven" countries.   The Tribunal is satisfied that this new instrument worsened
        WJ Holding's economic position.   However, there is no right or obligation to be
        found in the 2003 Agreement that relates in any way to the utility rates that the
        Bender plant would pay.   The warranties (to the extent relevant, given the timing
        issue raised immediately above) deal with other issues, including tax and customs,
        but not utility rates.[198]   The subject of the agreement is the transfer of shares in
        the Bender plant for a defined sum.[199]   The TMR's core obligations relate to the
        transfer of the shares.[200]   The Claimant's obligations relate to the payment of the
        purchase price and the carrying out of the investment program.[201]

178.    In any event, it is unclear how the stabilization clause could have been invoked to
        improve WJ Holding's position.   As noted, Article 6.4 requires that new
        legislation falling within its scope "shall not apply to the relations between the
        Parties under this Agreement."   Since utility prices were entirely disconnected
        from the parties' relationship under the 2003 Agreement, the stabilization clause
        would have had no practical benefit to offer the Claimant.   To say that the
        Bender plant should not have had to pay higher utility rates as a result of Decree
        No. 93 is to confuse the regulatory relationship between the Bender plant and the
        government on the one hand and the contractual relationship between the
        Claimant and the TMR.

179.    Based on the foregoing considerations, the Tribunal concludes that the TMR's
        adoption of Decrees No. 44 and 93 of 2013 and application of these provisions
        to the Claimant and its project did not violate the 2003 Agreement.

180.    The Claimant advances a further claim based upon the TMR Foreign Investment
        Law.   It contends that Article 7(1) of the law prohibits discrimination, such that
        the implementation of an unfavourable utility tariff for the Bender plant was

---

[198]    2003 Agreement, C-13, Art. 1.3.

[199]    2003 Agreement, C-13, Art. 2.1.

[200]    2003 Agreement, C-13, Art. 4.1.

[201]    2003 Agreement, C-13, Art. 4.2.

wrongful and gave rise to a right of compensation.[202]  However, the Tribunal lacks competence to examine this claim.  The TMR Foreign Investment Law clearly stipulates that all disputes "between foreign investors and government organs about the application of the present law ... are to be resolved in the economic court or courts of the Transdniestrian Moldavian Republic."[203]  Even if the Foreign Investment Law allowed the adjudication of such disputes by arbitration with the consent of the parties, the TMR's consent to arbitration in the 2003 Agreement is expressly limited to disputes "arising out of this Agreement."[204]  A claim based on the TMR Foreign Investment Law in relation to a government decree dealing with utility rates is decidedly *not* a dispute arising out of the 2003 (or 2012) Agreement.

181.    There is no need to address the Claimant's claim of discrimination based on "international investment law."  The argument appears to have been withdrawn, based upon the Claimant's statement in its Final Submission that "it is not necessary for it to claim rights that it may hold under 'international investment law'".[205]

182.    On the basis of the foregoing considerations, the claim based on increased utility rates is dismissed.

## E.    IMPROPER ENCUMBRANCE OF SHARES

## 1.    Claimant's Position

183.    The Claimant contends that the refusal to allow the restructuring of the Bender Plant's ownership through Russia to escape the "tax haven" status under Government Decree No 44 violated its ownership rights in the shares of the Bender Plant.[206]  Based upon Article 40-1(8) of the TMR Privatisation Law, the Claimant contends that there was no legal basis for Respondent to hinder the

---

[202]  Statement of Claim on Jurisdiction and Merits, para 230.

[203]  CLT-4, Art. 37(1).

[204]  2003 Agreement, C-13, Art. 6.2.

[205]  Claimant's Final Submission, para 11.

[206]  Statement of Claim on Jurisdiction and Merits, paras 221-224; Claimant's Final Submission, paras 15-64.

transfer of shares, whether among affiliates or to a third person, so long as the TMR consented and WJ Holding's obligations under the agreement were also transferred. In the Claimant's view, blocking the transfer was impermissible, even if the investment obligations had not been completely fulfilled.[207]

## 2.    Respondent's Position

184.   The Respondent denies that it interfered with WJ Holding's share ownership. The only condition imposed in this respect was that WJ Holding co-ordinate its actions with the TMR Ministry of Economic Development.[208] According to the Respondent, the Ministry of Economic Development did not prohibit the Claimant's ownership or management of the Bender Plant shares. The transfer of those shares would have been carried out as soon as the Claimant fulfilled the Investment Program under the 2003 Agreement.[209] In its Final Submission, the Respondent focused primarily on the Claimant's alleged failure to complete the investment program established in 2003, although it made no comment with respect to performance after 2012.[210]

## 3.    Decision of the Tribunal

185.   The focus of the claim as presented in the Claimant's Final Submission is that the TMR purported to impose (apparently from 2003) and maintain an encumbrance on the Bendery shares, which it had no right to do under the 2003 Agreement or TMR law.[211] This limitation on the Claimant's property rights allegedly prevented WJ Holding from transferring the shares to a Russian entity when Cypriot companies were accorded disadvantageous status in 2013.[212]

186.   The Tribunal notes that the Claimant insists paradoxically that no encumbrance actually exists as a matter of TMR law.[213] If the Claimant were correct, there

---

[207]   Statement of Claim on Jurisdiction and Merits, paras 234-236.

[208]   Hearing Transcript, pp 88-89.

[209]   Hearing Transcript, pp 88-89.

[210]   Respondent's Final Submission, paras 1-19.

[211]   Claimant's Final Submission, para 16.

[212]   Statement of Claim on Jurisdiction and Merits, paras 225-226.

[213]   Claimant's Final Submission, para 17.

would be nothing for the Tribunal to decide in this regard as no legal impediment would exist to its transfer of the Bendery shares and it could simply effect the transfer in the normal fashion by contract and recording of the transaction in the share register.  However, the picture that emerges from the legal framework and evidentiary record is different.

187.    The TMR Privatization Law as it existed in 2003 provided (last paragraph of Article 39(2)):

> *The contract of sale and purchase of privatized property shall be considered concluded from the date of its signing by the parties and shall be subject to state registration. Upon registration of the contract of sale and purchase according to the mandatory procedure prior to its proper performance, the encumbrance of the right of ownership (restriction of the new owner's right to alienate the privatization object or to dispose of it in another way) shall be registered.*[214]

On the Tribunal's reading, this law appears to *require* the imposition by the TMR of a specific encumbrance on privatized shares pending fulfilment of investment obligations by the purchaser, preventing the onward transfer of the shares.  The Claimant insists that this provision is poorly drafted and should interpreted to mean only that any encumbrance must be registered, if one is to be imposed at all.[215]  That argument is unavailing: the text in the Russian original is quite clear ("При регистрации договора [...] регистрируется обременение права собственности (ограничение права нового владельца на отчуждение объекта приватизации или распоряжение им иным способом)"), and would have required substantial modification to correspond to the Claimant's construction.

188.    Contrary to what the Claimant contends, the Tribunal considers that the mandatory imposition of a transfer restriction would not contradict Article 32 of the same law.[216]  Article 32 only envisages certain types of encumbrances and

---

[214]   TMR Privatization Law, CLT-17, (the Tribunal's translation from Russian).

[215]   Claimant's Final Submission, para 26.

[216]   Claimant's Final Submission, para 24.

indicates that the TMR may impose limitations upon privatized property in certain circumstances.[217]  In particular, this provision stipulates that:

> *[i]n case of alienation of state or municipal property through privatization, the relevant property may be encumbered by restrictions provided for by this Law or other laws, and by an easement.*[218]

As noted above, Article 39(2) of the Privatization Law *requires* the imposition of restriction on the transfer of privatized property pending fulfilment of investment obligations.  This is clearly a "restriction provided for by this Law" and consequently an encumbrance permitted by Article 32.

189.  The decree authorizing the privatization of the Bender plant does not specifically indicate that the sale would be subject to an encumbrance on the shares pending completion of an investment plan, but it indicates in several places that the transfer would be carried out in accordance with applicable legislation.[219]  The Privatization Committee that approved the sale of the Bendery Plant to the Claimant indicated that the shares would be "encumbered with the payment of accounts payable and investment obligations aimed at modernization and reconstruction of OJSC Bender Oil Extraction Plant".[220]  The Tribunal considers this to be a particularly important document, because it was attached as an annex to the 2003 Agreement itself.  The encumbrance described by the Privatization Committee was then carried over into the order by which the TMR actually transferred the Bender shares to the Claimant, which clearly indicated that the shares were "encumbered with investment obligations." [221]   Based on the evidence, it is thus clear to the Tribunal that this limitation was in accordance with TMR law and that the Claimant was aware of it in 2003.

190.  The Claimant nevertheless contends that the 2003 Agreement did not permit any such encumbrance, and that therefore the transfer limitation either did not come into being or constituted a breach of contract by the TMR.  Its argument is

---

[217]   TMR Privatization Law, CLT-17, Art. 32(2).

[218]   TMR Privatization Law, CLT-17, Art. 32(1) (emphasis added).

[219]   Presidential Decree No. 316 of 23 July 2003, C-17.

[220]   Privatization Committee Minutes No 5 of 21 August 2003, C-13, Annex 1, para 3(b).

[221]   Transfer Order No. 45 of 4 September 2003, C-48.

essentially that the 2003 Agreement made no mention of any encumbrance, and therefore none was created or permissible. The Claimant points in the first instance to the TMR's warranty that the shares were "free from any encumbrances, obligations, guarantees, restrictions, attachment or pledge, save for the obligations specified in this Agreement".[222] In the Tribunal's view, the final phrase of this clause – namely, "save for the obligations specified in this Agreement", drew attention precisely to the parties' common understanding that limitations *did* exist in connection to the investment obligations set out in the 2003 Agreement. Moreover, as noted, the Privatization Committee's specific stipulation to this effect was expressed in meeting minutes attached to the contract as an annex. For the Tribunal it does not matter whether the minutes had "contractual effect", which the Claimant denies.[223] The Claimant knew when it signed the 2003 Agreement that the TMR intended to transfer the Bender Plant shares with a limitation on further transfer, and the Tribunal finds that it must have considered this to be consistent with the contract it was signing.

191.   It is also significant that the Claimant did not contend that the encumbrance was contrary to the terms of the 2003 Agreement until 2013, at which point it needed to restructure the investment. The Claimant suggests that the circumstances giving rise to the breach "came to light" only after the introduction of higher utility rates for companies from "tax haven" jurisdictions.[224] To the extent the breach in question was the imposition of an encumbrance, the Tribunal's view is that the Claimant knew or should have known even before it signed the 2003 Agreement that an encumbrance would be placed on the shares, and that this was done by operation of the transfer order after the conclusion of the transaction.

192.   On the basis of the considerations above, the Tribunal finds that the imposition of this encumbrance was not a breach of the 2003 Agreement.

193.   The question remains whether the Respondent's refusal to permit share transfer in 2013 and 2014 was itself wrongful. It should be noted in this regard that the

---

[222]   2003 Agreement, C-13, Art. 1.3 (second bullet point).

[223]   Claimant's Final Submission, para 41.

[224]   Statement of Claim on Jurisdiction and Merits, para 234; Claimant's Final Submission, para 16.

Privatization Law was subsequently amended to address specifically the conditions in which privatized property could be transferred despite the existence of unfulfilled investment obligations.  Article 40-1(8), apparently adopted in 2009, provides:

> the owner of a privatized object in relation to which investment and other obligations set out in the contract of sale … have not been fulfilled in their entirety has the right to transfer the privatized object into the ownership of a third person, provided that the contract for the transfer of the object to the third person includes the transfer of the investment or other obligations not fulfilled in their entirety, and provided that the said contract is authorized by the executive state body … .[225]

Initially the Claimant invoked this part of the law, arguing that it shows share transfer was legally possible and the TMR had wrongfully withheld its consent for commercial reasons (the economic benefit to be gained from higher utility prices extracted from a Cypriot entity).[226]  But in its Final Submission, the Claimant reversed position and insisted that it does not apply by virtue of the stabilization clause in Article 6.4 of the 2003 Agreement.  The Tribunal is of the view that the Claimant's initial position was correct.  The Tribunal has already established that the TMR Privatization Law as it was in 2003 imposed a *mandatory* restriction on further transfer pending fulfilment of investment obligations.  There appears to have been no exception to this rule.  The addition of 40-1(8) was to the Claimant's *benefit*, because it created a mechanism whereby Article 39 could be bypassed – so long as the TMR provided its consent.  The Claimant's position under the 2003 Agreement was thus not "aggravated" by the addition of this clause, and it applies to the parties' relationship under the contract.

194.    It has been determined above that the 2003 Agreement permitted the TMR to restrict onward transfer of the Bender Plant shares pending fulfilment of the investment program.  The Tribunal also concluded that TMR law allowed – and even *required* that such a limitation be imposed.  On this basis, the 2003 Agreement placed no obligation upon the TMR to lift the restriction, except perhaps if the Claimant's investment obligations had been satisfied.  Otherwise,

---

[225]   TMR Privatization Law, CLT-5, Art. 40-1(8).

[226]   Statement of Claim on Jurisdiction and Merits, paras 234-235.

Article 40-1(8) appears to grant wide discretion to the government in deciding whether to lift transfer restrictions.

195.     The Tribunal considers it clear from the evidence that by the time force majeure was declared in 2005, not all of the 2003 investment program had been fulfilled. It is equally clear that the 2012 Agreement substituted a new set of investment obligations for the Claimant, partly incorporating and partly replacing the obligations imposed by the 2003 Agreement.[227] The Tribunal concluded above that the Claimant has failed to establish bad faith on the part of the TMR in refusing to recognize the 2012 investment program as having been completed, and that the evidentiary record is insufficient to reach a definitive decision with respect to the fulfilment of all investment obligations.  On this basis, the Tribunal concludes that the TMR did not breach either the 2003 Agreement or the 2012 Agreement by refusing to allow transfer of the shares.

196.     Based upon the foregoing considerations, the claim relating to the encumbrance on shares is rejected.

## F.     PRESSURE TO MODIFY THE 2003 AGREEMENT ARBITRATION CLAUSE

### 1.     Claimant's Position

197.     The Claimant contends that, by withholding its approval for the closure of the 2012 investment program, the Respondent sought to exert pressure on the Claimant to modify the 2003 Agreement, in particular to remove the arbitration and governing law clause in Article 6.2.[228]  In this regard, the Claimant relies on the testimony of Mr Drukker, who recounts how high officials of the TMR explicitly linked the closure of the investment program (and therefore the facilitation of the transfer of the Bender Plant shares away from Cyprus to a more favourable jurisdiction) to modification of the dispute resolution provisions of the 2003 Agreement.[229]

---

[227]   2012 Agreement, C-14, Articles 3.4 and 3.7, left column; Article 3.7, right column.

[228]   Statement of Claim on Jurisdiction and Merits, para 237.

[229]   First Witness Statement of Mr Drukker, para 15.

198.   The Claimant insists that this conduct constituted a violation of the 2003 Agreement, but has not identified what provision of that contract was thereby breached.

## 2.   Respondent's Position

199.   The Respondent has not expressed any view in relation to the claim of undue pressure to change the 2003 Agreement.

## 3.   Decision of the Tribunal

200.   The Tribunal considers that this claim has been formulated in vague terms.   It appears based on the proposition that the TMR had no right to use its refusal to close the investment program to compel the Claimant to relinquish important procedural and substantive rights that it had under the 2003 Agreement.   The Tribunal has reviewed the related correspondence between the parties. [230] However, the Claimant has not identified any specific provision of the contract, nor any principle or rule drawn from the applicable sources of law, that would support a conclusion of breach of contract on that ground.

201.   The Tribunal concluded above that the Claimant failed to establish bad faith on the part of the TMR when it rejected the Claimant's position that the 2012 investment program had been fulfilled.   It also found that TMR law and the 2003 Agreement permitted the government to block the transfer of the Bender Plant shares, so long as the Claimant's investment obligations had not been closed.   It is therefore difficult to understand how the Respondent could have acted wrongfully by proposing to give up its rights in this regard, and to modify the previously-agreed 2012 investment requirements, in exchange for an alteration of the governing law and dispute resolution provisions to correspond to its preference. [231]   Moreover, the Claimant rejected these overtures.   Otherwise put, the Respondent was unsuccessful in "pressuring" the Claimant to give up the

---

[230]   See, e.g., C-54, C-55, C-56, C-57, C-58, C-59, C-60, C-61, C-62.  See also Yuri Drukker First Witness Statement, para 15.

[231]   It should be noted that in the extensive correspondence in the record between the parties on the subject of possibly modifying the 2003 Agreement, the Claimant never suggested that the Respondent's amendment proposals were in themselves wrongful.

relevant clauses of the 2012 Agreement.   Any improper use of leverage was therefore without effect.

202.   For these reasons, the Tribunal concludes that the Claimant has not established that the Respondent breached the 2003 and/or 2012 Agreements by seeking to renegotiate the terms of the 2003 Agreement.  The claim is dismissed.

## VIII.   REMEDIES

### A.   DECLARATORY RELIEF

203.   In the Terms of Reference, the Claimant sought no declaratory relief except in respect of the assignability of the final award, dealt with separately in Section VIII.D below.[232]

204.   In its Final Submission, the Claimant sought several declarations from the Tribunal, specifically:

> *a.  There are no investment obligations remaining outstanding under either of the Agreements, and both Agreements are henceforth terminated;*
>
> *b.  The encumbrance that was placed by the Respondent on the OJSC Bendery shares was without basis and unlawful; and*
>
> *c.  The encumbrance must therefore be released, and the Claimant must be allowed to freely transfer the shares to any transferee.*[233]

205.   The Tribunal has determined that the evidentiary record is insufficient for any conclusion to be drawn about the completion of the 2012 investment program. It therefore cannot be concluded that there are no investment obligations outstanding under either the 2003 or 2012 Agreements, and the first request for declaratory relief must be rejected.

206.   The Tribunal concluded that the TMR was entitled to impose an encumbrance on the Bender Plant shares pending fulfilment of the Claimant's investment obligations.  This was permitted under both the 2003 Agreement and TMR law. The second request for declaratory relief must therefore also be rejected.

---

[232]   Terms of Reference, para 46.

[233]   Claimant's Final Submission, para 65.

207.    As a result of these determinations, the Tribunal cannot conclude that the encumbrance must be released, or that the Claimant must be allowed to freely transfer the shares.  The final request for declaratory relief is likewise rejected.

## B.    TERMINATION OF THE AGREEMENTS

208.    In the Terms of Reference, the Claimant did not indicate that it sought termination of either the 2003 Agreement or the 2012 Agreement.[234]

209.    In its Final Submission, the Claimant requests that the Tribunal find that both the 2003 Agreement and the 2012 Agreement are terminated with immediate effect. The Claimant contends that the Respondent materially breached the 2003 Agreement, giving rise to a unilateral right of termination by virtue of the TMR Civil Code, Art. 467(2)(a) and/or the Russian Civil Code, Art. 450(2).[235]  The Claimant seeks termination of the 2012 Agreement on grounds of material breach of contract and by operation of Article 4.2 of the 2012 Agreement.[236] The Respondent has taken no position with respect to the Claimant's purported right to terminate the agreements.

210.    Article 4.2 of the 2012 Agreement provides that WJ Holding "shall have the right to terminate this Agreement in the event of breach by [the TMR] of para. 3.3 of this Agreement".[237]  The Tribunal has found that the Respondent breached Article 3.3 of the 2012 Agreement by failing to maintain the required export tariff for five years.   The condition for unilateral termination by the Claimant is therefore satisfied.   The Tribunal therefore grants the Claimant's request to terminate the 2012 Agreement.

211.    With respect to the 2003 Agreement, the situation is different.  The only claims for breach of the 2003 Agreement were that the TMR had wrongfully imposed an encumbrance on the shares in the Bender Plant, and that the TMR improperly

---

[234]   Terms of Reference, para 46.

[235]   Claimant's Final Submission, para 14.

[236]   Claimant's Final Submission, para 13.   The Claimant incorrectly cites Article 4.1.1 of the 2012 Agreement in this regard, which deals with the Respondent's right to unilateral termination, but this is clearly a typographical error in the Final Submission.

[237]   2012 Agreement, C-14, Art. 4.2.

pressured the Claimant to modify the contract's dispute resolution provisions. For the reasons set out above, the Tribunal has rejected both of these claims. There was thus no material breach of the 2003 Agreement, and no basis for invoking provisions of the TMR or Russian Civil Code that empower a contracting party to terminate a contract unilaterally. The Claimant's request for termination of the 2003 Agreement is therefore denied.

## C.   COMPENSATION

212.   As a preliminary point, Article 6.4 of the 2003 Agreement provides that "The amount on losses to be indemnified in accordance with art. 5.3 of this Agreement shall be determined by the Arbitration Court under the International Chamber of Commerce". Although this provision refers to the "Arbitration *Court* under the International Chamber of Commerce", it actually means the Arbitral Tribunal acting pursuant to the applicable ICC Rules. No alternative interpretation was offered by either Party.

213.   In the Terms of Reference, the Claimant sought "damages preliminarily estimated at no less than US$10,000,000."[238] It also requested the award of interest on damages.[239]

214.   The Claimant's case on damages evolved over the course of the arbitration, beginning with its Statement of Claim on Damages, through the oral hearing, and with substantial modification in its Final Submission.[240] The heads of compensation sought by the Claimant as reflected in the Final Submission and those parts of the Statement of Claim on Damages that were unmodified thereby are as follows:

---

[238]   Terms of Reference, para 46(a).

[239]   Terms of Reference, para 46(b).

[240]   Claimant's Final Submission, para 66 ("The quantum of monetary damages claimed has changed since 31 January 2017 and the summary table at par. 40 of the [Statement of Claim on Damages] is therefore replaced by the amounts set out below. While the main ideas underlying the claim for monetary damages in the First Damages Submission remain – the Claimant's legal arguments have been reworked as a consequence of discussions with the Tribunal that took place at the Hearing").

(a)     Refund of share purchase price: US$1,050,000;[241]

(b)     Investments made during the period 2003-2011: US$2,768,684;[242]

(c)     Investments made during the period 2012-2014: US$6,343,923;[243]

(d)     Lost profits based on "holistic" assessment: US$16,270,063;[244]

(e)     In the alternative to (d), "specific" lost profits: US$2,286,200;[245]

(f)     Contractual penalty, calculated on the basis of amounts actually awarded.[246]

## 1.     Contractual limitation of liability

215.    The Respondent denies that the Claimant is entitled to any award of damages in case of breach of Article 3.3 of the 2012 Agreement, and that instead it can only seek to terminate the Agreements.[247] This position is based upon Article 4.2 of the 2012 Agreement, which accords the Claimant a unilateral termination right should the Respondent breach Article 3.3.

216.    The Tribunal reads this provision as establishing a specific affirmative right of the Claimant to terminate in particular circumstances.  Such a clause was a logical stipulation where the Parties intended to agree that the fulfilment of Article 3.3, and in particular the imposition an export tariff on seeds, was vital to their agreement.  By including this language, they made it unnecessary to later determine whether the conditions for termination were satisfied as a matter of the applicable law.  In particular, under both Russian and TMR law, termination of a contract on breach is possible only where the breach is material.[248]

---

[241]  Claimant's Final Submission, para 93.

[242]  Claimant's Final Submission, para 94 (claim stated as US$3,818,684, including the purchase price of US$1,050,000).

[243]  Claimant's Final Submission, para 96.

[244]  Claimant's Final Submission, para 135.

[245]  Claimant's Final Submission, para 136.

[246]  Claimant's Final Submission, para 138.

[247]  Email from the Respondent of 10 October 2016, C-24, p. 4.

[248]  TMR Civil Code, Art. 467(2)(a); Russian Civil Code, Art. 450(2)(1).

217.    The Tribunal does not read Article 3.3 as purporting to limit the Claimant's rights.  If the Parties had agreed that the Claimant was giving up the right to claim any damages, such agreement would be expected to be made explicit.

218.    The intention of the Parties in Article 3.3 of the 2012 Agreement is also illuminated by the presence of similar termination provisions in the 2003 Agreement.  Article 5 of that contract lists a range of circumstances in which each of the Parties has the right to terminate.  The language used in Article 5 is very similar to that found in Article 3.3 of the 2012 Agreement.  At the same time, there are specific provisions in the 2003 Agreement dealing with the recovery of damages in case of termination.  It would appear that these terms with respect to damages are incorporated into the 2012 Agreement by operation of Article 4.3 of the 2012 Agreement.[249]  The co-existence of terms on termination and damages is inconsistent with the Respondent's position that the stipulation in the 2012 Agreement on conditions sufficient for termination also constitutes an exclusion or waiver of claims for damages.

219.    On this basis, the Tribunal concludes that Article 4.2 of the 2012 Agreement does not bar the Claimant's request for compensation for damages arising out of the breach by the Respondent of Article 3.3.

## 2.    Heads of Loss

### (a)    Cost of Acquisition of Shares of OJSC Bendery and Investments Made in 2003-2011

220.    The Claimant seeks recovery of the purchase price of the shares in the Bender Plant and investments made to improve and operate the facility during the period up to the conclusion of the 2012 Agreement.  As set forth above, the purchase price claimed is US$1,050,000, and the investments made during the 2003-2011 period are asserted to total US$2,768,684,[250] for a total of US$3,818,684.[251]

---

[249]    C-14, Art. 5.2.

[250]    Claimant's Final Submission, paras 92-93.

[251]    The Claimant initially advanced an additional claim for US$1.2 million.  This claim represented payment for equipment purchased in 2007-2008 from Olivex Ltd.  Statement of Claim on Damages, paras 24-25.  In its Final Submission, the Claimant withdrew this claim because it was unable to provide documentary evidence substantiating the expense.  Claimant's Final Submission, para 113.

221.    This claim is based primarily on Article 5.3 of the 2003 Agreement, which provides in its second paragraph:

> *If the Agreement is terminated or found to be invalid through the fault of the Seller, the Purchaser shall receive back the amount paid by it for the Object of Sale in US dollars as of the date of payment for the purchased Object of Sale, as well as the value of investments made, including any improvement of the state property or enhancement in composition and value of assets, property and non-property rights, made in dollars, in US dollars as well. As regards investments, including improvements and enhancement of property and non-property rights, made in TMR rubles, the Purchaser shall receive back the equivalent amount in US dollars calculated on the basis of the official exchange rate of the TRB as of the date of making the investments, improvements or enhancements of property. The Seller shall compensate the Purchaser for all losses incurred by the Purchaser in this connection as determined by a court, within 15 business days from the date on which they are claimed based on such court decision.*[252]

According to the Claimant, Article 5.3 of the 2003 Agreement is incorporated by reference into the 2012 Agreement by operation of Article 5.2 of that contract. As a result, the Claimant contends, the same consequences flow from the breach of either agreement.[253]

222.    The Claimant also advances a legal theory for the recovery of sunk costs based upon Russian law and the practice of international arbitral tribunals awarding damages for breach of State contracts.[254]

223.    The Respondent has said practically nothing in the arbitration about the Claimant's entitlement to this head of loss.  With respect to the quantum of the claim, prior to the arbitration the Prime Minister confirmed in a letter of 3 November 2014 that the investments that had been made pursuant to the 2003 Agreement at that time totalled US$2,768,684, and attached a detailed table substantiating this figure.[255]  The Claimant has explained that the quantum of its

---

The Claimant also initially advanced a claim of US$2,492,238 for working capital loans.  Statement of Claim on Damages, para 34.  This claim was withdrawn because the audit work required to substantiate it could not be completed.  Claimant's Final Submission, para 114.

[252]  2003 Agreement, C-13, Art. 5.3.

[253]  Claimant's Final Submission, para 72.

[254]  Claimant's Final Submission, paras 74-83.

[255]  Letter of 3 November 2014 from Ms Parnas (Prime Minister) to Ms Baranova (head of Presidential Administration) under cover of letter from Ms Baranova to Mr Drukker, C-47.

claim was based upon the TMR's assessment "in the interest of expediency", although it submits that the actual investments made during the relevant period were "much higher".[256]  In its Final Submission, the Respondent stated that "[t]he total amount of recognized investments for the period from 2003 to January 1, 2011 was 3,136,103.17 USD," an amount somewhat higher to the figure cited by the Prime Minister in 2014.[257]  The Respondent also submitted a report of the oversight committee that it said corroborated this amount.[258]

224.    The Tribunal has concluded that the 2012 Agreement was breached and subject to unilateral termination at the Claimant's request, but that the 2003 Agreement was not breached and remains in force.  Article 5.3 therefore cannot apply directly to provide a remedy to the Claimant.  The application of this provision can only be because the clause was incorporated by reference into the 2012 Agreement by operation of Article 5.2 of that contract.  Article 5.2 of the 2012 Agreement stipulates that "All other liabilities of the Parties and other provisions are regulated according to" the 2003 Agreement.  The 2012 Agreement deals with the grounds for termination in Article 4.  However, it says nothing about the consequences of termination, which is the subject of Article 5.3 of the 2003 Agreement.  Since the 2012 Agreement is silent on the consequences of termination, this important topic must logically be one of the "other provisions" that the parties agreed would be "regulated according to" the 2003 Agreement.

225.    The second paragraph of Article 5.2 of the 2003 Agreement, as incorporated into the 2012 Agreement, is triggered only where the contract is terminated (or invalidated) "through the fault of the Seller", i.e. the TMR.  The Tribunal has declared the 2012 Agreement terminated based upon Article 4.2, which accorded to the Claimant a right to terminate should the TMR fail to implement the export tariff as agreed in Article 3.3.  It is clear that the termination was the result of the TMR's action in contravention of a core obligation under the 2012 Agreement, and that the termination was therefore the Respondent's "fault" under the terms

---

[256]   Statement of Claim on Damages, para 22; Claimant's Final Submission, para 92.

[257]   Respondent's Final Submission, para 19.

[258]   "Report on final fulfilment of conditions under the Agreement for the Sale and Purchase of the 100% State-Owned Block of Shares of OJSC Bender Oil Extraction Plant of 22 August 2003" dated 21 June 2011, attached to Respondent's Final Submission.

of Article 5.2.   Article 5.2 of the 2003 Agreement is thus engaged, and the Claimant has a right to the remedy prescribed there.

226.   The first component of compensation under Article 5.2 of the 2003 Agreement is that the Claimant is to "receive back the amount paid by it for the Object of Sale in US dollars as of the date of payment for the purchased Object of Sale". Article 3.1 of the 2003 Agreement defined the purchase price as US$1,050,000.[259] The evidence reflects that the Claimant in fact paid this amount.[260] The Claimant is entitled to receive this amount.

227.   The second component of compensation under Article 5.3 of the 2003 Agreement is the payment of sums equivalent to the "value of investments made, including any improvement of the state property or enhancement in composition and value of assets, property and non-property rights."[261] The meaning of "investments made" for purposes of the 2003 and 2012 Agreements is not subject to doubt.   The investment programs annexed to these contracts must have been squarely within the parties' understanding of "investment", and the expenditures listed in those programs were clearly intended to improve and enhance the Bender Plant. Moreover, the Respondent's oversight commission, and ultimately the Prime Minister and presidential administration, carried out their own periodic assessments of the "investments" that WJ Holding had carried out in relation to the Bender Plant.[262]   The Commission was precisely charged with assessing the expenditure on "investments" as defined in the 2003 (and subsequently 2012) investment program.   According to Prime Minister Parnas, a "verification" of compliance with the investment program was carried out by the Monitoring Commission on an annual basis.   The results of these audits led her to conclude in 2014 that investments by the Claimant totalling US$2,768,684.40

---

[259]   2003 Agreement, C-13, Art. 3.1.

[260]   "Report on final fulfilment of conditions under the Agreement for the Sale and Purchase of the 100% State-Owned Block of Shares of OJSC Bender Oil Extraction Plant of 22 August 2003" dated 21 June 2011, attached to Respondent's Final Submission, preamble (stating that "On 22 August 2003 state-owned block of shares (100%) of OJSC Bender Oil Extraction Plant was sold to WJ Holding Limited, Cyprus *at a price 1,050,000 USD*" (emphasis added)).

[261]   2003 Agreement, C-13, Art. 5.2.

[262]   Monitoring Commission Minutes, C-46; Letter of 3 November 2014 from Prime Minister to Presidential Administration, C-47.

were "recognized" by the TMR.[263]  It is also relevant that the TMR stated in its Request for Arbitration against the Claimant in 2011 that "Total sum of approved investments thereby amounts to 3,136,103.17 U.S. dollars."[264]

228.   Thus, the Respondent has repeatedly admitted, both in this proceeding and contemporaneously, that the Claimant in fact made "investments" within the meaning of Article 5.3 of the 2003 Agreement, in an amount no less than the US$2,768,684 sought as compensation by the Claimant.  On the basis of all the evidence it is established to the satisfaction of the Tribunal that the Claimant in fact invested this amount and is entitled to its reimbursement under Article 5.3 of the 2003 Agreement, incorporated by reference into the 2012 Agreement.

229.   Claimant's relief for reimbursement of the purchase price and for compensation of investments made during the 2003-2011 period totalling US$3,818,684 is therefore satisfied in full (US$1,050,000 + US$2,768,684 = US$3,818,684).

   **(b)   Investments made during the period 2012-2014**

230.   The Claimant also seeks reimbursement of alleged investment costs incurred to improve and operate the Bender Plant beginning in 2012.  These expenses are claimed to be US$6,343,923 (see para 214 above).[265]  This figure is based upon several reports submitted by the accounting firm Baker Tilly.[266]

231.   These claims are based primarily on the same Article 5.3 of the 2003 Agreement, incorporated by reference into the 2012 Agreement.  In addition, the Claimant contends that the same sum is due because the harm was caused by three breaches of the 2012 Agreement, namely:

   a.   Failure to implement a permanent export duty on oilseeds, in breach of Article 3.3 of the 2012 Agreement;

---

[263]   Letter of 3 November 2014 from Prime Minister to Presidential Administration, C-47.

[264]   ICC Request for Arbitration dated 21 October 2011, C-21, p. 11.

[265]   Claimant's Final Submission, para 96. See also Statement of Claim on Damages, paras 26-31.

[266]   C-71; C-82; C-86.  The authors of the Baker Tilly reports were not called for cross examination at the hearing.

b.      Breach of good faith through a "consistent pattern of deceitful conduct in relation to the export duty"; and

c.      Misrepresentation as to the authority and capacity to enter into and perform obligations under the 2012 Agreement in breach of Article 2.1.[267]

232.    WJ Holding claims reimbursement for the funds it spent on purchasing new equipment, capital repair and the operating costs of the plant, which as it claims, could not be covered due to insufficient activity.   These investments were brought to the attention of the Respondent in a number of letters sent by Mr. Drukker.[268]   The total sum claimed by the Claimant of  US$6,343,923 [269] (subsequently corrected to US$6,342,923[270]) is an aggregate sum of loans made by Claimant (US$3,881,842)[271] (versus earlier submitted figure of US$3,981,466[272]) and its sister companies Stubrick (US$2,061,081)[273] (versus earlier submitted figure of US$1,408,683[274]) and Grain-Oil (US$400,000).[275]   These figures are said to be drawn from the Baker Tilly assessments,[276] but those sources in fact show that the Claimant loaned US$3,632,432,[277] Stubrick loaned US$1,484,627,[278] and Grain-Oil US$400,000.[279]   Since the Claimant has sought compensation based upon the amount *loaned* as a proxy for the amount *spent*, and given that on its case it funded the investments *exclusively* by means of these loans, it can only be

---

[267]   Claimant's Final Submission, para 97.

[268]   See letters of 8 April 2013, 31 December 2013 and 27 January 2014, C-36, C-39, C-43.

[269]   Claimant's Final Submission, para 96.

[270]   Claimant's Final Submission, table in para 114.

[271]   Baker Tilly Report, C-82, p. 5.

[272]   Claimant's Statement of Claim on Damages, para 28.

[273]   Baker Tilly Report, C-82, p. 5.

[274]   Claimant's Statement of Claim on Damages para 28.

[275]   Claimant's Final Submission, para 101 and table in para 114;  Baker Tilly Report, C-86, p. 5. In para. 109  of the Final Submisison, the Claimant puts forward the figure of US$400,055, which seems to be a typing mistake).

[276]   Claimant's Final Submission, para 101.

[277]   Baker Tilly Report, C-82, p. 5.

[278]   Baker Tilly Report, C-82, p. 5.

[279]   Baker Tilly Report, C-86, p. 5.

awarded damages on the basis of the actual loan amounts. The Tribunal must therefore retain these lower figures, which total US$5,517,059, as the base for the Claimant's compensation claim under this heading.

233.    The Respondent has made no comment on investments made post-2012, nor with respect to the Claimant's entitlement to their reimbursement, save for a general point in relation to the need to identify the entity having made the payments (or suffered the losses) in question. In its Final Submission, the Respondent stated that "loans from WJ Holding and Stubrick for Agro-Leon, Grain Oil and others are part of the agreement between these companies," to which the TMR is not a party, and therefore it "cannot be held responsible for the consequences of WJ Holding's failure to fulfill its obligations under these agreements".[280]

234.    There are three separate issues that the Tribunal must consider in order to decide whether the expenditures in question qualify for repayment pursuant to Article 5.3 of the 2003 Agreement (as incorporated by reference into the 2012 Agreement) as "investments made" in the Bendery Plant. First, it must be determined if the expenditures in question were "investments". Second, the Claimant must have established that it was the Claimant who made the investments. And third, the Tribunal must weigh the evidence to be satisfied that the investment was actually made.

235.    The 2017 Baker Tilly Report is central to the resolution of the first of these questions. The accountants at Baker Tilly indicate that they reviewed extensive records of the Bender Plant to identify the expenses incurred and to test on a sampling basis whether invoices and other corroborating materials support the amounts reflected in the Plant's financial statements and claimed in the arbitration. Annex 2 of the Baker Tilly Report breaks down the expenses in a table:

---

[280]    Respondent's Final Submission, p. 5.

| Category | Total Expenses paid | | Total Expenses paid and tested | | Tested |
|---|---|---|---|---|---|
| | TRB | USD | TRB | USD | % |
| Electricity | 6,516,730 | 587,020 | 5,906,832 | 532,095 | 91% |
| Equipment | 13,811,333 | 1,240,996 | 13,807,081 | 1,240,613 | 100% |
| Income tax | 3,696,809 | 333,030 | 2,986,058 | 269,014 | 81% |
| Materials | 2,892,710 | 259,955 | 2,420,152 | 217,482 | 84% |
| Natural Gas | 14,049,199 | 1,265,321 | 14,049,199 | 1,265,321 | 100% |
| Petroleum products | 3,300,286 | 296,850 | 3,300,286 | 296,850 | 100% |
| Repair works, maintenance | 5,447,381 | 489,113 | 5,285,129 | 474,536 | 97% |
| Salaries | 21,693,603 | 1,952,860 | 21,316,940 | 1,919,019 | 98% |
| Social contributions | 6,265,056 | 563,950 | 5,157,552 | 464,280 | 82% |
| Spare parts | 437,508 | 39,238 | 437,508 | 39,238 | 100% |
| Water supply | 749,938 | 67,555 | 622,298 | 56,063 | 83% |
| Rent and heating | 1,932,113 | 174,040 | 1,531,570 | 137,963 | 79% |
| **Total** | **80,792,666** | **7,269,931** | **76,820,604** | **6,912,474** | **95.08%** |

236. The Parties reflected in the 2012 Agreement their understanding of "investments" by listing line items in the investment program that the Claimant was expected to pay for.  Each of these line items is associated with a column entitled "Investment – US Dollars".[281]  Some of these items fall within the common-sense meaning of the word "investment", such as "Acquisition of agricultural machinery".[282]  Others, to the Tribunal's thinking, would not normally be described in that fashion, for example "Payment of wage arrears".[283]  However, the parties clearly indicated that each of the fifteen categories of expense listed in the annex to the 2012 Agreement were in their understanding "investments".  It follows that they also understood each of these line items to fall within the scope of the obligation to reimburse "investments made" under Article 5.3 of the 2003 Agreement.  Other payments made that are not listed in the investment program could also qualify as "investments" for reimbursement purposes, but such items would need to be investments as that word is normally understood.

237. The Claimant has made no attempt to link the 2012-2014 expenditures of the Bender Plant to the line items in the 2012 investment program.  It is for the Tribunal to do so, using the work of Baker Tilly as a guide.  The most obvious matches to contractually-identified "investments" are equipment (lines 2, 6, 8 and 11), materials (lines 1, 2, and 10), repair works and maintenance (line 2), salaries

---

[281]   2012 Agreement, C-14, Annex 1.

[282]   2012 Agreement, C-14, Annex 1, line 11.

[283]   2012 Agreement, C-14, Annex 1, line 5.

(line 5), social contributions (line 13), and spare parts (line 2). Less obvious are the substantial payments for water, gas, electricity and petroleum products reflected in the Baker Tilly Report. However, line 5 of the 2012 investment program does refer to the payment of arrears for energy and water. It could be argued (as with respect to salaries) that the payment of arrears at the time the program was adopted is different from the payment of such expenses on an ongoing basis. This would be somewhat illogical; the failure to pay the same expenses on an ongoing basis would simply lead to the accrual of new arrears, undoing the "investment" that had been made. Therefore, it appears that the parties agreed that the payment of these particular operational expenses would be an "investment" subject to reimbursement on termination at the fault of the TMR. With respect to taxes, line 13 describes "timely settlement of accounts with the State budget." One can only conclude that this refers to the payment of taxes and duties.

238.     This leaves only income tax and "rent and heating" as expenses of the Bender Plant not identified by the parties as "investments." These are purely operational expenditures, which would not normally be considered investments within the commonly accepted definition of the term as understood by the Tribunal. The Tribunal cannot conclude on the evidence that the parties intended such expenses to be reimbursed as investments by operation of Article 5.3. Nor can rent and heating costs be categorized as "losses", which are also subject to repayment under that provision. A "loss" in common parlance is a harm suffered. Even setting aside the question of causation, the payment of routine expenses of an enterprise is not a "loss", because such disbursements are essential to the functioning of the business in any event. They are thus a "cost", but cannot be understood as lost.

239.     Having determined that all but the rent and heating expenses fall within the scope of reimbursement under Article 5.3, the Tribunal turns to the question of whether the Claimant is entitled to recover these expenses in full, given that part of the expense was funded by other entities within the WJ group. As noted above the Baker Tilly Report confirms that some of the "investments" were made by the Bender Plant using loan proceeds from the Claimant, while others

were made using loans from Stubrick and Grain-Oil. Article 5.3 is phrased in the passive voice, such that "investments made" are to be reimbursed, without reference to the entity making the payment. Many of the items in question had necessarily to be paid by the Bender Plant itself, such as salaries and taxes. More importantly, the Respondent confirmed substantial "investments" of a similar nature for the pre-2012 period, although funds were provided for those payments by a similar system of intra-company loans.[284] There is no basis to differentiate between pre- and post-2012 "investments" in this regard. The Tribunal therefore concludes that amounts subject to reimbursement as "investments" pursuant to Article 5.3 of the 2003 Agreement are compensable regardless of the source of funds.

240.    The Tribunal comes finally to the question of proof. As noted, Baker Tilly verified based upon primary documentation the receipt by the Bender Plant from WJ Holding, Stubrick and Grain-Oil the sum of US$5,517,059 over the period 2012-2014.[285] In a separate report, Baker Tilly verified based upon primary documentation the receipt by the Bender Plant from Grain-Oil the sum of US$400,000 in 2012.[286] The loan agreements and other documentation underlying these contributions of funds specifically earmark the loan proceeds for use in the fulfilment of the investment program and the 2012 Agreement.[287]

241.    There is very limited direct evidence that the funds received from the Claimant and its sister companies were actually used for that purpose, but the Tribunal considers this to be very likely in light of the circumstances. Baker Tilly verified by reviewing primary documentation the actual payment of US$6,505,497 corresponding to the recoverable categories of "investment" identified above, well in excess of the amount claimed (the total of US$6,912,474 minus

---

[284]   "Report on final fulfilment of conditions under the Agreement for the Sale and Purchase of the 100% State-Owned Block of Shares of OJSC Bender Oil Extraction Plant of 22 August 2003" dated 21 June 2011, attached to Respondent's Final Submission.

[285]   Baker Tilly Report of 15 June 2017, C-82, p. 5. The Tribunal notes that there are discrepancies in the numbers presented in the Baker Tilly reports, and has adopted the most conservative figures as those verified.

[286]   Baker Tilly Report of 31 July 2017, C-86, p. 5.

[287]   Loan Agreements, C-83, C-84, C-85, C-88 and instruction letters, C-87.

US$269,014 for income tax and US$137,963 for heating and rent).[288]  At the same time, the revenues from business activity recorded at the Bender Plant over the 2012-2014 were not even close to sufficient to cover the expenditures in question.   Indeed, in two of those three years revenues were less than US$700,000.[289]  This indicates strongly that the investments in question were made using funds primarily from the Claimant and its sister companies.  In any event, the entitlement to reimbursement would be no different if the Bender Plant had paid from its own resources.   As noted, Article 5.3 refers to "investments made".  If expenditures of the Claimant's sister companies into the project are covered, then it must be the case that expenditures of the project company itself are equally subject to reimbursement.   The Tribunal is thus satisfied that the full amount potentially recoverable was actually spent as "investments made", and is therefore subject to compensation.

242.   The Tribunal has already determined in paragraph 232 above that the proper base for compensation under this heading is US$5,517,059, which is the sum of intra-company loans reflected in the evidentiary record.   Based on the foregoing considerations, the Claimant is entitled to repayment of the full amount (US$5,517,059), less the sums identified by Baker Tilly as associated with "income tax" (US$269,014) and "rent and heating" expenses (US$137,963).  The total awarded under this head of damages is therefore US$5,110,082.

243.   This leaves only the "rent and heating expenses" to be considered in light of the Claimant's alternative legal arguments, which are based upon the proposition that "sunk costs" are recoverable for breach of contract.[290]  In support of its position the Claimant cites international arbitral awards, as well as provisions of the Russian and TMR Civil Codes and an opinion on Russian law of damages by Ms Daria Zhdan-Pushkina.[291]   Having reviewed the material submitted by the Claimant, the Tribunal does not find this argument convincing.

---

[288]   Baker Tilly Report of 15 June 2017, C-82, p. 7.

[289]   Baker Tilly Report of 31 January 2017, C-71, p. 12.

[290]   Claimant's Final Submission, paras 74-83.

[291]   Opinion of Ms Zhdan-Pushkina, C-81.

244.    In the first instance, the international arbitration awards cited by the Claimant involved the application of a specific applicable law (for example, English law) that has no place in the governance of the parties' relationship in this case,[292] and they are therefore of little utility for the Tribunal.

245.    In addition, the Tribunal cannot agree with the Claimant's assessment of the position under Russian and TMR law.  Article 15 of the TMR Civil Code defines recoverable loss for breach of contract as:

> *expenses which the person whose right has been violated made or must make in order to restore the violated right, loss or damage of his property (real damage), and also revenues not received which this person would have received under ordinary conditions of civil turnover if his right had not been violated (lost advantage).*[293]

The Russian Civil Code contains precisely the same wording.[294]  This basic rule is reinforced by Article 410 of the TMR Civil Code, which provides that "[a] debtor shall be obliged to compensate the creditor for losses caused by the failure to perform or improper performance of an obligation."[295]  The same rule is found verbatim in the Russian Civil Code.[296]

246.    The Tribunal reads these two provisions together as imposing the logical proposition that damages should restore the injured party to the situation that would have prevailed if the breach of contract had not occurred.  Sunk costs are by definition those that would have been incurred by the injured party *in any event*.  In the case at hand, the Claimant does not argue that it would have avoided these expenses if the TMR had maintained an export duty as stipulated in Article 3.3 of the 2012 Agreement.  Paying "rent and heating" costs for the Bender Plant and its income taxes would have been necessary in any event.  Therefore, what the Claimant is actually seeking when it requests the payment of "sunk costs" is the restoration of the situation that would have prevailed *if the contract had never been*

---

[292]  See *Himpurna California Energy Ltd v. PLN* (Indonesian law applicable); *Siemens v Argentina* (public international law applicable); *Bridas v Turkmenistan* (English law applicable).

[293]  TMR Civil Code, Art. 15(2).

[294]  Russian Civil Code, Art. 15(2).

[295]  TMR Civil Code, Art. 410(1).

[296]  Russian Civil Code, Art. 393(1).

*concluded.* That is not the measure of damages for breach of contract, but for rescission (on the basis of fraud or mistake, for example). Indeed, the Tribunal notes that Russian and TMR law are absolutely clear on the consequences of contract termination in this regard:

> *The parties shall not have the right to demand the return of that which was performed by them under the obligation before the moment of change or termination of the contract, unless established otherwise by a law or by agreement of the parties.*[297]

247. In her legal opinion, Ms Zhdan-Pushkina begins from these same provisions of Russian law, and offers no explanation as to how in normal circumstances they could be interpreted to allow the recovery of past investment costs for breach of contract.[298] She nevertheless concludes that "court practice" supports awarding sunk costs as damages for breach of contract.[299] Ms Zhdan Pushkina then cites and describes several decisions of first-instance courts in the Russian Federation, which appear to support that conclusion.[300] The Tribunal is conscious that the Russian Federation – like the TMR – is a civil law system, where court practice is used for illustrative purposes only. The decisions of courts (and particularly of first-instance courts) are not law, and cannot change the text of legislation. Moreover, the decisions cited appear very different on their facts, and in some cases recovery was not based upon damages for breach of contract, but unjust enrichment – which is inapplicable in the case at hand. The Tribunal therefore finds that in this respect, Ms Khdan-Pushkina's legal opinion offers little assistance, and that the Claimant has not established its entitlement to the repayment of its sunk costs.

248. On the basis of the above considerations, the Claimant's alternative claims for compensation of the remaining expenditures at the Bender Plant for the 2012-2014 period are rejected.

---

[297]   Russian Civil Code, Art. 453(4); TMR Civil Code, Art. 470(4).

[298]   Opinion of Ms Zhdan-Pushkina, C-81, paras 3-4, 14.

[299]   Opinion of Ms Zhdan-Pushkina, C-81, para 8.

[300]   Opinion of Ms Zhdan-Pushkina, C-81, paras 10-12.

(c)    **Past lost profits**

249.    The Claimant made clear in its Statement of Claim on Damages that it seeks compensation only for actual damages incurred in the past.  These claims are made to the exclusion of any claims of future lost profits.[301]  The compensation sought in the Statement of Claim on Damages was calculated up until 31 December 2014 (the end of the year in which the Bender Plant ceased to operate).[302]  The amount claimed consisted of losses incurred not only by the Claimant, but also by its affiliates, other companies in its holding group owned by the same beneficial owner.[303]  The Claimant contended (and continues to contend) that it is entitled to recover all amounts "lost," and that the TMR understood the group's structure and the reality that losses would be incurred by various group companies.[304]

250.    At the Hearing the Respondent took the position that the losses of the Claimant must be considered separate from those of its sister companies.  The TMR was not in a position to influence the intra-group decisions made by the Claimant, and had no contractual relationship with any company other than WJ Holding.  It can therefore bear no responsibility for any damages that they may have suffered.[305]  As noted, this theme was repeated in the Respondent's Final Submission.[306]

251.    The Claimant substantially modified its claim for lost profits in the Final Submission.  As its primary claim, WJ Holding still seeks compensation for operating losses for the years 2012-2014.  This claim has two separate bases. First, it is asserted that past operating losses are the type of "losses" (убытки) contemplated as subject to reimbursement on termination at the TMR's fault, in addition to investments made, under Article 5.3 of the 2003 Agreement (as

---

[301]   Statement of Claim on Damages, para 10.

[302]   Statement of Claim on Damages, para 23

[303]   Statement of Claim on Damages, paras 19-20.

[304]   Hearing Transcript, pp 142-143.

[305]   Hearing Transcript, p. 142.

[306]   Respondent's Final Submission, p. 5.

incorporated by reference into the 2012 Agreement).[307]   Second, the Claimant contends that "the entirety of the Claimant's losses could be attributed to the Respondent's breaches of contract".[308]   Otherwise stated, "[h]ad the 2012 Agreement not been signed, the factory would not have been relaunched, and no commercial losses would have been incurred in connection with the factory's activities in the first place."[309]   WJ Holding quantifies this primary "holistic" claim for damages at US$16,270,064.[310]

252.   The Claimant advances an alternative claim for past lost profits, which it says arose directly from the Respondent's breach of contract.   These lost profits fall into two categories, namely the increased cost incurred as a result of the need to acquire seeds from abroad rather than from local producers, and the increased cost of utilities as a result of the unfavourable treatment of WJ Holding as a Cypriot company.   This alternative claim is quantified at US$2,286,200.[311]

### 1.   Holistic claim

253.   As noted, the "holistic claim" is based upon the proposition that, had the 2012 Agreement never been concluded, the Claimant would not have sought to revive the Bender Plant after the cessation of *force majeure*, and the plant would not have run at a loss for more than two years.   The Claimant insists that "[e]ven if market or harvest conditions contributed to a portion of the losses, the Respondent pushed very hard for the factory to be relaunched and gravely misled the Claimant with regard to the real nature of its intentions."[312]   The Tribunal notes, however, that the Respondent's intentions are not part of the evidentiary record in this arbitration.   No attempt was made by the Claimant to make out a claim for fraud in the conclusion of the 2012 Agreement, although the statement cited immediately above appears to suggest just that.

---

[307]   Claimant's Final Submission, para 71.

[308]   Claimant's Final Submission, para 115.   See also Statement of Claim on Damages, para 38.

[309]   Claimant's Final Submission, para 115.

[310]   Claimant's Final Submission, para 135.   See also Baker Tilly Report of 31 January, C-71.

[311]   Claimant's Final Submission, para 136.

[312]   Claimant's Final Submission, para 115.

254.    In the context of this claim, the Claimant is expressly seeking to be restored to the position it would have occupied if the 2012 Agreement had never been concluded. As explained earlier, that is not the proper measure of damages for breach of contract under any of the applicable laws in this case. Rather, the Claimant is entitled to compensation capable of eliminating the consequences of the *breach*.

255.    Nevertheless, the claim for reimbursement of operating losses can also be characterized as one aimed at restoring the position that would have prevailed absent the breach. This is closer to how the Claimant articulated its position in the Statement of Claim on Damages.[313] Here the proposition is that, had the 2012 Agreement been fully performed, the Bender Plant would not have operated at a loss. The Tribunal notes that this is a potentially sustainable claim, as a matter of law, but it requires proof of causation that the losses claimed were caused by the Respondent's breach of contract.

256.    First, the Tribunal has found only one breach of the contract, namely the failure to maintain the export duty. Meanwhile, the Claimant accepts that losses resulted from an "accumulation of adverse factors", including the increase in utility costs – which was not found to be a breach of the 2012 Agreement.[314] Second, what would have been the impact on revenues of a 10% duty at a minimum of €30 per ton? While the Claimant insists that the volume of seeds purchased domestically would have been drastically higher, it has put forward no evidence to that effect. Third, a range of other factors could have impacted the results of the Bender Project – including market forces, weather, harvest conditions, and international politics. The Claimant appears to recognize the multitude of influences on financial performance.[315]

---

[313]  Statement of Claim on Damages, para 37. But compare with the "fraud" type formulation at Statement of Claim on Damages, para 39 ("Had the Claimant not made its capital investments and relaunched the factory as per the 2012 Agreement, none of these activities would otherwise have been conducted, and none of the losses set out in the Accountant Report would have been incurred").

[314]  Statement of Claim on Damages, para 37.

[315]  Claimant's Final Submission, para 115 ("Even if market or harvest conditions contributed to a portion of the losses …").

257.    Meanwhile, the Claimant has submitted no evidence relevant to the key question of causation.  It offers only documents referring to the small volumes of seeds purchased in 2012-2014.[316]    Beyond pure argument and contemporaneous complaints in correspondence from Mr Drukker,[317] for the Tribunal the reason for the Bender Plant's inability to purchase more seeds remains obscure – and more importantly, unproven.  The Baker Tilly Report simply quantifies operating losses over the relevant period on the basis of accounting documentation.  It does nothing to indicate the reasons for poor performance.[318]  Having assessed all the evidence in the record, the Tribunal is compelled to conclude that any assessment of damages for operating losses would be speculative, given the failure to prove that any particular amount of damage was caused by the failure to maintain an appropriate export duty on seeds.

258.    It remains to be determined whether the Claimant is nevertheless entitled to recover operating losses pursuant to Article 5.3 of the 2003 Agreement (as incorporated by reference into the 2012 Agreement).  That provision calls for compensation not only for investments made, but for "all losses incurred by the Purchaser in this connection [...] ."[319]  Although not expressly articulated, the contention appears to be that this part of the compensation provision entitles the Claimant to recover all operational losses associated with the Bender Plant, even if they were not caused by the Respondent's breach of contract.  This seems to the Tribunal a far-fetched interpretation.  The word "losses" (like the original Russian word "убытки") is ambiguous, and can mean either negative net cash flows (which is the nature of the claim here) or financial harm.  Taken in context, the parties must have intended the latter.  It would have been surprising for the parties to agree that the TMR would bear the Bender Plant's negative cash flows on termination for fault, even if such "losses" were caused entirely by management incompetence or by crop failures.  Moreover, Article 5.3 covers only losses "in this connection", that is, in connection with the termination that is the

---

[316]    Bender Plant Director Certificate, C-80.

[317]    See, e.g., C-33 to C-43.

[318]    Baker Tilly Report of 31 January 2017, C-71.

[319]    2003 Agreement, C-13, Art. 5.3.

subject of the entire clause. Years of historical accumulated operating losses are not connected to the subsequent termination of the contract. The Tribunal reads the phrase as further confirming that the parties had in mind to compensate harm *caused by the termination*, in the nature for example of *future forgone profits*. The claim for operating profits therefore does not fall within the scope of Article 5.3.

259. On the basis of the foregoing considerations, the Tribunal concludes that the claim for operating losses should be rejected.

### 2.     *Alternative lost profits claim*

260. In the alternative to its "holistic" claim for operating losses, the Claimant seeks compensation for two heads of loss of more limited breadth: the added cost that it and its sister companies incurred by importing seeds instead of buying them in Transdniestria; and the increased cost of utilities.

261. The second of these heads of alternative loss can be dismissed at the outset. It is based upon the claim that the unfavourable treatment that WJ Holding received as a Cypriot entity was wrongful. The Tribunal rejected this claim, and therefore no damages can be awarded in relation to it.

262. The claim for increased costs from foreign seed purchases is legally sound. The Tribunal concluded that the failure to maintain an appropriate export duty on seeds was a breach of the 2012 Agreement. It seems plausible that at least some of the seeds that were bought abroad in 2012, 2013 and 2014 could have been acquired in Transdniestria (with corresponding cost savings) if a €30 per ton duty had been imposed on all local seed producers seeking to export their produce. The question is whether there is evidence that this would have been the case, rather than merely a plausible surmise.

263. The Claimant contends that statistics on seed purchases over time show that it was better able to acquire local seeds when the agreed export duty was in place in September 2012, and that this figure quickly tailed off when the export duty weakened and then disappeared.[320] The documentary record shows that the

---

[320]   Claimant's Final Submission, para 125.

Claimant acquired 2,586 tons of local sunflower seeds in September 2012, but only 633 tons in October, 228 tons in November and 958 tons in December 2012. Meanwhile, the Claimant purchased larger quantities of imported Moldovian seeds in November and December 2012 (1,627 and 2,395 tons respectively).[321] The statistics for 2013 are still more telling. It is recalled that from mid-February until early September 2013 there was no export duty in place. The local seed acquisitions for the Bender Plant during these months was minimal, in some months nil. When a duty was re-imposed in September (albeit at a lower level than that agreed) the impact was immediate: in that month 6,855 tons of Transdniestrian seeds were bought, nearly double the imported quantity. This dynamic continued until February 2014, precisely when the export duty was finally abolished. The local seed purchases again dropped off to minimal levels.[322]

264.    These figures, substantiated by contemporaneous evidence, demonstrate that the absence of an export duty did result in less local and more imported seeds being purchased. However, they do not establish even approximately what proportion of imported seeds *would not have been bought* had the quote been imposed and maintained as the 2003 Agreement required. Indeed, the Claimant admits the evidentiary problem: "[t]he corresponding bottom line effect has not been modelled, as it is simply too difficult to project how many more tons of Transdniestrian seeds could have been purchased."[323] The claim is effectively for the entire additional cost of buying Moldovan seeds. This depends on the highly unlikely assumption that with the export duty in place the Claimant would have purchased no foreign seeds at all. The official records show that even in September and October 2012, the plant was unable to acquire all of its seeds in Transdniestria.[324] This was not the result of limited local harvest: during the "bumper crop" of 2013, imported seeds were still purchased when duties were in

---

[321]   Official record of seed purchases over time, C-91.

[322]   Official record of seed purchases over time, C-91.

[323]   Claimant's Final Submission, para 129.

[324]   Official record of seed purchases over time, C-91.

place, and in each relevant year the harvest was more than sufficient to satisfy the Bender Plant's full requirements.[325]

265.    There is an additional evidentiary problem.  One of the most important factual assertions underlying this claim is that "imported" Moldovian seeds cost substantially more than "domestic" Transdniestrian seeds.[326]  The Claimant submitted tables purporting to show the comparative prices paid for the Bender Plant's seeds over the relevant period from different sources.[327]  The Claimant insists that this data shows the "over the period examined, the price of Moldovian seeds was consistently higher than that of Transdniestrian seeds".[328] But the tables are undated and for the most part unmarked; those that bear any indication at all show that they were created by one of the Claimant's affiliate companies at some unidentified time.   This is difficult to characterize as "evidence" at all, as it appears to have been created for the purposes of the arbitration without any provision of underlying documentation to corroborate its accuracy.  Meanwhile, Mr Drukker's testimony before the Tribunal was precisely to the contrary.  He had the following exchange with the Chairman, which casts serious doubt on the Claimant's central assertion underlying this head of damage:

> THE PRESIDENT: Did you generally consider Moldova to be part of your domestic market for buying seeds?
>
> MR DRUKKER: Yes, of course.
>
> THE PRESIDENT: So the price of seeds, roughly speaking, in Moldova proper and Transdniestria was roughly the same?
>
> MR DRUKKER: Yes.[329]

---

[325]   Harvest records for 2012-2014, C-93, C-94 and C-95 (minimum harvest of 39,000 tons, compared to maximum sunflower seed delivery for Bender Plant of approximately 11,000 tons).

[326]   Claimant's Final Submission, para 117 (describing the claim as "This section models the losses attributable to the purchase of *Moldovan-origin sunflower seeds* during the two seasons of operation" (emphasis added)), and 124 ("over the period examined, the price of Moldovan seeds was consistently higher than that of Transdniestrian seeds").

[327]   C-92.

[328]   Claimant's Final Submission, para 124.

[329]   Hearing Transcript, p. 165.

266.    In its Final Submission, the Claimant drew the Tribunal's attention to the circumstances in which it prepared its case on damages.[330]  In particular, it explained that with the Bender Plant dormant for some time, the Claimant is insolvent, and beset by creditors in litigation around the world.  Its resources are very limited,[331] which it insists was the reason why it did not engage a financial expert to provide testimony supporting its damages case.  Third-party funding, the Claimant insists, was unavailable due to the "idiosyncratic status of the Respondent."[332]  The Claimant asks the Tribunal "to take these factual elements into account as it prepares to issue its award."[333]

267.    Although the Claimant is not explicit as to how it would have the Tribunal take the given circumstances into account, presumably it means that some leeway should be given in the assessment of the totality of the evidence in relation to quantification of damages.  The Tribunal understands the proposition to be that the Claimant's impecuniosity, and therefore its limited ability to muster the evidence necessary to prove the quantum of compensation, is the result of the Respondent's conduct.  To allow this negatively to impact the outcome of the arbitration would arguably reward the Respondent for the breach of its obligations, having crippled the innocent party to such a degree that it is no longer able to vindicate its rights in arbitration as it would have done if it were financially healthy.

268.    The Tribunal's duty is to observe the rules of law and principles of due process. These include the fundamental principle that a claimant bears the burden of proof with respect to each fact necessary to its entitlement to compensation. Normally the standard by which this burden is measured is the balance of probabilities, ie, whether a fact is more likely than not to have occurred.  It has not been shown to the Tribunal that a relaxation of the burden of proof with respect to the quantification of damages, once harm has been established is part of the body of international commercial law and practices governing the contract.

---

[330]   Claimant's Final Submission, para 5.

[331]   See, e.g., C-71.

[332]   Claimant's Final Submission, para 5.

[333]   See, e.g., C-71.

Meanwhile, Russian and TMR law make no exception with respect to the burden of proof in relation to damages. The Tribunal is mindful of the opinion of Ms Zhdan-Pushkina that under Russian law, "the amount of losses must be determined with a reasonable degree of certainty."[334]

269.   Proving the quantum of loss would not have been an insurmountable challenge for the Claimant. It had access to extensive data on prices, quantities and export duty levels over the entire relevant period. It advanced various reports on seed prices in the Black Sea Region,[335] on the Bender Plant's accounts,[336] and on Russian law.[337] It could also have asked an agricultural economist to estimate the impact of a particular export duty over time on the availability of local seeds for purchase. Absent some anchor, and in light of the (at times contradictory) evidence described above, the Tribunal would be left simply to guess at the magnitude of the additional cost incurred to acquire seeds from Moldova or elsewhere. This the Tribunal is not entitled to do. On this basis, the alternative claim for past lost profits is therefore rejected.

### (d)   Contractual Penalties

270.   The Claimant invokes Article 5.4 of the 2003 Agreement, which provides for the payment of a penalty should the Respondent fail to fulfil its obligations under the contract. It contends that this provision applies equally to breaches of the 2012 Agreement by reference through Article 5.5 of the later contract. The contractual penalty is said to be equivalent to 0.3% of the outstanding sum per day for the first thirty days, and from then calculated based on the refinancing rate of the Transdniestrian Republican Bank (*TRB*). The TRB refinancing rate has been 3.5% for the remaining relevant period.[338]

271.   Article 5.4 of the 2003 Agreement provides, in relevant part:

---

[334]   Opinion of Ms Zhdan-Pushkina of 27 June 2017, C-81, p. 6.

[335]   Report of APK Inform of 9 June 2017, C-96.

[336]   Baker Tilly Reports, C-71, C-82, C-86.

[337]   Opinion of Ms Zhdan-Pushkina of 27 June 2017, C-81.

[338]   Claimant's Final Submission, para. 57; Penalty calculation table, C-100.

*If the Seller fails to fulfil the obligations specified herein in due time the Seller shall pay to the Purchaser a penalty in the amount of 0.3% for each day of delay, and beginning from the 31ˢᵗ day the penalty shall be accrued on the basis of the refinancing rate fixed by the Transdniestrian Republican Bank as of the day of payment.*

272.   This provision clearly reflects the Parties' understanding that the Respondent would be subject to a penalty if it was late in fulfilling its obligations.   Such contractual penalties are expressly envisaged in both Russian and TMR law.[339]

273.   The application of Article 5.5 of the 2012 Agreement has been covered earlier in this award.   The consequences of a party failing to fulfil its obligations (other than unilateral termination) are one of the core areas not specifically covered in the 2012 Agreement.   The accrual of a penalty is therefore one of the "other" liabilities targeted for incorporation by reference in Article 5.5.   The Tribunal is satisfied that Article 5.4 of the 2003 Agreement should apply to breaches of the 2012 Agreement, until the contract is terminated.

274.   The means of calculating the penalty pursuant to Article 5.4 of the 2003 Agreement are relatively clear, and for the most part are correctly explained by the Claimant.   The penalty is to be 9% in total for the first thirty days of delay (0.3% per day), and subsequently at a specific annual rate published by the TRB.

275.   However, the calculation is not without its complexities.   In particular, it is unclear in the present circumstances to which amounts the penalty should apply and from when it would accrue.

276.   The corresponding penalty provision with respect to failings by the Claimant (the first part of Article 5.4) specifies that the penalty applies to overdue *payments* to the Respondent.   The base amount upon which penalties would accrue is less straightforward in respect of a delay in the Respondent's "obligations", which were not monetary in nature, and thus not quantified as an initial matter.   The Claimant takes the position that every amount it claims, each head of loss, is fully subject to penalty accrual.[340]   Such a position would seem reasonable with respect to claims for which the obligation to pay and where the quantum of that

---

[339]   Russian Civil Code, Articles 330-333; TMR Civil Code, Articles 347-350.

[340]   C-100.

"obligation" was known at the outset. But where the Respondent did not know that it was subject to an "obligation" to pay a certain amount at a particular time, it could not reasonably be said that it was late in fulfilling the obligation to pay.

277.   The Tribunal has found that the Respondent breached the 2012 Agreement by failing to impose an export duty on seeds as envisaged in Article 3.3. That obligation was to be fulfilled by 1 August 2012.[341] In fact, the obligation was fulfilled only the export duty was repealed by Decree No. 62 on 12 February 2013.[342] The TMR was never again in full compliance with its obligation under Article 3.3 of the 2012 Agreement. On the Claimant's view, all of the damages that later arose from that breach should accrue the penalty as from 1 October 2014. The Respondent must have known that it was failing to implement the export duty. The question is whether it could be expected to have known that its "obligation" included compensating the Claimant for investments made in the Bender Plant pursuant to Article 5.4 of the 2003 Agreement (as incorporated by reference in the 2012 Agreement).

278.   The obligation to refund the Claimant's payment for the Bender Plant shares and subsequent investments in the project is specifically contemplated in the 2003 Agreement. The point in time at which this obligation had to be fulfilled was clear, as was the amount of money that had to be paid to fulfil it. This seems precisely the kind of "obligation" that the Parties considered should be subject to the late performance penalty under Article 5.4. It could be argued that the "obligation" to reimburse these amounts in fact arose only on termination of the 2012 Agreement. Since the Claimant only sought termination during these proceedings, one might say, the Respondent cannot have been expected to pay the relevant compensation any earlier, and no penalty should accrue. However, this approach would deprive the penalty clause of any practical effect. Since the Respondent must have been aware that it was in breach of a core obligation, to maintain the export duty, and it knew the consequences of that action (ie, reimbursement of investments – the magnitude of which it had by October 2014

---

[341]   C-14, clause 3.3; Statement of Claim on Jurisdiction and Merits, para 153; Hearing Transcript, pp 33-34.

[342]   C-29.

itself approved), it was upon the government to pay the requisite amount if it wished to avoid the penalty that it knew would otherwise accrue.

279.   It remains to determine the date until which the penalty should accrue.  The penalty is the product of a provision of the 2012 Agreement, which can only apply to the extent that the 2012 Agreement is valid and in force.  The Claimant has requested termination of the contract, and this request has been granted. There can be no basis for awarding any penalty based on Article 5.4 of the 2003 Agreement as imported into the 2012 Agreement once the termination has taken effect.  Since the termination of the 2012 Agreement is effected by the Tribunal's Award, the penalty must cease to accrue at the date of this Award.

280.   The Claimant has been awarded a total of US$5,110,082.  As noted, the Claimant seeks payment of the penalty only from 1 October 2014.[343] Article 5.4 imposes an initial 9% penalty for the first thirty days (from 1 to 31 October 2014).  This amount is US$459,907 (5,110,082 * 9%).  The TRB refinancing rate on 1 November 2014 was 3.5%, and it remained at this level until 15 February 2017 – when it rose to 7% per annum.[344] For the period when the applicable rate was 3.5%, the penalty accrued was US$410,130 (US$5,110,082 * 3.5% / 365 = US$490 per day, * 837 days = US$410,130).  For the remaining period until the date of this award (inclusive), the penalty at 7% is US$468,440 (US$5,110,082 * 7% / 365 = US$980 per day, * 478 days = US$468,440).  The total penalty for the period 1 October 2014 to 6 June 2018 is thus US$878,570.

**D.   TRANSFERABILITY OF AWARD**

281.   The Claimant has asked the Tribunal to rule that this Award, and in particular the order that the Respondent pay a particular sum to the Claimant, be assignable by the Claimant to a third party at will.[345] In this regard it points out that there is no provision in the 2003 or 2012 Agreements limiting assignment, and contends that international commercial practice (as reflected in the UNIDROIT Principles)

---

[343]  C-100.  The Claimant has not sought compounding of the penalty, and there is no indication in the 2003 Agreement that compounding was envisaged by the parties.

[344]  TRB website extract, C-77.  See also TRB website, https://www.cbpmr.net/content.php?id=80.

[345]  Statement of Claim on Damages, para 61.

permits assignment of rights without the consent of other concerned parties so long as the right (or obligation) in question is not inherently personal in nature.[346] The Respondent has remained silent with respect to the transferability of the award.

282.   The Tribunal is satisfied that the rule postulated by the Claimant with respect to assignment of rights and obligations is broadly accepted in international practice. It is also part of French law, which appears to be the most obviously applicable national system of law for determining the nature and limitations of an arbitral award rendered in France.[347]   Neither the 2003 nor the 2012 Agreement establishes any conditions for the assignment of rights and obligations thereunder, although doubtless the core rights and obligations under those contracts were sufficiently personal in nature to prevent transfer without the other party's consent.   An arbitral award arising out of the violation of the contractual obligations is quite different, however.   It is a requirement that money be paid.   There is nothing personal about such an obligation.   For the judgment debtor in particular, it makes no difference to whom the payment must be made.

283.   On the basis of the foregoing considerations, the Tribunal concludes that this Award is freely transferable, with no need to obtain consent from any other party.

E.   INTEREST

284.   In the Request for Arbitration and Terms of Reference, the Claimant indicated that it would seek an award of interest on any monetary relief granted.[348]   As a result, the determination of entitlement to interest and the proper rate at which such interest should accrue were identified as issues for the Tribunal to decide in the present arbitration.[349]   However, neither the Claimant's Statement of Claim on Damages nor its Final Submission included any reference to pre-judgment

---

[346]   Statement of Claim on Damages, paras 62-64.

[347]   French Civil Code, Art. 1321 (a claim is transferrable "without the consent of the debtor being required, unless the claim expressly provides that it cannot be assigned").

[348]   Request for Arbitration, para 2.1.1; Terms of Reference, para 46(b).

[349]   Terms of Reference, para 49(i).

interest (let alone argument or substantiation).   Therefore the Tribunal must conclude that this request was abandoned, and need not be addressed any further in the Award.

## F.   FINAL CONSIDERATIONS ON REMEDIES

285.   It could be considered that the termination of the 2012 Agreement, with the 2003 Agreement remaining in force, creates an untenable situation.   As explained above, the termination of the 2012 Agreement as a result of the Respondent's conduct entails consequences in terms of monetary remedies.   It does not, however, result in the transfer of the OJSC Bender shares back to the Respondent.   This is the consequence of Article 5.3 of the 2003 Agreement, which specifically calls for the return of the shares *only* in the part dealing with termination due to the Buyer's fault.   The reimbursement of the purchase price to the Buyer is accompanied, in the paragraph dealing with that scenario, with the return of the shares.   The Tribunal notes that such a transfer is conspicuously absent from the paragraph dealing with the situation where termination results from the Seller's conduct.

286.   How then are the Parties to deal with one another, in a situation where they are returned to the contractual arrangement of 2003, including its investment program, fulfilment of which is a necessary precondition for the contract remaining on foot?[350]   This Tribunal is only empowered to resolve the claims that have been presented to it by the Parties.   The Claimant may prefer with compensation in hand to abandon the Bender Plant.   The Parties may find it mutually beneficial to renegotiate the 2003 Agreement to adapt its terms to present conditions in Transdniestria.   Or the Respondent may consider that the Claimant is in breach of the 2003 Agreement's terms and seek to terminate it and recover the OJSC Bender shares.   The Tribunal is in no position to assess such possibilities, which do not form part of the present arbitration.   It is for the Parties – and possibly a future arbitral tribunal – to consider the proper way forward in the circumstances.   This Tribunal has fulfilled its duty, no more and no less, and must leave any future difficulties for others to solve.

---

[350]   2003 Agreement, C-13, Art. 5.3.

## IX.    COSTS

287.    At its session of 26 April 2018, the ICC Court fixed the costs of this arbitration at US$367,000. The Respondent has not made any claim for costs.

288.    The Claimant does not advance any claim for its legal fees and expenses.[351] It requests reimbursement of the arbitration costs, specifically the ICC administrative fees and arbitrators' fees.[352] The Claimant recognizes that Article 6.2 of the 2003 Agreement deals with the allocation of certain costs associated with ICC arbitration, but contends that the provision only requires it to carry the cost of case registration, or US$3,000. The Claimant takes the position that the remaining fees charged by the ICC should be for the Respondent to bear.[353] In the alternative, it submits that even if the 2003 Agreement places the burden of all ICC fees on the party who initiates arbitration, it should be entitled to recover these expenses as damages.[354]

289.    Article 6.2 of the 2003 Agreement provides:

> *For the purpose of examination of a dispute by the Arbitration Court of the International Chamber of Commerce in Paris, any charges and other obligatory payments shall be effected by the Party to this Agreement that filed claim before such court.*

290.    In the Claimant's view, this provision was intended to refer only to payments that are "mandatory *per se*", or "pre-fixed", and that only the registration fee corresponds to this description. It notes that the original Russian word translated as "charges" is "пошлины", a term that also corresponds to a duty (as in a customs duty). The fees charged by the ICC for administration and for the arbitrators' services are not of this type, the Claimant contends, and therefore fall outside the scope of the Parties' agreement on the allocation of costs.[355]

---

[351]    Claimant's Final Submission, para 139.

[352]    Claimant's Final Submission, para 140.

[353]    Statement of Claim on Damages, para 59.

[354]    Claimant's Final Submission, para 140.

[355]    Statement of Claim on Damages, para 59.

291.    The wording of Article 6.2 is broad.   It refers to "any" charges, but it also includes "other obligatory payments".   Therefore, even if the Tribunal were to accept that "charges" refers only to impositions by the ICC that are fixed in sum, this would not assist the Claimant.   Logic dictates that "other obligatory payments" must refer to something *besides* "charges" (whatever those may be). Further, the word "obligatory" simply means mandatory, or not subject to the payer's discretion.   There is nothing in that epithet that could be taken to mean "pre-fixed", or otherwise akin to a duty.   The administrative and arbitrator fees are undoubtedly mandatory, as the ICC Rules unequivocally stipulate.[356] Therefore, all fees fixed by the ICC fall within the scope of Article 6.2 and are to be paid per the Parties' agreement by the party that initiated arbitration – in the present case the Claimant.

292.    It remains to consider whether the Claimant can recover the arbitration costs as damages.   There is logic to the proposition that arbitration costs borne by an innocent party are part of the loss caused by the other party's breach, given that there would have been no arbitration at all in the absence of the breach (and refusal voluntarily to pay compensation).   Indeed, this is the rationale underlying the generally-accepted principle in international arbitration that the cost of litigating should be borne by the losing party.

293.    In the case at hand, the Tribunal takes the view that awarding costs as a type of loss compensable by monetary damages would be inappropriate, because the parties agreed to a specific cost allocation regime in the 2003 Agreement (incorporated by reference into the 2012 Agreement).   As noted above, they stipulated that the suing party would bear the costs of the arbitration.   Describing those costs as damages cannot vitiate the parties' express agreement.   Indeed, just as the parties are free to exclude certain types of loss or damage by way of a limitation of liability agreement, their accord with respect to the allocation of costs – regardless whether conceived as an issue of costs or damages – must be respected.

---

[356]  ICC Rules, Appendix III, Article 2(1) and 2(5) (the ICC Court "shall fix" administrative and arbitrator fees according to the relevant schedule).

294.   On this basis, the Tribunal orders that the Claimant shall bear the costs of the arbitration, as fixed by the ICC Court.  Each Party shall bear its own costs and expenses, in the absence of any claim to the contrary.

## X.   ORDER

295.   In light of the foregoing, the Arbitral Tribunal:

    (a)   CONCLUDES that it has jurisdiction to adjudicate the present dispute;

    (b)   DECLARES that the Respondent breached the 2012 Agreement by failing to maintain an export duty on oilseeds at the requisite level for the agreed period of time;

    (c)   DECLARES that the 2012 Agreement is terminated as of the date of this Award;

    (d)   ORDERS the Respondent to pay to the Claimant

        (i)   US$1,050,000 as reimbursement of the purchase price for the shares in OJSC Bendery;

        (ii)   US$2,768,684 as compensation for investments made during the period 2003-2011;

        (iii)   US$5,110,082 as compensation for investment made during the period 2012-2014; and

        (iv)   US$878,570   corresponding to the contractual penalty applicable to items (i)-(iii) above.

    (e)   DECLARES that the right to payment is freely transferable by the Claimant, without the permission of the Respondent; and

    (f)   ORDERS the Claimant to bear the costs of the arbitration, as fixed by the ICC Court.

All other claims are dismissed.

Place of arbitration: Paris, France.

Date:     6 June 2018.

_____
Noah Rubins

President

_____
Sophie Nappert

Co-arbitrator

_____
Galina Zukova

Co-arbitrator